Olga A. Yatzus

1    the mother?

2        A.    I was next door with the mobile crisis worker

3    and the mother.

4        Q.    At any point, did Ms. Mitchell or anyone else

5    tell you it's your job to watch this student?

6        A.    No.

7        Q.    After that incident, did Dr. Lauer ever put

8    anything in writing about it to you?

9        A.    Yes.

10       Q.    Do you recall what he said?

11       A.    That I had to appear before a committee and

12   that my -- for negligence in handling this case.

13   Something to that degree.  And that my job might be in

14   jeopardy and that I should bring a union rep.  And

15   that's to the best of my recollection.

16               (Yatzus Deposition Exhibit No. 7 was marked

17   for identification.)

18   BY MS. MARTINELLI:

19       Q.    The court reporter is going to hand you a

20   document marked as Yatzus 7.  And this appears to be a

21   letter from Vaughn Lauer to you, dated February 4th

22   2001.  I believe it's been established earlier in the

23   litigation that this was -- that this was actually

24   2002.  Is that correct?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

# APPENDIX PAGE A158 TO
# DEFENDANTS' OPENING BRIEFS
# IN SUPPORT OF THEIR MOTIONS FOR
# SUMMARY JUDGMENT
# REDACTED
# ENTIRETY OF PAGE CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:    July 10, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

# APPENDIX PAGES A159 THROUGH A165 TO DEFENDANTS' OPENING BRIEFS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

# REDACTED
# ENTIRETY OF PAGES
# CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:     July 10, 2006

059265 1007

Olga A. Yatzus

Page 89

1    A.    I felt that, after my complaint, that there was

2    a difference in the way I had been treated not too

3    long after that complaint was filed, and I felt that

4    there was a tone of hostility and negativity.

5    Q.    Why did you believe that was a result of your

6    complaint?

7    A.    I felt that other people weren't treated in the

8    way I was, comments that were made to me that weren't

9    made to other people, and I felt that that started --

10   I started sensing that or feeling that about --

11   probably closer to May.

12   Q.    So it's based on timing?

13   A.    Yes.

14   Q.    Did anyone at the school district make a

15   comment to you about -- that gave you an indication

16   that was the reason for -- that it was in retaliation?

17   A.    No, no one in the school district said that.  I

18   felt that.

19   Q.    Okay.  Did they say anything that would suggest

20   that?

21   A.    No.

22   Q.    Are there any other reasons you believe that

23   this was -- these actions were in retaliation for your

24   sexual harassment complaint?

Olga A. Yatzus

Page 90

1    A.   I felt that things deteriorated after that, and
2    it just continued.
3    Q.   Okay.  At what point did you -- you may have
4    already stated this.  I apologize.  But at what point
5    did you come to believe you were being retaliated
6    against for filing your sexual harassment complaint?
7    A.   I spoke to Tony early on that I felt comments
8    he was making weren't fair, and I was uncomfortable
9    with some of the things that I felt were said to me.
10   So I talked to Tony early on about feeling
11   uncomfortable.
12   Q.   Was that in relationship to the summer calendar
13   or summer hours?
14   A.   No.  That was before that.  I know that when I
15   had submitted a request to attend a conference -- a
16   couple conferences in May, one -- both, I think
17   were -- one was, I was a chairperson or a co-chair of
18   a convention that I had to go to, and another one was
19   a conference that was related to my job.  And as I
20   stated earlier, you need to have 75 hours of
21   continuing ed. credits to keep my NCSP current.  And I
22   always tried to find things that would be directly
23   related to issues that I was dealing with.  And I had
24   submitted a request to attend a couple of these, I

Olga A. Yatzus

1    think, and Tony made a comment to me that he thought I

2    was taking advantage of the fact that I didn't have a

3    direct supervisor, so I was using this as an

4    opportunity to go to extra conferences.

5        Q.    Let me ask --

6               MR. BARTOSHESKY:  She wasn't finished her

7    answer.

8        A.    And so at that point, I felt like there were

9    two people that I shared an office with that went to

10   four week-long out-of-state conferences, which is

11   almost unheard of for the same two people.  Generally,

12   if a district sends people, it has to be very related

13   to the job, and if you get to go to one in a school

14   year, that's a lot.  But for the same two people to

15   have gone to four different conferences in one school

16   year and I asked to go to two day-long conferences,

17   and had that comment, I felt that that was way out of

18   line.

19       Q.    So there were two different conferences you

20   requested to attend?

21       A.    Yes.

22       Q.    In the spring or late --

23       A.    No.

24       Q.    -- in the spring --

Olga A. Yatzus

1    A.    I don't recall the exact dates.

2    Q.    2002 we're talking about?

3    A.    It was in the spring of 2002.  I recall that

4    conversation was somewhere in May because that's when

5    I -- late April, early May, mid May, somewhere in

6    there -- I had that conversation with Tony.  And

7    because of the fact that he made reference to the fact

8    that I was taking advantage of not having a

9    supervisor, I felt that that was related to my

10   previous complaint.  I didn't bring that up.  He did.

11   Q.    He made a reference to that you were taking

12   advantage of not having a supervisor?

13   A.    That's -- something to that effect, yes.

14   That's what he thought.

15   Q.    Who was your supervisor?  Did you have a

16   supervisor after Dr. Lauer was placed on this special

17   situation for the rest of the year?

18   A.    I wasn't sure who my supervisor was.  We were

19   primarily dealing with Tony at that point.

20   Q.    Okay.

21   A.    And Ann Thomas was -- I looked to as my

22   supervisor at Townsend Elementary because I was

23   working between there and the high school.  Bill Cohee

24   had been the principal that year of Middletown High

Olga A. Yatzus

Page 93

1    School, but he wasn't getting his contract renewed,

2    and he was never in the building, it seemed.  So I

3    wasn't sure who my high school contact was at that

4    point.

5       Q.   No one ever told you someone would be replacing

6    Dr. Lauer as your supervisor in the interim until a

7    new person was hired?

8       A.   Tony said for us just to deal with him until

9    Vaughn's replacement got hired.  So we were kind of

10   floundering at that point.

11      Q.   And you said there were two different

12   conferences you requested to attend?

13      A.   I think it was, yeah, I think it was two.

14      Q.   Did Dr. Marchio deny your attending those

15   conferences?

16      A.   He allowed me to go to one.  Then he came back

17   with a comment for the other that he didn't know why I

18   wanted to go to Philly to the conference by the

19   airport there instead of the Delaware one.  I told him

20   that I -- I don't recall what.  I think it was

21   something with the university that I had to do that

22   particular day, so I couldn't go on the day that I

23   had -- that I would have preferred to go in Delaware,

24   but the same conference was offered five minutes down

Olga A. Yatzus

Page 94

1    the road.  So I asked to go to that one.

2        Q.   Did you explain that to Dr. Marchio?

3        A.   Yes, I did.  After I explained that, he allowed

4    me to go to that one.

5        Q.   He allowed to you attend the one you wanted to

6    go to?

