Olga A. Yatzus

Page 240

1    a result of your discussions with Mr. Taschner?

2    A.    Yes.

3    Q.    And they informed you the parents had to file

4    themselves?

5    A.    Yes.

6    Q.    And then you contacted the parents -- I'm

7    sorry, did you say, just by virtue of the ongoing

8    contact you had with them --

9    A.    Yes.

10    Q.    -- you suggested that they file OCR complaints?

11    A.    Yes.

12    Q.    And did you further assist them in any way in

13    filing those complaints?

14    A.    I gave them suggestions in terms of the fact

15    that they had the right to access their children's

16    files and get copies of what they needed.  As far as

17    physically assisting them, no, they completed their

18    own complaints and proceeded with that.

19    Q.    Were all the parents special ed. students that

20    filed the complaints?

21    A.    There were some that were 504 students.  I know

22    that Marie Wagenaar filed a complaint that she felt

23    her daughter was discriminated against.  She was not a

24    special needs student.  I don't recall any others that

Olga A. Yatzus

1    were not at that time.

2       Q.    I'm sorry.  Did you say when you think you

3    started this process?

4       A.    It would have been after my discussion with

5    Jeff.

6       Q.    So maybe March of '03?

7       A.    Maybe late February, early March.

8       Q.    And did you help organize these parents in any

9    other fashion?

10      A.    There was ... we did meet at the Stidds one

11   time when we were just trying to talk about what we

12   could do to help children.  At that point, they were

13   involved -- they got involved with Marie Wagenaar, who

14   organized the Zero Tolerance thing in terms of trying

15   to get the district to change their policy on the Zero

16   Tolerance attitude.  So that was something that was

17   indirectly related.  But I didn't have anything to

18   really do with that Zero Tolerance movement at that

19   point.

20      Q.    So Marie -- you said Marie Wagenaar organized

21   this Zero Tolerance movement, you called it.  Was

22   there a name?

23      A.    I forget what the name was.  Marie had made up

24   some T-shirts that zero -- I don't remember exactly

Olga A. Yatzus

Page 243

1   A.    Yes.

2   Q.    Then what was your involvement with the Zero

3   Plus Zero group?

4   A.    I didn't have any direct involvement.  They

5   would e-mail me.  Marie would e-mail and ask me about

6   my thoughts and opinions about some things.  That was

7   a movement that Marie pretty much developed.

8   Q.    And your assistance with the OCR complaints,

9   did you think that was part of your job as school

10  psychologist?

11  A.    I think that as an advocate for children,

12  absolutely.  As a school psychologist, part of the

13  role and responsibility on a national level in terms

14  of what is the role is that if there are violations

15  that we really need to be an advocate.  And if being

16  an advocate means trying to represent that child in a

17  meeting, whether it's informing parents of what their

18  rights are, what the law is, I think that that is our

19  job.  I think that's our job as special educators,

20  that parents have a right to be informed, and they

21  need to understand the law.  Most parents don't

22  understand the law.  And it's not well described for

23  them.  Parents are given a document that says, okay,

24  here are your due process rights, but nobody

Olga A. Yatzus

Page 244

1    interprets that for them.  Often parents feel victims

2    of the system because they don't know that they have

3    rights and that their children have.  I think when we

4    see that children are being railroaded or that certain

5    things aren't happening, it is our job to let parents

6    know what they need to do to be an advocate for their

7    children.

8        Q.    I believe you said that Mr. Taschner was the

9    one who first recommended the OCR complaints?

10       A.    He said that I have to do something to effect

11   some change.  And we talked about where would I go.

12   One of the things that we explored was that the Office

13   of Civil Rights would oversee what was happening or

14   not happening and that if that's what I needed to do,

15   then that's what I needed to do.

16       Q.    Okay.  So he indicated that in your role as

17   school psychologist that filing or going to the OCR

18   was appropriate?

19       A.    Yes.

20       Q.    And did you believe that anyone at the district

21   was aware of your involvement with the OCR complaints?

22       A.    I think everyone in the district was very aware

23   that I was trying to help these students and families.

24       Q.    And why did you think they were -- let me ask

Olga A. Yatzus

1   first.  When did you think they became aware of that?

2       A.    At one point, Donna Mitchell came to me and

3   said that she found it interesting that a lot of,

4   quote, unquote, my parents were requesting copies of

5   their children's school records.

6       Q.    I guess you took it from that question that she

7   knew of your involvement?

8       A.    Yes.

9       Q.    How did you respond when she asked that?

10      A.    I don't recall exactly what I said to her at

11  that time.  I said -- something to the effect that

12  parents have the right to get copies of their

13  children's school records.

14      Q.    Did you ever come forth with your involvement

15  in the OCR complaints?

16      A.    Not directly.

17      Q.    Indirectly, did you come forth with it?

18      A.    I think there were many situations where I had

19  conversations with Donna to indicate that part of my

20  job was to help these parents and be an advocate for

21  these children.

22      Q.    Did you indicate in those conversations that

23  helping them file OCR complaints was part of your

24  role?

Olga A. Yatzus

Page 246

1    A.    I didn't talk to her specifically that I was

2  helping them file an OCR complaint at that time.    I

3  felt that the complaints had to stand on their own at

4  that point and, specifically, each parent had to make

5  their own decision as to whether they chose to file or

6  not.

7    Q.    I'm sorry.  Did you say a time frame when you

8  thought that they became aware?

9    A.    I don't recall when I had that conversation

10  with Donna specifically.

11    Q.    But you think it was before the complaints

12  themselves were received by the district?

13    A.    Yes.  Well, before any of the complaints got

14  filed, the parents felt that they needed to get all of

15  the information that they needed.

16    Q.    Did you attend any of the Zero Tolerance

17  meetings?

18    A.    I attended the meetings that we were

19  discussing, the OCR -- or giving parents background in

20  terms of what the law is and what their rights could

21  be and what options they had.  There were other

22  meetings that Marie had that she really went off on

23  the let's-go-to-the-board-meetings kind of thing.  The

24  whole Zero Tolerance issue was always at the back of

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## APPENDIX PAGE A227 TO
## DEFENDANTS' OPENING BRIEFS
## IN SUPPORT OF THEIR MOTIONS FOR
## SUMMARY JUDGMENT

# REDACTED
# ENTIRETY OF PAGE CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:     July 10, 2006

Olga A. Yatzus

1   in response to a question Donna had or if it was just

2   responding to Susan of, well-I-don't-know-what-she's-

3   talking-about kind of thing.  So I don't know.  There

4   is not enough information that I recall on that one.

5      Q.   It has quotes around the statement as if you

6   made that statement to someone else, but you are not

7   sure?

8      A.   Well, a lot of times I'll use quotes when I

9   am -- I think through a lot of my writings, I'll put

10  quotes when I'm questioning what is going on or what's

11  not going on or when things have occurred.  So I don't

12  know if that's a quote of that's what I said directly

13  or if that's a I-don't-know--what-she's-talking-about

14  kind of thing.

