IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,                       §
                                             §
        Plaintiff,                           §         Case No.: 05-103 SLR
                                             §
                                             §
                v.                           §
                                             §
APPOQUINIMINK SCHOOL DISTRICT                §
and TONY MARCHIO, individually               §
and in his official capacity, MARY ANN       §         **TRIAL BY JURY DEMANDED**
MIECZKOWSKI, individually and in her         §
official capacity, DONNA MITCHELL,           §
individually and in her official capacity,   §
and MARION PROFFITT, individually            §
and in her official capacity,                §
                                             §
        Defendants.                          §

APPENDIX PAGE B51 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

climate of the high school has become unbearable for so many of the students. They are being suspended and expelled without the right to due process. They are treated with the utmost disrespect and Mitch has been an integral part of that behavior towards our special needs students. Parents are routinely treated in the same manner.

Counseling and support services are minimally provided and children are hassled and forbidden to access services. Our guidance counselors are total overwhelmed and students are denied access to the Wellness Center. I have no place to meet with children and they are then given a hard time if they need to see me. The entire focus of the high school is to throw kids out of school for the least offense and these "at-risk" students are put out of school for weeks at a time. No support services or prevention or intervention services are put into place. They children they fall far behind that they feel hopeless and stop attending classes. They are then thrown out of school again for days and weeks at a time.

The parents believe there have not been any alternatives in getting the District to recognize their concerns. They believe that the District has been behaving as if there is a conspiracy that stems from the top since this behavior is also conducted by Kittie Rehrig in expulsion hearings and alternative placement meetings. I would be more than happy to have this discussion with you in more depth if you are truly interested in addressing these problems. I have been working in a completely hostile environment and have felt that you would not be receptive to my observations or my concerns.

I have already forwarded two very alarming incidents regarding Donna Mitchell's behavior and have not received any response from you.

B-52 307

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## Appendix Page B53 to Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment

## Redacted Page
## Confidential

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

children have been treated. I believe that many children get targeted by the administration, and then at the first opportunity, children are suspended and expelled with little evidence. Due process is by-passed repeatedly and parents are treated as if they are the enemy when they would like a chance to address their concerns. Often children are suspended and the parents never are notified. In reviewing their attendance records, often these suspensions are recorded as unexcused absences. Discipline records seem to be held in the strictest confidence. I have requested on numerous occasions for a weekly, or even daily report of all discipline referrals and their outcomes so that I can provide early intervention. I usually am not aware of suspensions unless the students or parents inform me.

Then special education office rarely gets notified of these situations and then we are unless to comply with timely meetings as required by law. This issue has been raised with the MHS office on a number of occasions. The discipline system at the high school is creating many more problems than it resolved. Our at-risk students are put out of school with such frequency, that they fall so far behind and then they see no point in trying. Once suspended there is no mechanism to help these children get back on track. They are thrown back in and have to sink or swim. Everything focuses on the punitive and there are little or no resources for support.

These children often have family issues, or have diagnosed emotional and neurological impairments that leave them vulnerable to school success in the first place. The high school is currently run like a police state with administrators waiting to catch children up and then they get suspended. These kids never know from one day to the next what the rules are and what they are going to be punished for. The hostility and negativity are beyond belief. We have five administrators and 3 guidance counselors. Children are being punished for going to the Wellness Center. I have had no office since Christmas to work with children privately. I often talk to children in the commons because there is no other place I can meet with them. They are public display. There are no support services for these students and frankly, I am overwhelmed. They are so depressed and desperate and I can't get to them on a consistent basis because I am spending most of my time focusing on behavioral manifestations and developing functional behavioral assessments.

The endless hours that we are spending on these issues and with angry and disgruntled parents is making it impossible for us to hold IEP meetings and attend to our other responsibilities in a timely fashion, if at all. Everything is in crisis mode all of the time. When I tried to talk to Donna about rethinking how we are disciplining our students, I have been yelled at and told that she doesn't want to talk to me about it. Attached you will find a 9th grade student's description of what happened to his education this year. His grandmother finally pulled him out of school and sent him to Germany to get away from what is happening here.

In regard to the special education office at the high school, things are out of control. As I stated earlier, we are so overwhelmed with crises in regard to the fallout from the discipline situation, that it is impossible for us to sit down and regroup to come up with proactive strategies to address the problems. Sharon started in January and was never transitioned by anyone who could helped on plant her feet on the ground. We had so many students that were in the process of meetings and follow up services. Most of these ended up falling through the cracks. Last year there were so many internal problems that we addressed as a department. Those issues were never addressed and then Marilyn was assigned to the high school. She walked into a hornets nest. The files were not filed and were thrown about in the record room. There were sixty some items that were not brought to closure from the previous year. She also had approximately 200 students with schedules that did not reflect their IEP and she had to go through each IEP and schedule and then had to make recommendations to the counselors. Then she had to try to schedule and hold meetings on the students that were new to our school, etc. Phyllis never worked with special education files and needed training, which no had time to provide. Mitch treated Marilyn with such disdain, lack of respect and support that Marilyn left because she could not work under those

conditions.

When Sharon started,. she never had the opportunity to get a handle on the needs of the department, the procedures that were in place, etc. Since January, the majority of our time has been spent on dealing in a crisis mode with students and parents due to discipline. Mitch often comes into the office yelling, screaming and accusing anyone and every one of something that was not done correctly. Today she did not stop yelling and screaming for one and a half hours. This is unnecessary and does nothing but get everyone totally upset. It actually interferes in our ability to even think. I was trying to work on putting a list together for Mitch of students that need re-evaluations and initial evaluations and was not able to stop being badgered until almost 4:30. The morale of the entire special education staff is beyond repair. Mitch has never gotten any handle on what the needs or this department were and yet teachers and staff are blamed and scapegoated whenever Mitch or Donna feel that they are in the hot seat. People can only get beaten up on for so long before the give up.

Tony, I have been so upset with everything that I see going on and feel that there is no avenue to pursue to have anyone willing to listen and address these problems. I feel that I have been dealing with a totally hostile situation and have been disrespected by everyone I encounter from an administrative, standpoint. I believe that if we focus on the needs of the child, and try to support children to become the best that they can be, children will strive and thrive. Parents will be positive and supportive and they will work in cooperation with us. When children are being abused by an insane system that does nothing to promote success, but harshly and unjustly sets them up for failure and rejection, then we all have failed as a system. Most importantly, we have failed our youth. What is happening at Middletown High School is what happens, when we loose focus on our purpose to serve all children to the best of our abilities.  The focal point of MHS has been about total control and power and has had nothing to do with fairness and compassion. We have behaved in a socially irresponsible manner. Our 15 and 16 year olds are thrown out of school and are arrested for trivial offenses. We are creating a community of high school drop outs with police records that have little or nothing productive to do with their unsupervised days out of school. I desperately hope that this nightmare will cease spinning out of control and that someone will say, lets sit down and look at what we've down. Once we identify the problems, lets figure out how to solve it in a responsible and ethical manner and that we will never lose sight of why we were  hired in the first place.

B-55
P-364

**Donna Mitchell**

| | |
|---|---|
| **From:** | Olga22@aol.com |
| **Sent:** | Friday, April 04, 2003 12:16 AM |
| **To:** | donna.mitchell@appo.k12.de.us; Tony.Marchio@appo.k12.de.us; tlvadala@msn.com; vicky.boyd@dsea.org; chet.hadley@appo.k12.de.us; Mitch9440@aol.com; mary.keebler@appo.k12.de.us |

**Subject:** Jake

I THOUGHT THAT I SHOULD SHARE THE CHAIN OF EVENTS THAT TRANSPIRED.

B-56
P-445

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## Appendix Page B57 to Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment

## Redacted Page Confidential

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B58 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## REDACTED PAGE
## CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

teachers.....waiting until almost 4:00. The meeting should have started at 2:30. We finally had to call you since you were the only one who had information to share about the incident.

It is very interesting that you have the audacity to send me a letter of reprimand when you clearly have been in violation of federal law and were deliberately conspiring to get rid of this disabled student in the most unethical and immoral manner. I believe that this letter is retaliation because I did not allow this child to become a victim to your deliberate and calculating behavior.

B-59
P-448

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,                    §
                                          §
        Plaintiff,                        §        Case No.: 05-103 SLR
                                          §
             v.                           §
                                          §
APPOQUINIMINK SCHOOL DISTRICT             §
and TONY MARCHIO, individually            §        **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN    §
MIECZKOWSKI, individually and in her      §
official capacity, DONNA MITCHELL,        §
individually and in her official capacity,§
and MARION PROFFITT, individually         §
and in her official capacity,             §
                                          §
        Defendants.                       §


### APPENDIX PAGE B60 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

I am willing to try to resolve our differences so that we can work to serve the students in our District. I do not believe that this can occur without support from a third party. I would like to suggest that Vicky Boyd and Julie Bowers help to facilitate this meeting if you would be in agreement. Please let me know if you are willing and I will contact Vicky and Julie.

B-61
P-268

2/28/03

Jim,

I am seeking clarification on the discussion that we had a couple of weeks ago. You initially wrote me a letter of reprimand for having a student in my office. You then asked Donna Mitchell for clarification regarding her directive. She stated that students were allowed in the office, but they had to remain on Phyllis' side. I asked if this was a mandate just for me or if it applied to Sharon as well. You replied that it was true for both of us. Then you rescinded the reprimand.

Since that discussion, students have been spending time in the office working on their projects for black history month. I have no problem with Sharon having the students in the back of our office. I believe that MHS is a school for children and I believe that we should all welcome children into our rooms and offices. I am very confused with this directive since I see students in all other offices and rooms throughout the building. Can you please clarify this directive and provide me with the rationale?

Olga

B-62
P-269

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §      Case No.: 05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §
and in his official capacity, MARY ANN §      **TRIAL BY JURY DEMANDED**
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

## APPENDIX PAGE B63 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## REDACTED PAGE
## CONFIDENTIAL

### BIGGS AND BATTAGLIA

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

# Exhibit 8

B-63(a)

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B64 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Subj:    **Re: Thanks**
Date:    4/28/2003 9:45:30 PM Eastern Standard Time
From:    toothdr@verizon.net
To:    Olga22@aol.com
*Sent from the Internet (Details)*

Dear Olga,

I appreciate your taking the time to communicate at length with me in regards to behavior that has obviously upset your professional and moral conscience. You can be assured I will review what you have taken the time to forward to me. You have been kind to offer your gratitude ahead of any operational change. Though it saddens me there seems to be a history here—please keep in mind that I too am only one voice and one vote on that board. So you keep pounding them in the hallways—and I'll do what I can in the boardroom—and maybe the stereo will reach them!!! Keep up your good work—I know it's not all progress.

Sincerely,
Joanne C.

   —— Original Message ——
   **From:** Olga22@aol.com
   **To:** toothdr@bellatlantic.net
   **Sent:** Sunday, April 27, 2003 11:35 PM
   **Subject:** Thanks

   Joanne,

   I just need you to know how impressed I am with you true dedication to the District, the students and their families. You are truly the one who can make their visions, dreams and hopes for the future, a reality. I will be willing to help you in any way that I can. Again, this is not about me and my issues....although some may wish to make it as such. This is about what is in the best interest of the children in our district. I know you will have tremendous support for the families and I, too, will be willing to help in any way.

   Olga (999-8365)


P-308

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## Appendix Page B66 to Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment

## Redacted Page
## Confidential

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B67 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Subj:     **Fwd: response to question**
Date:     4/5/2003 1:14:58 PM Eastern Standard Time
From:     Olga22
To:       AM_Vicario@msn.com, bdazzleddesigns@hotmail.com, mbillington@dca.net, dlstidd@comcast.net, tlvadala@msn.com

THIS IS FROM MY FRIEND WHO WAS BULLIED INTO RETIRING.

Forwarded Message:
Subj:     **Re: response to question**
Date:     4/5/2003 1:09:43 PM Eastern Standard Time
From:     llpurrtycatz
To:       Olga22

Thank you. Let me know if you get any response from Tony.....or anyone else for that matter.

I got a reprimand from Donna in the mail yesterday. I am not sure what child she was referring to. She indicated that I had chaired a meeting on Dec. 13 when a child was identified. That child has since been caught with a 'controlled substance' and they had to determine that his behavior was a manifestation of his disability because I marked on the iep that he displayed behaviors that impeded his/or others' learning and that there were no provisions for behavioral goals, etc. So, I got another letter in my file. My first inclination was to respond, but after rereading the letter, it seemed like she was trying to blame me for not being able to get one of our kids out of her school.