7        A.   Yes.

8        Q.   And the other one you said you did attend also?

9        A.   Yes.

10       Q.   So as a result of the -- the original question

11   was at what point you believed you were being

12   retaliated against for your sexual harassment

13   allegations.  And you stated that before the summer --

14   issue with the summer hours there was this issue with

15   the conferences.  Is that the first time -- was that

16   the beginning --

17       A.   That was the first time I felt that -- it was

18   the tone of voice, it was the attitude and the comment

19   that I was trying to take advantage, that I felt

20   uncomfortable because nobody else was -- would have

21   been receiving that kind of comment that, oh, I just

22   think that you're trying to take advantage.

23       Q.   And you thought that other employees were being

24   treated more favorably?

Olga A. Yatzus

Page 95

1    A.    Yes.  I just -- I didn't hear him talk to

2    anyone else that way.  Let's put it that way.  I don't

3    know how other employees were being treated or not.

4    Q.    Now, at some point there was an issue about

5    your hours over the summer between you and

6    Dr. Marchio.  Is that correct?

7    A.    Yes.

8    Q.    Can you describe what that problem was?

9    A.    When Vaughn hired the special ed. coordinators

10   and when he hired me, we were given a guarantee of 20

11   days of summer work.  The program coordinators

12   automatically were going to put that team in without

13   any questions asked, and Tony told me that there was

14   no -- that he wasn't aware that that promise was made,

15   but that he made reference to the fact that he thought

16   I deliberately didn't do -- get some work done because

17   I expected to do it over the summer or something to

18   that effect -- or that I -- that I wanted an excuse or

19   a reason to work over the summer.  And that couldn't

20   have been further from the truth.

21   Q.    At some point, did Dr. Marchio have a meeting

22   with all the psychologists and request their summer

23   schedules?

24   A.    Yes.  We were told to make sure the secretary

Olga A. Yatzus

Page 96

1   knew what days we were going to be coming in, and so

2   that he wanted all of us to give him that information.

3       Q.   The secretary being the special ed. secretary?

4       A.   Yes.

5       Q.   Is that -- who was that at the time, do you

6   recall?

7       A.   Chrissie O'Grady.

8       Q.   Your recollection of the meeting was

9   Dr. Marchio just asked you to tell Chrissie O'Grady --

10      A.   To turn in our schedules or what days we would

11  be working.

12      Q.   What days you were working?

13      A.   Yes.

14      Q.   No additional information you thought was

15  required?

16      A.   I didn't think there was any at that point.  I

17  recall Chrissie coming to my desk.  I was letting her

18  know what days I would be coming in.

19      Q.   You said you recalled going to Chrissie O'Grady

20  and letting her know what days?

21      A.   Chrissie and I sat down with her appointment

22  book, and I told her what days I would be coming in.

23      Q.   Was that shortly after the initial meeting with

24  Dr. Marchio?

Olga A. Yatzus

1    as I would complete some evaluations, there were some

2    parents that would cancel, so I would have to

3    reschedule.  Other times, I wasn't sure how long an

4    evaluation would take on a particular child.  So some

5    days you could get two kids done in a day.  Sometimes

6    it would take a whole day to get that particular child

7    done.  So I would try to see where I was on that list

8    and then schedule a week or two in advance to get the

9    kids in.

10    Q.    So you are saying you were unable to provide a

11    list of dates?

12    A.    Exact date of who was coming and when for the

13    duration of that time because that was --

14    Q.    Could you provide dates that you were going to

15    be working over the summer?

16    A.    Yes.

17    Q.    Did you do that?

18    A.    I had given the information to Chrissie in

19    terms of what days I would be available to come into

20    work.

21    Q.    You had given the verbal information to

22    Chrissie?

23    A.    Yes.

24    Q.    You thought that complied with Dr. Marchio's

Olga A. Yatzus

Page 102

1    written requests?

2    A.   I -- after he sent the one thing that he wanted

3    to know who and what I was going to be doing, I gave

4    him this, and asked him if he needed anything more, to

5    let me know.

6    Q.   Your testimony is that prior to Dr. Marchio's

7    follow-up letter of July 3rd, 2002, you thought you

8    had complied with his request by your verbal --

9    A.   By letting --

10   Q.   -- discussion with Chrissie?

11   A.   -- Chrissie know what days I would be there.

12            MS. MARTINELLI:  Let me know when you want

13   to take a lunch break.  I can do it now.

14            MR. BARTOSHESKY:  You want to do it now?

15            MS. MARTINELLI:  That's fine.  Yeah.

16            (Luncheon recess taken at 12:10 p.m. and

17   reconvened at 12:58 p.m.)

18            (Yatzus Deposition Exhibit No. 16 was

19   marked for identification.)

20   BY MS. MARTINELLI:

21   Q.   Ms. Yatzus, you have been handed a document

22   identified as Exhibit 16, and in the lower right-hand

23   corner, it's identified as P-227.  It's dated

24   August 29th, 2002.  And it appears to be a letter from

Olga A. Yatzus

Page 106

1    Q.    So you didn't communicate any further directly
2    with Dr. Lauer on the summer schedule issue after
3    this?
4    A.    Dr. Lauer.
5    Q.    I apologize.  Dr. Marchio.
6    A.    Right.
7    Q.    And that was because you had gotten --
8    A.    Vicky --
9    Q.    -- Boyd involved?
10    A.    Yes.
11    Q.    Vicky Boyd was who?
12    A.    The Uniserve rep for the DSEA.
13    Q.    Vicky Boyd, you said, was the Uniserve rep for
14    DSEA?
15    A.    Mm-hmm.
16    Q.    Did she act as your advocate in that regard?
17    A.    She was -- I was asking her to help with the
18    communication.  Whether she was an advocate or not, I
19    was relying on her professional expertise.
20    Q.    Did she represent you at any grievance
21    hearings?
22    A.    She would -- yes.  She would be the one that
23    would come along with Lynn Kebler at times.
24    Q.    Did you consider Ms. Boyd to be a fair and

Olga A. Yatzus

1    A.   I felt that the more information she had, the

2   better she would be able to help me with that.

3   Frankly, there was no other resource that I felt that

4   I could get opinions and get -- check things out.

5   There really wasn't another source for that.

6    Q.   I want to refer back to Dr. Marchio's reprimand

7   letter, dated August 29th, Exhibit 16.  Do you contend

8   that anything is false in this letter?

9    A.   Let me re-read it.

10   Q.   Okay.

11   A.   Well, there are some things I can't account --

12  I mean, I wouldn't know whether they were false or not

13  in terms of what Judy and Chet did in response.  I

14  don't have any way of knowing that.

15   Q.   Is there anything you know is -- I'm sorry.

16  Continue.

17   A.   I didn't deliberately ignore his request the

18  second time.  I thought I had given him what he

19  wanted.  On August 5th, I didn't deliberately not

20  respond or chose to ignore.  At that point, I had

21  asked Vicky to communicate on my behalf.  As far as

22  what he requires from other people, I can't attest to

23  that because I don't have any knowledge of that.

24   Q.   Did you ever provide any additional information

Olga A. Yatzus

Page 110

1    writing?