15     Q.   Okay.

16     A.   Meaning I-don't-know-if-she's-referring-

17  to-something-else kind of thing.

18     Q.   So other than Ms. Mitchell's questioning you

19  about why parents were requesting records, did you

20  have any other reason to believe that the -- anyone in

21  the district knew that OCR complaints were going to be

22  filed?

23     A.   I had the sense from Donna that she was

24  wondering why, you know, these parents were all asking

Olga A. Yatzus

Page 250

1    for very specific information.  But above and beyond

2    that, we didn't make it clear that the OCR complaints

3    were being filed, no.

4        Q.    Why didn't you make it clear?

5        A.    Because I felt that at that point the parents

6    needed to file, and there was fear there would be

7    further retaliation toward their children, and that we

8    felt that once the complaints were made, then further

9    retaliation couldn't or shouldn't have occurred at

10   that point.

11       Q.    Were you aware of any OCR complaints being

12   filed against the district in the past?

13       A.    Not that I am aware of.  I know that there was

14   an incident or a legal issue with another student that

15   was -- there were a couple, I think, students whose

16   parents were going through due process and another one

17   was going through some legal proceedings.  But as far

18   as OCR, I wasn't aware one way or the other.

19                (Yatzus Deposition Exhibit No. 39 was

20   marked for identification.)

21   BY MS. MARTINELLI:

22       Q.    I am showing you a document marked as Exhibit

23   39.  In the lower right-hand corner, it's identified

24   as P-274.  It appears to be an e-mail, subject line:

Olga A. Yatzus

Page 278

1    what had happened?

2    A.    Right.  And Kitty that one day.  But not after

3    that.

4    Q.    I'm sorry.  So what was the conversation with

5    Kitty again?

6    A.    They told me that I had to -- if I turned in

7    that time sheet like that day and they needed to have

8    an administrator sign off on it.  So I had given it to

9    Kitty and explained to her that my time sheet had

10   gotten lost and could she help take care of that for

11   me.

12   Q.    Okay.  But Kitty didn't give you any

13   explanation as to why it wasn't taken care of the

14   first time?

15   A.    Nobody told me any reason why it hadn't been --

16   nobody seem to know anything about it.

17             (Yatzus Deposition Exhibit No. 40 was

18   marked for identification.)

19   BY MS. MARTINELLI:

20   Q.    I am showing you a document identified as

21   Exhibit 40, and on the lower left-hand corner it is

22   identified as D-81.  It appears to be an Appoquinimink

23   School District hourly personnel time sheet received

24   July 11th signed by you at the bottom July 11th, 2002.

A230

Olga A. Yatzus

Page 279

1    Do you recognize this document?

2      A.    That's my handwriting, yes.

3      Q.    Okay.  And this was submitted on 7/11/2002,

4    which appears to be the last date listed on the list

5    of dates and times.  So do you think this was the

6    first time sheet that you submitted?

7      A.    That would be my guess.

8      Q.    And the total in the lower right-hand corner

9    appears to be 45 hours.  Is that correct?

10     A.    Yes.

11                 (Yatzus Deposition Exhibit No. 41 was

12   marked for identification.)

13   BY MS. MARTINELLI:

14     Q.    And this document has been identified as

15   Exhibit 41, and also it's indicated as D-80 in the

16   lower left-hand corner.  This also appears to be a

17   school district time sheet signed by you for the same

18   period, 7/1 through 7/11/2002.  Only this time sheet

19   is dated 8/1/2002.  Do you believe this is the second

20   time sheet you submitted when requested?

21     A.    Right.  When I had gone in that date -- during

22   the summer, I would use the time sheet to just jot

23   down what hours that I was there.  And as I said

24   previously, I always made a copy, but this particular

A231

Olga A. Yatzus

Page 280

1    one I didn't.  So when payroll said, well, if you get

2    it in today ... and so I tried to recreate that from

3    my memory the best I could at that point.

4        Q.    So do I understand then you don't record your

5    hours anywhere except on this sheet --

6        A.    Right.

7        Q.    -- is what you are saying?

8        A.    Right.  I was keeping track of my hours on my

9    time sheet.

10       Q.    You don't have a calendar or anywhere else you

11   keep track of that time?

12       A.    No, I didn't on my calendar.  I just did on the

13   time sheets that I would go in and when I would leave.

14       Q.    With the first document that's identified as

15   Exhibit 40, would you on a daily basis enter these,

16   you know, times by each date?

17       A.    Yes.

18       Q.    So each of these entries were done on the date

19   themselves?

20       A.    Right.

21       Q.    And then you just did your best from memory to

22   recreate the document?

23       A.    Right.

24       Q.    It appears that the total on the second one is



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

## Appoquinimink School District, et al.

C.A. # 05-103 SLR

---

Transcript of:

Marchio, Ed.D., Tony

March 21, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A233

Tony Marchio, Ed.D.

1   School District?

2   A.   We typically have a standard employee contract,

3   and I am not -- I was not aware and I am not aware now

4   of anything that was different from the typical

5   contract that we give to all employees.

6   Q.   Did either Olga Yatzus or anyone else ever tell

7   you there were additional terms and conditions aside

8   from the written contract?

9   A.   Only Mrs. Yatzus.

10   Q.   What did she tell you those additional terms

11   and conditions were, if you remember?

12   A.   This was some time after she had been employed

13   for quite awhile in our district.  She relayed to me

14   that it was her understanding from the director that

15   she would be granted extra days through the summer

16   months, 20 extra days, that she would be given those

17   as part of her employment.

18   Q.   When you say quite awhile, can you give me some

19   estimate of the time frame she was already working for

20   the district when she told you that?

21   A.   Yes.  I would say that occurred in May of 2002.

22   Q.   Was that the first -- well, do you know when

23   she was hired by Appoquinimink?

24   A.   I am not certain of her employment date, no.

Tony Marchio, Ed.D.

Page 21

1      A.    That's correct.

2      Q.    Or was at the time.  Is she --

3      A.    Still is, yes.

4      Q.    I think you also said one of her functions was

5   to be involved with the whole issue of sexual

6   harassment?

7      A.    Yes.

8      Q.    How is it that the someone who has the position

9   of finance director is assigned that responsibility?

10     A.    Well, for a couple of reasons.  Number one,

11  we're a small district, so our directors have multiple

12  assignments, and that was one of them that she had.

13  There was a time when I started at Appoquinimink that

14  I was the only district office administrator.  We had

15  a supervisor of transportation, one of food service.

16  That was it.  So we brought people on slowly.

17  Mrs. Nutter was one of the first to come on board and

18  because of that actually had many, many different

19  duties and responsibilities, almost as an assistant

20  superintendent.  And that was one that I had assigned

21  to her and that she was comfortable in doing.

22     Q.    Did she have any background in that area, do

23  you know?