Since you might have been involved, I would appreciate your input.

Is it your opinion that I should forward the letter to DSEA?

Even though they got rid of me, they are still going after my butt.

llcatz

B-68
P-356

—— Original Message ——
**From:** Olga22@aol.com
**Sent:** Tuesday, April 22, 2003 8:54 PM
**To:** AM_Vicario@msn.com
**Subject:** Re: PBS Practice Systems Change in Positive Behavior Support

ANG,

KITTIE IS STARTING TO "PREP" THE POWERS THAT BE WITH THIS PROGRAM. THE PROBLEM IS THAT IMPLEMENTING THIS IN A ZERO TOLERANCE CLIMATE IS LUDICROUS. I WOULD SUGGEST THAT YOU ASK TO BE A PARENT REPRESENTATIVE ON THE SCHOOL CLIMATE COMMITTEE.......THE OTHER PLAN WOULD BE TO PRESENT TO THE BOARD. WRITE LETTERS TO THE EDITOR......ETC.

MY OFFICE WAS MOVED TO 1032......MY DESK, FILES, BOOKSHELVES RUG...

SHE EVEN SET UP A TABLE WITH SOME CHAIRS, HAD MY PHONE SET UP, ALTHOUGH MY NUMBER NOW IS THE MAIN OFFICE 376-4141 X 1032, AND SHE SET UP MY COMPUTER AND PRINTER. SHE IS BEING WAY TOO NICE. LYNN KEBLER, AEA REP THINKS THAT THIS IS A TROJAN HORSE. WE'LL SEE. I DO LOVE MY NEW DIGS THOUGH..........................FINALLY, I HAVE BEEN WANTING MY OWN OFFICE FOR THE PAST TWO YEARS. HAS IT BEEN TOO MUCH TO ASK FOR?????

OLGA

---

Get more from the Web. FREE MSN Explorer download : http://explorer.msn.com

B-69
P-358

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,　　　　§
　　　　　　　　　　　　　　　　§
　　　　　Plaintiff,　　　　　　§　　　Case No.:　05-103 SLR
　　　　　　　　　　　　　　　　§
　　　　　　v.　　　　　　　　 §
　　　　　　　　　　　　　　　　§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §
and in his official capacity, MARY ANN §　　**TRIAL BY JURY DEMANDED**
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
　　　　　　　　　　　　　　　　§
　　　　　Defendants.　　　　　 §

APPENDIX PAGE B70 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
    Plaintiff, §          Case No.: 05-103 SLR
§
    v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §          **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN §
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
    Defendants. §

## APPENDIX PAGE B71 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Subj:     **Song & Dance Routine**
Date:     4/23/2003 9:05:51 AM Eastern Standard Time
From:     bdazzleddesigns@hotmail.com
To:       mbillington@dca.net, Olga22@aol.com, distidd@comcast.net, AM_Vicario@msn.com,
          Mqqnmaiden0720@aol.com
*Sent from the Internet (Details)*

Hi Mike,

I wrote the following Press Release and if your employer is not being very nice to you, we can release it to alternative media. Timing is everything. Your editors may be interested in the military angle too.

Tell me what you think.--Marie

For Immediate Release
Contact: Marie Wagenaar, 376-1509

Parent Group Blows the Whistle on Delaware School District

Parents allege discrimination of special ed, minority and low-income white students

Members of a parent watchdog group, Parents Advisory Council Team (P.A.C.T.) has reported the Appoquininink School District of Odessa, Delaware to the U.S. Department of Education Office of Civil Rights, alleging noncompliance with special education IEPs, racial discrimination, and misuse of zero tolerance to target and expel low-income white students and minority students that school administrators do not like.

The parents and children span racial, cultural, socioeconomic and political lines.

The parents claim the school district is abusing their power and authority and betraying the trust of parents and taxpayers. They allege the District is taking an active role in destroying the future of their children by harsh and discriminatory discipline practices. Some of the children were on the honor roll and participants in the JROTC program.

"These are good kids and they are trying to ruin them," says Marie Wagenaar, mother of one of the JROTC students who was expelled. "They are trying to close the door on a military career for some of these kids whose parents don't have the money to send them to college."

Nonetheless, high school and middle school students have been suspended and eventually expelled for minor and non-violent offenses. Disturbingly, school officials have the authority to turn over unsworn witness statements to the New Castle County police and Family Court for criminal prosecution. The parents say their children are never read their rights when arraigned and are further traumatized by being stripped of their coats and shoes and handcuffed to a wall, in an unheated, locked cell, at the New Castle County Police Station in Middletown.

They allege the school district is taking an active role in creating a community of high school dropouts, some as young as 14, with police records that are undeserved.

We have been told by Kittie Rehrig, Supervisor of Student Services, that as far as she was concerned, "expulsion is not good enough," say two of the mothers. "Is this what she means?"

The parents allege violations of the children's civil and Constitutional rights to due process and the right to a free public education specified in State law.

P.A.C.T.'s website is http://totallyunjust.hypermart.net

B-365

# # #

**Subj:** **Appoquinimink candidates**
**Date:** 4/25/2003 1:10:56 PM Eastern Standard Time
**From:** AM_Vicario@msn.com
**To:** Kristen.newell@doverpost.com, mtyrell@delawareonline.com, distidd@comcast.net, bdazzleddesigns@hotmail.com, Olga22@aol.com

*Sent from the Internet (Details)*

Kristen,

Hi, it was very nice meeting you last night. I wanted to drop you an em in response to the article in today's News Journal pertaining to the "quiz" of the candidates last evening. Also, I wondered if you had a contact number or place of employment for Mr. Dina? I would very much like to discuss some further issues with him.

In regards to Mr. Dina's response last night "what are we prepared to do?" in relation to Zero Tolerance, Discipline, and Positive Supports, I would like to propose that very question. Perhaps you would be interested in an angle of such. Not only what are the parents to do, but the school administrators, staff, board members, state officials, and so on. Let's take a look at the number (while remembering that all of the numbers are still not reported) and look at the rapid climb of suspensions and expulsions. Let's look at the push to promote the alternative education programs. Look at the failure to produce adequate statistics in relation to success of these programs. Clearly I believe we can conclude that the current system is NOT working!

Mr. Ammann, in my opinion gives a completely misguided response. "Police will use negative consequences for citizens endangering others, he said, and children need to be prepared to live according to that system." Absurd! Let me give you an example of an offense a student was arrested for and is currently facing charges for. A 9th grade student was drinking juice in the hallway (as many students do), because he did not immediately throw out the drink, and completed his drink, then threw it out, he was subsequently charged and arrested for defiant behavior. This child now faces a PERMENANT criminal record due to DRINKING JUICE IN THE HALLWAY! This I assure you is one of MANY stories of the same substance. When we continue to DUMP these children out of our schools, and continue to provide them with criminal records, what injustices are we putting not only on our kids, but society in whole. Let's throw them into the juvenile justice system, have them drop out of school, pursue a life of crime, and then what!!

These are VERY REAL issues that must be addressed! Like I stated, the problem is not going away, the system is not working. In the words of Mr. Dina, "WHAT ARE WE PREPARED TO DO??" There are many model programs out there throughout the nation being implemented that have PROVEN SUCCESS RECORDS. They prove statistically that through education and positive supports offered by all involved, parents, students, staff, administrations, policy makers, board members, etc., these programs work!! They show decline in suspensions, expulsions, and an increase in test scores, moral, and school support. They offer complete training for everyone involved. We truly need to begin to look at all students as individuals and be able to address needs individually. This CAN BE DONE! It also will prove that in doing so, the successful implementation of these programs will provide positive results for all who are involved.

Shouldn't we be treating our children as though they were worth our every effort to help succeed and to provide them with every opportunity to be educated to ensure successful futures. We know that education is the key to our future. The President of the United States has the "No Child Left Behind" Law. Why are we allowing our public schools and district to "wash their hands" of certain students. (Non-Violent Offenders I remind you.) How is that "NO CHILD LEFT BEHIND"? I am here to remind you - we have many children being VERY LEFT BEHIND! It's time to step up to the plate!!

B-3
P-369

Thank you and I look forward to your response.



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

_____

### Transcript of:

### Olga A. Yatzus

### March 30, 2006

_____

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-74

Olga A. Yatzus

Page 38

1  A.  Yes.
2  Q.  And then Mr. -- Dr. Lauer --
3  A.  Dr. Lauer contacted me.
4  Q.  Did you know Dr. Lauer prior to that?
5  A.  Marginally. I knew him from the Department of
6  Education. And he would come to the schools I worked
7  in sometimes to conduct audits of the special ed.
8  files. So I knew him from that as well as sitting on
9  a committee here or there or -- I think one time he
10 came and did a staff development program for one of
11 the schools I worked at as well.
12 Q.  So you had had limited contact with him on a
13 professional level?
14 A.  Yes.
15 Q.  And were you then -- after you submitted the
16 application, you said he contacted you. Did you have
17 an interview?
18 A.  Yes.
19 Q.  And who was that with?
20 A.  Vaughn Lauer.
21 Q.  Anyone else?
22 A.  No.
23     (Yatzus Deposition Exhibit No. 3 was marked
24 for identification.)

Page 39

1  BY MS. MARTINELLI:
2  Q.  Ms. Yatzus, I am handing you a document
3  identified now as Exhibit Yatzus 3. At the top it
4  says, "Appoquinimink School District, Odessa,
5  Delaware, Application For Employment." It's also
6  marked in the bottom right-hand corner as D-322. Have
7  you seen this document before?
8  A.  Yes.
9  Q.  Is this the application for the position that
10 you were describing?
11 A.  Yes.
12 Q.  Everything on this application is correct?
13 A.  Yes.
14 Q.  You can take a minute to review that if you'd
15 like. Well, it was correct at the time you submitted
16 it?
17 A.  Yes.
18 Q.  So you said you were offered the position by
19 Dr. Lauer. Is that correct?
20 A.  Yes.
21 Q.  At what salary, do you recall?
22 A.  No, I don't.
23 Q.  Was it just a base salary or was there anything
24 else that would constitute your compensation? Do you

Page 40

1  recall that?
2  A.  I had talked to Vaughn. Appoquinimink didn't
3  pay as well as vo-tech did. And so when I got hired,
4  Vaughn had promised me 20 additional days over the
5  summer that would be paid at a per diem rate that
6  would offset the difference in salary.
7  Q.  Do school psychologists normally work over the
8  summer?
9  A.  Many times they do, but it's not -- it's a
10 ten-month position. So it would be up to the school,
11 if they had a need or if they expected school
12 psychologists to work. Many times they do.
13 Q.  So if they do work over the summer, they're
14 compensated separately for that --
15 A.  Yes.
16 Q.  -- above and beyond the annual salary?
17 A.  Yes. But that would be true for teachers as
18 well. They're hired at a contracted base level and
19 then if they do additional work, then that would be
20 paid separately.
21 Q.  Okay. So you said Dr. Lauer, in order to
22 compensate -- correct me if I am -- I am not trying to
23 rephrase your testimony, but -- in order to compensate
24 you for a lower salary than you had been receiving,

Page 41

1  promised you 20 hours of work --
2  A.  20 days.
3  Q.  I'm sorry. -- 20 days of work --
4  A.  Yes.
5  Q.  -- over the summer at a per diem rate?
6  A.  Yes.
7  Q.  Is there a set rate per day or is it per hour?
8  A.  No. The per diem rate would be based on my
9  salary and --
10 Q.  It's a daily rate?
11 A.  Yes.
12 Q.  Okay. Did he tell you you wouldn't have to
13 work at all during those days?
14 A.  No.
15 Q.  Did he promise you that you wouldn't have to be
16 accountable for that time at all?
17 A.  No. He said that there would be 20 days of
18 work.
19 Q.  The position that was offered to you, school
20 psychologist, is that correct?
21 A.  Yes.
22 Q.  Were the duties described to you any
23 differently than the general duties were discussed of
24 a school psychologist?

ae31e66d-74ea-4d46-a838-d2a32d3734bf

Olga A. Yatzus

Page 50

1  because of -- and you have checked "race, sex,
2  disability" and then it appears to be "(ADD), DX,"
3  diagnosis; is that right?
4   A.  Yes.
5   Q.  And retaliation.  Is discrimination on the
6  basis of race part of your complaint?
7   A.  No, it is not.  I'm sorry.  The retaliation
8  is, but.
9   Q.  Retaliation based on your race?
10  A.  No.
11  Q.  Is discrimination based on a disability part of
12  your current complaint?
13  A.  I'm sorry.  Say that again.
14  Q.  Is discrimination based on -- discrimination or
15  retaliation based on your disability a part of your
16  current complaint?
17  A.  No.
18  Q.  You state also in this document, the last
19  handwritten sentence under the second block that says,
20  "At this time, I suspect my contract will not be
21  renewed."
22  A.  Yes.
23  Q.  Is that true at that time you suspected it
24  would not be renewed?