2        A.    I can't recall.

3        Q.    At any point, did you receive a written

4    reprimand for being absent from work without proper

5    notification?

6        A.    Yes.  I recall seeing a reprimand to that

7    effect.

8                (Yatzus Deposition Exhibit No. 18 was

9    marked for identification.)

10   BY MS. MARTINELLI:

11       Q.    I am showing you what's been marked as Exhibit

12   18.  In the lower right-hand corner, it's identified

13   as D-7.  It's a document, dated April 2nd, 2003, to

14   you.  At the bottom, it appears to be signed by you

15   and Donna Mitchell.  Did you -- have you seen this

16   document before?

17       A.    Yes.

18       Q.    And is this the reprimand you were referring

19   to?

20       A.    Yes.

21       Q.    Did you report to work on April 2nd -- I'm

22   sorry, yes, on April 2nd?

23       A.    I don't recall April 2nd.

24       Q.    Do you want to take time to review this

Olga A. Yatzus

1    reprimand?

2    A.    Well, I think you are talking about March 8th.

3    The letter was dated --

4    Q.    The second paragraph that's one sentence, "We

5    had seven IEP meetings today and planned on a

6    psychologist attending."  The following paragraph

7    said -- and "today" appears to be the date of the

8    letter, April 2nd, 2003.  It says, "You did not report

9    to work today and you did not contact the substitute

10   caller."

11   A.    All right.  Okay.  Yeah.  I'm sorry.  I recall

12   the day, whatever day that was, that there was an

13   emergency at my son's school as I dropped him off.  I

14   wasn't planning to be out that day.  Whatever I had to

15   deal with school that day took a lot longer than I had

16   intended.  So I contacted the school to say that I

17   needed to take that as a sick day.

18   Q.    Was the emergency related to a school project

19   he had, your son?

20   A.    Originally, there was supposed to be a school

21   project, but there was another issue that had come up

22   that I had to deal with that was much more involved.

23   Q.    And what was that issue?

24   A.    Something to do with some behavioral concerns.

A179

Olga A. Yatzus

Page 115

1    district office to notify them that we would be out.

2    So that's always been the procedure.

3        Q.    Notify them being who?

4        A.    Like the special ed. secretary.

5        Q.    The people you mentioned before?

6        A.    Yes.

7        Q.    The secretary or the ed.?

8        A.    Right.

9        Q.    When you say we were notified, do you remember

10   who --

11       A.    I think just us, the psychologists.  We were

12   all kind of -- I think that first year I was hired, we

13   were instructed to call Kathy Bromwell if we were

14   going to be out and let her know.

15       Q.    Would that have been Dr. Lauer --

16       A.    Yes.

17       Q.    -- who gave you that instruction?

18              I think you mentioned at some point

19   Ms. Mitchell gave you different instructions?

20       A.    Right.  She told me I had to call the

21   substitute caller.  I recall saying I never had to do

22   that before since you don't call a substitute in for a

23   psychologist.  She said, well, she didn't care what I

24   had been instructed before; that's what she wanted me

Olga A. Yatzus

Page 116

1    to do.

2      Q.   This document indicates that the discussion

3    occurred on March 8th, 2003.  Does that sound correct?

4      A.   It's here.  I don't have any recollection.

5      Q.   Did that discussion occur before this incident

6    with your son at the school and coming in late?

7      A.   Well, it says that on March 8th we had that

8    discussion.  So that would have been before.

9      Q.   Is there any reason you didn't follow those --

10     A.   I wasn't planning on being out the whole day.

11     Q.   When you did call in at 12:58, correct, you

12   said you wouldn't be able to make it in that day?

13     A.   Right.

14     Q.   And you didn't call the substitute caller then?

15     A.   Well, you are supposed to call the substitute

16   caller before 6:30 a.m.  If I didn't know I was going

17   to be out that whole day, how could I have called

18   before 6:30 a.m.?

19     Q.   So you thought it was no longer necessary

20   because you didn't figure out until 1:00 that you

21   weren't going to come in for the day?

22     A.   Right.

23     Q.   And I'm sorry.  Tell me who Sue Poore was

24   again.

Olga A. Yatzus

Page 120

1    A.    The IEP team, the psychologist, generally

2    reviews the testing, any kind of documentation.    And

3    it's a committee process.

4    Q.    Is there someone who leads the discussion?

5    A.    Sometimes the ED will walk through that.

6    Sometimes the psychologist will.    But the psychologist

7    is involved in the process.

8    Q.    Is the psychologist's attendance more critical

9    for behavior manifestation than an IEP meeting?

10   A.    Yeah.

11   Q.    Is that required?

12   A.    A psychologist should be there.

13   Q.    Do you recall what time you arrived at this

14   meeting scheduled for 10:00 a.m.?

15   A.    I think it was about 10: -- this says 10:30.

16   It was around there.    I don't know exactly.

17   Q.    Why were you late for the meeting?

18   A.    There was a student that showed up at my office

19   that I had never seen before who was -- looked very

20   manicky.

21   Q.    I'm sorry.    Looked?

22   A.    Looked manicky.    He was agitated.    And I didn't

23   know the student at all.    And he -- I felt like I

24   needed to assess quickly what was going on to make

Olga A. Yatzus

Page 121

1    sure that, you know, he wasn't in crisis at that time.

2           So as I finished -- as I felt that he was

3    okay and sent him on his way, I went to find the

4    meeting, and checked several locations in the high

5    school, and -- because that's where I thought the

6    meeting was going to be held -- and then found out it

7    was actually going to be at the district office.  And

8    I got over there as quickly as I could.

9    Q.    So a student came to your office.  Is that --

10   A.    Yes.

11   Q.    And what student was that?

12   A.    What's his name?  I can see him.  I can't

13   recall his name.

14   Q.    Do you recall about what time that was?

15   A.    Probably about quarter to 10:00.  Somewhere

16   around there.

17   Q.    He was in your office for how long?

18   A.    I -- he wasn't in that particular office.  I

19   met -- there was another room -- because I shared an

20   office and I didn't like to talk with other people

21   there when I met with kids, if I could help it, so

22   there was another room that was available.  So I met

23   with him there for about 15 minutes, maybe.  And then

24   tried to get out of there so I could attend this

Olga A. Yatzus

1    meeting.

2        Q.    And this was in the high school you worked --

3        A.    Yes.

4        Q.    -- you met with him?

5              And you knew the meeting was scheduled,

6    correct, at that time?

7        A.    At that point, yeah, I did know the meeting was

8    scheduled.  I was planning on getting there, but felt

9    that I just quickly needed to find out what was going

10   on with this kid that I had never met him before.

11       Q.    Did you think your presence at this meeting was

12   important?

13       A.    Yes.

14       Q.    Do you recall being written up on any occasions

15   for not completing IEP reports?

16       A.    IEP reports?  I am not sure what an IEP report

17   is.

18       Q.    Evaluation report?

19       A.    Yes.

20       Q.    Psychological evaluation?

21       A.    Yes.

22       Q.    Do you recall being written up for not

23   completing psychological evaluations?