24     A.    I believe that she did.  She had extensive

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

# APPENDIX PAGES A236 THROUGH A242 TO
# DEFENDANTS' OPENING BRIEFS
# IN SUPPORT OF THEIR MOTIONS FOR
# SUMMARY JUDGMENT

# REDACTED
# ENTIRETY OF PAGES
# CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:    July 10, 2006

Tony Marchio, Ed.D.

Page 56

1    Olga Yatzus.  The sentence that begins, "He then said

2    we all had to submit schedule prior to working."  You

3    agree that you told Olga Yatzus that?

4      A.   I did say that, yes.

5      Q.   And all the other psychologists as well?

6      A.   And all of them, yes.

7      Q.   And then it says, "Chet." That's, I believe,

8    Chet Hadley?

9      A.   Yes.

10     Q.   He's another psychologist in the district?

11     A.   Yes, that's correct.

12     Q.   "Chet as union rep said that he didn't think

13   that I should be asked to do that since none of the

14   coordinators were asked to do that."  Did Mr. Hadley

15   ever say something like that to you?

16     A.   He never said it to me, no.

17     Q.   Now, did Olga Yatzus relate to you her belief

18   that she should not have to do the same thing as the

19   other psychologists because of some representation

20   that Dr. Lauer had made to her when she was fired?

21     A.   No, no.  She just didn't submit the summer

22   schedule after repeated requests.  She did tell me at

23   the time that we had our discussion that the 20 days

24   were promised to her.  And my response to her was

Tony Marchio, Ed.D.

Page 57

1    that, you know, we have no record of that.  That's not

2    a part of the contract that she was given.  I am

3    unaware of any type of arrangement of that nature.

4              Then I asked all of them, I said, "Are you

5    saying to me that you are just given 20 days without

6    having to work?"  They said, No, that's not the case.

7    We work -- we expect to work those 20 days.

8              And I did not deny that to them.  I said if

9    you need 20 days in the summer, then you can work 20

10   days.  I just ask you to submit your summer work

11   schedule.  I ask that of every employee who works in

12   our district through the summer.  And I as the

13   superintendent of schools submit a summer work

14   schedule.  And that's just so that we'll know who is

15   working and who isn't and where they are and how we

16   can reach them if we have to.

17              I did not deny the 20 days.

18   Q.   Were the education coordinators asked to put in

19   the same kind of work schedule as the psychologists?

20   A.   My meeting was with the psychologists.  And at

21   the time that I met with the psychologists, I was kind

22   of taken back by this 20-day promise.  And so I was

23   unaware -- if anybody had been promising summer days,

24   then I was unaware of that.

Tony Marchio, Ed.D.

Page 58

1      What happened with the coordinators I am

2  not real clear on.  But I do know from that summer on,

3  every single employee, including the coordinators, the

4  psychologists, anybody who works one extra day in the

5  summer has that approved -- there is an approval

6  process for that -- and a summer schedule submitted.

7  And even this particular summer, every employee,

8  except for Mrs. Yatzus, submitted the summer work

9  schedule.  She is the only one who would not comply

10  with that directive.

11  Q.   So you are saying that this particular summer

12  the education coordinators were required to put in

13  schedules ahead of time?

14  A.   I can't speak to that.  I don't know because my

15  meeting at that time was not with them.  It was with

16  the psychologists.  They understood my directive, I

17  know that.  And I do believe that had I gone to them

18  directly, they would have complied.  But my discussion

19  was with the four psychologists.  And three of the

20  four submitted theirs within two days of that meeting.

21  Q.   Now, this goes on to say, "I gave Tony a list

22  of what I had already completed and what else needed

23  to be done."  Did she do that?

24  A.   She sent to me a list of names, which

Tony Marchio, Ed.D.

Page 60

1    one time sheet throughout the course of that whole

2    summer that was held.

3        Q.    Why was it held?

4        A.    It was held because I knew there was an error

5    on the time sheet.  July 3rd, 2002, she submitted in

6    her original time sheet that she had worked a full

7    day.  We had a question that came up from a parent at

8    one of our schools and needed to talk to her.  So we

9    called where we thought she was.  No summer schedule.

10   So we called around the district, just about every

11   school, in attempt to find her.  We couldn't find her.

12            The secretary in the special education

13   department, Kathy Bromwell, called her house at 10:30

14   a.m. that morning.  Her daughter said she was in the

15   shower.  So we asked for her to call the office when

16   she got out of the shower and was ready to come to

17   work.

18            She never did report to work that day.  At

19   4:30 p.m., we had a log from that secretary, Kathy

20   Bromwell, stating that Mrs. Yatzus had called the

21   district office wanting to know why we needed to reach

22   her.  So she did not report to work on July the 3rd,

23   but yet she submitted the time sheet with hours on

24   there to be paid for that day.  And that's why I held

Tony Marchio, Ed.D.

Page 61

1  the time sheet, because I wanted to talk -- I wanted

2  to discuss that with her.

3     Q.   And did you at some point tell her that her

4  time sheet was being withheld because of that

5  discrepancy?

6     A.   I sent her a memo that day on July the 3rd, and

7  I explained to her that I would like to talk to her.

8  I explained to her that, you know, we were in the

9  middle of the summer; I still hadn't received her time

10  sheet; I wanted her to submit the time sheet, and that

11  there was a problem with one of the days that she

12  submitted on that time sheet.  And that was in a memo

13  dated July 3rd, the very day that she was not at work.

14     Q.   Well, when you sent that memo to her, you

15  didn't have the time sheet at that point, did you, for

16  that work period covering the July the 3rd?

17     A.   I didn't have the time sheet, but I knew she

18  didn't work that day.  I knew that, yes.

19     Q.   So at that point you couldn't have decided

20  to -- you couldn't have already withheld the time

21  sheet because it wasn't submitted at that point?

22     A.   And I didn't say that is in my memo to her.  I

23  said to her that there was as question about her

24  work -- I don't believe I referred to anything about

A247

Tony Marchio, Ed.D.

Page 62

1    the time sheet.  But I said to her there was a

2    question about her working on that date.  And then

3    later she submitted the time sheet with those hours

4    worked.

5    Q.   And you didn't get any response to that memo,

6    is that what you are saying?

7    A.   Absolutely none.  Then she submitted, I believe

8    after July 3rd, she submitted this list of names.  And

9    we corresponded back and forth in early August about

10   the time sheet again -- not about the time sheet, but

11   about her summer schedule.  I explained to her how

12   frustrated I was after repeated attempts to get that

13   summer schedule for her.  We were into August and I

14   still hadn't received it.

15   Q.   Okay.  Let me see if I have this straight

16   because I think sometimes maybe both of us have been

17   using the word "time sheet" maybe interchangeably with

18   the schedule that you are talking about.

19   A.   Maybe so.

20   Q.   But there was a situation that arose on July

21   3rd when you couldn't find her and you sent her a memo

22   saying, what were you doing, where were you this day?