Page 51

1   A.  I suspected it much sooner than that.
2   Q.  Okay.  Why did you suspect -- let me ask.  Did
3  you think the decision had been made at that time?
4   A.  Yes.
5   Q.  Sometime prior to when you --
6   A.  Yes.
7   Q.  -- came in?
8       And why did you think that?
9   A.  Because I felt that there was a concerted
10  effort by the school administrators to find any reason
11  to place a letter of reprimand in my file.  And I saw
12  no other reason for them doing that other than to make
13  a case to terminate me.
14  Q.  So at the time you filled this out, you thought
15  the termination was -- your termination was a done
16  deal?
17  A.  Yes.
18  Q.  I believe you testified to this a little
19  earlier, but is there a time frame generally for
20  non-renewals of contracts for school district
21  employees that they have to get notice?
22  A.  May 15th.
23  Q.  May 15th the employee has to get notice that
24  their contract isn't going to be renewed?

Page 52

1   A.  Yes.
2   Q.  So when you say you thought the decision was
3  already made, did you know that that time-line was
4  coming up?
5   A.  Yes.
6   Q.  Do you recall if you sent this document
7  identified as Yatzus 4 to anyone in Appoquinimink
8  School District?
9   A.  Yes.  To Zen Marusa under the recommendation of
10  the person I talked to at the Department of Labor.
11  Q.  Is that an intake officer?
12  A.  Yes.
13  Q.  Was it he or she, do you recall?
14  A.  A he maybe.
15  Q.  Was it his -- whoever it was, was it his
16  recommendation?
17  A.  His recommendation was I should notify the
18  district as soon as possible.
19  Q.  He initiated that discussion?
20  A.  Yes.
21  Q.  Did he say why he thought you should notify
22  them as soon as possible?
23  A.  He told me that they should be made aware
24  because they shouldn't -- I think ... I'm trying to

Page 53

1  recall that conversation exactly.  But he felt that
2  they should be aware that I made this complaint.
3   Q.  Did you understand at the time that there would
4  be a formal charge drafted that would go to the
5  district?
6   A.  Yes.  They said that that would be coming, but
7  he wanted me to let them know as soon as possible
8  because I let him know there was the May 15th date
9  that they would notify me.
10  Q.  Did you think that if they received this before
11  the May 15th date, it might change the decision?
12  A.  I hadn't thought of that when I had gone.  I
13  just wanted to get the complaint filed.  But his
14  communication to me said that it could possibly.
15  Q.  So he recommended get -- did you e-mail it to
16  Mr. Marusa, by the way?
17  A.  I e-mailed Mr. Marusa that I filed a complaint.
18  And I sent a copy of this through the courier to him,
19  and then he --
20  Q.  Hand-delivered?
21  A.  It was through courier in district mail.
22  Q.  Interoffice mail?
23  A.  Yeah.
24  Q.  Okay.

B-75(a)

ae31e66d-74ea-4d46-a838-d2a32d3734bf

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §      Case No.: 05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §      **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN §
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

## APPENDIX PAGE B76 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## Appendix Page B77 to Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment

## Redacted Page
## Confidential

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,            §
                                 §
        Plaintiff,               §        Case No.: 05-103 SLR
                                 §
            v.                   §
                                 §
APPOQUINIMINK SCHOOL DISTRICT    §
and TONY MARCHIO, individually   §        **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN   §
MIECZKOWSKI, individually and in her     §
official capacity, DONNA MITCHELL,       §
individually and in her official capacity, §
and MARION PROFFITT, individually        §
and in her official capacity,            §
                                 §
        Defendants.              §

APPENDIX PAGE B78 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B79 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Olga A. Yatzus

Page 94

1 the road. So I asked to go to that one.
2 Q. Did you explain that to Dr. Marchio?
3 A. Yes, I did. After I explained that, he allowed
4 me to go to that one.
5 Q. He allowed to you attend the one you wanted to
6 go to?
7 A. Yes.
8 Q. And the other one you said you did attend also?
9 A. Yes.
10 Q. So as a result of the -- the original question
11 was at what point you believed you were being
12 retaliated against for your sexual harassment
13 allegations. And you stated that before the summer --
14 issue with the summer hours there was this issue with
15 the conferences. Is that the first time -- was that
16 the beginning --
17 A. That was the first time I felt that -- it was
18 the tone of voice, it was the attitude and the comment
19 that I was trying to take advantage, that I felt
20 uncomfortable because nobody else was -- would have
21 been receiving that kind of comment that, oh, I just
22 think that you're trying to take advantage.
23 Q. And you thought that other employees were being
24 treated more favorably?

Page 95

1 A. Yes. I just -- I didn't hear him talk to
2 anyone else that way. Let's put it that way. I don't
3 know how other employees were being treated or not.
4 Q. Now, at some point there was an issue about
5 your hours over the summer between you and
6 Dr. Marchio. Is that correct?
7 A. Yes.
8 Q. Can you describe what that problem was?
9 A. When Vaughn hired the special ed. coordinators
10 and when he hired me, we were given a guarantee of 20
11 days of summer work. The program coordinators
12 automatically were going to put that team in without
13 any questions asked, and Tony told me that there was
14 no -- that he wasn't aware that that promise was made,
15 but that he made reference to the fact that he thought
16 I deliberately didn't do -- get some work done because
17 I expected to do it over the summer or something to
18 that effect -- or that I -- that I wanted an excuse or
19 a reason to work over the summer. And that couldn't
20 have been further from the truth.
21 Q. At some point, did Dr. Marchio have a meeting
22 with all the psychologists and request their summer
23 schedules?
24 A. Yes. We were told to make sure the secretary

Page 96

1 knew what days we were going to be coming in, and so
2 that he wanted all of us to give him that information.
3 Q. The secretary being the special ed. secretary?
4 A. Yes.
5 Q. Is that -- who was that at the time, do you
6 recall?
7 A. Chrissie O'Grady.
8 Q. Your recollection of the meeting was
9 Dr. Marchio just asked you to tell Chrissie O'Grady --
10 A. To turn in our schedules or what days we would
11 be working.
12 Q. What days you were working?
13 A. Yes.
14 Q. No additional information you thought was
15 required?
16 A. I didn't think there was any at that point. I
17 recall Chrissie coming to my desk. I was letting her
18 know what days I would be coming in.
19 Q. You said you recalled going to Chrissie O'Grady
20 and letting her know what days?
21 A. Chrissie and I sat down with her appointment
22 book, and I told her what days I would be coming in.
23 Q. Was that shortly after the initial meeting with
24 Dr. Marchio?

Page 97

1 A. Yes.
2 Q. You told her the days for the whole summer?
3 A. I told her as many days as I thought of at that
4 point that I would be in. I was planning to get
5 everything done within that time frame.
6 Q. And she recorded it on her calendar?
7 A. That's what I saw her do.
8 (Yatzus Deposition Exhibit No. 13 was
9 marked for identification.)
10 BY MS. MARTINELLI:
11 Q. Ms. Yatzus, I am showing you a document that's
12 been marked as Exhibit 13. In the lower right-hand
13 corner, it's identified as D-75. It's dated July 3rd,
14 2002. It appears to be a letter from Tony Marchio to
15 you. Have you seen this letter before?
16 A. Yes.
17 Q. Did you see it at the time?
18 A. Yes.
19 Q. Go ahead and take a minute to review it if you
20 need to.
21 This letter says -- Dr. Marchio's statement
22 is: "I asked that you indicate on these schedules the
23 number of days you proposed to work, the number of
24 students that you would be evaluating, and the date of

25 (Pages 94 to 97)

Olga A. Yatzus

Page 98

1  the submission for the evaluation." Is that -- was
2  that your understanding of his request?
3  A.  No, not prior to that.
4  Q.  So prior to this you had given a verbal
5  statement to Chrissie O'Grady?
6  A.  Chrissie.
7  Q.  About --
8  A.  Yes.
9  Q.  -- what days you would be in for maybe not the
10  whole summer, but part of the summer?
11  A.  Yes.
12  Q.  And you thought that that satisfied
13  Dr. Marchio's request?
14  A.  Prior to that, I had.  So then after this, I
15  gave him a list of what I had already completed and
16  what other students still needed evaluations.
17  Q.  Okay.  Did you give anything in writing to
18  Chrissie O'Grady before Dr. Marchio --
19  A.  I don't recall giving her anything in writing
20  specifically.
21        (Yatzus Deposition Exhibit No. 14 was
22  marked for identification.)
23  BY MS. MARTINELLI:
24  Q.  Ms. Yatzus, I am showing you a document

Page 99

1  identified as Exhibit 14.  It's identified in the
2  lower right-hand corner as D-79.  Have you seen this
3  document before?
4  A.  I think it was -- recently I think I saw it.
5  Q.  Only in connection with this litigation?
6  A.  Yes.
7  Q.  Is this your handwriting?
8  A.  No, it doesn't look like my handwriting.
9  Q.  Is it Chrissie O'Grady's handwriting?
10  A.  Possibly.
11  Q.  The copy is bad, but it appears to say "Olga"
12  at the top and "until July 18th," I think is what it
13  says.  Does this look like this might have been the
14  schedule that you gave her verbally?
15  A.  Possibly.  I don't recall seeing this, so I
16  can't really make any comment about that.
17  Q.  You testified that after Dr. Marchio's written
18  correspondence of July 3 that you provided a list of
19  students that needed to be tested?
20  A.  Yes.
21  Q.  Do you recall, did you give specific dates that
22  you were going to be in and what you were going to be
23  doing in that list?
24  A.  Not specific dates in advance because a lot of

Page 100

1  times if a student didn't show up or like sometimes
2  the parents would cancel, or weren't sure of what days
3  they might be available.  It was -- and sometimes I
4  didn't know how long I would need to work with a
5  particular child, depending on what their needs were,
6  so I would schedule the students as I would complete
7  one evaluation and try to plug in where I could.  So
8  it was difficult to project that ahead of time,
9  depending on the needs of the students and the
10  families.
11        (Yatzus Deposition Exhibit No. 15 was
12  marked for identification.)
13  BY MS. MARTINELLI:
14  Q.  I am showing you a document that's been marked
15  as Exhibit 15.  In the bottom right-hand corner, it
16  says, P-199. "To: Tony Marchio. From: Olga Yatzus.
17  Re: Summer Professional Responsibilities. Date:
18  July 9, 2002." Is this the list you were describing?
19  A.  Yes.
20  Q.  It says, "Thus far, I have completed the
21  following duties:" And "to be completed within the
22  remaining summer hours:" And your testimony is you
23  were unable to give specific dates?
24  A.  For the summer, I mean, you know, in terms of

Page 101

1  as I would complete some evaluations, there were some
2  parents that would cancel, so I would have to
3  reschedule. Other times, I wasn't sure how long an
4  evaluation would take on a particular child.  So some
5  days you could get two kids done in a day. Sometimes
6  it would take a whole day to get that particular child
7  done.  So I would try to see where I was on that list
8  and then schedule a week or two in advance to get the
9  kids in.
10  Q.  So you are saying you were unable to provide a
11  list of dates?
12  A.  Exact date of who was coming and when for the
13  duration of that time because that was --
14  Q.  Could you provide dates that you were going to
15  be working over the summer?
16  A.  Yes.
17  Q.  Did you do that?
18  A.  I had given the information to Chrissie in
19  terms of what days I would be available to come into
20  work.
21  Q.  You had given the verbal information to
22  Chrissie?
23  A.  Yes.
24  Q.  You thought that complied with Dr. Marchio's