24       A.    Yes.

Olga A. Yatzus

Page 123

1          (Yatzus Exhibit Nos. 20, 21 and 22 were

2    marked for identification.)

3    BY MS. MARTINELLI:

4      Q.    Let's start with these two.  I have handed you

5    two documents identified as Exhibits 20 and 21.

6      A.    No.  I have -- oh, okay.  20, 21.

7      Q.    I'm sorry.  Those numbers are confusing.  They

8    are similar.  And on the bottom, the one identified as

9    20 is on the bottom D-23.  Is that correct?

10     A.    Yes.

11     Q.    Starting with the document that's been

12   identified as Exhibit 20.  It's dated September 30th,

13   2002.  In the bottom right-hand corner, it says D-22?

14     A.    No.  That's --

15     Q.    No.

16     A.    -- 21.

17     Q.    Exhibit 20 in the bottom right-hand corner says

18   D-23.  Is that correct?

19     A.    Yes.

20     Q.    Okay.  Starting with the document identified as

21   Exhibit 20 and in the lower resident corner says D-23.

22     A.    Right.

23     Q.    It's dated September 25th, 2002 and it's -- it

24   appears to be a letter from Donna Mitchell that you

Olga A. Yatzus

Page 124

1    and she signed.  Is that correct?

2       A.    That's correct.

3       Q.    This appears to document an incident in

4    which -- dealing with an evaluation report, as it's

5    described there, that wasn't presented in a timely

6    fashion.  Can you describe what happened there?

7       A.    During the month of September, we had a new ED

8    to our building that year that took over the high

9    school special ed. files which were left in hard

10   condition for Marilyn when she started.  And she was

11   immersed that whole month in trying to clean up

12   everything that she was left with.  So I had told

13   Marilyn I had tested some kids that we needed to

14   schedule some meetings for.  During the month of

15   September, trying to get computers up and running

16   isn't -- is a massive task for the technology staff.

17   So my computer hadn't been up and running at that

18   point.  So I would take whatever work that I needed to

19   at home and work at home.

20              There were -- some of the meetings that I

21   told Marilyn we didn't have to rush and get them done

22   before the 30th, that we could do them in October

23   because they weren't going to necessarily -- that they

24   weren't going to qualify for any services.  What we

Olga A. Yatzus

Page 125

1    try to do is get the kids that would be eligible by

2    the 30th.

3              But I remember that it was a Monday

4    afternoon that I was leaving my office and saw an

5    envelope from Marilyn, I think.  But I was walking out

6    the door and I figured I'd check my mail when I came

7    back since I didn't want to misplace those papers.

8    So, evidently, I was given some notice of meetings at

9    that time, which I didn't -- like I said, I was

10   walking out of the building when it was placed in my

11   mailbox, so I didn't have a chance to really look at

12   it.

13             The next day, I was assigned to a different

14   school.  So I wasn't in the building that whole next

15   day.  When I arrived at work on Wednesday morning, I

16   found out that these meetings were scheduled, which I

17   didn't know prior to walking in at that particular

18   moment.  So the work that I was -- I had worked on was

19   at home.

20   Q.    These are the psychological evaluations you are

21   referring to?

22   A.    Yes.

23   Q.    Does -- is the notice for meeting what

24   generates your need to complete the --

Olga A. Yatzus

Page 126

1     A.    When we are swamped with trying to get

2   everything done that we need to get done, we try to

3   get them done before the meeting.  But that doesn't

4   always mean that -- I mean, if we're testing and doing

5   a bunch of other things and we've got a meeting, then

6   we try to prepare for that meeting when you're doing a

7   bunch of other evaluations and anything else that

8   needs to be done prior to that time.

9     Q.    I'm sorry.  So the answer was it is the meeting

10  notice that generates your --

11    A.    Well, it depends.  I think it really depends.

12  I think it depends on when that meeting is scheduled

13  by, how much notice you are given as far as that goes,

14  and all of the other things that you have to

15  accomplish.  So if you know that the meeting is going

16  to be at that time, then you try to have that as

17  the -- you know, if this meeting is scheduled, I need

18  to try to make sure I have this together for that.

19    Q.    Were you expected to provide these reports in

20  advance of the meeting to anyone at the district?

21    A.    That wasn't communicated to me prior to this.

22    Q.    And you said that you had permission to do some

23  work on the reports at home.  Is that what you said?

24  Or you made the decision to work on these reports at

Olga A. Yatzus

Page 127

1    home?

2       A.    I think it's impossible to get everything done

3    that you need to get done in the course of a school

4    day, so I don't know about you, but I would take a lot

5    of work home on a regular basis to try to keep up.

6    But especially when I didn't have my computer

7    operational at that time, I really needed to make sure

8    that I was able to get some of that stuff done at

9    home.

10      Q.    And you left it at home because you didn't

11   realize you had a meeting, that meeting that day until

12   you got in?

13      A.    Yes.

14      Q.    You have a second document in front of you

15   marked as Exhibit 21, and in the lower right-hand

16   corner is identified as D-22.  This appears to be a

17   letter, dated September 30th, from Mary Ann

18   Mieczkowski to you, and it's signed by Mary Ann at the

19   bottom.  Did you receive a copy of this letter at the

20   time?

21      A.    Yes.

22      Q.    Can you tell me what this letter concerns?

23      A.    The same.  It was all for the same day.  The

24   same set of circumstances.

Olga A. Yatzus

Page 128

1    Q.    Does this reference anything that

2  Ms. Mitchell's letter did not?

3    A.    I am sure that ...

4    Q.    If I can direct your attention to the third

5  paragraph, the third sentence.  "As I further

6  researched the issue at hand, one student referred for

7  testing by the child study team in January 30th, 2002

8  and testing did not occur for him until the week of

9  September 16th."  Is that related?  It sounds

10  different.  Is that related to the September 25th

11  meeting or is that separate?

12    A.    Those -- these two letters were the result of

13  the same day as far as what Mitch wanted to pinpoint

14  in her letter and what Donna wanted to pinpoint in her

15  letter.  I am sure they decided which issues that they

16  wanted to confront.

17    Q.    Were Ms. Mitchell and Ms. Mieczkowski present

18  for that IEP meeting --

19    A.    They were both --

20    Q.    On the 25th?

21    A.    -- in the building.  I can't recall who

22  participated in which meeting.  I'd have to see

23  them -- the attendance minutes to see who was at what

24  meeting.  I think there were some that they both were

Olga A. Yatzus

Page 129

1    in.

2    Q.   I am going to show you a third document.

3              (Yatzus Deposition Exhibit No. 23 was

4    marked for identification.)

5    BY MS. MARTINELLI:

6    Q.   This document is identified as Exhibit 23 and

7    in the lower right-hand corner as D-26.  It appears to

8    be a reprimand, dated September 25th, 2002, from James

9    Dooley.  Did you receive a copy of this?

10   A.   Yes, I did.

11   Q.   In the first paragraph it says, "On four

12   separate occasions today, you failed to present a

13   written report ..."  the letter is dated September

14   25th.  So it appears to be referring to the same IEP

15   meeting.  Is that --

16   A.   There were meetings scheduled throughout that

17   day.