23   She didn't respond to that, but later submitted a time

24   sheet that showed hours worked on that day?

Tony Marchio, Ed.D.

1   is a problem with your time sheet, you need to put in

2   another one?

3       A.   I don't know the specific date that she

4   contacted her, but it was very shortly after the 3rd.

5       Q.   Well, would it have been shortly after -- it

6   couldn't have been sooner than after July 11th when

7   this time sheet was received, could it?

8       A.   I don't know when she asked her to submit it.

9   But there is another problem here, too, in that the

10  time sheets are different.  One time sheet she

11  submitted for 45 hours.  The very same period she

12  submitted for 50 and a half hours.  You know, on

13  July the 3rd, the date in question, now she worked

14  from 8:00 until 5:00.  So, you know, there is some

15  obvious problems with her time sheet.

16      Q.   But it's your belief that Ms. Bromwell, after

17  this time sheet came in, called Olga Yatzus and said,

18  There is a problem with the time sheet that we've

19  received; you need to submit another one?

20      A.   Yes.

21      Q.   She specifically said to her the problem has to

22  do with what you did on July the 3rd?

23      A.   No.  She said, "There is a problem with the

24  time sheet; you'll need to submit another one."

Tony Marchio, Ed.D.

Page 67

1    Q.    Ultimately -- well, let me ask you.  The

2    document that's stamped D-80, the first page of this,

3    at the top right where it says, "Received," and it's

4    an abbreviation, "8/1," do you know whose handwriting

5    that is?

6    A.    No.

7    Q.    And at the bottom -- and part of it is actually

8    cut off by the photocopying, but it looks like it

9    says, "Summer schedule was never submitted."  Is that

10   your initials after that?

11   A.    Yes.

12   Q.    Did you write it?

13   A.    I did write it.

14   Q.    Next to that in a circle it says, "August 23

15   paid."  Do you know who wrote that?

16   A.    I wrote that.

17   Q.    In fact, was Olga Yatzus paid for this time

18   period?  And I guess it was based on the other time

19   sheet, though, correct?

20   A.    She was paid.  I mentioned earlier that she was

21   paid on time -- with every time sheet that was

22   submitted, she was paid on time, except for this one.

23   She was eventually paid.  I think back here, I am not

24   sure IF she's saying she ever did receive her pay.

Tony Marchio, Ed.D.

Page 75

1   testified, and correct me if I'm wrong, that both you

2   and Ms. Nutter talked to Mrs. Cheek about that

3   situation?

4       A.    About the e-mail?

5       Q.    Right.  About the e-mail, correct.

6       A.    I don't believe I said that.  I believe I said

7   Mrs. Nutter and I talked about the e-mail.  I don't

8   remember having a discussion with Mrs. Cheek.

9       Q.    Now, at one point or at some point it was

10  decided that Olga Yatzus would not be offered a

11  contract for the next school year.  Is that correct?

12      A.    Yes, that's correct.

13      Q.    And how was that decision arrived at?

14      A.    Well, it was -- I guess there were several

15  things that were taken into consideration.  And the

16  primary factor I would have to say would be the number

17  and the nature of the reprimands that were put in her

18  file.

19              And, again, that decision, no matter who is

20  involved, is my decision to make and to make that

21  recommendation to the board.

22      Q.    I take it there were people other than you that

23  were involved in making that decision.  Is that

24  correct?

Tony Marchio, Ed.D.

Page 76

1    A.    There were other people involved in helping me

2    to formulate that decision because really that is my

3    decision.  I did have discussions with the principal

4    and others.  And I think that was a part of the

5    decision-making that influenced my decision.

6    Q.    How did you know how many -- you said the

7    number and nature of the reprimands.  How did you know

8    how many were in her file and what the nature of those

9    were?

10    A.    Well, I knew right off the bat that two were

11    mine, and that she had been defiant to me as a

12    superintendent.  I made a very simple, basic request

13    of her that she didn't have enough respect to honor,

14    and so -- that was one thing.  And, again, I mentioned

15    earlier that I had discussions with the principal

16    about similar situations.  And I think it caused me to

17    look at her situation a little closer.

18    Q.    Did you actually go and look at the personnel

19    file and review all of the reprimands that were in

20    there?

21    A.    Yes, I did.

22    Q.    And do you know whether -- well, do you know

23    how many were in there?  You talked about the number.

24    A.    I don't know about the number.  The reprimands.

Tony Marchio, Ed.D.

Page 77

1    One thing that I think certainly influenced me was the

2    reprimands from so many people.  She had two

3    reprimands from the superintendent.  She had one from

4    the supervisor of special education.  She had one from

5    her principal.  She had one from the assistant

6    principal.  So it was from a variety of people.  You

7    know, maybe one person might not -- might have a

8    reason for -- some alternative reason for doing it,

9    but from four different people, I thought that was

10   noteworthy.

11      Q.   Were you aware of any situation where there

12   were a number of reprimands that were supposed to have

13   been consolidated into one reprimand?

14      A.   No, I am not aware of that.

15      Q.   And when you looked at her file, was a

16   reprimand from Vaughn Lauer still in her file?

17      A.   I don't specifically recall one from Vaughn.

18   You know, at that particular time, it wasn't what

19   Vaughn did that was important to me; it was her job

20   performance after that that I thought was important.

21      Q.   Do you remember what the specific problems were

22   with her job performance?  I assume you are saying

23   they were reflected in those reprimands?

24      A.   Yes, they were reflected in the reprimands.  I

Tony Marchio, Ed.D.

1    Another one with the IEPs.  She wasn't

2    present for a very, very important IEP meeting.  We

3    had another attorney present.  We had various other

4    participants, the parents there.  I as a

5    superintendent am not typically at IEP meetings.  I

6    have sat in on those from time to time.  We all made

7    it on time except for her.  So I think she was

8    negligent in her responsibility in that technical

9    situation.

10    In other cases, the reprimands, I think

11    were for various reasons, not completing assessments

12    when she needed to and not coming to IEP meetings

13    prepared.

14    Q.    Now, the meeting where you were present and she

15    came late to, that meeting, why was -- you said you're

16    not normally at those kind of meetings.  Why were you

17    at that one, do you remember?

18    A.    Because it was a very long, drawn out, very

19    contentious case that we were having with a parent, a

20    student, that had been going on for some time, and I

21    think it escalated to the point that I needed to be

22    involved personally.

23    Q.    Do you remember the name of the mother of that

24    student?

Tony Marchio, Ed.D.

Page 82

1    Q.   Now, that meeting was for some reason at the

2    district office.  Was it not?

3    A.   Yes.

4    Q.   Do you know why it was scheduled for that

5    location?

6    A.   It's not atypical to do that.  With another

7    attorney involved, two attorneys, it's a lot of times

8    a more convenient location.  It's quieter.  There

9    aren't quite as many disruptions.  The administrators

10   who are there are less distracted if it's in a neutral

11   location.