B-81

26 (Pages 98 to 101)

Olga A. Yatzus

Page 102

1   written requests?
2     A.  I -- after he sent the one thing that he wanted
3   to know who and what I was going to be doing, I gave
4   him this, and asked him if he needed anything more, to
5   let me know.
6     Q.  Your testimony is that prior to Dr. Marchio's
7   follow-up letter of July 3rd, 2002, you thought you
8   had complied with his request by your verbal --
9     A.  By letting --
10    Q.  -- discussion with Chrissie?
11    A.  -- Chrissie know what days I would be there.
12         MS. MARTINELLI:  Let me know when you want
13  to take a lunch break.  I can do it now.
14         MR. BARTOSHESKY:  You want to do it now?
15         MS. MARTINELLI:  That's fine.  Yeah.
16         (Luncheon recess taken at 12:10 p.m. and
17  reconvened at 12:58 p.m.)
18         (Yatzus Deposition Exhibit No. 16 was
19  marked for identification.)
20  BY MS. MARTINELLI:
21    Q.  Ms. Yatzus, you have been handed a document
22  identified as Exhibit 16, and in the lower right-hand
23  corner, it's identified as P-227.  It's dated
24  August 29th, 2002.  And it appears to be a letter from

Page 103

1   Tony Marchio to you.  Have you seen this document
2   before?
3     A.  Yes, I have.
4     Q.  Is this the official reprimand concerning the
5   summer hour issue we were discussing before the break?
6     A.  Yes.
7     Q.  You received a copy of this memo sometime
8   around August 29th?
9     A.  It was over Labor Day weekend.
10    Q.  In the second paragraph of this letter it says,
11  "On July 3, 2002, I requested from you, in writing, a
12  copy of your summer schedule.  I believe we've already
13  reviewed that document.  I also mentioned there is an
14  irregularity in one of your work days and asked you to
15  stop by my office at your earliest convenience to
16  discuss this issue.  A meeting was scheduled for July
17  9th."
18    Q.  What was discussed at that meeting?  Do you
19  recall a meeting on July 9th?
20    A.  I recall a meeting, but I don't recall the
21  contents that were discussed.  There were several
22  meetings, so I can't recall specifically.
23    Q.  Okay.  Dr. Marchio says in his letter, "At this
24  meeting you submitted a list of duties that you

Page 104

1   completed to date and a list of student testing yet to
2   be completed."  He says he explained while this
3   information was useful it was not the information he
4   had requested.  Do you recollect that conversation?
5     A.  Not in that regard, no.
6     Q.  What do you recall?
7     A.  Just talking about what I had submitted.  But I
8   don't recall the last part of that.
9     Q.  Which part is that?
10    A.  That, again, I asked to resubmit -- I told him
11  that I had given my days to Chrissie and I had given
12  that and I wasn't sure what else he wanted.
13    Q.  At the conclusion of that discussion, what was
14  your understanding?  Did you think that you owed him
15  anything else?
16    A.  I didn't at that point.  I thought I had
17  already -- you know, we had discussed it and I didn't
18  think that he needed anything more in writing at that
19  point.
20    Q.  This letter also says that Dr. Marchio -- this
21  is in the third paragraph -- sent you an e-mail on
22  August 5, 2002 requesting you to submit your summer
23  work schedule.  Do you recall receiving an e-mail to
24  that effect?

Page 105

1     A.  I don't recall specifically on that one.
2         (Yatzus Deposition Exhibit No. 17 was
3   marked for identification.)
4   BY MS. MARTINELLI:
5     Q.  Ms. Yatzus, this is a document identified as
6   Exhibit 17.  At the bottom right-hand corner it says.
7   D-76.  At the top, it says, "Tony Marchio."  To,
8   appears to you, to your e-mail address, copied to
9   Kitty Rehrig regarding the summer schedule.  Does this
10  refresh your recollection.  Did you see this e-mail
11  around --
12    A.  Yeah.  At this point in time, I had been in
13  contact with Vicky Boyd, and at that point Vicky was,
14  I think handling any further communication because I
15  felt that things weren't moving in a positive
16  direction in terms of our communication.  I just felt
17  like I really needed Vicky to step in.  At that point,
18  I had been concerned that there was a time sheet that
19  had disappeared, according to the payroll office.
20  They said they never received it when I was inquiring
21  as to why other people had gotten paid and I hadn't.
22  And I was really concerned with what was happening.
23  And I just felt that I needed someone else to step in
24  and help with the communication process at that point.

Olga A. Yatzus

Page 106

1   Q.  So you didn't communicate any further directly
2   with Dr. Lauer on the summer schedule issue after
3   this?
4   A.  Dr. Lauer.
5   Q.  I apologize.  Dr. Marchio.
6   A.  Right.
7   Q.  And that was because you had gotten --
8   A.  Vicky --
9   Q.  -- Boyd involved?
10  A.  Yes.
11  Q.  Vicky Boyd was who?
12  A.  The Uniserve rep for the DSEA.
13  Q.  Vicky Boyd, you said, was the Uniserve rep for
14  DSEA?
15  A.  Mm-hmm.
16  Q.  Did she act as your advocate in that regard?
17  A.  She was -- I was asking her to help with the
18  communication.  Whether she was an advocate or not, I
19  was relying on her professional expertise.
20  Q.  Did she represent you at any grievance
21  hearings?
22  A.  She would -- yes.  She would be the one that
23  would come along with Lynn Kebler at times.
24  Q.  Did you consider Ms. Boyd to be a fair and

Page 107

1   objective representative?
2   A.  Not necessarily.  I always felt that the union
3   was in that conflict situation sometimes because a big
4   part of their job was to negotiate contracts and look
5   at the big picture.  And I felt that they had to walk
6   a fine line of supporting the district and doing what
7   they needed to support its members.  So I felt that at
8   times they were walking a tightrope.
9   Q.  Did you feel that at the time, or did you --
10  A.  I did question that at the time.
11      MR. BARTOSHESKY:  You have to wait for her
12  to finish her question.
13  A.  I'm sorry.
14  Q.  You did feel that at the time was your
15  response?
16  A.  I had some feelings in that regard.
17  Q.  You had quite a bit of correspondence with her
18  is that correct --
19  A.  Yes.
20  Q.  -- regarding your concerns?  And you confided a
21  lot of information in her, with her?
22  A.  Yes.
23  Q.  Despite the fact that you had concerns about
24  her objectivity?

Page 108

1   A.  I felt that the more information she had, the
2   better she would be able to help me with that.
3   Frankly, there was no other resource that I felt that
4   I could get opinions and get -- check things out.
5   There really wasn't another source for that.
6   Q.  I want to refer back to Dr. Marchio's reprimand
7   letter, dated August 29th, Exhibit 16.  Do you contend
8   that anything is false in this letter?
9   A.  Let me re-read it.
10  Q.  Okay.
11  A.  Well, there are some things I can't account --
12  I mean, I wouldn't know whether they were false or not
13  in terms of what Judy and Chet did in response.  I
14  don't have any way of knowing that.
15  Q.  Is there anything you know is -- I'm sorry.
16  Continue.
17  A.  I didn't deliberately ignore his request the
18  second time.  I thought I had given him what he
19  wanted.  On August 5th, I didn't deliberately not
20  respond or chose to ignore.  At that point, I had
21  asked Vicky to communicate on my behalf.  As far as
22  what he requires from other people, I can't attest to
23  that because I don't have any knowledge of that.
24  Q.  Did you ever provide any additional information

Page 109

1   to Dr. Marchio regarding your summer hours?
2   A.  At that point, I sat down with or I had been in
3   communication with Vicky to clarify what else he was
4   asking of me.  And she was in communication with him.
5   I wasn't privy to all of what she communicated with
6   him.  Just what she told me in whatever correspondence
7   I had with her.  And --
8   Q.  Did you ever -- go ahead.
9   A.  And at that point -- I was away for part of
10  that time as well.  I am trying to recall time-lines.
11  Vicky was to get back to me about -- and I am just
12  guessing in terms of what happened when.  But she was
13  supposed to get back to me after talking with Tony.
14  And I at that -- somewhere around that ballpark time,
15  I had communicated with Terri Cheek.  And it was
16  shortly after my communication with Terri that I got
17  this letter, and we ended up sitting down and having a
18  meeting with Vicky and Tony after that.
19  Q.  Did you ever provide any additional information
20  on your summer schedule to Vicky Boyd?
21  A.  I am not recalling specifically what I may have
22  given her.  I may have, but I am not sure specifically
23  what I gave her at that time or not.
24  Q.  Do you recall if you gave her anything in

B-83

ae31e66d-74ea-4d46-a838-d2a32d3734bf

Olga A. Yatzus

Page 110

1   writing?
2     A.  I can't recall.
3     Q.  At any point, did you receive a written
4   reprimand for being absent from work without proper
5   notification?
6     A.  Yes.  I recall seeing a reprimand to that
7   effect.
8          (Yatzus Deposition Exhibit No. 18 was
9   marked for identification.)
10  BY MS. MARTINELLI:
11    Q.  I am showing you what's been marked as Exhibit
12  18.  In the lower right-hand corner, it's identified
13  as D-7.  It's a document, dated April 2nd, 2003, to
14  you.  At the bottom, it appears to be signed by you
15  and Donna Mitchell.  Did you -- have you seen this
16  document before?
17    A.  Yes.
18    Q.  And is this the reprimand you were referring
19  to?
20    A.  Yes.
21    Q.  Did you report to work on April 2nd -- I'm
22  sorry, yes, on April 2nd?
23    A.  I don't recall April 2nd.
24    Q.  Do you want to take time to review this

Page 111

1   reprimand?
2     A.  Well, I think you are talking about March 8th.
3   The letter was dated --
4     Q.  The second paragraph that's one sentence, "We
5   had seven IEP meetings today and planned on a
6   psychologist attending."  The following paragraph
7   said -- and "today" appears to be the date of the
8   letter, April 2nd, 2003.  It says, "You did not report
9   to work today and you did not contact the substitute
10  caller."
11    A.  All right.  Okay.  Yeah.  I'm sorry.  I recall
12  the day, whatever day that was, that there was an
13  emergency at my son's school as I dropped him off.  I
14  wasn't planning to be out that day.  Whatever I had to
15  deal with school that day took a lot longer than I had
16  intended.  So I contacted the school to say that I
17  needed to take that as a sick day.
18    Q.  Was the emergency related to a school project
19  he had, your son?
20    A.  Originally, there was supposed to be a school
21  project, but there was another issue that had come up
22  that I had to deal with that was much more involved.
23    Q.  And what was that issue?
24    A.  Something to do with some behavioral concerns.

Page 112

1     Q.  Did you tell anyone at the time that was the
2   issue?
3     A.  I -- originally when I told Phyllis that I'd be
4   a little bit late, I said that I was going to go in
5   for a school -- to see his project.  And then when it
6   got more extensive and took more time, I told her that
7   I wasn't going to be able to make it in and that I
8   expected that would be taken as a sick day.
9     Q.  And Phyllis is who?
10    A.  She was the secretary in the special ed.
11  office.
12    Q.  Phyllis Waecker?
13    A.  Yes.
14    Q.  And you said you notified her in advance of
15  April 2nd that you would be late because of --
16    A.  That I was going to stop by the school and that
17  I would be in right after that.  And then I didn't
18  anticipate that it was going to take nearly as long as
19  it did.
20    Q.  Okay.  You called her later to say it was
21  taking longer?
22    A.  Mm-hmm.
23    Q.  This letter from Donna Mitchell says in the
24  third paragraph, "At 12:58 today, you contacted are

Page 113

1   Sue Poore and indicated you had stopped at your son's
2   school and got tied off longer than you anticipated,
3   so you were just going to take the day."  Do you
4   recall was it Sue Poore or Phyllis Waecker you spoke
5   to?
6     A.  Well, I spoke to Phyllis earlier and then later
7   had contacted Sue.
8     Q.  Who was Sue Poore?
9     A.  She was in the high school office.
10    Q.  What was her position?
11    A.  She was secretary.
12    Q.  Was there any procedure for when you were sick
13  as a school psychologist or unable to attend for any
14  reason, was there any procedure for reporting that?
15    A.  In all of the years that I've ever worked and
16  up until Donna told me that I had to call the
17  substitute caller, prior to that, the procedure has
18  always been to either contact whatever secretary that
19  we were working with to let them know.  And most of
20  the time, if it was possible, to call the -- I would
21  generally call the ED and just check in and -- or the
22  school counselor or anybody that I might, you know,
23  have had some -- something on the agenda to notify
24  them and let them know.