18   Q.   Several meetings.  As a result of receiving

19   these three reprimands, did you file a grievance?

20   A.   Yes, I did.

21   Q.   What happened as a result of the grievance?

22   A.   A decision was made to pull these three letters

23   and replace it with one.

24   Q.   Was there a meeting held for the grievance?

Olga A. Yatzus

Page 130

1    A.    As I recall, yes.

2    Q.    A hearing, maybe, might be the proper term.

3         I am going to show you what was marked as

4    Exhibit 22.  This is a letter -- well, it's identified

5    as Exhibit 22 and in the lower right-hand corner

6    D-20 -- a letter dated November 17, 2002 to you and

7    signed by you and Ms. Mieczkowski.  Is this the letter

8    that replaced the three previous letters?

9    A.    Yes.  That was my understanding.

10   Q.    Okay.  As a result of the grievance hearing?

11   A.    Yes.

12   Q.    At the bottom of this letter, the last

13   paragraph, after -- the last paragraph indicates that

14   "... it is now understood that any information

15   provided by the psychologist during an IEP or 504

16   meeting regarding any student, in the form of an

17   evaluation summary or 'gathering of data,' shall be

18   considered a report and copies shall be provided to

19   the administration and educational diagnostician at

20   least 48 hours prior to the scheduled meeting."

21        Was that discussed in the hearing or the

22   grievance discussion?

23   A.    I don't recall exactly what was discussed at

24   that meeting.

A192

Olga A. Yatzus

Page 131

1    Q.    But you saw this --

2    A.    Yes.

3    Q.    -- in this letter?

4         Regarding the meeting, the IEP meetings on

5    the 25th, you said you didn't get notice of them until

6    the day of?

7    A.    That morning, yes.  That's when I first saw it,

8    although Marilyn had placed them late Monday in my

9    box.

10   Q.    Do you have to initial requests for meetings?

11   A.    Do I have to initial requests for meetings?

12   Q.    Who makes a request for meetings?  How is the

13   meeting generated?  How is the process started for an

14   IEP meeting?

15   A.    The educational diagnostician would generally

16   schedule that and then give notice.  And they would

17   send the notice to the parent.

18        Now, if the meeting was scheduled by phone,

19   let's say, and the parent wanted to waive their right

20   to ten-day prior notice, then that would get taken

21   care of at the meeting.  If there was a circumstance

22   where they wanted to -- for whatever reason we needed

23   to get the meeting scheduled less than those ten days.

24        (Yatzus Deposition Exhibit No. 24 was

Olga A. Yatzus

Page 132

1    marked for identification.)

2    BY MS. MARTINELLI:

3        Q.    This is a document identified as Exhibit 24 and

4    in the lower right-hand corner as D-15.  It's dated

5    January 8th, 2003.  It appears to be a letter from

6    James Dooley to you.  Do you recall receiving a copy

7    of this letter?

8        A.    Yes.

9        Q.    And you refused to sign it.  Is that correct?

10       A.    That's correct.  At that point, Mr. Dooley and

11   I talked.  And on this particular day, or within that

12   period -- it was right after spring break, or

13   Christmas vacation, which would have been the

14   beginning of January, maybe January 2nd -- I arrived

15   at my office, and my entire office was moved.  I had

16   files left in one area.  Other things were scattered

17   all over the place.  I couldn't get my fingers on

18   anything.  And we were -- I was put into an office

19   with Sharon Hill and Phyllis Waecker.

20              And it seemed that I was being set up to

21   produce documentation while I was trying to move and

22   find my files and belongings.  And it was a ridiculous

23   request for me to try to get that before my computer

24   or anything else was set up or located.  And when I

Olga A. Yatzus

Page 133

1  talked to Mr. Dooley, he is like, well, I have to

2  write you up or I'll get written up.

3      Q.    Were those his words?

4      A.    Yes.

5      Q.    Did you request any clarification on that

6  statement?

7      A.    No.  I kind of knew what he meant.

8      Q.    What did you think he meant?

9      A.    That he was instructed to write me up.

10     Q.    To write you up specifically?

11     A.    Yes.

12     Q.    Did he say anything else that would make you

13 think that's what --

14     A.    He said that to me on another occasion, too.

15     Q.    Just to quote, "If I don't write you up, I'll

16 be written up"?

17     A.    Right.

18     Q.    Did you at the time he -- Mr. Dooley made the

19 request for the written reports, did you tell him you

20 were unable to complete it because of the office

21 situation?

22     A.    Well, he certainly knew what the situation --

23           MR. BARTOSHESKY:  Wait.

24     A.    I'm sorry.

A195

Olga A. Yatzus

Page 134

1    Q.    Did you tell him you would be unable to
2    complete it because of the situation in your office?
3    A.    I had explained to him I'll get what he was
4    asking for as soon as I could.
5    Q.    Did you mention the situation in your office?
6    A.    He was very aware of the situation in my office
7    because I discussed that situation with him at the
8    same time.
9    Q.    Were you issued a laptop by the school
10   district?
11   A.    I had a laptop that I allowed my intern to use
12   for a period of time because she was working at
13   Townsend Elementary and didn't have a computer
14   available to her at that time.
15   Q.    Which intern was that?
16   A.    Eileen Baker.  So I allowed her to use me
17   laptop and I used the desktop.
18   Q.    She was already working as your intern at this
19   time?
20   A.    Yes, she was.
21   Q.    She didn't have her own laptop?
22   A.    No, not at that time.
23   Q.    So you didn't have use of your laptop because
24   it was with her?

Olga A. Yatzus

Page 135

1    A.    Yes.    As I recall.    Because I remember she

2   didn't have access, so I allowed her to use it.

3    Q.    And this says, Mr. Dooley's letter says, "As of

4   Wednesday, January 8 this written documentation has

5   not been submitted."  Was that true, you hadn't

6   submitted it yet at that time?

7    A.    Right.

8    Q.    Did you ever provide the documentation he

9   requested?

10   A.    As I recall.  We had moved that -- like I said,

11   I think everything was moved and scattered on

12   January 2nd when I arrived, and we were in that room

13   for -- trying to make headway with the chaos that was

14   in there -- for about a week maybe, and then they up

15   and moved us to another room right about then.  So

16   there were two separate moves that occurred within

17   about a week, week and a half.

18   Q.    You claim regarding the office moves you were

19   moved four times in one school year?

20   A.    I was moved one, two, three, four, and

21   eventually five.

22   Q.    In one school year?

23   A.    Yes.

24   Q.    Can you describe your different office

Olga A. Yatzus

Page 138

1    A.    No.  A separate space.

2    Q.    Just the school psychologists?   All the school

3    psychologists were in the one --

4    A.    No, no.  Everybody was assigned to their own

5    building.

6    Q.    You were in your own office?

7    A.    Yes.

8    Q.    In the high school?

9    A.    Yes.

10   Q.    And --

11   A.    And just -- I started out sharing my time

12   between Townsend Elementary and the district -- or the

13   high school that year.