12   Q.   Do you know whether or not Sharon Hill was also

13   issued a reprimand for being late to that meeting that

14   was later withdrawn?

15   A.   I don't know.

16        Another thing, too, that's important about

17   the meeting is that the -- neither the parents nor the

18   opposing attorney wanted to begin the meeting until

19   Mrs. Yatzus was present.  So it wasn't we could

20   proceed.  I think that's what made it more blatant.

21   It wasn't that we could proceed until she got there.

22   We had to just wait in the room until she showed up.

23   Q.   And that meeting then began about a half hour

24   or so late; is that right?

Tony Marchio, Ed.D.

Page 87

1    A.    No, I never heard that.

2    Q.    Now, in the normal situation where you have

3    this level of a grievance proceeding, is there

4    something that -- if the employee isn't satisfied with

5    the result, do they have a recourse to take it to

6    another step or another level?

7    A.    They can appeal, yes.

8    Q.    To what body do they appeal to?

9    A.    They can appeal either to the superintendent or

10   to the Board of Education.

11   Q.    Well, in this case, Dr. Proffitt was acting,

12   essentially, as the superintendent; isn't that right?

13   A.    Right.

14   Q.    What was the other avenue of appeal?

15   A.    The Board of Education.

16   Q.    Have you ever been involved with a situation

17   where an employee took it to that level, appealed to

18   the Board of Education?

19   A.    No.

20   Q.    Well, do you know what the Board of Education

21   is supposed to do?  Do they start from scratch and

22   hear the whole thing or do they look at what the

23   previous --

24   A.    Typically review of records.

Tony Marchio, Ed.D.

1    Q.    And what record would they review?

2    A.    Well, they would review any kind of

3    documentation that they would request.  They would

4    look at the reprimand.  They would look at anything

5    that the hearing officer, in this case, Dr. Proffitt,

6    would have written.  They could request anything.

7    They could start over if they wanted to.  It's really

8    up to them to conduct that in any manner that they saw

9    fit.

10   Q.    Do you recall any situations where Olga Yatzus

11   made some complaints to you about the conduct of Mary

12   Ann Mieczkowski?

13   A.    Are you talking about in writing or in a

14   personal meeting with her?

15   Q.    Well, let's start with any -- a personal

16   meeting.

17   A.    No.  I can't say that I recall any conversation

18   like that.

19   Q.    Did you ever have a personal meeting with Olga

20   Yatzus where she raised complaints or concerns about

21   the principal, Donna Mitchell?

22   A.    I had discussions with Mrs. Yatzus about the

23   high school.  I can't say specifically about Donna

24   Mitchell, but just the general conditions of the high

Tony Marchio, Ed.D.

Page 92

1    Q.    Daniels?

2    A.    I don't recall that name at all.

3    Q.    Stidd, S-T-I-D-D.  I am not sure if that's how

4    that's pronounced.

5    A.    I believe so, yes.

6    Q.    Was there a Carter also?

7    A.    Yes.

8    Q.    And some or all of these people actually went

9    to the Office of Civil Rights about the situation.

10   Did they not?

11   A.    Yes.

12   Q.    You knew about this group.  And they had a name

13   for themselves.  And I think even a website maybe?

14   A.    Yes.  Zero Tolerance.

15   Q.    You knew about that even before you received

16   anything from the OCR, didn't you?

17   A.    Yes.

18   Q.    Did you know if Olga Yatzus had any involvement

19   or contact with that group?

20   A.    I didn't know.  We didn't make the connection

21   there.  She may have.  She may have been a part of it.

22   But it wasn't something that overly concerned us.

23   Q.    When you say "overly concerned us," who is

24   "us"?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,            )
                                 )
                Plaintiff,       )
                                 )
        v.                       )    C.A. No. 05-103-SLR
                                 )
APPOQUINIMINK SCHOOL DISTRICT    )
and TONY MARCHIO, individually and in )   **TRIAL BY JURY DEMANDED**
his official capacity, MARY ANN  )
MIECZKOWSKI, individually and in her )
official capacity, DONNA MITCHELL, )
individually and in her official capacity, and )
MARION PROFFITT, individually and in )
her official capacity,           )
                                 )
                Defendants.      )

## APPENDIX PAGE A259 TO
## DEFENDANTS' OPENING BRIEFS
## IN SUPPORT OF THEIR MOTIONS FOR
## SUMMARY JUDGMENT
# REDACTED
# ENTIRETY OF PAGE CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:      July 10, 2006

Tony Marchio, Ed.D.

Page 100

1    A.    I talked to other administrators in the

2    building.  I asked my assistant superintendent, Marion

3    Proffitt, to actually set up an office in the high

4    school.  And she worked out of the high school almost

5    every day during this time period to monitor what was

6    happening there at special ed. and how the principal

7    was performing her duties.

8    Q.    There is a paragraph in the Olga Yatzus' e-mail

9    that begins, "During the school year, my office was

10   taken from me and I no longer have a place to meet

11   with children."  Did you ever look into that situation

12   or that claim?

13   A.    I don't know that anybody took the office.  I

14   think her office was moved.  That's not unusual at

15   Middletown High School either because of space

16   constraints that we have there.

17   Q.    Now, I may have asked you this, but.  After you

18   talked to Donna Mitchell and you talked to

19   Mrs. Mieczkowski and you talked to some other people

20   in the building, did you ever go back and talk to Olga

21   Yatzus about this situation?  It seems like there was

22   a problem with these people.  Did you ever try to do

23   anything about that?

24   A.    I don't know that I would do that.  I don't

Tony Marchio, Ed.D.

Page 115

1  do that in order for the program to survive.  So that

2  was, you know, one of the changes that we had hoped to

3  make.

4      Q.    And letters like that that make those kind of

5  personnel recommendations or informing an employee of

6  some kind of personnel change, would they have come

7  from Mr. Marusa?

8      A.    Yes, that's correct.

9      Q.    With respect to the recommendation that

10  ultimately was yours that Olga Yatzus' contract not be

11  renewed for the next year, do you remember when that

12  decision was made?

13      A.    I don't remember a specific date, no.  I can't

14  say that I do.

15      Q.    Well, how is that -- I assume that at the end

16  of the school year that certain reviews are done and

17  decisions have to be made about what's going to happen

18  in the next school year.

19      A.    Right.

20      Q.    How does that process work?

21      A.    Well, there is a deadline.  They need to be

22  notified by the 15th of May.  I believe the process

23  here, and in almost every case, would be an official

24  notification from the human resource department that

Tony Marchio, Ed.D.