D-84

Olga A. Yatzus

Page 114

1  Q. So the ED or the special ed. secretary would be
2  responsible for rescheduling any meetings or --
3  A. Right.
4  Q. -- any changes that would be necessary --
5  A. Yes.
6  Q. -- because of your absence?
7  A. Yes.
8  Q. That's why you would notify --
9  A. Yes.
10  Q. -- either one of them?
11  A. Yes.
12  Q. Didn't matter which one?
13  A. It would depend who was available when I would
14  call. Sometimes I would call the secretary. And if
15  tthe ED needed to ask, you know, me any questions or I
16  might say could you have them call me because I need
17  to give them an update or whatever the case might be.
18  Q. You said you followed that practice at other
19  schools and other districts?
20  A. Yes.
21  Q. And also at Appoquinimink up until Ms. Mitchell
22  told you otherwise?
23  A. Well, pretty much, we were instructed the year
24  before to just call special ed. when we were in the

Page 115

1  district office to notify them that we would be out.
2  So that's always been the procedure.
3  Q. Notify them being who?
4  A. Like the special ed. secretary.
5  Q. The people you mentioned before?
6  A. Yes.
7  Q. The secretary or the ed.?
8  A. Right.
9  Q. When you say we were notified, do you remember
10  who --
11  A. I think just us, the psychologists. We were
12  all kind of -- I think that first year I was hired, we
13  were instructed to call Kathy Bromwell if we were
14  going to be out and let her know.
15  Q. Would that have been Dr. Lauer --
16  A. Yes.
17  Q. -- who gave you that instruction?
18  I think you mentioned at some point
19  Ms. Mitchell gave you different instructions?
20  A. Right. She told me I had to call the
21  substitute caller. I recall saying I never had to do
22  that before since you don't call a substitute in for a
23  psychologist. She said, well, she didn't care what I
24  had been instructed before; that's what she wanted me

Page 116

1  to do.
2  Q. This document indicates that the discussion
3  occurred on March 8th, 2003. Does that sound correct?
4  A. It's here. I don't have any recollection.
5  Q. Did that discussion occur before this incident
6  with your son at the school and coming in late?
7  A. Well, it says that on March 8th we had that
8  discussion. So that would have been before.
9  Q. Is there any reason you didn't follow those --
10  A. I wasn't planning on being out the whole day.
11  Q. When you did call in at 12:58, correct, you
12  said you wouldn't be able to make it in that day?
13  A. Right.
14  Q. And you didn't call the substitute caller then?
15  A. Well, you are supposed to call the substitute
16  caller before 6:30 a.m. If I didn't know I was going
17  to be out that whole day, how could I have called
18  before 6:30 a.m.?
19  Q. So you thought it was no longer necessary
20  because you didn't figure out until 1:00 that you
21  weren't going to come in for the day?
22  A. Right.
23  Q. And I'm sorry. Tell me who Sue Poore was
24  again.

Page 117

1  A. She's the secretary in the high school office.
2  Q. Was she able to reschedule any meetings that
3  you had that day or responsible for rescheduling them?
4  A. When I called Phyllis earlier to let her know
5  that I was tied up, I let her know that I didn't know
6  which meetings I was going to be able to get in for.
7  Sue wouldn't have had any -- Sue wouldn't have been
8  responsible to reschedule those meetings.
9  Q. I thought you said that when you called
10  Ms. Waecker that you weren't sure -- at that point you
11  still thought you were going to be in?
12  A. Yes.
13  Q. So she wouldn't have a reason to reschedule
14  your meetings all day long. Is that correct?
15  A. That's correct. I mean, I thought I was going
16  to be able to get in and then called later and told
17  her that it was taking longer than I thought. And
18  after I called Phyllis, I called Sue to let her know
19  that I wasn't going to be there.
20  Q. So you called Ms. Waecker twice and then you
21  called Ms. Poore once?
22  A. Yes.
23  Q. And then your second call to Ms. Waecker, you
24  told her you weren't going to be in for the rest of

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,                §
                                      §
          Plaintiff,                  §          Case No.: 05-103 SLR
                                      §
              v.                      §
                                      §
APPOQUINIMINK SCHOOL DISTRICT         §
and TONY MARCHIO, individually        §          **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN §
MIECZKOWSKI, individually and in her  §
official capacity, DONNA MITCHELL,    §
individually and in her official capacity, §
and MARION PROFFITT, individually     §
and in her official capacity,         §
                                      §
          Defendants.                 §

APPENDIX PAGE B86 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

## Olga A. Yatzus

Page 122

1  meeting.
2  Q. And this was in the high school you worked --
3  A. Yes.
4  Q. -- you met with him?
5  And you knew the meeting was scheduled,
6  correct, at that time?
7  A. At that point, yeah, I did know the meeting was
8  scheduled. I was planning on getting there, but felt
9  that I just quickly needed to find out what was going
10  on with this kid that I had never met him before.
11  Q. Did you think your presence at this meeting was
12  important?
13  A. Yes.
14  Q. Do you recall being written up on any occasions
15  for not completing IEP reports?
16  A. IEP reports? I am not sure what an IEP report
17  is.
18  Q. Evaluation report?
19  A. Yes.
20  Q. Psychological evaluation?
21  A. Yes.
22  Q. Do you recall being written up for not
23  completing psychological evaluations?
24  A. Yes.

Page 123

1  (Yatzus Exhibit Nos. 20, 21 and 22 were
2  marked for identification.)
3  BY MS. MARTINELLI:
4  Q. Let's start with these two. I have handed you
5  two documents identified as Exhibits 20 and 21.
6  A. No. I have -- oh, okay. 20, 21.
7  Q. I'm sorry. Those numbers are confusing. They
8  are similar. And on the bottom, the one identified as
9  20 is on the bottom D-23. Is that correct?
10  A. Yes.
11  Q. Starting with the document that's been
12  identified as Exhibit 20. It's dated September 30th,
13  2002. In the bottom right-hand corner, it says D-22?
14  A. No. That's --
15  Q. No.
16  A. -- 21.
17  Q. Exhibit 20 in the bottom right-hand corner says
18  D-23. Is that correct?
19  A. Yes.
20  Q. Okay. Starting with the document identified as
21  Exhibit 20 and in the lower resident corner says D-23.
22  A. Right.
23  Q. It's dated September 25th, 2002 and it's -- it
24  appears to be a letter from Donna Mitchell that you

Page 124

1  and she signed. Is that correct?
2  A. That's correct.
3  Q. This appears to document an incident in
4  which -- dealing with an evaluation report, as it's
5  described there, that wasn't presented in a timely
6  fashion. Can you describe what happened there?
7  A. During the month of September, we had a new ED
8  to our building that year that took over the high
9  school special ed. files which were left in hard
10  condition for Marilyn when she started. And she was
11  immersed that whole month in trying to clean up
12  everything that she was left with. So I had told
13  Marilyn I had tested some kids that we needed to
14  schedule some meetings for. During the month of
15  September, trying to get computers up and running
16  isn't -- is a massive task for the technology staff.
17  So my computer hadn't been up and running at that
18  point. So I would take whatever work that I needed to
19  at home and work at home.
20  There were -- some of the meetings that I
21  told Marilyn we didn't have to rush and get them done
22  before the 30th, that we could do them in October
23  because they weren't going to necessarily -- that they
24  weren't going to qualify for any services. What we

Page 125

1  try to do is get the kids that would be eligible by
2  the 30th.
3  But I remember that it was a Monday
4  afternoon that I was leaving my office and saw an
5  envelope from Marilyn, I think. But I was walking out
6  the door and I figured I'd check my mail when I came
7  back since I didn't want to misplace those papers.
8  So, evidently, I was given some notice of meetings at
9  that time, which I didn't -- like I said, I was
10  walking out of the building when it was placed in my
11  mailbox, so I didn't have a chance to really look at
12  it.
13  The next day, I was assigned to a different
14  school. So I wasn't in the building that whole next
15  day. When I arrived at work on Wednesday morning, I
16  found out that these meetings were scheduled, which I
17  didn't know prior to walking in at that particular
18  moment. So the work that I was -- I had worked on was
19  at home.
20  Q. These are the psychological evaluations you are
21  referring to?
22  A. Yes.
23  Q. Does -- is the notice for meeting what
24  generates your need to complete the --

Olga A. Yatzus

Page 126

1    A.  When we are swamped with trying to get
2   everything done that we need to get done, we try to
3   get them done before the meeting.  But that doesn't
4   always mean that -- I mean, if we're testing and doing
5   a bunch of other things and we've got a meeting, then
6   we try to prepare for that meeting when you're doing a
7   bunch of other evaluations and anything else that
8   needs to be done prior to that time.
9    Q.  I'm sorry.  So the answer was it is the meeting
10  notice that generates your --
11   A.  Well, it depends.  I think it really depends.
12  I think it depends on when that meeting is scheduled
13  by, how much notice you are given as far as that goes,
14  and all of the other things that you have to
15  accomplish.  So if you know that the meeting is going
16  to be at that time, then you try to have that as
17  the -- you know, if this meeting is scheduled, I need
18  to try to make sure I have this together for that.
19   Q.  Were you expected to provide these reports in
20  advance of the meeting to anyone at the district?
21   A.  That wasn't communicated to me prior to this.
22   Q.  And you said that you had permission to do some
23  work on the reports at home.  Is that what you said?
24  Or you made the decision to work on these reports at

Page 127

1   home?
2    A.  I think it's impossible to get everything done
3   that you need to get done in the course of a school
4   day, so I don't know about you, but I would take a lot
5   of work home on a regular basis to try to keep up.
6   But especially when I didn't have my computer
7   operational at that time, I really needed to make sure
8   that I was able to get some of that stuff done at
9   home.
10   Q.  And you left it at home because you didn't
11  realize you had a meeting, that meeting that day until
12  you got in?
13   A.  Yes.
14   Q.  You have a second document in front of you
15  marked as Exhibit 21, and in the lower right-hand
16  corner is identified as D-22.  This appears to be a
17  letter, dated September 30th, from Mary Ann
18  Mieczkowski to you, and it's signed by Mary Ann at the
19  bottom.  Did you receive a copy of this letter at the
20  time?
21   A.  Yes.
22   Q.  Can you tell me what this letter concerns?
23   A.  The same.  It was all for the same day.  The
24  same set of circumstances.

Page 128

1    Q.  Does this reference anything that
2   Ms. Mitchell's letter did not?
3    A.  I am sure that ...
4    Q.  If I can direct your attention to the third
5   paragraph, the third sentence.  "As I further
6   researched the issue at hand, one student referred for
7   testing by the child study team in January 30th, 2002
8   and testing did not occur for him until the week of
9   September 16th."  Is that related?  It sounds
10  different.  Is that related to the September 25th
11  meeting or is that separate?
12   A.  Those -- these two letters were the result of
13  the same day as far as what Mitch wanted to pinpoint
14  in her letter and what Donna wanted to pinpoint in her
15  letter.  I am sure they decided which issues that they
16  wanted to confront.
17   Q.  Were Ms. Mitchell and Ms. Mieczkowski present
18  for that IEP meeting --
19   A.  They were both --
20   Q.  On the 25th?
21   A.  -- in the building.  I can't recall who
22  participated in which meeting.  I'd have to see
23  them -- the attendance minutes to see who was at what
24  meeting.  I think there were some that they both were

Page 129

1   in.
2    Q.  I am going to show you a third document.
3        (Yatzus Deposition Exhibit No. 23 was
4   marked for identification.)
5   BY MS. MARTINELLI:
6    Q.  This document is identified as Exhibit 23 and
7   in the lower right-hand corner is D-26.  It appears to
8   be a reprimand, dated September 25th, 2002, from James
9   Dooley.  Did you receive a copy of this?
10   A.  Yes, I did.
11   Q.  In the first paragraph it says, "On four
12  separate occasions today, you failed to present a
13  written report ..." the letter is dated September
14  25th.  So it appears to be referring to the same IEP
15  meeting.  Is that --
16   A.  There were meetings scheduled throughout that
17  day.
18   Q.  Several meetings.  As a result of receiving
19  these three reprimands, did you file a grievance?
20   A.  Yes, I did.
21   Q.  What happened as a result of the grievance?
22   A.  A decision was made to pull these three letters
23  and replace it with one.
24   Q.  Was there a meeting held for the grievance?