14   Q.    So the beginning of 2002-2003, you started in

15   the main office of the high school; you were in an

16   office by yourself?

17   A.    Yes.

18   Q.    And do you recall what the office number?  By

19   any chance, do you remember?

20   A.    No, I don't.

21   Q.    When Mary Ann Mieczkowski came on-board, you

22   were moved; is that what you said?

23   A.    No.  Mary Ann came on-board in the summer of

24   2002.  I can't recall if it was before the school year

Olga A. Yatzus

Page 139

1    started or right after the school year started our

2    office out of the district office was -- we were told

3    that we weren't to have any office space in the

4    district office at that point.  So we all -- all of

5    the EDs and psychologists had building assignments.

6    So that's where our office was to be in whatever

7    building we were assigned to.

8        Q.   So you started out at the district office.

9    Before the school year of '02-03, you were all in the

10   district office?

11       A.   We had office space there.

12       Q.   And then in the beginning, sometime in the

13   beginning of the '02-03 school year, you were moved

14   into the high school?

15       A.   Well, I had -- you would have a district

16   office, but you would have a space to work in at the

17   locations that you were assigned to.

18       Q.   Was your main office still considered in the

19   district office then?

20       A.   No.

21       Q.   Each psychologist was moved out to the school

22   they were working with?

23       A.   Their building.

24       Q.   Then what was the move you said occurred after

Olga A. Yatzus

Page 140

1    that?

2    A.   I got moved out of the main office.  There was

3    a new wing that was built on the high school and so

4    there was a room available that I was assigned to, and

5    I shared that space with Julie Bowers, who was the

6    transition coordinator.

7    Q.   Was Julie Bowers also moved at that time into

8    that space or was she new?

9    A.   No.  Julie and I moved in.  When we moved, we

10   moved together at that time.

11   Q.   Was anyone else affected by that move?

12   A.   Eileen had a desk there.

13   Q.   Okay.  And so you moved to a room available in

14   the new wing of the high school?

15   A.   Yes.

16   Q.   You, Julie and Eileen Baker?

17   A.   Yes.

18   Q.   And you moved again.  When was that?

19   A.   January.  When I returned from Christmas

20   vacation, my office had been moved prior to my return.

21   Q.   Was that the move you were referring to around

22   the time Mr. Dooley's --

23   A.   Yes.

24   Q.   You returned from vacation, and you didn't have

Olga A. Yatzus

Page 141

1    notice of that move before you came back?

2    A.    No, I did not have notice.

3    Q.    And you were moved to what office then?

4    A.    To a much smaller office that I was to share

5    with Sharon Hill and Phyllis Waecker.

6    Q.    Did Sharon Hill and Phyllis Waecker also move

7    from another office with that move?

8    A.    Sharon had been a teacher prior to that.  So

9    she didn't have an office prior to that.

10    Q.    She was new to that position?

11    A.    Yes.

12    Q.    And Ms. Waecker, did she move offices in that

13    move?

14    A.    She had an office space in the main office next

15    to Marilyn Sweeney's office prior to Marilyn leaving.

16    And Marilyn retired at the end of the 2002 -- December

17    of 2002.  So Marilyn retired or left -- her last day,

18    I think was right before Christmas vacation.  And

19    Phyllis' office was next to her.  And then when we

20    returned in January, Phyllis and Sharon and I were

21    placed in one room.

22    Q.    So Phyllis was new to the position, too?

23    A.    No.  Phyllis was working with Marilyn Sweeney

24    as the special ed. secretary for a few months.

Olga A. Yatzus

Page 142

1    Q.   But her space moved as a result of this move as

2    well?

3    A.   Yes.

4    Q.   And was anyone else affected by that move that

5    you can recall?

6    A.   Not that I can think of.  Well, yeah.  I

7    guess -- I think the interventionists used the space

8    that we moved into for a period of time.  So they

9    would have been affected.  They got moved to a room

10   upstairs, I think.

11   Q.   You don't recall the room number of that room.

12   A.   No, I don't.

13   Q.   And then was there a move after that?

14   A.   And it was just ungodly.  You couldn't function

15   in that room where we were placed in.  And none of us

16   could move or breathe in that room.  So we got moved

17   again back to the room that I had just left.

18   Q.   In the new wing of the high school space?

19   A.   Yes.

20   Q.   Was that all of you moved back to that space?

21   A.   Yes.

22   Q.   You, Sharon Hill, Phyllis Waecker all moved?

23   A.   Yes.

24   Q.   Was anyone else affected by that move?

Olga A. Yatzus

Page 143

1    A.   No.   Oh.   And Julie Bowers, she got moved to

2   Marilyn Sweeney's old room in the main office.

3    Q.   And were you -- did it give you more space,

4   this move back to the new wing?

5    A.   Yes.

6    Q.   Were you displeased with that particular move?

7    A.   Not as far as space to sit down and do work,

8   but I didn't have a private location to do my job.

9    Q.   Were you given the use of a conference room for

10   counseling?

11    A.   Or testing or anything else or meeting with

12   parents or whatever I needed to do during the course

13   of my day.  That all depended on whether or not that

14   room was going to be used for meetings.  So whether or

15   not I could count on -- depend on a working space

16   depended on -- my use of that room was always

17   preempted by the need to use that space for meetings.

18   When you have the number of special ed. students or

19   whatever other meetings we needed to have, there were

20   a lot of meetings that would go on in the course of a

21   day.

22    Q.   Did you say when approximately you thought that

23   move back to the new wing in the high school was made?

24    A.   That was within a week or so.

Olga A. Yatzus

Page 144

1    Q.    So back in January of '03?

2    A.    Yes.

3    Q.    What was the reason given for that move?

4    A.    I think they realized that we couldn't function

5    in that space.  There wasn't room to move.  There

6    wasn't space to put student files.  It was impossible

7    to work in there.

8    Q.    Was there ever a reason given to you at the

9    time for that move?

10   A.    I don't recall what reason other than we

11   decided that you're moving again.

12   Q.    Who told you you were moving?

13   A.    I don't recall.

14   Q.    So sometime in January of '03, you, Sharon Hill

15   and Phyllis Waecker moved back to the new wing in the

16   high school?

17   A.    Yes.

18   Q.    Was there a move after that?

19   A.    Then I got moved to that smaller conference

20   room.

21   Q.    In the high school?

22   A.    Yes.

23   Q.    Was that the conference room you were using

24   before when it was available?

Olga A. Yatzus

Page 145

1    A.    Yes.

2    Q.    Were you by yourself in that smaller conference

3    room?

4    A.    Yes.

5    Q.    So no one else was affected by that move?

6    A.    No.

7    Q.    Except for you?  And were you unhappy with that

8    move?

9    A.    No.

10   Q.    Were you pleased by it?

11   A.    I felt that I could actually have a place that

12   I could work.  I wasn't pleased by the fact that I had

13   to keep moving, which, when you move, it takes a lot

14   of time.

15   Q.    Were you pleased with that new space?

16   A.    Yes.

17   Q.    And you don't know the room number of that?

18   A.    No, I don't.  I don't remember.

19   Q.    And then was there a move after that?

20   A.    Just when my lock was changed and I was

21   moved -- I was reassigned to the district office.