Page 116

1    the contract will not be renewed.  There is an

2    opportunity via the code.  The code is included in

3    that letter that's sent to the employee.  The employee

4    then has a specific number of days to request the

5    reasons in writing.  And then that comes to me and

6    I -- or to the human resource department.  I believe

7    it will go to the human resource department there and

8    they'll handle it.  So the reasons are given in

9    writing.  Then the employee has a right to a hearing

10   with the superintendent.  And the superintendent's

11   decision is final if it's a non- tenured teacher.

12       Q.    Final with respect to the recommendation or

13   does that process go past --

14       A.    No.  The process ends at that point.

15       Q.    Ultimately, the school board has to make the

16   final decision.  Isn't that correct?

17       A.    Right.

18       Q.    By the time this process goes through the

19   review and comes to the superintendent and you say

20   it's a final decision, is that before or after the

21   school board has made some kind of decision?

22       A.    It's before, typically, before the school board

23   makes a decision.

24            MR. BARTOSHESKY:  Let me show you this

Tony Marchio, Ed.D.

Page 132

1    Mr. Marusa went out by mistake or do you think the

2    decision had in fact been made by that time?

3        A.    Well, we wouldn't have sent the letter if we

4    weren't thinking about that.  I mean, why would we

5    send the letter?  We weren't just writing to her.  You

6    know, evidently we had that in mind.  And I can't say

7    that it was absolute at that particular point in time.

8    She was entitled to a hearing.  She was entitled to

9    come in, which she did.  She exercised that right.

10   She had the right to present her case.  She had the

11   right to say anything she wanted.  I think if she had

12   said anything that was the least bit convincing, I

13   would have changed my opinion on that.

14       Q.    I understand that.  What I am trying to nail

15   down is, as best I can, is when the final decision was

16   made.  Do you think it was before May 5th of 2003?

17       A.    I think it was before May 5th, yes.

18       Q.    That you had in your mind at least formally

19   made that decision I am not going to recommend that

20   her contract be renewed?

21       A.    I had to, yeah.  I was coming up against the

22   deadline of May 15th.  So that decision had to be made

23   prior to the 15th of May.

24       Q.    Well, but do you think it had to be made before

A263

Tony Marchio, Ed.D.

Page 143

1    Q.    Were you aware by this time that some of them

2    had gone to or were talking about going to the Office

3    of Civil Rights about these problems that they

4    perceived?

5    A.    I didn't know in advance of their going to OCR

6    that they would do that.  I mean, we found out when

7    the OCR complaints were filed.

8    Q.    And how did you -- how do you find out that an

9    OCR complaint is filed?

10   A.    You are notified by OCR.

11   Q.    Do you get something in writing?

12   A.    Yes.

13   Q.    So the first thing you know is you get a letter

14   one day that says somebody has filed a complaint,

15   here's what it's about?

16   A.    That's right.  And they have a list of

17   information, materials that they want to ask us to

18   submit.

19   Q.    Prior to receiving one of those kind of

20   letters, you don't get any advanced warning from

21   anyone that that's happening?

22   A.    No.

23   Q.    Unless one of the parents might have said, by

24   the way, I am going to the OCR, something like that?



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

v.

# Appoquinimink School District, et al.

## C.A. # 05-103 SLR

---

Transcript of:

**Mitchell, Donna L.**

**April 5, 2006**

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

D. L. Mitchell

Page 35

1  make that recommendation in May of 2003 concerning

2  Olga Yatzus?

3  A.      Yes.

4  Q.      And would it have been in that timeframe

5  that you may have had some discussion about her, Olga

6  Yatzus, making some complaints about retaliation or

7  anything along those lines?

8  A.      No.  The only conversation we had was about

9  her performance.

10  Q.      And "we" is?

11  A.      Dr. Marchio and I.

12  Q.      And would the conversation have been with

13  anyone else, the personnel people, assistant

14  superintendent, anybody else?

15  A.      Yes.  I had conversation with Zen Marusa and

16  most likely Dr. Proffitt, although I don't recall

17  exactly.

18  Q.      And you think that would have been in the

19  timeframe leading up to the decision not to recommend

20  or to recommend not to renew her contract?

21  A.      Yes.

22  Q.      So that would have been almost a year after

23  this August 2002?

24  A.      Yes.

D. L. Mitchell

Page 108

1    A.        No.  In my head, it is more nonperformance

2    of duties.  I mean, it is more result of performance.

3    I may have translated it to that, but I can't say.

4    Q.        And I think you may have mentioned earlier

5    that -- regardless of whether you mentioned it

6    earlier, did you have a discussion with Mr. Marchio or

7    anyone else about the recommendation that her contract

8    not be renewed?

9    A.        Yes.

10    Q.        And I guess you did mention that.  It would

11    have probably been in the May timeframe.  And that is

12    when it happens every year --

13    A.        Yes.

14    Q.        -- if people are not going to be renewed.

15              Do you believe anyone else -- and I think

16    maybe you mentioned that Mr. Marusa may have been in

17    on that kind of conversation also.  Is that right?

18    A.        I would have had a conversation with

19    Mr. Marusa in addition to Dr. Marchio.

20    Q.        Okay.  It may not have been all one group

21    meeting?

22    A.        Correct.

23    Q.        Could it have been all together, all three

24    of you together?

D. L. Mitchell

1    A.        Not likely.

2    Q.        Not likely.  And would Dr. Proffitt also

3    have been in on that --

4    A.        I can't say.

5    Q.        -- decision?

6              Do you remember talking to Dr. Proffitt

7    about the idea that Olga Yatzus's contract would not

8    be renewed?

9    A.        As is the practice with my direct

10   supervisor, I submit a monthly list of individuals, of

11   staff members who are not performing as one of the

12   categories.  I would have submitted that name, so in

13   that sense, yes, I would have had a conversation with

14   her.

15   Q.        So every month during the school year you

16   send -- okay.  You are shaking your head.

17   A.        I am sorry.  Every -- we start monthly about

18   March.

19   Q.        Okay.  So from March until June?

20   A.        May.

21   Q.        May you would have sent a list of people

22   that you thought weren't performing to --

23   A.        I would not have sent a list.  I would have

24   given her a verbal list.  We have a conversation about

D. L. Mitchell

Page 114

1   those two people being brought to your attention?  Not

2   people.  Those two agencies being brought to your

3   attention.

4   A.        Not to my knowledge.  I am not recalling.

5   Q.        Let me show you a letter from Mr. Marusa

6   which has been marked previously P-221.

7                    (Mitchell Deposition Exhibit No. 31

8   was marked for identification.)

9   BY MR. BARTOSHESKY:

10  Q.        This is dated May 5, 2003.  It says, "Dear

11  Yatzus:  This letter is your notice that your contract

12  for the school year of 2002/2003 will not be renewed

13  due to the number and nature of letters in your

14  personnel file.

15          "I will be recommending to the Board of

16  Education at their May meeting that your contract be

17  terminated as of June 18, 2003."

18          Do you think you have ever seen this letter

19  from Mr. Marusa before today?