B-88

Olga A. Yatzus

Page 130

1    A.  As I recall, yes.
2    Q.  A hearing, maybe, might be the proper term.
3        I am going to show you what was marked as
4  Exhibit 22.  This is a letter -- well, it's identified
5  as Exhibit 22 and in the lower right-hand corner
6  D-20 -- a letter dated November 17, 2002 to you and
7  signed by you and Ms. Mieczkowski.  Is this the letter
8  that replaced the three previous letters?
9    A.  Yes.  That was my understanding.
10   Q.  Okay.  As a result of the grievance hearing?
11   A.  Yes.
12   Q.  At the bottom of this letter, the last
13 paragraph, after -- the last paragraph indicates that
14 "... it is now understood that any information
15 provided by the psychologist during an IEP or 504
16 meeting regarding any student, in the form of an
17 evaluation summary or 'gathering of data,' shall be
18 considered a report and copies shall be provided to
19 the administration and educational diagnostician at
20 least 48 hours prior to the scheduled meeting."
21       Was that discussed in the hearing or the
22 grievance discussion?
23   A.  I don't recall exactly what was discussed at
24 that meeting.

Page 131

1    Q.  But you saw this --
2    A.  Yes.
3    Q.  -- in this letter?
4        Regarding the meeting, the IEP meetings on
5  the 25th, you said you didn't get notice of them until
6  the day of?
7    A.  That morning, yes.  That's when I first saw it,
8  although Marilyn had placed them late Monday in my
9  box.
10   Q.  Do you have to initial requests for meetings?
11   A.  Do I have to initial requests for meetings?
12   Q.  Who makes a request for meetings?  How is the
13 meeting generated?  How is the process started for an
14 IEP meeting?
15   A.  The educational diagnostician would generally
16 schedule that and then give notice.  And they would
17 send the notice to the parent.
18       Now, if the meeting was scheduled by phone,
19 let's say, and the parent wanted to waive their right
20 to ten-day prior notice, then that would get taken
21 care of at the meeting.  If there was a circumstance
22 where they wanted to -- for whatever reason we needed
23 to get the meeting scheduled less than those ten days.
24       (Yatzus Deposition Exhibit No. 24 was

Page 132

1  marked for identification.)
2  BY MS. MARTINELLI:
3    Q.  This is a document identified as Exhibit 24 and
4  in the lower right-hand corner as D-15.  It's dated
5  January 8th, 2003.  It appears to be a letter from
6  James Dooley to you.  Do you recall receiving a copy
7  of this letter?
8    A.  Yes.
9    Q.  And you refused to sign it.  Is that correct?
10   A.  That's correct.  At that point, Mr. Dooley and
11 I talked.  And on this particular day, or within that
12 period -- it was right after spring break, or
13 Christmas vacation, which would have been the
14 beginning of January, maybe January 2nd -- I arrived
15 at my office, and my entire office was moved.  I had
16 files left in one area.  Other things were scattered
17 all over the place.  I couldn't get my fingers on
18 anything.  And we were -- I was put into an office
19 with Sharon Hill and Phyllis Waecker.
20       And it seemed that I was being set up to
21 produce documentation while I was trying to move and
22 find my files and belongings.  And it was a ridiculous
23 request for me to try to get that before my computer
24 or anything else was set up or located.  And when I

Page 133

1  talked to Mr. Dooley, he is like, well, I have to
2  write you up or I'll get written up.
3    Q.  Were those his words?
4    A.  Yes.
5    Q.  Did you request any clarification on that
6  statement?
7    A.  No.  I kind of knew what he meant.
8    Q.  What did you think he meant?
9    A.  That he was instructed to write me up.
10   Q.  To write you up specifically?
11   A.  Yes.
12   Q.  Did he say anything else that would make you
13 think that's what --
14   A.  He said that to me on another occasion, too.
15   Q.  Just to quote, "If I don't write you up, I'll
16 be written up"?
17   A.  Right.
18   Q.  Did you at the time he -- Mr. Dooley made the
19 request for the written reports, did you tell him you
20 were unable to complete it because of the office
21 situation?
22   A.  Well, he certainly knew what the situation --
23       MR. BARTOSHESKY: Wait --
24   A.  I'm sorry.

## Olga A. Yatzus

Page 134

1   Q.  Did you tell him you would be unable to
2   complete it because of the situation in your office?
3   A.  I had explained to him I'll get what he was
4   asking for as soon as I could.
5   Q.  Did you mention the situation in your office?
6   A.  He was very aware of the situation in my office
7   because I discussed that situation with him at the
8   same time.
9   Q.  Were you issued a laptop by the school
10  district?
11  A.  I had a laptop that I allowed my intern to use
12  for a period of time because she was working at
13  Townsend Elementary and didn't have a computer
14  available to her at that time.
15  Q.  Which intern was that?
16  A.  Eileen Baker.  So I allowed her to use me
17  laptop and I used the desktop.
18  Q.  She was already working as your intern at this
19  time?
20  A.  Yes, she was.
21  Q.  She didn't have her own laptop?
22  A.  No, not at that time.
23  Q.  So you didn't have use of your laptop because
24  it was with her?

Page 135

1   A.  Yes.  As I recall.  Because I remember she
2   didn't have access, so I allowed her to use it.
3   Q.  And this says, Mr. Dooley's letter says, "As of
4   Wednesday, January 8 this written documentation has
5   not been submitted."  Was that true, you hadn't
6   submitted it yet at that time?
7   A.  Right.
8   Q.  Did you ever provide the documentation he
9   requested?
10  A.  As I recall.  We had moved that -- like I said,
11  I think everything was moved and scattered on
12  January 2nd when I arrived, and we were in that room
13  for -- trying to make headway with the chaos that was
14  in there -- for about a week maybe, and then they up
15  and moved us to another room right about then.  So
16  there were two separate moves that occurred within
17  about a week, week and a half.
18  Q.  You claim regarding the office moves you were
19  moved four times in one school year?
20  A.  I was moved one, two, three, four, and
21  eventually five.
22  Q.  In one school year?
23  A.  Yes.
24  Q.  Can you describe your different office

Page 136

1   locations in the moves?
2   A.  First time I was in the main office.  Then --
3   Q.  The main office in the district building?
4   A.  In the high school.  Well, there was an office
5   provided at the district office that we were moved out
6   of that summer, I think, and told that we were going
7   to be assigned to the buildings, and that's where our
8   offices would be.
9   Q.  Who is "we"?
10  A.  The psychologists.
11  Q.  So there was another psychologist with you at
12  that time who was moved?
13  A.  Well, no.  All -- actually, it was all of the
14  educational diagnosticians and the psychologists.  We
15  had all shared a big room where we had desks and our
16  computers.  And then when Mary Ann Mieczkowski and
17  Kitty Rehrig came on-board, we were moved -- all of us
18  were moved out of the district office and assigned to
19  various buildings.  And so that's where our offices
20  were supposed to be.  So that happened.
21       And then I was going to have an office in
22  the main office.  So I started getting settled there.
23  And then I was moved to a separate office that I
24  shared with Julie Bowers until Christmas.  And then

Page 137

1   when I came back after Christmas break, everything had
2   been moved and some things were left, student files,
3   other things were left in the other room.  Like I
4   said, we were there for about a week.  I was supposed
5   to share with Sharon Hill and Phyllis Waecker.
6       Then we got moved back to the old room that
7   I was in.  And then later, I was moved to the smaller
8   room that we were -- we were bouncing back and forth.
9   Then I got moved into the smaller room maybe April
10  maybe, March.  No.  April maybe, sometime in April,
11  late March.  I don't recall exactly when.
12       Then after Mother's Day weekend when I
13  arrived at work, my office was locked and I was
14  reassigned to the district office at that point.
15  Q.  This was all during the course of the 2002-2003
16  school year?
17  A.  Yes.
18  Q.  I have to go back over that again.  You said
19  you started in the main office in the high school?
20  A.  Right.
21  Q.  At the beginning of the '02-03 school year?
22  A.  Yes.
23  Q.  And then -- and you were there also with the
24  EDs?



Olga A. Yatzus

Page 138

1    A.  No.  A separate space.
2    Q.  Just the school psychologists?  All the school
3  psychologists were in the one --
4    A.  No, no.  Everybody was assigned to their own
5  building.
6    Q.  You were in your own office?
7    A.  Yes.
8    Q.  In the high school?
9    A.  Yes.
10   Q.  And --
11   A.  And just -- I started out sharing my time
12  between Townsend Elementary and the district -- or the
13  high school that year.
14   Q.  So the beginning of 2002-2003, you started in
15  the main office of the high school; you were in an
16  office by yourself?
17   A.  Yes.
18   Q.  And do you recall what the office number?  By
19  any chance, do you remember?
20   A.  No, I don't.
21   Q.  When Mary Ann Mieczkowski came on-board, you
22  were moved; is that what you said?
23   A.  No.  Mary Ann came on-board in the summer of
24  2002.  I can't recall if it was before the school year

Page 139

1  started or right after the school year started our
2  office out of the district office was -- we were told
3  that we weren't to have any office space in the
4  district office at that point.  So we all -- all of
5  the EDs and psychologists had building assignments.
6  So that's where our office was to be in whatever
7  building we were assigned to.
8    Q.  So you started out at the district office.
9  Before the school year of '02-03, you were all in the
10  district office?
11   A.  We had office space there.
12   Q.  And then in the beginning, sometime in the
13  beginning of the '02-03 school year, you were moved
14  into the high school?
15   A.  Well, I had -- you would have a district
16  office, but you would have a space to work in at the
17  locations that you were assigned to.
18   Q.  Was your main office still considered in the
19  district office then?
20   A.  No.
21   Q.  Each psychologist was moved out to the school
22  they were working with?
23   A.  Their building.
24   Q.  Then what was the move you said occurred after

Page 140

1  that?
2    A.  I got moved out of the main office.  There was
3  a new wing that was built on the high school and so
4  there was a room available that I was assigned to, and
5  I shared that space with Julie Bowers, who was the
6  transition coordinator.
7    Q.  Was Julie Bowers also moved at that time into
8  that space or was she new?
9    A.  No.  Julie and I moved in.  When we moved, we
10  moved together at that time.
11   Q.  Was anyone else affected by that move?
12   A.  Eileen had a desk there.
13   Q.  Okay.  And so you moved to a room available in
14  the new wing of the high school?
15   A.  Yes.
16   Q.  You, Julie and Eileen Baker?
17   A.  Yes.
18   Q.  And you moved again.  When was that?
19   A.  January.  When I returned from Christmas
20  vacation, my office had been moved prior to my return.
21   Q.  Was that the move you were referring to around
22  the time Mr. Dooley's --
23   A.  Yes.
24   Q.  You returned from vacation, and you didn't have

Page 141

1  notice of that move before you came back?
2    A.  No, I did not have notice.
3    Q.  And you were moved to what office then?
4    A.  To a much smaller office that I was to share
5  with Sharon Hill and Phyllis Waecker.
6    Q.  Did Sharon Hill and Phyllis Waecker also move
7  from another office with that move?
8    A.  Sharon had been a teacher prior to that.  So
9  she didn't have an office prior to that.
10   Q.  She was new to that position?
11   A.  Yes.
12   Q.  And Ms. Waecker, did she move offices in that
13  move?
14   A.  She had an office space in the main office next
15  to Marilyn Sweeney's office prior to Marilyn leaving.
16  And Marilyn retired at the end of the 2002 -- December
17  of 2002.  So Marilyn retired or left -- her last day,
18  I think was right before Christmas vacation.  And
19  Phyllis' office was next to her.  And then when we
20  returned in January, Phyllis and Sharon and I were
21  placed in one room.
22   Q.  So Phyllis was new to the position, too?
23   A.  No.  Phyllis was working with Marilyn Sweeney
24  as the special ed. secretary for a few months.