22   Q.    I want to go back for just a second.  The move

23   to the smaller conference room by yourself, do you

24   recall when that was?

Olga A. Yatzus

Page 148

1   BY MS. MARTINELLI:

2      Q.   Ms. Yatzus, I believe you testified earlier

3   that you were not aware of any requirement to present

4   your psychological evaluation reports in advance of

5   the meeting until this exhibit, what's been marked as

6   Exhibit 20.  Do you want to refer to that again?

7      A.   That was my recollection, yes.

8              (Yatzus Deposition Exhibit No. 25 was

9   marked for identification.)

10  BY MS. MARTINELLI:

11     Q.   You have been presented with a document

12  identified as Exhibit 25.  In the lower right-hand

13  corner it's identified as D-101.  And it appears to be

14  a memorandum to the Appoquinimink psychologists,

15  educational diagnosticians, coordinators and

16  specialists from Mary Mieczkowski, dated September 16,

17  2002 evaluations, reevaluations, specialists reports

18  and evaluation summary report.  Do you recall

19  receiving this memorandum?

20     A.   I don't or I didn't at the time, no.  But as I

21  am looking at it now, yes, I remembered seeing this.

22     Q.   You do remember seeing this around this time

23  frame?

24     A.   Sometime in September.  I don't recall exactly

Olga A. Yatzus

Page 149

1    when.

2       Q.   And if you will refer to paragraph 3.  It

3    states that "The psychologist will be responsible for

4    conducting further assessments, gathering additional

5    information, and documenting their findings and

6    recommendations through a psychological report.  The

7    information in this report will be discussed at the

8    meeting.  The dissemination of this document is

9    responsibility of the psychologist.  The educational

10   diagnostician should receive an audit copy prior to

11   the meeting, and parents should receive a copy no

12   later than the meeting date."

13            Does that appear to require the report, as

14   stated by Donna Mitchell, in advance of the meeting?

15      A.   That's what that says.

16      Q.   Okay.  Were you actually written up for having

17   students in your office at Appoquinimink?

18      A.   I was given reprimand by Jim Dooley, who then

19   retracted that.

20      Q.   Did you keep a copy of that reprimand?

21      A.   He took it from me.

22      Q.   So you no longer have a copy?

23      A.   No.

24      Q.   Do you recall what it stated?

Olga A. Yatzus

Page 180

1    Those reports you identified, were they

2    verbal or in writing?

3    A.    What reports?

4    Q.    This says, plaintiff reported to the

5    administration that it was acting illegally and

6    outside the bounds of federal laws and state

7    requirements.

8    A.    I tried to make different administrators aware.

9    For example, kids were getting suspended for extended

10    periods of time beyond what we really should have been

11    doing for kids.  And kids were removed from school

12    before anything was being done to address any of the

13    requirements.

14    Q.    Okay.  And did you make those statements

15    verbally or in writing?

16    A.    Both.

17    Q.    Okay.  Let's start with the verbal.  Do you

18    recall when you made these kinds of verbal statements?

19    A.    It would have been ongoing, as I recall, at

20    various points.  I don't recall specific dates.

21    Q.    Ongoing beginning in October 2002?

22    A.    Yes.

23    Q.    And do you recall to whom you made these

24    statements?

Olga A. Yatzus

Page 181

1    A.   I tried to make Donna aware.  I am sure I made

2  some statements to Jim Dooley.  I recall even at one

3  point, I think talking to Kitty saying, you know, I

4  was really concerned with how much time kids were

5  being put out of school.  And I am sure I said things

6  to Mary Ann Mieczkowski, and later -- primarily those

7  people.

8    Q.   What exactly was -- to the extent you can

9  recall, what was the content of those statements?

10   A.   That I am really concerned about that students

11 aren't getting what they need in terms of an

12 education.

13   Q.   Did you say in those statements that you

14 thought the district was acting illegally or outside

15 federal or state law?

16   A.   I don't know if I said that in those terms in

17 October.  I expressed concern about what was happening

18 then.  I was alarmed at what I was seeing in terms of

19 how students were being treated.  I think I made --

20 that I really was concerned with the legality of a lot

21 of it later on.

22   Q.   So you believe you made these statements to Jim

23 Dooley, Donna Mitchell.  Anyone else?

24   A.   I don't know when I specifically would have

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

# APPENDIX PAGE A210 TO
# DEFENDANTS' OPENING BRIEFS
# IN SUPPORT OF THEIR MOTIONS FOR
# SUMMARY JUDGMENT
# REDACTED
# ENTIRETY OF PAGE CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:    July 10, 2006

Olga A. Yatzus

Page 184

1    A.    I think it's part of the role of the school

2    psychologist to be an advocate for children and to see

3    what we could do to make sure we're doing everything

4    that we can to address the law and the needs of the

5    student.   I have been an advocate for the student at

6    least in terms of trying to see that we were working

7    with what we needed to do for him.

8    Q.    So in your role as you -- your role as student

9    advocate, you thought it was important to report what

10   you perceived as illegal behavior?

11   A.    Yes.

12   Q.    Did you think it was a part of your job?

13   A.    I felt that that was part of my job.

14         And I had a conversation with Jeff Taschner

15   from the union expressing some concern about what I

16   observed happening.  He told me that if I saw this

17   going on and didn't report it, then I would be equally

18   responsible.  And so with his direction, I did what he

19   instructed me to do.

20   Q.    Who was that again?

21   A.    Jeff Taschner, who was the attorney for DSEA.

22   Q.    Do I understand he, essentially, conveyed to

23   you you wouldn't be doing your job if you did not

24   report this?

Page 185

1    A.   Yes.  And I had had, you know, conversations

2  even during meetings that we had to do what we

3  needed -- I mean, we had to do what we could to keep

4  kids receiving the program.  And when they kept

5  getting suspended for ridiculous things and being kept

6  out of school, then we weren't doing our job.

7              MS. MARTINELLI:  Do you want to break

8  before I move to another document?

9              MR. BARTOSHESKY:  Yes.

10             (Deposition recessed at 3:18 p.m., to

11 reconvene at a mutually agreeable date.)

12                  --   --   --   --

13                   I N D E X

14 WITNESS:  OLGA A. YATZUS                    PAGE

15   EXAMINATION BY MS. MARTINELLI              2

16           YATZUS DEPOSITION EXHIBITS

17 NO.                                        MARKED

18   1  Two-page report by P. Putnam,          23
        stamped P-921 - P-922
19
     2  Curriculum Vitae of O. Yatzus-Calistro  34
20      stamped D-327 - D-328

21   3  Application For Employment, stamped     39
        D-322 - D-325
22
     4  Document titled "Information            48
23      Questionnaire, Office of Labor Law
        Enforcement, stamped D-48
24



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

v.

# Appoquinimink School District, et al.

C.A. # 05-103 SLR

———————————

Transcript of:

# Yatzus, Olga A. - Vol. 2 (190-299)

Volume # 2

April 26, 2006

———————————

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A213

Olga A. Yatzus

Page 221

1    was in retaliation for making these complaints?