20  A.        I would have to say no.

21  Q.        Was the decision or you talked earlier about

22  some conversations you may have had with Mr. Marusa

23  and/or Mr. Marchio about whether or not Olga's

24  contract would be renewed.  Do you think those things

D. L. Mitchell

Page 115

1    took place before May 5, 2003?

2    A.        Oh, yes.

3    Q.        Well, when typically does the decision about

4    someone or the decision to recommend an employee's

5    contract not be renewed take place?  Is it typically

6    before May?

7    A.        Yes.

8    Q.        And why is that?

9    A.        The association contract gives a time line

10   as to when notification should occur.

11   Q.        Notification to the employee?

12   A.        Yes.

13   Q.        And that, I take it, is sometime in May it

14   should occur.

15   A.        Yes.

16   Q.        So that conversations or the decision would

17   have to be made before that time?

18   A.        Correct.

19   Q.        Other than this particular letter from

20   Mr. Marusa, do you recall any other letters either

21   from Mr. Marchio or anyone else that were sent to Olga

22   Yatzus indicating that there was going to be a

23   recommendation that her contract not be renewed?

24   A.        I don't recall.

D. L. Mitchell

Page 116

1   Q.        Was there ever any -- did you ever give Olga

2   personally any letter or other memorandum or any kind

3   of document that was some kind of notice to her or

4   indication to her that there would be a recommendation

5   that her contract would be terminated or not renewed?

6   A.        I don't know.  I don't believe I did.

7   Q.        Now, here is another letter to Mrs. Yatzus.

8   This one is from Dr. Marchio, with a copy to you.

9                   (Mitchell Deposition Exhibit No. 32

10  was marked for identification.)

11  BY MR. BARTOSHESKY:

12  Q.        Do you recall this letter?

13  A.        Yes.

14  Q.        Now, this says essentially that Olga Yatzus

15  is going to be placed on a special assignment for the

16  rest of the school year and her office is moved.  Do

17  you know why that was done?

18  A.        Nonperformance of her job and we couldn't

19  get the evaluations and assessments done with her at

20  the high school, so she was moved to district office.

21  Q.        And by this time, at least according to the

22  letter that we just looked at from Mr. Marusa, the

23  decision had already been made not to renew her

24  contract -- isn't that right? -- or recommend not to



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

v.

# Appoquinimink School District, et al.

## C.A. # 05-103 SLR

Transcript of:

## Mieczkowski, Mary Ann

## April 12, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Mary Ann Mieczkowski

1    compliance monitoring sheet was is there a

2    psychoevaluation -- psychoeducational evaluation

3    report in the child's folder?  At that time, I had a

4    discussion with Martha Toomey, who is now the state

5    director of special education, and she said because it

6    is something that the state requires through their

7    compliance monitoring that even if the federal law was

8    not crystal clear there was a report to be supplied

9    that through the State of Delaware compliance

10   monitoring and through the district that it is good

11   practice to make sure that that report is in the file.

12   So -- I'm sorry.

13       Q.   You are still answering.  That's fine.

14       A.   So as a point of clarification, I issued a memo

15   to the school psychologists, to the EDs and to all my

16   related therapists within the district, the speech

17   therapist, occupational and physical therapist, of how

18   we would like those reports to be disseminated and the

19   time-line of those reports.

20       Q.   What was that time-line?

21       A.   For those reports, that it had to be completed

22   before the meeting and that it was the responsibility

23   of the psychologist or the specialist to have that

24   report copied and a copy given to the educational

Mary Ann Mieczkowski

Page 30

1   diagnostician for the official records before they

2   walked in the door of the IEP meeting and that the

3   school psychologist and the specialist would have the

4   responsibility of providing the parent a copy of the

5   report at the meeting.

6       Q.   Now, would this report -- is that the report --

7   when you say the meeting, is that the meeting that

8   happens every three years to determine whether -- for

9   reevaluation or is it --

10      A.   It's an initial meeting or a reevaluation,

11  whether it be for special education services or

12  whether it be for related services because the related

13  service reports may not be -- may not coincide with

14  the special education reevaluation process.

15      Q.   Are you saying that the federal law doesn't

16  really require that kind of report before a meeting?

17  It must require some report or some writing at some

18  point, doesn't it?

19      A.   I would have to go back and look specifically.

20  I am sure it could say provide the parent and the IEP

21  team with this information.  But through the

22  Department of Education, Delaware Department of

23  Education, and through Appoquinimink School District,

24  we're requiring that it be in a report form because

Mary Ann Mieczkowski

Page 48

1    meeting you had with Olga Yatzus on October 3, was

2    there a subsequent meeting with Olga Yatzus and

3    somebody from the association or the, I'll call it the

4    union concerning these three reprimands issued to Olga

5    Yatzus?  Do you remember that?

6       A.   Yes.  I believe it was in November.

7              MR. BARTOSHESKY:  Let me show you a letter

8    from you, dated November 17, to Olga Yatzus, which has

9    been previously identified P-235.  I ask that it be

10   marked Exhibit 4.

11             (Mieczkowski Deposition Exhibit No. 4 was

12   marked for identification.)

13   BY MR. BARTOSHESKY:

14      Q.   In the last paragraph this refers to a meeting

15   that was held on November 6th.  Is that the meeting

16   you are talking about?

17      A.   Yes.

18      Q.   Why did that meeting take place, do you

19   remember?

20      A.   I believe that Olga grieved, went through the

21   grieving process, grievance process for the three

22   letters.

23      Q.   What happened as a result of that meeting on

24   November 6th?  Was one of the things that happened,

Mary Ann Mieczkowski

1    you issued another letter to her?

2    A.    It was decided at that meeting that the three

3    letters would be combined into one.  And I was chosen

4    as the person at the table to write the letter.

5    Q.    And when it's combined into one, does that mean

6    that the other three should have been sort of removed

7    from her folder or something like that?

8    A.    I believe, yes.

9    Q.    Do you know if that was ever done?

10   A.    I do not know.  I don't.

11   Q.    Whose responsibility would it have been to

12   remove them or do something with them so that they

13   aren't held against her as three different reprimands?

14   A.    The director of human resources, who was Zen

15   Marusa at the time.

16   Q.    Now, it says in this last paragraph that "the

17   report from the psychologist shall be provided to the

18   administration and educational diagnostician at least

19   48 hours prior to a scheduled meeting."  Why was that

20   requirement imposed?

21   A.    That requirement was imposed by Donna Mitchell.

22   A school principal can make the rules tighter within

23   their school building as then district-wide, just as

24   the district can impose rules that are tighter than

Mary Ann Mieczkowski

Page 50

1   the state and the state in turn can do the same with

2   federal regulations.  We cannot -- our rules can be

3   tighter, but they cannot supersede or -- not

4   supersede.  They cannot be considered less than the

5   federal law.

6      Q.    And so this was a requirement imposed by Donna

7   Mitchell upon Olga Yatzus that was different than that

8   imposed on any other school psychologist.  Is that

9   right?