B-91

Olga A. Yatzus

Page 142

1    Q.  But her space moved as a result of this move as
2    well?
3    A.  Yes.
4    Q.  And was anyone else affected by that move that
5    you can recall?
6    A.  Not that I can think of.  Well, yeah.  I
7    guess -- I think the interventionists used the space
8    that we moved into for a period of time.  So they
9    would have been affected.  They got moved to a room
10   upstairs, I think.
11   Q.  You don't recall the room number of that room.
12   A.  No, I don't.
13   Q.  And then was there a move after that?
14   A.  And it was just ungodly.  You couldn't function
15   in that room where we were placed in.  And none of us
16   could move or breathe in that room.  So we got moved
17   again back to the room that I had just left.
18   Q.  In the new wing of the high school space?
19   A.  Yes.
20   Q.  Was that all of you moved back to that space?
21   A.  Yes.
22   Q.  You, Sharon Hill, Phyllis Waecker all moved?
23   A.  Yes.
24   Q.  Was anyone else affected by that move?

Page 143

1    A.  No.  Oh.  And Julie Bowers, she got moved to
2    Marilyn Sweeney's old room in the main office.
3    Q.  And were you -- did it give you more space,
4    this move back to the new wing?
5    A.  Yes.
6    Q.  Were you displeased with that particular move?
7    A.  Not as far as space to sit down and do work,
8    but I didn't have a private location to do my job.
9    Q.  Were you given the use of a conference room for
10   counseling?
11   A.  Or testing or anything else or meeting with
12   parents or whatever I needed to do during the course
13   of my day.  That all depended on whether or not that
14   room was going to be used for meetings.  So whether or
15   not I could count on -- depend on a working space
16   depended on -- my use of that room was always
17   preempted by the need to use that space for meetings.
18   When you have the number of special ed. students or
19   whatever other meetings we needed to have, there were
20   a lot of meetings that would go on in the course of a
21   day.
22   Q.  Did you say when approximately you thought that
23   move back to the new wing in the high school was made?
24   A.  That was within a week or so.

Page 144

1    Q.  So back in January of '03?
2    A.  Yes.
3    Q.  What was the reason given for that move?
4    A.  I think they realized that we couldn't function
5    in that space.  There wasn't room to move.  There
6    wasn't space to put student files.  It was impossible
7    to work in there.
8    Q.  Was there ever a reason given to you at the
9    time for that move?
10   A.  I don't recall what reason other than we
11   decided that you're moving again.
12   Q.  Who told you you were moving?
13   A.  I don't recall.
14   Q.  So sometime in January of '03, you, Sharon Hill
15   and Phyllis Waecker moved back to the new wing in the
16   high school?
17   A.  Yes.
18   Q.  Was there a move after that?
19   A.  Then I got moved to that smaller conference
20   room.
21   Q.  In the high school?
22   A.  Yes.
23   Q.  Was that the conference room you were using
24   before when it was available?

Page 145

1    A.  Yes.
2    Q.  Were you by yourself in that smaller conference
3    room?
4    A.  Yes.
5    Q.  So no one else was affected by that move?
6    A.  No.
7    Q.  Except for you?  And were you unhappy with that
8    move?
9    A.  No.
10   Q.  Were you pleased by it?
11   A.  I felt that I could actually have a place that
12   I could work.  I wasn't pleased by the fact that I had
13   to keep moving, which, when you move, it takes a lot
14   of time.
15   Q.  Were you pleased with that new space?
16   A.  Yes.
17   Q.  And you don't know the room number of that?
18   A.  No, I don't.  I don't remember.
19   Q.  And then was there a move after that?
20   A.  Just when my lock was changed and I was
21   moved -- I was reassigned to the district office.
22   Q.  I want to go back for just a second.  The move
23   to the smaller conference room by yourself, do you
24   recall when that was?

B-2

Olga A. Yatzus

Page 154

1  A.  Yeah.
2  Q.  Do you want to take the time to review it?
3  A.  Okay.
4  Q.  Does this refresh your recollection as to the
5  time frame?
6  A.  Yeah. It's hard to recall. This was three
7  years ago.
8  Q.  This sounds like the reprimand was actually
9  handed to you and then later rescinded.
10  A.  No.
11  Q.  No?
12  A.  No. He handed it to me and then took it back.
13  Q.  Did he ask for clarification from Donna
14  Mitchell?
15  A.  This is what this is saying. Like I said, I
16  had several conversations with Jim about things that
17  were being thrown at me as directives or
18  non-directives. I know I had asked him clarification
19  about what that meant as far as students being in
20  there or not.
21  Q.  The final sentence says, "Can you please
22  clarify this directive and provide me with a
23  rationale?" Did he ever do that?
24  A.  No.

Page 155

1  Q.  Did anyone else in the administration do that?
2  A.  No.
3  Q.  What was the answer?
4  A.  No. Not that I recall.
5      (Yatzus Deposition Exhibit No. 27 was
6  marked for identification.)
7  BY MS. MARTINELLI:
8  Q.  I am showing you a document marked as Exhibit
9  27. It's signed by Donna Mitchell and also appears to
10  be signed by you. In the lower right-hand corner it
11  says, D-8. It's dated April 2nd, 2003. Do you recall
12  receiving this document?
13  A.  Yes, I do.
14  Q.  Can you describe what this was about?
15  A.  Well, a couple things. One is that I had sent
16  Tony Marchio an e-mail right before this occurred — I
17  got this or right about the same — right after that
18  about some concerns that I had with the way Donna was
19  behaving towards students. There was a meeting in —
20  what was that, December? — on a student that had been
21  out — didn't attend school for an extended period of
22  time. A student that I really didn't know at all at
23  that time. But that had just — the parent had him
24  privately evaluated and was trying to get him

Page 156

1  identified for special education. And the private
2  evaluation concluded that or at least demonstrated
3  that he would be eligible for services. So this was a
4  meeting, an IEP meeting where we reviewed this
5  independent evaluation and discussed as a team whether
6  or not he would qualify or not. None of us really
7  knew the student at the time.
8      Later in March, the student had had some
9  behavioral issues. During the course, he was being
10  suspended a lot. So we really didn't see him in class
11  too often. And at the time of the IEP meeting, not
12  knowing the student, we were concerned with his
13  behavior of not attending school, as being truant,
14  but — and so we indicated as a team that we felt
15  there were behavioral concerns, and that was his
16  cutting school, but we didn't know anything really
17  more about the student at the time.
18      The concern that Donna had reflected in
19  this letter was that because we indicated that he had
20  some behaviors that she couldn't — that we couldn't
21  conclude that the behavior was not a manifestation of
22  his disability, even though she felt that it should
23  have been, and she was hoping to expel the student
24  this time. And if the behavior manifestation

Page 157

1  concluded that it was a manifestation, then that would
2  limit what she could do at that time. So she was
3  pretty angry with the outcome of that meeting, and so
4  she sent a letter of reprimand to every person that
5  participated in that meeting, including Marilyn
6  Sweeney, who had already retired.
7  Q.  Who else did she send a letter to?
8  A.  Sarah Allbee, I know got one. And Sarah was
9  livid.
10  Q.  Anyone else?
11  A.  I don't remember who else was in attendance. I
12  know that Marilyn contacted me and told me that she
13  got a letter of reprimand three months after she
14  retired, which is what she thought was the most
15  ridiculous thing she had ever seen. And I did hear
16  and talked with Sarah about how incredibly angry she
17  was about this. And at that point, Sarah told me that
18  she was quitting, that she was not going to continue
19  to work in a district that treated people that way.
20  And she did leave. And it was a shame because she was
21  the best special ed. teacher that we had at the time.
22  Q.  Who else did you say was present at the
23  meeting? Sharon Hill? Was she present?
24  A.  Sharon wasn't —

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §            Case No.: 05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §
and in his official capacity, MARY ANN §    **TRIAL BY JURY DEMANDED**
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

APPENDIX PAGE B93 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
## CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Olga A. Yatzus

Page 154

1    A.  Yeah.
2    Q.  Do you want to take the time to review it?
3    A.  Okay.
4    Q.  Does this refresh your recollection as to the
5    time frame?
6    A.  Yeah.  It's hard to recall.  This was three
7    years ago.
8    Q.  This sounds like the reprimand was actually
9    handed to you and then later rescinded.
10   A.  No.
11   Q.  No?
12   A.  No.  He handed it to me and then took it back.
13   Q.  Did he ask for clarification from Donna
14   Mitchell?
15   A.  This is what this is saying.  Like I said, I
16   had several conversations with Jim about things that
17   were being thrown at me as directives or
18   non-directives.  I know I had asked him clarification
19   about what that meant as far as students being in
20   there or not.
21   Q.  The final sentence says, "Can you please
22   clarify this directive and provide me with a
23   rationale?"  Did he ever do that?
24   A.  No.

Page 155

1    Q.  Did anyone else in the administration do that?
2    A.  No.
3    Q.  What was the answer?
4    A.  No.  Not that I recall.
5        (Yatzus Deposition Exhibit No. 27 was
6    marked for identification.)
7    BY MS. MARTINELLI:
8    Q.  I am showing you a document marked as Exhibit
9    27.  It's signed by Donna Mitchell and also appears to
10   be signed by you.  In the lower right-hand corner it
11   says, D-8.  It's dated April 2nd, 2003.  Do you recall
12   receiving this document?
13   A.  Yes, I do.
14   Q.  Can you describe what this was about?
15   A.  Well, a couple things.  One is that I had sent
16   Tony Marchio an e-mail right before this occurred -- I
17   got this or right about the same -- right after that
18   about some concerns that I had with the way Donna was
19   behaving towards students.  There was a meeting in --
20   what was that, December? -- on a student that had been
21   out -- didn't attend school for an extended period of
22   time.  A student that I really didn't know at all at
23   that time.  But that had just -- the parent had him
24   privately evaluated and was trying to get him

Page 156

1    identified for special education.  And the private
2    evaluation concluded that or at least demonstrated
3    that he would be eligible for services.  So this was a
4    meeting, an IEP meeting where we reviewed this
5    independent evaluation and discussed as a team whether
6    or not he would qualify or not.  None of us really
7    knew the student at the time.
8        Later in March, the student had had some
9    behavioral issues.  During the course, he was being
10   suspended a lot.  So we really didn't see him in class
11   too often.  And at the time of the IEP meeting, not
12   knowing the student, we were concerned with his
13   behavior of not attending school, as being truant,
14   but -- and so we indicated as a team that we felt
15   there were behavioral concerns, and that was his
16   cutting school, but we didn't know anything really
17   more about the student at the time.
18       The concern that Donna had reflected in
19   this letter was that because we indicated that he had
20   some behaviors that she couldn't -- that we couldn't
21   conclude that the behavior was not a manifestation of
22   his disability, even though she felt that it should
23   have been, and she was hoping to expel the student
24   this time.  And if the behavior manifestation

Page 157

1    concluded that it was a manifestation, then that would
2    limit what she could do at that time.  So she was
3    pretty angry with the outcome of that meeting, and so
4    she sent a letter of reprimand to every person that
5    participated in that meeting, including Marilyn
6    Sweeney, who had already retired.
7    Q.  Who else did she send a letter to?
8    A.  Sarah Allbee, I know got one.  And Sarah was
9    livid.
10   Q.  Anyone else?
11   A.  I don't remember who else was in attendance.  I
12   know that Marilyn contacted me and told me that she
13   got a letter of reprimand three months after she
14   retired, which is what she thought was the most
15   ridiculous thing she had ever seen.  And I did hear
16   and talked with Sarah about how incredibly angry she
17   was about this.  And at that point, Sarah told me that
18   she was quitting, that she was not going to continue
19   to work in a district that treated people that way.
20   And she did leave.  And it was a shame because she was
21   the best special ed. teacher that we had at the time.
22   Q.  Who else did you say was present at the
23   meeting?  Sharon Hill?  Was she present?
24   A.  Sharon wasn't --

B-93(a)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

Transcript of:

# Olga A. Yatzus
### Volume # 2
### April 26, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-94

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,                    §
                                          §
        Plaintiff,                        §        Case No.: 05-103 SLR
                                          §
            v.                            §
                                          §
APPOQUINIMINK SCHOOL DISTRICT             §
and TONY MARCHIO, individually            §        __TRIAL BY JURY DEMANDED__
and in his official capacity, MARY ANN    §
MIECZKOWSKI, individually and in her      §
official capacity, DONNA MITCHELL,        §
individually and in her official capacity,§
and MARION PROFFITT, individually         §
and in her official capacity,             §
                                          §
        Defendants.                       §