2       A.    I felt that there was -- from the time that

3    Dr. Marchio in May was saying to me things like, "I

4    think you are deliberately trying to not do things

5    during the school year so you could have an excuse to

6    work over the summer" or "I think you are taking

7    advantage of the fact that you don't have an immediate

8    supervisor" back in May when I wanted to go to a

9    couple professional seminars where --

10      Q.    Sorry to interrupt.  But that was May of 2002?

11      A.    2002, yes.

12      Q.    Okay.

13      A.    I need to get 75 CEUs within a three-year

14   period to get recertified with my national

15   certification.  If I asked to go to a day conference,

16   which is within a close -- within close proximity of

17   Wilmington, that that's not an unreasonable thing to

18   ask.

19              My two office mates, as a matter of fact,

20   that particular year were able to go to four week-long

21   conferences out of state, which is unheard of, to let

22   the same people go to four conferences like that.  And

23   these were people that weren't even bringing anything

24   back to the staff or the students.  They were just

Olga A. Yatzus

Page 222

1   going on these trips.  And I felt that asking to go to

2   one conference here or one conference there and to get

3   that kind of response from Tony I felt was

4   inappropriate and rude.  I don't think that other

5   people would have been -- that answer would have been

6   given to other people.

7              I had asked Dr. Marchio that May for a job

8   evaluation.  I was a new employee.  I wasn't tenured

9   yet.  And I felt that that should be part of what has

10  to occur.  Since Dr. Lauer had left, I was concerned

11  as to who would do that performance appraisal.  And I

12  had asked Dr. Marchio specifically if Ann Thomas could

13  do my evaluation because I spent at least two days a

14  week over at Townsend Elementary School, and she sat

15  in on many, many meetings and with many parents and

16  staff members, and she could give a very good, and

17  accurate appraisal of what my job performance was.

18  And I had asked Dr. Marchio that on several occasions

19  about getting an evaluation, and he refused.  And I at

20  that point was questioning why would he refuse to

21  allow me to have an accurate evaluation of my job

22  performance.  So there was a lot of concern I had

23  early on.

24              By September when I got three letters of

A215

Olga A. Yatzus

Page 223

1   reprimand for one particular day, it was outrageous.

2   I felt that these individuals said, How many of us can

3   write her up on how many different kinds of things?

4   And I felt that that was the tone throughout that

5   entire school year.

6       Q.   So did you think that the grounds for your

7   termination were being laid back in May and September?

8       A.   Yes.

9       Q.   The plans were already in place?

10      A.   I felt that there was movement in that

11  direction.

12      Q.   You stated in your complaint that "Defendants

13  refused to take any action to address the illegal and

14  discriminatory behavior that you had raised."

15      A.   Yes.

16      Q.   What action do you think should have been

17  taken?

18      A.   I believe that Dr. Marchio should have taken an

19  active role in really taking a look at what was

20  happening at the high school.  Overall, the department

21  was in shambles.  There was a lot of team-building

22  that needed to occur, a lot of support

23  administratively in terms of what was happening.  And

24  instead of having the support of the administration, I

Olga A. Yatzus

Page 235

1   after the final termination or somewhere along --

2   sometime in June.

3     Q.   Are you saying these letters dated in May you

4   didn't get until June, some of them?

5     A.   No.  I got the May 14th letter, the P-391

6   letter.  I recall getting that one.

7     Q.   Who is Jeff Taschner?

8     A.   Jeff Taschner is the district attorney.  Not

9   the district attorney.  The DSEA attorney.

10    Q.   And I believe you testified earlier that you

11  spoke to him at some point --

12    A.   Yes.

13    Q.   -- regarding, was it your reports of unethical

14  behavior, is that what --

15    A.   I spoke to Jeff about the whole climate and the

16  whole situation and what was going on in

17  Appoquinimink.  And part of that discussion was

18  raising my concern about what I observed happening in

19  regard to the treatment of special needs students.

20    Q.   Do you recall when about you had those

21  conversations?

22    A.   I only met with him once.  That would have been

23  sometime in February, I think.

24    Q.   February of '03?

Olga A. Yatzus

Page 236

1    A.   Of '03.

2    Q.   So you met with him personally, those

3    discussions?

4    A.   Yes.  And I don't recall the exact date, but it

5    was sometime in January or February.

6    Q.   Was that the conversation, I think you

7    testified, that he told you it was your obligation or

8    duty as a school psychologist to report these

9    concerns?

10   A.   Yes.

11              (Yatzus Deposition Exhibit No. 37 was

12   marked for identification.)

13   BY MS. MARTINELLI:

14   Q.   This is a document identified as Exhibit 37.

15   In the lower right-hand corner it's Bates labeled

16   P-260.  And at the top it appears to be an e-mail

17   "Subject:  Re: Oops from Vicky Boyd to you."  There is

18   an e-mail attached to the bottom that appears to be

19   from you to Vicky Boyd.  Do you recall these e-mails?

20   A.   Yes.

21   Q.   In your e-mail to Vicky that starts at the

22   bottom of the page -- and this is dated January 24th,

23   2003 -- there is a paragraph that starts at the bottom

24   of the page saying, "Let me know what I need to do.  I

Olga A. Yatzus

Page 238

1    years.  That was always my goal.  But at that point in

2    time, I was beside myself in terms of thinking what

3    other options do I have.

4        Q.   Did you think somehow that notice that you were

5    going to retire in another year would help the

6    situation?

7        A.   Possibly.

8        Q.   On the second page, the last line says, "Have

9    you had a chance to talk to Jeff Taschner? "

10            Were you suggesting that Ms. Boyd talk to

11   Jeff Taschner?

12       A.   Jeff worked in Vicky's office, and I had asked

13   Vicky to arrange a meeting with Jeff.

14       Q.   Okay.  Does that help place the time frame?  If

15   that this e-mail was late January, it sounds like

16   February might have been --

17       A.   That's what I was thinking, it was sometime in

18   early February.

19       Q.   You've alleged in your complaint that you

20   assisted a number of special needs parents to file

21   complaints with the OCR?

22       A.   Yes.

23       Q.   Can you explain how that came about?

24       A.   When I spoke to Jeff and actually consulted

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,        )
                                      )
              Plaintiff,      )
                                      )
          v.               )   C.A. No. 05-103-SLR
                                      )
APPOQUINIMINK SCHOOL DISTRICT  )
and TONY MARCHIO, individually and in )  **TRIAL BY JURY DEMANDED**
his official capacity, MARY ANN      )
MIECZKOWSKI, individually and in her  )
official capacity, DONNA MITCHELL,   )
individually and in her official capacity, and )
MARION PROFFITT, individually and in  )
her official capacity,               )
                                      )
             Defendants.   )

# APPENDIX PAGE A220 TO
# DEFENDANTS' OPENING BRIEFS
# IN SUPPORT OF THEIR MOTIONS FOR
# SUMMARY JUDGMENT
# REDACTED
# ENTIRETY OF PAGE CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:    July 10, 2006