10     A.    I can tell you in another school building that

11  a school principal requires hers 24 hours on her desk

12  prior to the meeting.

13     Q.    That was in -- back in 2002, that requirement

14  that you are talking about now?

15     A.    I don't remember when it was imposed.  I

16  believe so.

17     Q.    Who was that principal?

18     A.    Lorraine Lybarger.

19     Q.    What school is that?

20     A.    Olive B. Loss.

21     Q.    If you need to take that call.

22     A.    No.  I'll turn it off.  I thought it was off.

23     Q.    Now, at that meeting on November 6th, do you

24  remember what else was discussed other than the idea



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Yatzus

### v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

---

### Transcript of:

### Bryer, M.D., Joseph B.

### May 2, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Joseph B. Bryer, M.D.

1    BY MS. MARTINELLI:

2       Q.   I am showing you what's been marked as Exhibit

3    2.  And it's noted at the top, described as a progress

4    note.  It's also been Bates labeled in the lower

5    right-hand corner as D-27883.  And this appears to be

6    a progress note from you, dated 3/5/02, regarding

7    Ms. Yatzus.  Is that correct?

8       A.   Yes, it is.

9       Q.   And there is a note at the bottom.  It appears

10   to be dated 4/4/02.

11      A.   Yes.

12      Q.   That I believe says, the second line, "mood and

13   anxiety good, but ongoing" --

14      A.   "Complaints of difficulty focusing."

15      Q.   -- "but ongoing complaints of difficulty

16   focusing.  Took Adderall in the past -- is that "with

17   some benefit," I guess, "but wants to try again."

18      A.   Mm-hmm.

19      Q.   This sounds like it was her suggestion that she

20   try Adderall.  Is that correct?

21      A.   She and I talked, when we first met, about the

22   uncertainty about whether her attentional difficulties

23   were related to depression or were independent.  I

24   documented there that her mood and sleep and anxiety

Joseph B. Bryer, M.D.

Page 15

1   were all improved, but she continued to have

2   difficulty with concentration.  It was based on that

3   that I felt it was reasonable to try a stimulant.  And

4   there are fundamental differences among the different

5   stimulants.

6               (Discussion off the record.)

7       A.   There are fundamental differences among the

8   stimulants, and so I would have no strong basis to

9   choose one over the other.  If a patient in that

10  situation has a preference, I will often go with that

11  preference.

12      Q.   So did the idea of taking a stimulant come from

13  you initially or her?

14      A.   Well, it came from me because we mentioned the

15  possibility that she had attention deficit disorder

16  from the very beginning, and so we -- I don't know

17  that I mentioned "stimulant" in my assessment, but the

18  idea came from me.  And it was based on her report of

19  her symptoms that I decided to proceed with a

20  stimulant.  As I said, when we talked about that, she

21  inquired as to whether Adderall could be chosen.

22               MS. MARTINELLI:  Okay.  We can go ahead and

23  break and let her come in.

24               THE WITNESS:  Okay.

Joseph B. Bryer, M.D.

Page 16

1          (Brief recess taken.)

2    BY MS. MARTINELLI:

3      Q.   So we were talking about your recommendation to

4    try Adderall in your progress notes.   Is Adderall

5    habit-forming?

6      A.   Yes.   All of the true stimulants have the

7    potential to be habit-forming.

8      Q.   Is it a controlled substance?

9      A.   Yes, it is.

10              MS. MARTINELLI:   3.

11              (Bryer Deposition Exhibit No. 3 was marked

12   for identification.)

13   BY MS. MARTINELLI:

14     Q.   Dr. Bryer, I am showing you what's been marked

15   as Exhibit 3 and also, in the bottom right-hand

16   corner, it's identified as D-27884 and appears to be

17   progress notes by you on Olga Yatzus, dated 4/23/02.

18     A.   Yes.

19     Q.   And under "Impression/Plan" it says, "Probable

20   ADD."   Can you identify what it says after that?

21     A.   "May increase Adderall to 30 milligrams QAM,

22   but switch to plain Adderall due to insomnia."

23     Q.   This appears to be from your records that I

24   have the first time that ADD is mentioned as the

Joseph B. Bryer, M.D.

Page 17

1    probable impression or diagnosis, I guess.

2    A.    Mm-hmm.

3    Q.    What was the basis of that determination at

4    that time?

5    A.    Well, as I stated earlier, when her mood

6    symptoms improved, but her attentional difficulties

7    did not, that suggests -- that's consistent with a

8    diagnosis of attention deficit disorder, and so I was

9    highly suspicious of it at that point.

10            And one other piece of confirmatory

11    information that came as a result of that April 23rd

12    visit was the fact there had been some improvement in

13    concentration and distractibility, but that it was

14    inconsistent.  And so, oftentimes, people with ADD

15    will respond fairly dramatically to relatively small

16    doses of a stimulant.  And so it was -- it suggested

17    that there was a partial response.  So that also was

18    consistent with the fact that she probably had ADD.

19    Q.    Do persons without ADHD respond positively to

20    Adderall in concentration?

21    A.    People -- if people without ADD took Adderall

22    in sufficient doses, they would certainly see effects

23    on their mood, their energy, their sleep.  There would

24    be a euphoric effect.  There would be increased focus

A282

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,     )
                                  )
                 Plaintiff,   )
                                  )
           v.               )     C.A. No. 05-103-SLR
                                  )
APPOQUINIMINK SCHOOL DISTRICT  )
and TONY MARCHIO, individually and in )   **TRIAL BY JURY DEMANDED**
his official capacity, MARY ANN       )
MIECZKOWSKI, individually and in her  )
official capacity, DONNA MITCHELL,    )
individually and in her official capacity, and )
MARION PROFFITT, individually and in  )
her official capacity,               )
                                  )
               Defendants.  )

## CERTIFICATE OF SERVICE

I, Adria B. Martinelli, Esquire, hereby certify that on July 10, 2006, I

electronically filed a true and correct copy of the foregoing **Appendix to Defendants' Opening**

**Briefs in Support of Their Motions for Summary Judgment (REDACTED)** with the Clerk of

the Court using CM/ECF, which will send notification that such filing is available for viewing

and downloading to the following counsel of record:

        Philip B. Bartoshesky, Esquire (#2056)
        Biggs & Battaglia
        912 N. Orange Street
        P.O. Box 1489
        Wilmington, DE 19899

        YOUNG CONAWAY STARGATT & TAYLOR, LLP

        /s/ Adria B. Martinelli
        William W. Bowser, Esquire (Bar I.D. 2239)
        Adria B. Martinelli, Esquire (Bar I.D. 4056)
        The Brandywine Building
        1000 West Street
        Wilmington, Delaware 19801
        Telephone: (302) 571-6601, 6613
        Facsimile: (302) 576-3282, 3314
        Email: wbowser@ycst.com; amartinelli@ycst.com