APPENDIX PAGE B95 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Olga A. Yatzus

Page 207

1  appreciate your taking the time to communicate at
2  length with me in regard to behavior that has,
3  obviously, upset your professional and moral
4  conscience." Again, the date of this e-mail is 4/28.
5  Do you recall that conversation with her she's
6  referring to?
7     A.  Yes.
8     Q.  Was that by telephone or in-person?
9     A.  It was a telephone conversation.
10    Q.  And did it occur shortly before this e-mail, do
11 you remember?
12    A.  Yes.
13    Q.  And what was the content of that conversation?
14    A.  She had -- she talked with some parents who
15 were very concerned about what was happening to their
16 children.  And my name was brought into that by a
17 parent, and Joanne wanted to talk to me about what
18 some of my concerns were.  So we had a telephone
19 conversation.
20    Q.  Do you recall what parent that was that gave
21 her your name?
22    A.  I think it would be -- I think it was Marie
23 Wagenaar or Deanna Stidd.  I am not sure.
24    Q.  So Marie Wagenaar, Deanna Stidd in their

Page 208

1  discussions with Ms. Christianson raised your name?
2     A.  Yes.
3     Q.  And I guess raised some of your concerns as
4  well?
5     A.  They raised concerns about their children.  I
6  don't know what else they had a discussion with her
7  about.  I wasn't present for that.
8     Q.  What concerns did you discuss with
9  Ms. Christianson in that telephone conversation?
10    A.  A lot about the number of kids that were up for
11 expulsion and extended suspensions.
12    Q.  Did you discuss specific students?
13    A.  I don't think I did by name specifically.  I
14 think I talked about just some observations in terms
15 of what was going on at the time.
16    Q.  And were those, essentially, the same
17 observations you just described to me?
18    A.  Yes.  At that point, I don't even recall how
19 many students were expelled that year, but it was an
20 extremely large number of students within one school
21 year.
22    Q.  What was Ms. Christianson's response on the
23 telephone?
24    A.  She indicated that she was very concerned --

Page 209

1  that she had been very concerned as well with the
2  number of students that had been expelled and had
3  voiced some of those concerns with other board
4  members, but that she was outnumbered, essentially, on
5  a lot of the decisions.
6     Q.  What decisions were up for debate?  Was it a
7  change in the code of conduct?
8     A.  No.  When children are up for expulsion, the
9  board has to give the final approval.
10    Q.  So in terms of specific students that were up
11 for expulsion, perhaps she felt one way, but was
12 outnumbered by the board?
13    A.  Yes.  That's what she indicated to me.
14    Q.  Okay.  And did you have any further discussions
15 with Ms. Christianson following this e-mail?
16    A.  No.
17    Q.  In addition to the three e-mails we've just
18 reviewed -- I believe there is one to Ms. Mitchell,
19 one to Dr. Marchio and then this one to
20 Ms. Christianson -- do you recall any other writings,
21 e-mails or otherwise where you discussed concerns
22 about illegal or unethical behavior?
23    A.  Other than I spoke with Ms. Mieczkowski
24 about --

Page 210

1     Q.  You spoke with her verbally?
2     A.  Both, verbally and in writing.
3        (Yatzus Deposition Exhibit No. 33 was
4  marked for identification.)
5  BY MS. MARTINELLI:
6     Q.  This document identified as Exhibit 33 is dated
7  3/28/03.  It says "Mitch" at the top.  I assume that
8  is Ms. Mieczkowski.
9     A.  Yes.
10    Q.  It doesn't say who it's from.  I assume it's
11 probably you.
12    A.  Yes.
13    Q.  And was probably attached to an e-mail?
14    A.  Yes.
15    Q.  Do you recall this document?
16    A.  Yes, I do.  If you ask me a specific question,
17 then I'll review it.
18    Q.  Okay.  Would this be the writing, the document
19 or the expression of your concerns in writing to
20 Ms. Mieczkowski you were referring to?
21    A.  Yes.
22    Q.  The first line says, "I would like to address
23 my concerns regarding your extremely hostile rude and
24 disrespectful behavior to me."  And I believe it goes

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## Appendix Page B97 to Plaintiff's Answering Brief in Opposition to Defendants' Motions for Summary Judgment

## Redacted Page
## Confidential

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B98 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §        Case No.: 05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §        **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN §
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

## APPENDIX PAGE B99 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## REDACTED PAGE
## CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B100 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Olga A. Yatzus

---

Page 243

1    A.  Yes.
2    Q.  Then what was your involvement with the Zero
3    Plus Zero group?
4    A.  I didn't have any direct involvement.  They
5    would e-mail me.  Marie would e-mail and ask me about
6    my thoughts and opinions about some things.  That was
7    a movement that Marie pretty much developed.
8    Q.  And your assistance with the OCR complaints,
9    did you think that was part of your job as school
10   psychologist?
11   A.  I think that as an advocate for children,
12   absolutely.  As a school psychologist, part of the
13   role and responsibility on a national level in terms
14   of what is the role is that if there are violations
15   that we really need to be an advocate.  And if being
16   an advocate means trying to represent that child in a
17   meeting, whether it's informing parents of what their
18   rights are, what the law is, I think that that is our
19   job.  I think that's our job as special educators,
20   that parents have a right to be informed, and they
21   need to understand the law.  Most parents don't
22   understand the law.  And it's not well described for
23   them.  Parents are given a document that says, okay,
24   here are your due process rights, but nobody

---

Page 244

1    interprets that for them.  Often parents feel victims
2    of the system because they don't know that they have
3    rights and that their children have.  I think when we
4    see that children are being railroaded or that certain
5    things aren't happening, it is our job to let parents
6    know what they need to do to be an advocate for their
7    children.
8    Q.  I believe you said that Mr. Taschner was the
9    one who first recommend the OCR complaints?
10   A.  He said that I have to do something to effect
11   some change.  And we talked about where would I go.
12   One of the things that we explored was that the Office
13   of Civil Rights would oversee what was happening or
14   not happening and that if that's what I needed to do,
15   then that's what I needed to do.
16   Q.  Okay.  So he indicated that in your role as
17   school psychologist that filing or going to the OCR
18   was appropriate?
19   A.  Yes.
20   Q.  And did you believe that anyone at the district
21   was aware of your involvement with the OCR complaints?
22   A.  I think everyone in the district was very aware
23   that I was trying to help these students and families.
24   Q.  And why did you think they were -- let me ask

---

Page 245

1    first.  When did you think they became aware of that?
2    A.  At one point, Donna Mitchell came to me and
3    said that she found it interesting that a lot of,
4    quote, unquote, my parents were requesting copies of
5    their children's school records.
6    Q.  I guess you took it from that question that she
7    knew of your involvement?
8    A.  Yes.
9    Q.  How did you respond when she asked that?
10   A.  I don't recall exactly what I said to her at
11   that time.  I said -- something to the effect that
12   parents have the right to get copies of their
13   children's school records.
14   Q.  Did you ever come forth with your involvement
15   in the OCR complaints?
16   A.  Not directly.
17   Q.  Indirectly, did you come forth with it?
18   A.  I think there were many situations where I had
19   conversations with Donna to indicate that part of my
20   job was to help these parents and be an advocate for
21   these children.
22   Q.  Did you indicate in those conversations that
23   helping them file OCR complaints was part of your
24   role?

---

Page 246

1    A.  I didn't talk to her specifically that I was
2    helping them file an OCR complaint at that time.  I
3    felt that the complaints had to stand on their own at
4    that point and, specifically, each parent had to make
5    their own decision as to whether they chose to file or
6    not.
7    Q.  I'm sorry.  Did you say a time frame when you
8    thought that they became aware?
9    A.  I don't recall when I had that conversation
10   with Donna specifically.
11   Q.  But you think it was before the complaints
12   themselves were received by the district?
13   A.  Yes.  Well, before any of the complaints got
14   filed, the parents felt that they needed to get all of
15   the information that they needed.
16   Q.  Did you attend any of the Zero Tolerance
17   meetings?
18   A.  I attended the meetings that we were
19   discussing, the OCR -- or giving parents background in
20   terms of what the law is and what their rights could
21   be and what options they had.  There were other
22   meetings that Marie had that she really went off on
23   the let's-go-to-the-board-meetings kind of thing.  The
24   whole Zero Tolerance issue was always at the back of

---

15  (Pages 243 to 246)

B-100(a)    091f31b0-6077-4a4b-9314-30aa4e1f0a4f

Olga A. Yatzus

Page 259

1  advocates and the content of what was being discussed
2  in meetings when parents were insisting that certain
3  things be done for their students and that they were
4  referring to the fact that they knew that children's
5  rights were being violated.
6      Q.  You said that was beginning around January of
7  2003 or not until a little later?
8      A.  It was -- before we even got to the OCR
9  situation, I would encourage parents to review the law
10  and think about being an advocate for their children
11  earlier on.
12      Q.  Earlier on being?  Can you give a time frame at
13  all?
14      A.  I think there were situations probably in
15  January, February.
16      Q.  Of '03?
17      A.  Mm-hmm.
18      Q.  But apparently at least according to this
19  description, they were feeling particular heat, as you
20  describe it, around the time frame of this e-mail?
21      A.  I think a lot of the parents at that point --
22  there were -- there was a real escalation in terms of
23  what was happening to particular students about that
24  time in terms of the number and nature of why kids

Page 260

1  were being suspended, put out of school, how they were
2  being disciplined.  So that was at about the same time
3  that I was informing parents that we can't keep kids
4  out of school for 20, 30 days at a time, that other
5  things need to be done.  So that kind of had been an
6  ongoing process.  The way that kids were disciplined
7  at that point had escalated, and that's when there was
8  some real concern.
9      Q.  When you refer in this paragraph to the "audit
10  files," are those the IEP files or are there separate
11  audit files?
12      A.  The audit file is the file that contains their
13  IEPs, their psychological, notice of meetings, things
14  that the audit team from DOE would come in to review
15  to make sure that the records are in compliance.
16      Q.  You said "the team from DOE"?
17      A.  When they do their audits, they'll come in and
18  review all the documents that need to be in compliance
19  with the law.
20      Q.  Do they do an annual audit?
21      A.  It's kind of randomly selected.  Not every year
22  do you get audited, but, you know, certain schools --
23  there are certain number of schools that the DOE will
24  come in to audit.  Whether you get audited that

Page 261

1  particular year or if they skip you for a year, you
2  know, it's not a guarantee that every year your
3  particular school would get audited.
4      Q.  Okay.  Do you know:  When a school is chosen to
5  be audited, does the administration have any notice of
6  that before they come in?
7      A.  Well, all the student numbers go in on
8  September 30th.  So after that, then the audit
9  schedule gets developed as far as I am aware.  And
10  generally, that audit would occur in October.
11      Q.  October immediately following the September
12  that the numbers --
13      A.  Yes.
14      Q.  When you say the numbers, the number of
15  students in the special ed. program is disclosed?  Is
16  that --
17      A.  Well, all students.
18      Q.  All students?
19      A.  You have the student count by September 30th in
20  terms of funding.  Particularly in terms of audit for
21  special ed. files, whatever students are identified by
22  September 30th, those are the ones that you get funded
23  for for that next year.
24      Q.  And the actual audit when the DOE, I guess,

Page 262

1  comes on site and review those documents, that's
2  usually in October?
3      A.  Usually, yes.
4      Q.  You were describing the case manager's
5  responsibility.  Do I understand that the case
6  managers are special ed. teachers?  Is that what you
7  said?
8      A.  When Barb was there the year before, she
9  developed a case management system where specific
10  teachers were assigned as case managers for particular
11  students.  When you're, you know, at a high school and
12  children change a lot of classes, you want to have at
13  least one teacher that's kind of overseeing what's
14  happening with that particular student.
15      Q.  So it may not be a special ed. teacher?
16      A.  No.  It would be a special ed. teacher.
17      Q.  Oh.  It is a special ed. teacher.  Okay.  In
18  paragraph 3 you say, "they decide" -- I guess that's
19  someone in administration -- "that they are going to
20  have all the case managers sign a form that states
21  that they were given the case management procedures."
22          Do you recall what that's referring to
23  exactly?
24      A.  I remember that there was some form in

d91f31b0-6077-4a4b-9314-30aa4e1f0a4f

B-10(b)