

**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

---

### Transcript of:

### Donna L. Mitchell

### February 23, 2006

---

**Wilcox & Fetzer, Ltd.**
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-101

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B102 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B103 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Yatzus                                    v.    Appoquinimink School District, et al.
Donna L. Mitchell    C.A. # 05-103 SLR    February 23, 2006

| Page 38 | Page 40 |
|---|---|
| 1  A.    Yes. | 1  A.    Most likely. |
| 2  Q.    And all three of them look like they talk | 2  Q.    And did you together decide you would each |
| 3  about some things that happened on September 25, 2002. | 3  write a letter? |
| 4  Is that right? | 4  A.    Yes, I believe so. |
| 5  A.    Yes. | 5  Q.    And do you think that you each -- you and |
| 6  Q.    What do you recall about the events of | 6  Mr. Dooley each reviewed the letters you sent before |
| 7  September 25, 2002 concerning Olga Yatzus? | 7  they were sent out? |
| 8  A.    We had quite a few IEP meetings scheduled | 8  A.    I don't recall. I would think not. |
| 9  that week. September 30 is the point at which we are | 9  Q.    If you look at the last paragraph on your |
| 10 allocated staff. And the accuracy and up-to-date | 10 letter and the last paragraph on Mr. Dooley's letter, |
| 11 status of our IEPs often determines whether or not we | 11 the first sentence, it looks to me like they are |
| 12 qualify for staff, additional staff. So we had a lot | 12 identical. |
| 13 of IEPs scheduled. | 13 A.    Most likely are. |
| 14     To the best of my recollection, my letter | 14 Q.    And how does it happen that they are |
| 15 references a specific meeting that I attended. And | 15 identical, if you remember? |
| 16 the main objective, I believe, of that meeting was to | 16 A.    Oh, I recall. The administration uses |
| 17 evaluate or to go over an evaluation that Olga was | 17 similar or identical language in holding all staff |
| 18 responsible for. When she was asked about it, she | 18 accountable to behavior. When it is related to |
| 19 indicated that it was at home. | 19 special education and IDEA, that statement is used. |
| 20     Prior to that we had had conversations about | 20 Q.    "That statement" being the first sentence of |
| 21 the need to have the reports done ahead of time and to | 21 the last paragraph of both letters? |
| 22 share the findings and/or the report with the | 22 A.    That statement or some variation, yes. |
| 23 administration and educational diagnostician. | 23 Q.    Now, do you think that either you or |
| 24     I believe Mr. Dooley's letter references | 24 Mr. Dooley talked to Mary Ann Mieczkowski before her |

| Page 39 | Page 41 |
|---|---|
| 1  another meeting or meetings that he attended as the | 1  letter went out? |
| 2  direct supervisor of special education that day as | 2  A.    Most likely. |
| 3  well. I believe for one meeting or at least one | 3  Q.    And hers is five days after yours and |
| 4  meeting Mary Ann Mieczkowski in the building and | 4  Mr. Dooley's; right? Hers is dated -- Mary Ann |
| 5  attended a meeting. And similar behavior was | 5  Mieczkowski, which is marked as Mitchell No. 11, is |
| 6  demonstrated in all of the meetings. | 6  dated September 30, while yours and Mr. Dooley's are |
| 7     I do recollect that because there were three | 7  September 25; is that right? |
| 8  letters submitted with regard to the same behavior, a | 8  A.    It appears that way, yes. |
| 9  grievance was filed and a grievance hearing was held, | 9  Q.    Did you encourage Ms. Mieczkowski to write a |
| 10 and it was decided to combine the behavior in all | 10 third letter? |
| 11 three letters to one letter that would end up in | 11 A.    No. |
| 12 Olga's file. That's my recollection. | 12 Q.    Did she talk to you about the idea or the |
| 13 Q.    Now -- and you think that was done? One | 13 fact that she was going to write a letter; do you |
| 14 letter was sent out to replace these three? | 14 remember? |
| 15 A.    That's my recollection, yes. | 15 A.    Probably. |
| 16 Q.    And when that happens, are these three | 16 Q.    Well, do you specifically remember whether |
| 17 supposed to be taken out of her file? | 17 she did or not? |
| 18 A.    I believe so. | 18 A.    I don't specifically remember. |
| 19 Q.    And do you know if that was done? | 19 Q.    Let me show you what has been identified |
| 20 A.    I don't. | 20 earlier as D No. 30. |
| 21 Q.    Now, before any of these letters went out -- | 21     (Mitchell Deposition Exhibit No. 12 |
| 22 well, let me change that. Did you talk to Mr. Dooley | 22 was marked for identification.) |
| 23 about the situation before his letter went out or | 23 BY MR. BARTOSHESKY: |
| 24 before your letter went out? | 24 Q.    And this is a letter dated November 17, 2002 |

B-104

73ba89f4-a29e-4a63-97fe-0a8f6782500a

Yatzus                                   v.    Appoquinimink School District, et al.
Donna L. Mitchell    C.A. # 05-103 SLR    February 23, 2006

---

**Page 42**

1  from Olga Yatzus to Mary Ann Mieczkowski. And it
2  references -- do you remember -- there is a copy sent
3  to you. Do you remember this letter?
4  A.    Absolutely.
5  Q.    Is this the letter that you were talking
6  about earlier that after a meeting it was decided that
7  one letter would replace the others?
8  A.    Yes.
9  Q.    And at the bottom there is some handwriting
10 that says, "Takes place of," and it looks sort of like
11 it might be a 4 or it might be cut off. It is hard to
12 tell from this photocopy. Do you know whose writing
13 that is?
14 A.    Zen Marusa.
15 Q.    And you are not aware of whether or not the
16 other three letters were taken out of her personnel
17 file?
18 A.    I wouldn't be.
19 Q.    Well, if that was the plan, to take it out,
20 to take the other three out, who would be the one that
21 would actually physically do that?
22 A.    Zen Marusa, the director of human resources.
23 He is deceased.
24 Q.    I understand that. Now, this letter

---

**Page 43**

1  references a meeting, in the last paragraph, meeting
2  on November 6, which you attended, among others, and
3  Vicky Boyd from the DSEA, you, Lynn Kebler. Who is
4  Lynn Kebler?
5  A.    She is our building association
6  representative.
7  Q.    Now, is she an employee of the school
8  district?
9  A.    Yes.
10 Q.    Is Vicky Boyd an employee of the school
11 district?
12 A.    No.
13 Q.    And they are both connected to the
14 association?
15 A.    Yes.
16 Q.    Do you recall that meeting?
17 A.    I do.
18 Q.    And is that where it was decided that one
19 letter would replace the other three?
20 A.    Yes.
21 Q.    And is that what Olga Yatzus was told would
22 happen, one letter would replace the other three?
23 A.    I can't answer that.
24 Q.    You don't remember if that was a

---

**Page 44**

1  conversation at that meeting or not?
2  A.    I don't recall specifically if that was.
3  Q.    Let me show you what has been previously
4  identified as D-21.
5        (Mitchell Deposition Exhibit No. 13
6  was marked for identification.)
7  BY MR. BARTOSHESKY:
8  Q.    This is a letter dated October 14, 2002, to
9  Olga Yatzus from you. I want to ask if you remember
10 this letter.
11 A.    Yes.
12 Q.    Now, there is some handwriting at the
13 bottom. Do you know whose that is?
14 A.    That would be mine.
15 Q.    Now, at least this copy of the letter isn't
16 signed by you. Do you think that there is another
17 copy around someplace where you signed it?
18 A.    I don't know the answer to that.
19 Q.    Now, at the top somebody wrote "original."
20 Is that your handwriting?
21 A.    No. That is Zen Marusa's.
22 Q.    And on the right side of it, circled, it
23 says, "old one." Do you see that?
24 A.    Yes.

---

**Page 45**

1  Q.    Is that, again, Mr. Marusa's handwriting?
2  A.    No. That is mine.
3  Q.    That is yours. Do you know what that means,
4  why you wrote that there?
5  A.    The best of my recollection, I sent this
6  over to Mr. Marusa. We had a conversation about
7  Olga's request to remove child study from the letter.
8  I probably wrote "old one," indicating that this was
9  written prior to any removal of that.
10 Q.    And do you think that there was removal of
11 that reference to child study?
12 A.    I can't answer that. I don't recall.
13 Q.    And is that in the third paragraph there,
14 the second or third sentence? The sentence begins
15 with "In addition, the child study process." Is that
16 what you are referring to?
17 A.    Yes.
18 Q.    And your recollection is you had a
19 discussion with Olga where she said or asked that that
20 be removed?
21 A.    Yes.
22 Q.    And you don't remember whether it was
23 actually removed or not?
24 A.    I don't.

B-105

12 (Pages 42 to 45)

73ba89f4-a29e-4a63-97fe-0a8f6782500e

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B106 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B107 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Yatzus                              v.    Appoquinimink School District, et al.
Donna L. Mitchell    C.A. # 05-103 SLR    February 23, 2006

Page 74

1  A.      Right now I don't directly do it. I have
2  another assistant principal who supervises special
3  education who does it, because I have a dedicated
4  psychologist in my building.
5  Q.      How often are performance evaluations
6  supposed to be done?
7  A.      Depends.
8  Q.      What does it depend on?
9  A.      On the teacher's term of employment and the
10 process that they are using.
11 Q.      What do you mean by the process they are
12 using?
13 A.      Well, right now we are going -- we are in
14 two different processes. We have DPAS I and DPAS II.
15 DPAS I, which was in effect when Olga was there,
16 tenured teachers -- and again, teachers and
17 specialists differ. The psychologist is a specialist,
18 not a teacher.
19        The practice is that specialists -- I will
20 limit my answer to that, since that is what she was --
21 tenured get evaluated in a job analysis two times in
22 the course of two years, with a performance appraisal
23 at the end of one of those two years. It is a
24 two-year sequence.

Page 75

1  Q.      What about nontenured specialists?
2  A.      Three times.
3  Q.      Three times?
4  A.      Job analysis.
5  Q.      Three times in what period?
6  A.      In a year.
7  Q.      Now, when Olga Yatzus was there, was there
8  ever any of those things done for her?
9  A.      I don't -- I didn't directly supervise her.
10 She was not -- I only directly supervise or evaluate
11 individuals that are charged to my unit count, so to
12 speak.
13 Q.      So you don't know whether or not any kind --
14 any of those kind of evaluations --
15 A.      I don't. To my knowledge, no one in my
16 building was directly responsible for her job analysis
17 or her performance appraisal.
18 Q.      Do you know who would have been?
19 A.      I don't.
20 Q.      Now, if there is a problem with -- after any
21 of these kind of evaluations, if there is a problem
22 with an employee, are they put on some kind of
23 improvement plan or something like that?
24 A.      Can be.

Page 76

1  Q.      Is that the normal thing that happens?
2  A.      It is -- there is no standard answer for
3  that.
4  Q.      Well, does the district follow with its
5  employees some kind of progressive discipline policy?
6  A.      I can't answer for the district.
7  Q.      Okay.
8  A.      I can only answer for my own performance.
9  Q.      Okay. In your school then, in your
10 building, is that how it works? If you get a certain
11 number of reprimands, do you get warned if you don't
12 improve you are in danger of suspension or termination
13 or that kind of thing?
14 A.      Yes.
15 Q.      And is that policy written down in the
16 association contract or in an employee handbook or
17 anyplace else; do you know?
18 A.      I don't know.
19 Q.      It is just the practice that you follow?
20 A.      Yes.
21 Q.      And you have no idea if any of that kind of
22 process was followed with Olga Yatzus?
23 A.      I know that when it was directly related to
24 me holding her accountable, I followed my progressive

Page 77

1  process: First, verbal conversation; then written
2  conversation; and then -- well, we never made it to
3  the next steps, which would be written with suspension
4  with or without pay, and then -- well, I have never
5  gotten further than that.
6  Q.      And you said it never got to that next, to
7  that step. Do you know why it didn't get to that
8  step, the next step?
9  A.      With me, because I wouldn't be -- I wasn't
10 responsible for her job analysis.
11 Q.      Let me show you what has been previously
12 identified as D-7.
13        (Mitchell Deposition Exhibit No. 22
14 was marked for identification.)
15 BY MR. BARTOSHESKY:
16 Q.      This is an April 2, 2002 letter to
17 Mrs. Yatzus from you. Do you remember that?
18 A.      Yes.
19 Q.      Can you tell us what this is about?
20 A.      It is about failure to follow the
21 expectation for notification and/or coverage for when
22 you are absent from school.
23 Q.      And it references back to a March 8
24 situation. Is that when you explained your

B-108

20 (Pages 74 to 77)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302) 655-0477

73ba89f4-a29e-4a63-97fe-0a8f6782500e

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B109 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,     §
    §
    Plaintiff,     §     Case No.: 05-103 SLR
    §
    v.     §
    §
APPOQUINIMINK SCHOOL DISTRICT   §
and TONY MARCHIO, individually     §     **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN   §
MIECZKOWSKI, individually and in her   §
official capacity, DONNA MITCHELL,   §
individually and in her official capacity,   §
and MARION PROFFITT, individually   §
and in her official capacity,     §
    §
    Defendants.     §

APPENDIX PAGE B110 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Yatzus                                    v.    Appoquinimink School District, et al.
Donna L. Mitchell    C.A. # 05-103 SLR    February 23, 2006

---

Page 98

1 part of an e-mail string on the top of page P-300. It
2 is from Tony Marchio to Olga and also to A. M.
3 Vicario, and that is a response to an e-mail from Olga
4 to Dr. Marchio and A. M. Vicario. Do you think you
5 have ever seen either of these e-mails before?
6 A.    I have.
7 Q.    And under what circumstances did you see
8 them?
9 A.    I believe Dr. Marchio and I had a
10 conversation about them.
11 Q.    Do you recall when that conversation --
12 well, first of all, do you think that he then
13 forwarded -- what he is saying is: "I would like your
14 permission" -- he is saying this to Olga in this. "I
15 would like your permission to share your letter with
16 Mrs. Mieczkowski and Mrs. Mitchell so that I can
17 address the issues that you have outlined."
18          Do you think that he either forwarded it to
19 you or sent you a copy of Olga's letter to him?
20 A.    I don't know for sure, but I would have to
21 speculate that he did not forward it to me. He would
22 have shared it with me.
23 Q.    And you did have a conversation with him
24 about it?

Page 99

1 A.    I believe so.
2 Q.    Do you remember what was said?
3 A.    I don't.
4 Q.    In the middle, towards the middle of the
5 second paragraph, there is a specific reference to
6 you, the second paragraph of Olga Yatzus's letter, and
7 it is the line that starts with the end of a sentence
8 "my opinion." And it says, "Mitch and Donna will hold
9 private meetings about their planned outcomes for
10 students and I am never invited to express my opinions
11 or nor share my concerns."
12          Did you have any conversation with
13 Mr. Marchio about that kind of accusation?
14 A.    I don't specifically recall it, but I know I
15 have talked to individuals about that accusation. We
16 don't have private meetings. As is the practice with
17 any individual, school personnel talks about a plan of
18 programming and offerings for a child based on their
19 needs. We often have those conversations, whether it
20 be between parents and staff or just staff themselves,
21 about what a child needs prior to going into a
22 meeting.
23          If you don't have those conversations prior
24 to going in, the meetings are ten hours long, because

Page 100

1 everything coming to the table is brand new and we
2 don't have a plan of action.
3          Very often we look at recommendations from
4 assessments and whatnot and say, well, here is the
5 best thing we can offer this child. And we have those
6 conversations with parents; we have those
7 conversations with staff. They are not private
8 meetings, though. And we are not permitted to make
9 any decision for a child outside the team.
10 Q.    Now, this follows along and it says, "The
11 day after Matt's ten hour marathon meeting, Donna
12 actually reprimanded me for not voting with the
13 school. When I said that I will not vote in violation
14 of the law and that if it went to court, I did not
15 want to have to perjure myself, she said, 'Let Angela
16 take us to court, I don't care. You need to be one of
17 us.'"
18          Did you ever make that statement to Olga
19 Yatzus?
20 A.    No. I probably said something like if we
21 don't present ourselves as a team when we go into
22 there, then we look like we are fighting in a meeting.
23          I don't recall those words exactly, no.
24 Absolutely not.

Page 101

1 Q.    Well, if you are not supposed to decide
2 before the meeting what is going to happen, why is it
3 a problem if one of the people on the team disagrees
4 with the rest?
5 A.    It is not a problem. There is often
6 disagreement in a meeting. But typically, the
7 disagreement that occurs is based on assessment data
8 that is presented. It is based on practicality of a
9 recommendation; for example, if a child is asking for,
10 a parent or someone on the team is asking for a
11 one-on-one. I mean, in this case specifically Matt
12 demonstrated through his behavior that his actions
13 typically were exacerbated when there was a one-on-one
14 around.
15 Q.    Later on there is a reference here to Olga
16 Yatzus saying that her office had been taken from her
17 "and I no longer have a place to meet with children."
18 Was her office physical location moved more than once
19 during that 2002-2003 school year?
20 A.    Yes.
21 Q.    Why was that?
22 A.    Unfortunately, we are the fastest-growing
23 district in Delaware, and lots of people's offices
24 move. Programming needs mostly.

26 (Pages 98 to 101)

73ba89f4-a29e-4a63-97fe-0a8f6782500e

13-109(9)



### WILCOX & FETZER LTD.

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

## C.A. # 05-103 SLR

---

### Transcript of:

## Mary Ann Mieczkowski

## April 12, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-111

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B112 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## REDACTED PAGE
## CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Mary Ann Mieczkowski

Page 22

1  for IEP meetings. They have to conduct the IEP
2  meeting itself. They have to make sure all the
3  people's work is in compliance. And then they have to
4  ensure that the students are receiving their services
5  within their school buildings.
6      And they can conduct achievement
7  assessments for -- or screenings for the school
8  psychologist for a student who is requesting education
9  services. So they can assist. And some psychologists
10 ask, depends on their case load, ask the ED to conduct
11 the screenings, and some prefer to do it themselves.
12 Q. And what then is the role of a school
13 psychologist?
14 A. A school psychologist has many roles. In the
15 education process, they are the lead person to do the
16 testing and evaluation -- they are the lead person to
17 collect all the information regarding eligibility.
18 They are the people who do the testing, the official
19 testing of students that they suspect may need special
20 education services. A school psychologist conducts
21 that part of an eligibility meeting where they have to
22 compile all the information, not only from their
23 psychoeducation report, but from different members of
24 the IEP team during that eligibility meeting.

Page 23

1      They have to facilitate and document
2  through the evaluation summary process that a student
3  is eligible for special education services. They also
4  have to do a three-year reeval -- the same process
5  where they gather information. They have to complete
6  their psycoeducation report, psychoeducational
7  evaluation report. They have to gather information
8  for reeval to make sure a student is still eligible to
9  receive special education services.
10     They also are the lead person facilitating
11 and documenting a manifestation meeting. They must be
12 present during a manifestation meeting. They are the
13 experts during an IEP meeting to interpret evaluation
14 information to a parent.
15     Not only do they do counseling, and some
16 run social skills groups and anger management groups
17 and things like that, they assess students who are
18 suicidal. There are a number of things that a school
19 psychologist does. But in the special education
20 realm, they are the evaluator and the lead person in
21 determining eligibility.
22 Q. Now, one of the things that the school
23 psychologist does is this, I guess, an initial
24 evaluation to see if a certain student is eligible

Page 24

1  for -- eligible to be considered a special ed.
2  student. I am not sure that's the right way to put it
3  exactly. Is that generally accurate?
4  A. To receive special education services.
5  Q. And does that usually happen before the high
6  school age, before a student is of high school age,
7  that initial --
8  A. I don't know whether you can absolutely say
9  usually. Because there are students who are
10 identified before time -- before high school because
11 it's very apparent that a student needs support in
12 school in addition to regular education. Depends upon
13 the child. Depends upon their level of disability.
14 Is it unusual for a high school student to be
15 identified in special education services? Absolutely
16 not. It's not unusual. And as a matter of fact, in
17 my career, especially as the supervisor of special
18 education services, as kids begin to look into
19 colleges, if they're struggling in school or they
20 suspect that they may have a disability, they
21 absolutely -- parents would seek evaluation for
22 special education services.
23 Q. For this initial evaluation, say, then of a
24 high-school-age student, what does the school

Page 25

1  psychologist do? What kind of testing do they do and
2  what kind of time does it take to do that kind of
3  initial evaluation by the school psychologist?
4  A. We're required by law -- if a parent or anyone
5  suggests that a student be tested for special
6  education, a parent -- you have to get permission to
7  evaluate from a parent. And then there are federal
8  laws that say within, I believe it's 45 school days --
9  I have an administrative manual that I make sure that
10 I am to the letter of the law I refer to all the time.
11 But we usually do it within the 45 school days. The
12 law has changed in 2004 with IDEA. Delaware's laws
13 are more strict than the federal laws. So within 45
14 school days an evaluation has to be completed and a
15 student be determined whether they are or they are not
16 eligible to receive special education services.
17 Q. Well, how long does it take the psychologist to
18 do the evaluation, do you know?
19 A. There are a number of steps. Testing that has
20 to be done, and that -- I am not positive how long
21 that could take. It could take a series of sessions
22 for a school psychologist to test. But also, they
23 would -- they do classroom observations. They may
24 send out behavior raters to parents and to teachers

Mary Ann Mieczkowski

Page 30

1 diagnostician for the official records before they
2 walked in the door of the IEP meeting and that the
3 school psychologist and the specialist would have the
4 responsibility of providing the parent a copy of the
5 report at the meeting.
6   Q.  Now, would this report -- is that the report --
7 when you say the meeting, is that the meeting that
8 happens every three years to determine whether -- for
9 reevaluation or is it --
10   A.  It's an initial meeting or a reevaluation,
11 whether it be for special education services or
12 whether it be for related services because the related
13 service reports may not be -- may not coincide with
14 the special education reevaluation process.
15   Q.  Are you saying that the federal law doesn't
16 really require that kind of report before a meeting?
17 It must require some report or some writing at some
18 point, doesn't it?
19   A.  I would have to go back and look specifically.
20 I am sure it could say provide the parent and the IEP
21 team with this information. But through the
22 Department of Education, Delaware Department of
23 Education, and through Appoquinimink School District,
24 we're requiring that it be in a report form because

Page 31

1 that is something that the State of Delaware looks for
2 when they do compliance monitoring.
3   Q.  And you require it before the meeting is held?
4   A.  I require it as they walk into the meeting.
5   Q.  And do you know if any other school district
6 does that in Delaware?
7   A.  Require?
8   Q.  The report be written up and presented before
9 the meeting actually starts.
10   A.  I don't -- I don't know. I know as compliance
11 monitoring, they were in the students' folders.
12   Q.  Now, you mentioned one of the things that a
13 school psychologist does either as part of an
14 evaluation or a reevaluation is the testing. I assume
15 that there are some written kinds of tests involved
16 with that a psychologist uses to evaluate
17 students.
18   A.  Mm-hmm.
19   Q.  The actual tests that are used, does the school
20 psychologist decide which tests are appropriate for
21 which student, or is that something that the district
22 decides, or how is that done?
23   A.  The school psychologists meet on a monthly
24 basis in our school district. And as a group, they

Page 32

1 decide what tests that are most current and that
2 provide the information that they need for students.
3 It doesn't state in the federal law what test to use.
4 I am not sure whether the Delaware School
5 Psychologists Association tells them what test. I
6 don't think so. Because I have heard -- I have been
7 in meetings where our school psychologists are
8 deciding to get a new edition of this test and things
9 like that. So as a whole, I leave it up to the
10 professional judgment of my school psychologists
11 because they know exactly -- they know that field much
12 better than I know that field of what tests they would
13 use.
14   Q.  Have you ever directed a school psychologist to
15 use a certain test or not to use a certain test?
16   A.  I don't believe I have.
17   Q.  Now, did you ever impose upon Olga Yatzus a
18 requirement that she have those written reports in 48
19 hours before an IEP meeting?
20   A.  I did not.
21   Q.  By the way, if you want to take a break at any
22 time, let us know.
23   A.  Okay.
24   Q.  This isn't an endurance test.

Page 33

1   A.  Good.
2   Q.  Now, is there a policy in place in the school
3 district, in Appoquinimink, of what a school
4 psychologist is supposed to do if he or she is going
5 to be absent for a day for some reason?
6   A.  I would have to look in the employees handbook
7 to see if it is a district-wide policy. I know each
8 school has their own -- I know each school has their
9 own procedures for arriving and departing and
10 reporting absences. I know we have a sub service,
11 caller service within our district. I know that
12 teachers are required to call when they're sick to the
13 sub service.
14   Q.  Is that required of a school psychologist also,
15 that they call a sub service, do you know?
16   A.  I don't know.
17   Q.  Now, when you first came into your position in
18 Appoquinimink, do you know who the ED -- who had the
19 ED position for Middletown High School?
20   A.  Marilyn Sweeney.
21   Q.  And Olga Yatzus was the school psychologist at
22 that time, right?
23   A.  Correct.
24   Q.  And what -- Marilyn Sweeney didn't finish that

B-114

426d22f3-02e8-4cc9-b693-687bb23628ef

Mary Ann Mieczkowski

Page 38

1  Q.  And in the second paragraph, it refers to a
2  memo from you, dated September 9, 2002.  Is that what
3  you earlier testified --
4  A.  Yes.
5  Q.  -- about, that you had required that written
6  reports be presented before an IEP meeting?
7  A.  Yes.
8  Q.  Now, was this the first -- do you remember if
9  there were IEP meetings before September 25th of that
10  year that Olga Yatzus did supply reports for or was
11  this the first series of meetings?
12  A.  I can tell you that I am sure there were many
13  meetings before September 25th.  I am not in every
14  meeting.  I was in the meetings of this morning of
15  September 25th.  So I cannot say whether there were
16  reports that were all handed in prior to
17  September 25th.  I know that I attended these meetings
18  and there was an issue.
19  Q.  Now, in the third paragraph, it says, the line
20  starting with the words "January 30, 2002," and then
21  at the end of that line, it says, "This is a serious
22  violation of IDEA."  What was the violation, if you
23  remember?
24  A.  That student was referred to testing by the

Page 39

1  child study team in January, and that the testing did
2  not occur until the week of September 16th.  When a
3  child is referred for testing by the child study team,
4  it has to happen within a time frame specified by
5  IDEA.  And it did not happen.
6  Q.  Do you know what the time frame was?
7  A.  Forty-five school days, I believe.
8  Q.  Okay.  Between January 30, 2002 and September
9  of 2002, there would have been a summer intervening,
10  isn't that right?
11  A.  It was referred to testing on January 30th.
12  Q.  Right.
13  A.  So we have a time frame between
14  January 30th ...  This should have been done the
15  spring before or the end of the winter before.
16  Q.  Okay.  But there would have been a summer
17  involved --
18  A.  Yes.
19  Q.  -- before September, is that right?
20  A.  Yes.
21  Q.  This student that's being referred to in this
22  paragraph where you see an IDEA violation, is that
23  student one of the three IEP meetings that you
24  attended on September 25th?

Page 40

1  A.  Yes.
2  Q.  Now, the last part of this letter, it says, "If
3  you disagree with any of the information presented,
4  please inform me of your perspective."  Did Olga
5  Yatzus do that?  Did she talk to you about what was in
6  this letter?
7  A.  Yes.
8  Q.  Do you remember when that happened?  At the
9  bottom here you say a meeting was held on October 3.
10  Is that when she told you about it?
11  A.  I believe so.
12  Q.  Do you remember what she said about any of
13  this?
14  A.  Do I remember specifically what she said?  No.
15  I do believe that one of the things was that she
16  surprised that she -- she did not know that those
17  meetings were being held.  And I had researched and
18  found out that she had asked Marilyn Sweeney to set
19  them up.
20  Q.  Well, did you confirm with anyone that the
21  actual dates of the meetings that she asked to be set
22  up were -- that she was notified of those dates?  You
23  are saying she asked that certain meetings be set up.
24  Correct?

Page 41

1  A.  Yes.  She asked on September 16th that Marilyn
2  Sweeney set them up.  It's the school psychologist's
3  responsibility to make sure these meetings are held.
4  Q.  Okay.  But it was the ED's responsibility to
5  set up the meetings and notify everybody who is going
6  to be there.  Isn't it?
7  A.  Yes.
8  Q.  Did you check to see if the notices actually
9  went to Olga a specific date?
10  A.  I don't recall.
11  Q.  Now, before you sent this letter out to Olga
12  Yatzus, did you talk to any other school
13  administrators or -- about what happened on
14  September 25?
15  A.  Yes.  I believe I was in the meetings and Jim
16  Dooley was in the meetings also.
17  Q.  Were you aware whether or not he had already
18  sent out a reprimand to Olga Yatzus?
19  A.  I believe that I said she needs to be written
20  up for this.  Do I recall specifically that he
21  presented her with one?  I don't recall whether I knew
22  that before.  I just know that when I did further
23  research, there was more involved in this issue than
24  just the absent reports, that the testing was not done

Mary Ann Mieczkowski

Page 46

1   been marked as No. 1?
2     A.  I don't recall if I saw it before I wrote it.
3     Q.  Do you know, do you remember if you talked to
4   Donna Mitchell before you wrote your September 30
5   letter?
6     A.  I am sure I did.
7     Q.  Do you remember what you talked about?
8     A.  Probably the incidents of lack of reports on
9   that day on September 25th.
10    Q.  Did you discuss with Donna Mitchell whether or
11  not there should be several written reprimands issued
12  to Olga Yatzus for what happened on September 25?
13    A.  I don't recall that we discussed there should
14  be several.
15    Q.  So when you talked to her, did you have in your
16  mind you were going to issue a write-up to Olga
17  Yatzus?
18    A.  If I can recall correctly, back -- I remember
19  saying that she needs to be written up.  I also
20  remember that I did further research that showed that
21  there were IDEA violations, and that the University of
22  Delaware practicum student, the supervision was not
23  being followed correctly.  Because they are further
24  under my supervision, I felt the need that I had to

Page 47

1   write a letter explaining that.
2     Q.  You said you did further research.  What was
3   the further research that you did, do you remember?
4     A.  The testing was -- for that student, I
5   researched that the testing was researched back in
6   January and that the testing was not done until
7   September.
8     Q.  Now, in Mr. Dooley's letter, which we've marked
9   as No. 2, in the middle paragraph there, it begins
10  with the sentence or begins with the words "In one of
11  the meetings ..."
12    A.  Mm-hmm.
13    Q.  It says, "In one of the meetings, an intern was
14  left to review the results of an assessment which she
15  had completed."  Is that the same thing you are
16  talking about, the practicum student being involved in
17  one of these reports?
18    A.  Yes.
19    Q.  Is it accurate to say that these three letters
20  are really talking about the same set of circumstances
21  which occurred on September 25?
22    A.  It's accurate to say that they are referring to
23  the same three meetings on September 25.
24    Q.  And when you -- did you -- other than the

Page 48

1   meeting you had with Olga Yatzus on October 3, was
2   there a subsequent meeting with Olga Yatzus and
3   somebody from the association or the, I'll call it the
4   union concerning these three reprimands issued to Olga
5   Yatzus?  Do you remember that?
6     A.  Yes.  I believe it was in November.
7         MR. BARTOSHESKY:  Let me show you a letter
8   from you, dated November 17, to Olga Yatzus, which has
9   been previously identified P-235.  I ask that it be
10  marked Exhibit 4.
11        (Mieczkowski Deposition Exhibit No. 4 was
12  marked for identification.)
13  BY MR. BARTOSHESKY:
14    Q.  In the last paragraph this refers to a meeting
15  that was held on November 6th.  Is that the meeting
16  you are talking about?
17    A.  Yes.
18    Q.  Why did that meeting take place, do you
19  remember?
20    A.  I believe that Olga grieved, went through the
21  grieving process, grievance process for the three
22  letters.
23    Q.  What happened as a result of that meeting on
24  November 6th?  Was one of the things that happened,

Page 49

1   you issued another letter to her?
2     A.  It was decided at that meeting that the three
3   letters would be combined into one.  And I was chosen
4   as the person at the table to write the letter.
5     Q.  And when it's combined into one, does that mean
6   that the other three should have been sort of removed
7   from her folder or something like that?
8     A.  I believe, yes.
9     Q.  Do you know if that was ever done?
10    A.  I do not know.  I don't.
11    Q.  Whose responsibility would it have been to
12  remove them or do something with them so that they
13  aren't held against her as three different reprimands?
14    A.  The director of human resources, who was Zen
15  Marusa at the time.
16    Q.  Now, it says in this last paragraph that "the
17  report from the psychologist shall be provided to the
18  administration and educational diagnostician at least
19  48 hours prior to a scheduled meeting."  Why was that
20  requirement imposed?
21    A.  That requirement was imposed by Donna Mitchell.
22  A school principal can make the rules tighter within
23  their school building as then district-wide just as
24  the district can impose rules that are tighter than

Mary Ann Mieczkowski

Page 54

1  reports?
2      A.  I am not sure whether that comes through COGNOS
3  or whether that comes through -- there is two separate
4  programs, DELSYS and COGNOS.  And COGNOS may be the
5  name of the program that would present the 400 screens
6  so that the EDs and school psychologists can keep
7  records of when an IEP meeting was held and an
8  evaluation was held and the student's birth date and
9  student ID number.  That could be produced through
10  COGNOS, but that's not a term I typically use.
11     Q.  Did Sharon Hill ever complain to you that she
12  wasn't -- that her system wasn't set up so she could
13  use that program or some other program to do her job?
14     A.  I don't recall that.
15     Q.  So you don't know if she -- you don't recall
16  that she complained to you.  Do you know if she
17  complained to anybody about that?
18     A.  No.  I don't recall that she complained to
19  anybody about it.
20     Q.  Now, when Sharon Hill started as ED, she was
21  new in that position; correct?
22     A.  Yes.
23     Q.  After Christmas.  At that time, that was your
24  first year in the -- in Appoquinimink as the director

Page 55

1  of special ed.; is that right?
2      A.  Correct.
3      Q.  It was at that point in time Donna Mitchell was
4  the interim principal; is that right?
5      A.  Correct.
6      Q.  Phyllis Waecker, she was the secretary for that
7  department at Middletown High School; correct?
8      A.  Correct.
9      Q.  How long had she held that position?
10     A.  She was moved from human resources into that
11  position during the fall, and I don't remember when
12  during the fall of that year.
13     Q.  Do you know why she was moved?
14     A.  There was a need -- the high school is a big
15  program, the number of students in the school and the
16  number of special education students.  I know that
17  Marilyn Sweeney needed help over in the high school,
18  so we had to create a position to have a secretary or
19  an assistant of some sort over there to help with some
20  of the clerical things in the high school.
21     Q.  And do you know if Ms. Waecker had or
22  Mrs. Waecker had any kind of background or training in
23  special ed. at all?
24     A.  I don't believe so.

Page 56

1      Q.  And did she finish out the year in that
2  position, do you remember?
3      A.  No.
4      Q.  Do you remember what happened?
5      A.  Do I remember what happened?  I remember that
6  she was frustrated with the paperwork and the things
7  that were happening, and that one day she just said,
8  "I am retiring" because she had her years in.
9      Q.  Did you talk to her about her frustration with
10  the paperwork and what was happening?
11     A.  I am sure on a number of occasions that I spoke
12  with her.  I know that day I had asked her if she
13  could explain to me how she sent out notice of
14  meetings and how she kept track of -- like her system
15  of keeping track of notice of meetings.
16     Q.  You said she was frustrated with the paperwork
17  and what was happening.  What do you mean by "what was
18  happening"?
19     A.  Because it was a new job for her and new
20  people.  Sharon Hill was new in that position.
21  Marilyn Sweeney -- she was new in the position when
22  Marilyn was there, and then Sharon Hill -- Sharon Hill
23  coming in new in the position.  I think just having
24  the people the first year was overwhelming.

Page 57

1      Q.  And you said that at the time that she decided
2  to leave that you were asking her about something
3  about notices going out.  Had there been a problem
4  with that?
5      A.  People were saying they did not get their
6  notice of meetings.  I had gotten a report that a few
7  people had not gotten their notice of meetings.
8      Q.  Did you ever write Phyllis Waecker up for not
9  getting the notices out?
10     A.  I don't believe I did.
11     Q.  Were you angry with her that day?
12     A.  I might have been frustrated because notice of
13  meetings -- people were complaining they didn't get
14  notice of meetings.  I don't recall that I was angry
15  with her.
16     Q.  Did you raise your voice when you were talking
17  to her that day?
18     A.  I don't believe I did.  I believe I asked her
19  could she show me how she keeps track of her notice of
20  meetings.
21     Q.  And that was enough to cause her to decide she
22  didn't want to do the job anymore?
23     A.  I didn't realize that she had made that
24  decision.  I was told a little while later that she

B-117

Mary Ann Mieczkowski

Page 58

1  had gotten up and said, "I am retiring. I am
2  resigning from this job." It wasn't a decision that
3  she made right there in front of me or gave notice to
4  me.
5     Q.  Now, switching gears a little bit. Do you
6  recall a situation where Olga Yatzus received a
7  reprimand for being late to a meeting?
8     A.  Yes.
9     Q.  What do you remember about that?
10    A.  I know the meeting was held in district office.
11  It was a meeting of great controversy. We had an
12  attorney on our side and the mother had brought an
13  attorney. The superintendent had been invited to that
14  meeting. So we decided to hold the meeting in the
15  district office because there would be so many people
16  attending and the superintendent would be attending.
17    Q.  And other than Olga Yatzus, do you recall if
18  Sharon Hill also arrived late for that meeting?
19    A.  I believe she did.
20    Q.  And had you told her -- told Sharon Hill before
21  the meeting that she should go stop and get doughnuts
22  and coffee before the meeting?
23    A.  I did not.
24    Q.  You did not. Did you review Sharon Hill's

Page 59

1  testimony before you came here today?
2     A.  Yes.
3     Q.  So you know that she has testified that you did
4  ask her to do that.
5     A.  Mm-hmm.
6     Q.  You did read that?
7     A.  Yes.
8     Q.  And you are saying that did not happen?
9     A.  I did not ask her to get doughnuts.
10    Q.  And did she receive a reprimand for being --
11  did Sharon Hill receive a reprimand for being late to
12  that meeting?
13    A.  I do not recall.
14    Q.  Do you recall that she showed up at the meeting
15  with doughnuts and coffee?
16    A.  Yes.
17    Q.  Did she tell you why she was late to that
18  meeting, Sharon Hill?
19    A.  I don't recall whether she said why she was
20  late. We were already in the meeting and the people
21  were already around the table when she came in.
22    Q.  And at some point Olga Yatzus did show up for
23  the meeting. Is that right?
24    A.  Yes.

Page 60

1     Q.  She was about a half hour late; is that right?
2     A.  Correct.
3     Q.  Did she offer any explanation of why she was
4  late for the meeting?
5     A.  I don't recall whether we -- whether anyone
6  asked her right then and there in front of everyone
7  whether -- why she was late. But I recall that she
8  had said she was taking care of an emergency in the
9  high school.
10    Q.  At some point she said that?
11    A.  Yes.
12    Q.  And do you know if that was true or not?
13    A.  I have no idea.
14    Q.  Do you know if anyone ever looked into whether
15  or not it was true she was taking care of an
16  emergency?
17    A.  I don't know.
18       MR. BARTOSHESKY:  Now, let me show you what
19  has been previously stamped as D-13 and ask the court
20  reporter to mark it as No. 5.
21       (Mieczkowski Deposition Exhibit No. 5 was
22  marked for identification.)
23  BY MR. BARTOSHESKY:
24    Q.  This is a letter, dated March 3, 2003, from

Page 61

1  Tony Marchio to Olga Yatzus. I believe it's the
2  written reprimand with respect to the meeting at which
3  Olga Yatzus showed up late that we have just been
4  talking about. It shows a photocopy sent to you. Do
5  you remember receiving this letter or a copy of this
6  letter?
7     A.  I am sure I did.
8     Q.  At the bottom it says you actually
9  hand-delivered it to Olga Yatzus.
10    A.  Yes.
11    Q.  Do you remember doing that?
12    A.  Mm-hmm.
13    Q.  Is that yes?
14    A.  Yes.
15    Q.  We're both talking at the same time again. I'm
16  sorry. It says in the first paragraph here that "Olga
17  Yatzus was notified of this meeting in writing." Do
18  you know if that is actually true, that she was
19  notified of the meeting in writing?
20    A.  I believe she would be, yes. Do I know for
21  sure?
22    Q.  Yes.
23    A.  I would have to look up the notice of meeting
24  to see if her name was on there. But because it was a

Mary Ann Mieczkowski

Page 86

1   Q.  Okay.
2   A.  Whether it was back in February or whether it
3   was in March, April, May. I don't remember.
4   Q.  When she said that, did she say that to you,
5   that she thought the environment was hostile?
6   A.  I believe she did, yes.
7   Q.  Did you take that to mean that she thought you
8   were being hostile towards her or that it was
9   something else?
10  A.  I would take it to believe that she thought I
11  was, yes.
12  Q.  Did she ever convey to you that she thought
13  there were other people in the district that were
14  being hostile towards her?
15  A.  I know Olga had a concern or a complaint about
16  the administration in the high school.
17  Q.  When do you believe you found out about that
18  concern?
19  A.  I don't recall. I don't -- I don't remember a
20  specific date that she would have said that. But I
21  know she had a complaint about the administration in
22  the high school.
23  Q.  And that was before or while she was still
24  employed in the district. Is that right?

Page 87

1   A.  Yes.
2   Q.  And what was the nature of the complaint, do
3   you know?
4   A.  She thought the administration was targeting
5   students.
6   Q.  Target?
7   A.  Targeting students with disabilities.
8   Q.  Targeting them for what?
9   A.  For write-ups and suspensions.
10  Q.  And she expressed that to you and to others in
11  the school?
12  A.  I believe she did, yes.
13  Q.  Did anybody ever look into it to see if there
14  was any merit to that complaint?
15  A.  As the school psychologist, I said to her that
16  it is part of her responsibility -- part of the school
17  psychologist's and the ED's responsibility are to make
18  sure that students with disabilities are not suspended
19  for more than ten days without receiving services. I
20  know Olga complained at one time -- it could be a few
21  times, but I know one specific time where she thought
22  that kids were being suspended. And I had said to
23  her, this is where you have to communicate with the
24  administration and set up some kind of system so that

Page 88

1   you know when kids are reaching their ten days of
2   out-of-school suspension.
3   Q.  So you are saying that it was -- it was either
4   the school psychologist's or the ED's job to keep
5   track of the suspension rate of every student?
6   A.  No. It's the school's job to keep track of the
7   suspension rate of every student. But it is the
8   special ed. department, the school psychologist has to
9   lead, be the facilitator of the manifestation meeting.
10  A child who is being removed from the educational
11  environment for more than ten days or being removed at
12  any time because of behavior have to go through a
13  manifestation determination. And a school
14  psychologist leads the IEP team through that. So it's
15  imperative that the school psychologist be on top of
16  that within each school building.
17  Q.  Well, is there some mechanisms that was or
18  should be set up within the school building to notify
19  a school psychologist if a special ed. student is
20  suspended?
21  A.  I think in each school, in each building has
22  their own mechanism, and that would be the
23  responsibility of the school psychologist to talk with
24  the administration on how they would communicate that

Page 89

1   to the school psychologist. Everything is inputted
2   into the system and I believe that a school
3   psychologist would have access to that. When a
4   student is suspended, it's for good reason, according
5   to the code of conduct. In most cases, a school
6   psychologist would know about that.
7   Q.  How?
8   A.  Through counseling, through an incident that
9   happened within the school building, through
10  communication of the administration.
11  Q.  Then you are saying it's the school
12  psychologist's function to keep track of those kind of
13  things so that the time period required by federal law
14  to have one of these manifestation determinations is
15  put into place?
16  A.  Yes.
17  Q.  You don't know what the system was at
18  Middletown High School in this 2002-2003 time frame
19  to --
20  A.  I know the system within the high school is
21  that the interventionists and the assistant principals
22  is inputted into the system. And it's a
23  computer-generated report that can be presented out
24  for each student.

119

23 (Pages 86 to 89)

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B120 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## REDACTED PAGE
## CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §        Case No.: 05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §        **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN §
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

APPENDIX PAGE B120(A) TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

---

**Transcript of:**

**Sharon E. Hill**

**March 15, 2006**

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-121

Sharon E. Hill

Page 10

1    A.  No, that's not --
2    Q.  How --
3    A.  No.  I was told that I would be the new ED,
4  that I would be replacing a co-worker of mine,
5  Mrs. Sweeney.  So I didn't apply for it.  I had no
6  idea that it was open.
7        Mr. Dooley, who was my immediate supervisor
8  at the time, assistant principal, and Mrs. Mitchell
9  came to my classroom and said to me, "What do you
10  think about it?  We'd love to have you.  You know,
11  starting whenever Marilyn gets her paperwork all tied
12  up, you will be the new ED."  I said, "Okay."
13    Q.  What was Mr. Dooley's position?
14    A.  He was assistant principal at the time.
15    Q.  At what school was that?
16    A.  At Middletown High School.
17    Q.  And that's where you were teaching at the time?
18    A.  Yes, it is.
19    Q.  And the principal then was Donna Mitchell.  Is
20  that right?
21    A.  Yes.
22    Q.  Did anybody else in the administration, like
23  Dr. Marchio or Dr. Proffitt, talk to you about taking
24  the ED job?

Page 11

1    A.  Afterwards, Dr. Proffitt briefly told me, you
2  know -- I asked her about it.  I said, "How did this
3  come about?"  She said, "You know, you are doing a
4  wonderful job.  We really think it would be a good
5  experience for you as well as the students.  You are
6  going to be good at it."  That was, basically, the
7  extent of the dialogue.
8    Q.  Was that the first time you were in an ED
9  position?
10    A.  No.  Part-time ED in Red Clay at the
11  alternative school, and also at H. B. DuPont, I was
12  part-time ED.
13    Q.  In those two positions, were you also teaching
14  at the same time?
15    A.  Yes.
16    Q.  And were the job responsibilities that you
17  assumed when you became an ED at Middletown, were they
18  the same as the ED job responsibilities you had when
19  you were an ED at Red Clay or H. B. DuPont?
20    A.  The responsibilities, I would say, are similar,
21  but very different circumstances.  Red Clay, we came
22  from a special education management system that was
23  very automated.  Everything was computerized.  In
24  Appoquinimink, things were handwritten.  Different set

Page 12

1  of administrations.  So it made the job a little
2  different.
3    Q.  Tell us, generally, the ED position at
4  Appoquinimink, what were your job responsibilities?
5    A.  To maintain compliance with IDEA, "no child
6  left behind"; the management of student records; to
7  schedule meeting for parents; work collaboratively
8  with our student support services team, which at that
9  time was Mrs. Yatzus and the administration; interact
10  with the students; provide support services where
11  necessary.
12    Q.  Were you the only the ED for Middletown at that
13  time?
14    A.  Yes, I was.
15    Q.  You replaced somebody, Mrs. Sweeney, I think
16  you said earlier?
17    A.  Marilyn Sweeney, yes.
18    Q.  Did anyone tell you why she left her position?
19    A.  She did.  She said it was very stressful for
20  her.  Marilyn and I both worked together in Red Clay.
21  And I knew Marilyn previously.  And I knew that
22  Marilyn was -- she was one of the persons when I was
23  at H. B. that mentored myself and the other
24  educational diagnostician.  And I knew her to be

Page 13

1  proficient, well-trained.  And I was surprised that
2  she left.  But I believe that she left under duress.
3  I don't think maybe it was her choice -- at least
4  that's what she said.  But she also said she was glad
5  to go.
6    Q.  As part of your responsibilities as an ED in
7  Appoquinimink, you said you maintained the student
8  records?
9    A.  Yes.
10    Q.  What does that involve, maintaining the
11  records?  I assume it's more than just putting them in
12  a folder and putting them in a file drawer someplace.
13    A.  Oh, absolutely.  Making sure that the
14  demographics are correct, like the students' names and
15  addresses; that the participants -- all documents are
16  signed; that they participated in the meeting; making
17  sure that things are done in a timely fashion, such as
18  your notice of meeting; making sure the goals and
19  objectives for the students are well-developed and
20  well stated; making sure that every three years the
21  students' eligibility for special ed. is activated or
22  it's implemented by the school psychologist.
23    Q.  And when you say "notice of meeting," is it
24  your responsibility to make sure those things are in

Sharon E. Hill

Page 14

1  the file or are you the one that actually goes out and
2  does the notices for meetings?
3  A.  Traditionally, most EDs with a school the size
4  of Middletown would have had a secretary that was able
5  to do it.  We did have a secretary, Mrs. Waecker.
6  Mrs. Waecker, I believe came from district office with
7  very limited knowledge of the special education
8  process.  In speaking with her, she actually had no
9  training, but was a district office employee at the
10 time.  And I think for some reasons maybe they moved
11 their secretarial pool or their support staff pool
12 around.
13        Maybe about two to three weeks into the
14 process we sat down as a group, Mrs. Yatzus, myself
15 and Phyllis talked about how we wanted the office to
16 operate in professional progression.  And we agreed
17 that we would meet, I think maybe two times a week, on
18 a Monday and again on a Wednesday and if we decided
19 again, it would be on a Friday just to talk about the
20 way things happen.
21        Phyllis admitted to me she really didn't
22 know.  I gave her a document, which was a checklist
23 which explained to her what the IEP process looked
24 like and what her responsibilities would be to

Page 15

1  Mrs. Yatzus and myself.  And we talked about, you
2  know, these are things -- getting the notice of
3  meeting out I think may have been difficult for
4  Phyllis because she was sick at the time.  We didn't
5  know until maybe, I'd say, February that she was in
6  remission from breast cancer.  But Olga and I had some
7  concerns because she was looking sick.  So I just took
8  that responsibility on myself.  I would send the
9  notice of meetings out because I knew that she was
10 sick.  But, generally, your secretary can -- you know,
11 the secretary generally does it for a school that's
12 that large.
13 Q.  Did you and Olga Yatzus and Phyllis continue to
14 have those meetings weekly through the rest of the
15 time that you were at Appoquinimink?
16 A.  As much as possible.  There were some very
17 different events that took place, unfortunately, in
18 our office that I believe were to the detriment of any
19 of us being successful there.
20        Olga and I first -- what I recollect, what
21 I recall is that when I returned from Christmas break,
22 we were placed in a very small office that may have
23 been three-quarters of the size of this room, if that;
24 files were thrown all over the place; our computers

Page 16

1  were not hooked up, and Phyllis was to sit in that
2  office with us.
3  I have asthma.  I couldn't manage -- I just
4  felt it was a very unhealthy situation.  There were no
5  egress in the -- the circulation was awful.  Air
6  quality was awful.  I remember vividly Olga coming in
7  and saying, "Oh, my gosh!  My things are all over the
8  place."  I didn't know which files were Marilyn's,
9  which files were mine.  It was just a mess, a total
10 mess.  And I think that was probably the beginning of
11 things not starting out to a great start for student
12 support service.
13        Marilyn's files at that time didn't make
14 any sense to me because, I mean, literally things were
15 just jumbled all over the place.  There was some very
16 important records.  I think Olga was looking for
17 something with a student, and if I recall, her name
18 may have been Jade.  She was looking for some things.
19 She said, "I need to get on top of this."  I think she
20 spoke with Mrs. Mitchell.  And she said, "Well, what
21 happened?"  She said, "I just moved your stuff.  I
22 moved it myself."
23        They went on to have dialogue about that.
24 She was very concerned.  She said, "You know, this is

Page 17

1  just a total mess."
2        Later that afternoon, I spoke with
3  Mr. Dooley.  I said, "This is not going to work.  I
4  said, "I can't make heads or tails of what's going on,
5  like who the next people were; what is my next IEP; I
6  don't have computer access."  He said, "Well, let me
7  work on it, Sharon."  I am like, "Fine."
8  I asked them then can I, please, call
9  Marilyn and ask her, you know, where -- you know what
10 are your high profile students?  Olga said to me there
11 was a sheet of paper that Marilyn kept on her desk.
12 And it was several students.  And it was on a yellow,
13 I guess, legal pad.  And she said they would talk
14 about those things.  We could never locate that, which
15 concerned me.  But, you know, we worked away.
16        Olga and I knew each other previously from
17 just professionally in the vo-tech district.  And we
18 also have a mutual acquaintance, Dr. Walker, who did
19 my training also.  I said to her, "Olga, where do we
20 begin?"  She said, "Let's just start over and try to
21 rearrange and get some balance to this."
22        And that's ultimately what my entire stay
23 at Appoquinimink was, putting out fires, trying to
24 rearrange, trying to make sense of what was going on

Sharon E. Hill

Page 18

1  and then being expected to keep up with the workload.
2        They moved us out of that office into a
3  larger office. And they got the technology piece
4  straightened out, and Phyllis was set up reasonably
5  well, but it still continued that we started out
6  really not knowing the status of students. I did not
7  get COGNOS access nor did Mrs. Yatzus until midway
8  through. It's just like the basic nuts and bolts of
9  being able to be successful in either one of our
10 positions was not there. It was difficult.
11    Q. You sounded like you began to say that you
12 asked can I call -- if you could contact Marilyn?
13    A. Call Marilyn. And I was told "no."
14    Q. Who told you "no"?
15    A. Mrs. Mitchell. She told me I didn't need to
16 speak with her.
17    Q. Did she tell you why?
18    A. No. I thought maybe, honestly, at that time, I
19 thought maybe it was because she was no longer an
20 employee that there was, basically, no reason for me
21 to have contact with her. I was told her, "This is
22 your job. Sharon, I asked you if you could do this
23 job. You know, I don't need you to contact her." I
24 said, "Okay."

Page 19

1    Q. Before when you said when you came back from
2  Christmas break, you found your stuff in a smaller
3  office, where were you located before?
4    A. No. What happened -- in October -- no. I take
5  that back. November. I was told that I would be the
6  new ED. They were waiting, I guess, for Marilyn to
7  resign or whatever time-line she had given them. At
8  Christmas break, I was told that Marilyn would be
9  leaving. And when I got back, all my things would be,
10 like my things for my ED stuff would be in an office
11 and all set up and ready to go.
12    Q. So your first exposure to being the ED at
13 Appoquinimink was when you walked into this --
14    A. When I walked into the mess.
15    Q. You said eventually -- at some point you were
16 moved into a larger office?
17    A. Into a larger office, mm-hmm.
18    Q. When was that, do you remember? Or how long
19 were you are in the small office?
20    A. Maybe for about a month, give or take.
21    Q. When you moved to the larger office, were
22 things -- when that move took place, did you help in
23 that move? Did you know about it ahead of time, that
24 kind of thing?

Page 20

1    A. I knew about it, but I didn't know exactly
2  where. But it was still sorting through all the mess.
3  It was a mess. It was a total mess. Some of the
4  files were in order. But, you know, it's just like
5  scooping up everything in here and putting it in a
6  shoe box and expecting someone to be able to make
7  heads or tails of it. It was virtually impossible.
8    Q. You also mentioned -- and I may have heard a
9  word wrong, but some kind of access?
10   A. Access to COGNOS. COGNOS and E-SCHOOL is a
11 system that drives your special education records.
12 And you have to have that in order to be successful.
13 You are able to update student records like when you
14 do -- when you convene an IEP meeting, you are able to
15 put the new meeting date, the triannual date -- that's
16 your eligibility date -- when the student was
17 evaluated, in a computer system. I think maybe the
18 database is kept at district office.
19        So being able to update those records
20 didn't take place. I can't remember the person's
21 name -- I want to say her name is Sandy Joswick --
22 finally came over, I'd say, mid February and had
23 promised to train Mrs. Yatzus and myself. And I said,
24 "Can Phyllis do it because we have such a large case

Page 21

1  load?" Donna said, "No, she's not capable of doing
2  that. I said, "Okay, fine."
3    Q. Is it Cog notes?
4    A. COGNOS, C-O-G-N-O-S.
5    Q. That's a software program?
6    A. I think it is a software program, yes.
7    Q. That didn't get up and running until you think
8  February?
9    A. Around February.
10   Q. That was after you were moved out of the small
11 office?
12   A. Mm-hmm.
13   Q. That's yes?
14   A. Yes.
15   Q. When you say "mm-hmm," it's hard --
16   A. Yes. I'm sorry.
17   Q. That's okay. You mentioned the case load.
18 What kind of case load did you have?
19   A. I'd say, it was maybe, give or take, maybe
20 about 130 students. And that may not have been
21 including the community-based students and your
22 ongoing referrals. I think we were getting referrals
23 in for students that -- parents that were requesting
24 special education services or students to be

Sharon E. Hill

Page 22

1  evaluated. I would say we were getting about eight or
2  ten students that were crisis level a month.
3  Q. When you first were assigned to the ED
4  position, did anyone tell you that you should be going
5  in and looking, looking at how Olga was doing her job
6  and reporting back to people about what she was doing?
7  A. Yes.
8  Q. What did they tell you and who was it?
9  A. Dr. Proffitt came into the office and I said to
10  her, "Why are we in this little tiny box?" And she
11  said, "Your job is to get this back into shape and to
12  tell us what Olga is doing." And I said, "Well, we
13  sit here together. I can literally almost reach out
14  and kiss her, that's how close we are." And I said,
15  "Olga and I have always got along well." And she
16  said, "When you are requesting anything, you need to
17  e-mail it or put it in writing." I thought about it.
18  I said, "That's strange." I said, "But maybe this is
19  a different process for different school districts."
20  And I felt then, quite honestly, you've got a new
21  principal who has a lot of things to prove. You have
22  got a relatively new administrator or superintendent,
23  Dr. Proffitt. You also have a new supervisor -
24  special education. And maybe this is one of their

Page 23

1  check and balance systems to make sure that the
2  persons that are in student support are doing their
3  job and were communicating about the students. So,
4  initially, you know, that was fine.
5      And things in the office -- things started
6  to be a little more apparent to me as to what was
7  going on. I really didn't feel it was necessary and
8  decided -- I didn't decide solely. But Olga and I
9  talked. I said, Let's do the meeting because we're
10  all professionals and we're all adults. And I don't
11  want to be involved in what I perceived as a gotcha
12  kind of mentality. That's just not who I am.
13  Q. What led you to believe that sort of gotcha
14  mentality was something that was there?
15  A. Just from the tenor and demeanor of the persons
16  that supervised us.
17  Q. Who were those persons?
18  A. Donna Mitchell, Mary Ann Mieczkowski, and
19  Mrs. Proffitt.
20  Q. What about their demeanor led you to feel that
21  way?
22  A. The reactive management, the yelling, the
23  screaming I want to know why. Just I think
24  professionally that has probably been one of my lowest

Page 24

1  points to be employed by anyone in the State of
2  Delaware. Absolutely. I just can't describe how
3  depraved it was to work in that setting.
4  Q. Well, you say, screaming, yelling.
5  A. Screaming, yelling, intimidation, blaming,
6  mistruthfulness, divisiveness.
7  Q. And was it from all three of those individuals?
8  A. All three of them.
9  Q. And what about that atmosphere was intimidating
10  to you?
11  A. The yelling and the bantering.
12      Let me give you a little bit of background.
13  I come from a family of educators. And from uncles to
14  aunts that have been superintendents in school
15  districts. My father, who is a stellar educator in
16  the State of Delaware. And I would say to him -- and
17  my godfather who is an assistant principal. I would
18  say to him, "I need some help in managing some of
19  these things." Also being enrolled in graduate
20  studies, asking some of my professors, is this the way
21  it should look or is this the way that it should feel
22  when you work in an environment such as this? And my
23  father and my uncle were very clear with me oftentimes
24  when you have a new regime of administrators coming

Page 25

1  in, they have points to prove, and they're going to
2  come in and, so to say, kick ass and get things in
3  line. And reactive management is never a good way to
4  resolve things.
5      I can remember one day vividly, and I just
6  thought it was the ultimate of disgusting that I was
7  just sick. Olga and I-- my desk was like the second
8  desk as you come in the door. And Olga's desk was on
9  the left-hand side of the window. It was a big
10  picture window. And Phyllis was partitioned sort of
11  away from us. And just listening to Mary Ann banter,
12  Mary Ann Mieczkowski, banter us about this kid's
13  records. And it was to the point that she was just
14  screaming: "Olga, Olga, Olga, did you not know?"
15  Then she turned around and said, "Do you hear me
16  talking?" I looked. I said, "Are you talking to me?"
17  I want to know if you are upset. I want to know are
18  you upset about any of this? Do you care?" I was
19  like, "Mitch, why are you yelling? We're not hearing
20  impaired. Do you want me to be upset or do you want
21  me to give you resolve to the problem?"
22      So we later did some research and found out
23  there was an ED -- I think it was Barb Mazza who
24  had misplaced this student's IEP and put it in the

Sharon E. Hill

Page 26

1  student's cumulative files instead of putting it in an
2  audit file. The student was transferring, I believe,
3  from a treatment facility in New Jersey. And when the
4  parent came back in, wanted to talk about services and
5  treatment -- but the parent didn't come in that school
6  year, they came in the following school year because I
7  guess the student was in crisis. And it appears to me
8  that Barb Mazza started out having an IEP meeting on a
9  student that she did not have an IEP for. She started
10  out taking minutes. And she also had a participant's
11  page. And I believe Mrs. Yatzus' name was on the
12  participants page. Mary Ann was on and on how could
13  you do it? It's against the law. You only have 30
14  days. You have 60 days for out-of-state student's
15  IEP. Blah, blah, blah, went on and on. When we found
16  out where the IEP was, Olga said, "I wouldn't have put
17  it there." I said, "I certainly didn't even know
18  where to look for it." And the response was, "Oh.
19  Well, Barb Mazza must have done that. That's okay."
20  I was just like that is absolutely disgusting. I
21  said, "I'm going home." I said, "I cannot manage this
22  today."
23          I could not manage being in that building.
24  It was toxic and poisonous to the point that I had to

Page 27

1  take medication. All of us were sick. Phyllis was
2  sick. I was sick. Olga was sick. It's just that
3  emotional kind of -- the irritable bowel syndrome. We
4  would laugh. What are you taking today? I am taking
5  Zelnorm. I am taking this. That's a terrible place.
6  That's a terrible disposition to have to be in. And I
7  think the thing that probably rang so clear to me is
8  that that building, with the needs of the students in
9  that building, needed another ED, and they needed a
10  counseling psychologist as well as a psychologist to
11  do what they wanted to do with Olga. It was
12  overwhelming.
13  Q.  What position did Ms. Mazza have?
14  A.  She was the previous ED. I think what they did
15  is that they had like maybe an ED who covered
16  part-time the high school. I don't know if Barb was
17  there full-time or not. But I know she left to go to
18  another building.
19  Q.  And did it seem to you that when it was -- when
20  Ms. Mieczkowski found out that it was Barb Mazza makes
21  who put some paperwork --
22  A.  Oh, it was okay.
23  Q.  -- in some other file that that was no problem?
24  A.  Yes. Absolutely.

Page 28

1  Q.  Did that seem different from the way you and
2  Ms. Yatzus was being treated?
3  A.  Very different. And I think the difference
4  also I found that everything was very reactive. In
5  the ideal setting when EDs come into a building, there
6  is a process, and they tell you this is when this is
7  due; this is when that's due; this is -- this is your
8  access to all the technology that you need; and they
9  give you someone to mentor you. They don't just throw
10  you into the frying pan and say, okay, just do it.
11  What I was told -- and this also rings clear to me --
12  from Mrs. Mitchell, "I don't exactly know what I want,
13  but I know what I don't want."
14  Q.  She said that to you?
15  A.  I said to her, "What is it that you want here?"
16  Because you know Donna, at that time, we were on very
17  good terms. I said, "Donna, I want to be successful
18  with this." I said to her then, "I need to sit down
19  and meet with you and Marion, Dr. Proffitt, and Mitch
20  and determine how we're going to attack this. It
21  seems like I inherited a mess, Olga and I both."
22          So I met with them, I want to say, it was
23  maybe again in February -- it may have been early
24  March -- to sit down and talk about what is the

Page 29

1  strategy what are the next steps we're going to do to
2  get us out of this. Because we're behind in IEPs;
3  there are some outdated triannuals; some kids that
4  needed eligibility; Olga had a lot of students that
5  were coming in and out that were in significant crisis
6  that really needed her attention. And we needed to
7  move forward and be successful.
8          We had that meeting. We came up with a
9  game plan that we would schedule these parents and we
10  would like just double IEPs. I described this as
11  a marathon -- I may say that it was on a Tuesday and a
12  Thursday -- to get these parents in and out and get us
13  into compliance, which I said, "That's fine. You are
14  going to give me a regular ed. substitute and a
15  special ed. substitute so we can have the team come
16  down," which I thought was a great idea.
17          Shortly after the meeting, they moved Olga
18  out of my office, out of the office that we knew,
19  which I never understood. And they said it was
20  because they didn't want the children coming in and
21  out with the confidential records. I said, "Okay,
22  fine. But they're locked and they're not sitting
23  out." But they just felt that things may be out on
24  the desk. I was like, "Fine, okay."

Sharon E. Hill

## Page 30

1  So she moved back into the smaller office
2  where we were. And I think it was with the purpose of
3  giving her space to do her counseling and to get her
4  reports done. But it was very difficult because I
5  couldn't really communicate with her other than
6  e-mail. And I think that was part of forcing me to
7  e-mail her to keep up, I guess, what I perceived as
8  being a paper trail for both of us.
9  Q.  Now, when you said that there was this meeting
10  where you set up -- tried to set up a process, who was
11  in that meeting? It was you and who else?
12  A.  Just myself, Mary Ann Mieczkowski and
13  Dr. Proffitt and Donna.
14  Q.  Donna Mitchell, the principal?
15  A.  Yes, yes.
16  Q.  You talked a little bit about when you first
17  started as the ED and you were supposed to be
18  reporting back to them about things that were going
19  on.
20  A.  Mm-hmm.
21  Q.  And did you have -- did your relationship with,
22  say, Dr. Proffitt and Mary Ann Mieczkowski and Donna
23  Mitchell, did that change over time? I think you said
24  at some point, "We just have to have a meeting and get

## Page 31

1  things done."
2  A.  Right.
3  Q.  Did something change?
4  A.  My opinion. Yeah, it did because I wasn't -- I
5  didn't feel that I wanted to be a part of the gotcha
6  regime. I just wanted to do my job. I just wanted to
7  come here, do my job, do what I am supposed to do for
8  the kids, provide them service. And the rest of the
9  foolishness, whatever it is going on with you and
10  Olga, it's not my day to report on what she does.
11  Another example of this that rings
12  absolutely clear in my mind, again, Mary Ann
13  Mieczkowski's just awful demeanor with people in
14  general, just speaking to people as if they're lower
15  than dirt. And it was not a secret amongst kids that
16  our office was very kid friendly. We would have to
17  stop them at the door. This was before Olga was moved
18  to another office. We had a group of students that
19  were waiting for me because I also did the pep squad.
20  We had a big meeting at district office. And my girls
21  were waiting to tell me something, and Mary Ann was
22  in the office and just spoke to them in such rude ways
23  that they were crying and screaming. And I said,
24  "What happened? What is going on?" "This lady came

## Page 32

1  in, this white lady, and she told us to get out and we
2  didn't have any business being in there." I said,
3  "Was it Miss Olga?" They said, "No." I said, "Was it
4  Phyllis?" They said, "No, it wasn't any of the ladies
5  that work in here." "Well, who was it? They
6  described her. I said, "Oh, I know who that was." I
7  said, "Okay."
8  By then, it was a parent on my phone.
9  "Well, who told my daughter she didn't belong in
10  here?" I said, "I don't know," I said, "but that --
11  certainly, I think that was maybe misunderstood. I
12  don't think there is an adult in this building that
13  would say that to anyone's children."
14  By the time I took care of that, I was a
15  running a little late getting over to district office
16  for the meeting. Mary Ann walked down the hall. She
17  said, "Well, are you on your way? Are you going?" I
18  said, "Yes." She said, "Well, before you come in, got
19  buy a box of joe and some doughnuts because this is
20  going to be a long meeting." I said, "Fine." I saw
21  Olga in passing. I knew she was involved in
22  something, but I didn't know exactly what it was. I
23  went to pick up the meeting. Of course, got caught by
24  the big old Middletown train, so I was late getting to

## Page 33

1  the meeting.
2  When I walked into the meeting, Mary Ann
3  met me just absolutely enraged. "Where have you
4  been?" I have got a box of joe in my hand and
5  balancing doughnuts in the other. And she's having
6  this tug of war with me. I am like, "Wait a minute.
7  This is hot."
8  The two other social workers, and I can't
9  remember -- two black social workers that worked there
10  saw the whole thing, and they were just like, oh, my
11  gosh. I can't believe that.
12  I really wanted to drop it on her foot
13  because -- I am saying, "This is hot." She made me
14  leave the doughnuts out in the hallway and walk into
15  the meeting. I said, "Well, you sent me to go pick
16  them up."
17  So we were all sitting there waiting. I
18  think maybe the parents' attorney was late. We were
19  sitting there waiting. And Donna says to me, "Where
20  is Olga?" I looked. I said, "She's probably back at
21  school." I said, "I know there were a few things that
22  were going on, but I am certain" -- I sat and I looked
23  and thought to myself, It's really not my day to watch
24  her. I don't know where she is.

Sharon E. Hill

Page 34

1    So I got up and went to the bathroom and
2  walked by, and there was Mrs. Proffitt standing,
3  looking on the floor at the doughnuts that were
4  dropped on the floor. She said, "Who are these?" I
5  said, "Maybe you should ask Mrs. Mieczkowski how those
6  got there," and just left.
7    That kind of -- it's just unprofessional.
8  Just terrible.
9   Q.  Did you get any reprimand or get in any
10  discipline because you were late to that meeting?
11   A.  In that meeting, I was asked why I was late,
12  and I explained to them that there was something going
13  on at the high school, that if I didn't take care of
14  it, it had significant racial implications and that I
15  needed to take care of it. I said to Donna then. I
16  said, "Mary Ann must have been in the office and
17  yelled at someone because I had four parents that were
18  willing to go to the newspaper about things that had
19  gone on with the pep squad."
20    A little history on that. The pep squad
21  was put at the end of the parade at the high school,
22  which certainly a not nice message to the
23  parents. So we have been dealing with that for a
24  little bit. So I said here again, "If you wanted

Page 35

1  another fire to put out, I needed to take care of
2  that." I was told, "I am going to have to write you
3  up." I was like, "Okay, but I needed to take care of
4  it."
5    Later I was told that Olga and I both were
6  going to get written up for not being at the meeting
7  on time. I later found out that Olga's mother -- I
8  think she got an emergency phone call that her mother
9  had been very sick and that she needed to either make
10  it -- it was an appointment that was previously set
11  that she needed to make sure that she got to. And she
12  wasn't able to make it. And she was also told, which
13  I thought was just sacrilegious, that if she left to
14  take her mother to the appointment, that her
15  employability would be jeopardized.
16   Q.  Were you in fact written up for being late to
17  that meeting?
18   A.  No.
19   Q.  Do you know if Olga was?
20   A.  I think she was. I am almost certain that she
21  was.
22   Q.  Were you saying that you think the attitude
23  towards you changed after you made it clear that you
24  didn't want to be part of this, what you say, gotcha

Page 36

1  situation?
2   A.  Yes. Mm-hmm.
3   Q.  Now, were you or Olga ever instructed that you
4  could not have students in your offices?
5   A.  Yes.
6    MR. BARTOSHESKY: And let me show you a
7  document that's been marked previously as P-269. I
8  guess make this Hill No. 1.
9    (Hill Deposition Exhibit No. 1 was marked
10  for identification.)
11  BY MR. BARTOSHESKY:
12   Q.  This, like I say, was marked P-269 and the date
13  at the top is 2/28/03. It's to Jim from Olga. First
14  of all, have you ever seen this before?
15   A.  Yes, I have. I can't recall actual -- I think
16  Olga and I had discussions about this. But actually
17  to see the document ... Mm-hmm. Yeah.
18   Q.  Now, it says, "Jim." Do you think that would
19  be Mr. Dooley?
20   A.  Yes.
21   Q.  It says -- it's from Olga. "I am seeking
22  clarification on the discussion we had a couple of
23  weeks ago. You initially wrote me a letter of
24  reprimand for having a student in my office." Do you

Page 37

1  recall that event where there was some reprimand to
2  Olga for having a student in her office?
3   A.  This specific event?
4   Q.  Yes.
5   A.  Not this one. Honestly, there were so many I
6  can't say that I recall this one.
7   Q.  Okay. And it looks like, initially at least,
8  anyway the policy was going to be that the students
9  had to remain on Phyllis' side of the office. And you
10  couldn't have students in the office also. Do you
11  remember that kind of directive?
12   A.  Yes, I do. Now that I read further. This is
13  the same thing. This is the Black History month
14  thing. Absolutely. That was that same morning.
15  Absolutely.
16   Q.  So this is sort of a description of the events
17  that you were talking about earlier where --
18   A.  Yes.
19   Q.  -- Ms. Mieczkowski came in and gave some
20  students a hard time for being around your offices?
21   A.  Yes. This is absolutely this one.
22   Q.  Now, let me show you another document. This is
23  a --
24    Mark this.

B-128

ab583e46-5fea-4651-8e8f-fbd720d8638b

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B128(A) TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B129 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B130 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Sharon E. Hill

Page 50

1  happened between you and Ms. Mieczkowski, and we
2  talked about a couple things with Olga and
3  Ms. Mieczkowski. Were there other things, other
4  adults that she had problems with that you remember?
5      A.  Basically, anyone that didn't go along with
6  what she said.
7      Q.  Did you ever talk to anyone in the
8  administration about problems that either you or Olga
9  or anyone else was having with Ms. Mieczkowski?
10     A.  Oh, I talked to several people.
11     Q.  Who did you talk to?
12     A.  I talked to Dr. Proffitt.
13     Q.  What did she say?
14     A.  She told me to go back to Mrs. Mitchell and
15 handle it. I talked to Donna about it, Mrs. Mitchell.
16 When I did not get resolve, I needed to get the union
17 involved. When the union -- and I am not pro union.
18 My thing has always been if I have a conflict, my
19 belief is I have an attorney that manages things when
20 I can't do it. So when things got really bad and it
21 started -- just being in that toxic, awful cesspool
22 there; and it wasn't the children -- I had to get an
23 attorney, Joe Rhoades, and I explained to him the
24 level of stress, the disrespectful behavior. He heard

Page 51

1  it one day on the phone. I had my cell phone on so he
2  could hear just how rude rude could be.
3          Vicky Boyd overheard them one afternoon. I
4  scheduled an IEP meeting for a parent who had an
5  in-home daycare. And she wasn't able to come in until
6  like maybe 5:30. Donna said to me, "Well, who is
7  going to be the special ed.? Who is going to be the
8  regular ed.? And did you think about this before?
9  And who is going to pay the teachers to stay?" I
10 said, "Donna, I had already spoken to the teachers,
11 and they agreed to come back because they were in
12 Middletown." She said, "Well, that's just great.
13 Well, I am not paying anyone." I said, "Well, fine."
14 She said, "Who is going to convene the meeting?" I
15 said, "You could be regular ed., I could be special
16 ed., and we could have John Martin or another
17 administrator or guidance counselor here to convene
18 it, if need be." And I was so just upset with her
19 response and her yelling and the tapping of the
20 fingernails and the throwing of the pencil -- this is
21 a typical Donna behavior -- that I just started
22 crying. I am not a cryer. That is just not who I am.
23         I remember Joanne Singleton, who was there
24 at the time, she said, "Leave. You need to leave."

Page 52

1  Vicky Boyd called me and said to me, "I want you to
2  leave and don't convene this meeting. Let them figure
3  it out. Sharon, no one has to listen to that. And
4  we'll deal with it." She said, "That's just
5  absolutely ridiculous."
6          When I met with Vicky and Donna, Donna
7  described the conversation between us as "peppered."
8  And I remember saying to her, "Was that mild green
9  pepper, hot habanero pepper? What kind of pepper do
10 you think it was when you throw a pencil at someone
11 and when you banter and badger them and refuse to be a
12 part of a team, when you refuse to be a part of the
13 solution and choose to be a part of the problem? It
14 is not peppered, absolutely and unequivocally not." I
15 said, "You yelled at me. You threw a pencil at me.
16 Is this the way you treat people? I said, "This is
17 it," I said.
18          My blood pressure was off the charts. I
19 have not ever had to take blood pressure medication,
20 Toprol. What I was else was I taking? Elavil. You
21 name it, I have it. My doctor said, "You come home."
22          Every time that I was out, they had another
23 ED; two additional support people; they brought people
24 in from district office. At that point, I said,

Page 53

1  "Well, they must realize this is a job that is too big
2  for two people to do."
3          At that time, Olga was sick. She was
4  nauseous. She was vomiting. She was sick. She
5  needed to go to the bathroom. I mean, it was funny.
6  It was just like the revolving door. And now the
7  office -- I came remember one morning Olga came into
8  the office with Cheerios, dry Cheerios because she
9  was actually like with the dry heaves. I said, "Olga,
10 go home. You are sick." Dark circles under her eyes.
11 I mean, just shaking nervous. I am like, "Olga, why
12 are you here? You are sick." I said, "Go home." She
13 could hardly talk. Just coughing and coughing. I am
14 like, "Go home." She said, "Sharon, your eyes are
15 red. I am worried about you." I said, "I am going to
16 be all right," I said because Joe Rhoades is handling
17 this for me. I can't do it another day." I said, "I
18 just can't."
19          I just couldn't. My doctor said, "No, you
20 don't go back until your blood pressure is down. You
21 don't go back until, you know, the acne" -- it was
22 just like one physiological symptom that was a part of
23 the stress of being there. And as soon as I left
24 Appoquinimink, as soon as I got to Brandywine, that

Sharon E. Hill

Page 66

1   Q.   Let's take a step back.  It says, "Monday, we
2   were in room 1006 conducting a behavior manifestation
3   for Tyrell McG?
4   A.   McGlottin.
5   Q.   "You stormed into the office and immediately
6   pulled the binder out of Sharon's hands."  This is
7   Olga describing an incident with Mary Ann Mieczkowski.
8   Do you remember that happened?
9   A.   Yes.
10  Q.   Describe your memory of that incident.
11  A.   I was standing like near Phyllis' desk or the
12  edge of her desk, and I was looking down at the
13  binder, just taking the binder out of the vertical
14  files and pulled it out.  And I was looking at it.
15  She walked in and just took it, just like took it out
16  of my hand, not regarding the fact that I was reading
17  it.  And she was thumbing through it, sort of
18  haphazardly and was pointing and yelling about the
19  date and saying, "Did you see this?  Did you see
20  this?"  And some other utterances.  And she walked
21  back and spoke to Olga.  I remember looking at the
22  clock and Phyllis just looking at me.  And we sat and
23  actually watched the clock and listened.  That was a
24  typical thing, how much longer is she going to yell

Page 67

1   today?  Until Phyllis got up.  Phyllis couldn't stand
2   it anymore.
3       I just looked.  And I remember Olga asking
4   her to back up "because you are touching me."  And I
5   didn't know what was going on.  And she was literally
6   cowered over her while she was at her desk looking at
7   the e-mails.  She said, "Back up.  You have got your
8   breast on me.  You are standing too close.  You are in
9   my space."  She kept repeating it to the point where I
10  turned around and looked over.  And I was just like,
11  Wow!  She also told her, "You are out of control, you
12  are out of control."
13  Q.   Olga told Mrs. Mieczkowski that?
14  A.   Yes.  She said, "Mitch, you are out of control.
15  Step back."
16  Q.   Did it go on for -- this says, "Your tirade
17  lasted at least an hour and a half."
18  A.   It was quite a -- it was about that time.
19  Because we had time to get up, take a break, come
20  back, and it was still going on.
21  Q.   Now, at the beginning of this paragraph it
22  says, "Phyllis and Sharon are both out this week for
23  extremely high blood pressure."  Is that what you were
24  talking about before --

Page 68

1   A.   Yes.
2   Q.   -- how all three of you were having problems
3   that way?
4   A.   Yeah.
5   Q.   And you were out --
6   A.   Yes.
7   Q.   -- for a time with blood pressure?
8   A.   Mm-hmm, mm-hmm.  It's all documented.  As I
9   said, I had to take Toprol, Toprol XR, Toprol 25
10  milligrams and 50 milligrams and a 100 milligrams.  I
11  was taking Lisinopril.  I can't remember how many
12  different medications I was taking at that time.  But
13  I'd say it was at least twice a day.  And it just
14  increased to the point that when I started taking
15  Elavil, I needed to come home because I couldn't drive
16  to work and take that.
17  Q.   At the bottom of this page -- by the way, take
18  a step back.  Is there anything on the first e-mail on
19  this page, the one that's the subject: copy of letter
20  sent to Tony --
21  A.   Mm-hmm.
22  Q.   -- down to the last sentence, says, "Under your
23  leadership, a very good and dedicated professional
24  retired and two are out sick (doctors orders)."  Is

Page 69

1   there anything there you believe would be inaccurate?
2   A.   No.  That's accurate.
3   Q.   Now, the next e-mail, which is dated April 8th,
4   2003 and it's from Olga Yatzus to Tony Marchio, in the
5   second paragraph of that, it says, about halfway
6   through, and talking about -- well, let me just read
7   this sentence.  It says, "I believe that many children
8   get targeted by the administration and then at the
9   first opportunity children are suspended and expelled
10  with little evidence.  Due process is by-passed
11  repeatedly, and parents are treated as if they are the
12  enemy when they would like a chance to address their
13  concerns.  Often children are suspended and the
14  parents never are notified."
15      Do you with that?  Did that happen?
16  A.   Mm-hmm.  I am not going to say it happened all
17  the time.  But there were certainly enough incidents
18  of that that that's consistent with what I saw when I
19  was there.
20  Q.   Then the next sentence says, "In reviewing
21  their attendance records, often these suspensions are
22  recorded as unexcused absences."  Did you ever see
23  that?
24  A.   Mm-hmm.  And I do know that there is a little

B-132

ab583e46-5fea-4651-8e8f-fbd720d8638b

Sharon E. Hill

Page 70

1  bit of leeway with some disciplinary things that
2  principals can either choose to make it an official or
3  unofficial or a student removal.
4        But I also think the impetus or the driving
5  point with this document is that so many of
6  students -- they're spending more time out of school
7  than in. And I think that's what my perception was
8  with Olga is that she just said when we have students
9  that are here in school, we can work with them. But
10 putting them out without supports and putting them out
11 or kicking them out is not the best way to handle the
12 problem, that we need to rely on our professional
13 resources to support the students.
14 Q.  I am turning to the next page. I am jumping
15 around a little bit because some of these things I
16 think that are in here you have already talked a
17 little bit about.
18       In the third paragraph down, it starts off
19 with a sentence that says, "The endless hours we are
20 spending on these issues with angry and disgruntled
21 parents is making it impossible for us to hold IEP
22 meetings and to attend to our other responsibilities
23 in a timely fashion if at all." Do you agree if that
24 was true?

Page 71

1  A.  Yes.
2  Q.  "Everything is in crisis mode all time. When I
3  tried to talk to Donna about rethinking how we are
4  disciplining our students I have been yelled at and
5  told that she doesn't want to talk to me about it."
6        Did you ever overhear anything like that,
7  Olga trying to talk to Donna Mitchell about these
8  things and being told let's not talk about it?
9  A.  Just -- not to hear her say she didn't want to
10 talk about it. But just to ignore her. Or to -- you
11 know, she didn't want to talk to you, she just
12 wouldn't be available.
13 Q.  Donna Mitchell wouldn't be available?
14 A.  Yes. I never heard her say she really didn't
15 want to talk to Olga about it, but just to make
16 herself not available. She didn't want to hear what
17 you had to say. That's accurate.
18 Q.  Now, the next paragraph, I think it sounds
19 consistent with what you have testified earlier, but
20 can you read that? It begins with -- read it to
21 yourself -- "in regard to special education office,
22 things are out of control." That paragraph. Tell me
23 if there is anything in there you think is inaccurate.
24 Actually --

Page 72

1  A.  That's absolutely accurate. It couldn't be
2  more accurate.
3  Q.  The next paragraph that starts with "When
4  Sharon started," is that paragraph accurate also?
5  A.  Yes, it's accurate.
6        You know what, I think the worst part of it
7  with me, just working with children and parents of
8  special needs children, this whole, I guess part of my
9  life and even having to bring this back up again is
10 such a sad commentary on education. It is. It's bad.
11 Q.  This incident with Mary Ann Mieczkowski coming
12 in and taking the binder out of your hands, do you
13 know, ever hear Ms. Mieczkowski make any explanation
14 or description of that event to anyone?
15 A.  No. I don't remember her making any
16 description of it because that's just her general rude
17 behavior. I really don't think that she is well aware
18 of how rude her behavior was at that time.
19       MR. BARTOSHESKY:  Let me show you a paper
20 that's been marked as D-84. It's a memorandum to Zen
21 Marusa from Mary Ann Mieczkowski. It's dated June 23,
22 2003. It says, "Re: Olga Yatzus' complaint."
23       (Hill Deposition Exhibit No. 4 was marked
24 for identification.)

Page 73

1        THE WITNESS:  This is not accurate.
2  BY MR. BARTOSHESKY:
3  Q.  What about it is not accurate? No, she did not
4  take the binder away from me in a calm manner. No,
5  she did not sit down next to me in a calm manner. Nor
6  did she listen. When she walked in, she was loaded
7  for bear. That's how I can describe her behavior,
8  loaded for bear. And there was no listening that I
9  recall. She was yelling. I mean, yelling accurately
10 describes, yelling and pointing and banging her finger
11 on the desk and, you know, the whole thing around her
12 neck. She just has all these little different
13 mannerisms when she's really frustrated. The rubbing
14 of the fingertips in the palm, and the back and the
15 forth of the hands, and the pointing. It's -- reading
16 this is just like being right there again.
17 Q.  It says at the bottom of that second paragraph
18 Mrs. Mieczkowski says, "During the discussion" -- and
19 she's talking about, I guess, a discussion between her
20 and Mrs. Yatzus. It says, "During the discussion,
21 she" -- meaning Olga Yatzus -- "stated that the entire
22 team, including herself, messed this one up."
23       Do you remember at that time Olga saying
24 something like that?

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B134 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Sharon E. Hill

Page 78

1  make some real unpopular decisions. But in the final
2  analysis, I have to live with me, and I am not going
3  to do anything to damage another human-being or to
4  cause them stress or strife. And I wasn't going to be
5  in that position.
6        One thing I knew about Olga is that she was
7  very child-centered from working with her previously.
8  The one thing that I felt about Donna -- and I think
9  in a very strange way, it may be accurate -- that
10  she's very child-centered. She has some strong
11  talents. Leadership, I don't believe it's her forte.
12  I think she is a better assistant principal than she
13  was a principal. Hopefully, she's grown into that.
14  Mitch, I don't see any earthly good in her at all.
15  That's my opinion. I just don't. Mrs. Proffitt,
16  Dr. Proffitt, I think she needs to grow up. Because
17  her behavior at times -- she's talented. I think
18  that's the thing that really scares me is that each of
19  those three ladies, Donna, Mary Ann and Marion, have
20  tremendous strength to do great things with children.
21  And it's just unfortunate that this whole incident
22  didn't parlay where everyone walked away with a
23  win-win. Because not only did they damage children,
24  they damaged people for their inept behavior. And

Page 79

1  that's just unfortunate.
2  Q.  Now, Phyllis -- and how do you say her last
3  name?
4  A.  Waecker.
5  Q.  Waecker. Did she leave the district also at
6  the end of that year?
7  A.  She left after a yelling tirade. She couldn't
8  stand it another minute.
9  Q.  Who was yelling?
10  A.  Mary Ann. And I was so hurt and embarrassed
11  that day, again, and how it was trivialized or
12  editorialized is that Phyllis didn't like black
13  people. That's how it was told. And I later said
14  that I don't think that that was the case. And
15  certainly, everyone is entitled to their opinion. If
16  Phyllis did have that issue, it never came between the
17  two of us as far as me being the person that she
18  needed to help.
19        But it was something that Phyllis forgot to
20  do. And I had e-mailed her. And this is when I
21  remember saying to Donna, "I think Phyllis is sick
22  again. I think she's going for treatment again.
23  She's getting the little brown splotches on her face.
24  I noticed that she comes in very early, that she's

Page 80

1  just not herself." Her hair was starting to thin. I
2  said that to Donna. She said, "Well, until she comes
3  to me and tells me that's so, I expect her to do her
4  job." I was like that's really humane, I thought to
5  myself.
6        And Mary Ann came in and said, "Did Sharon
7  e-mail you this checklist? Did she go over this with
8  you? I need to know. Phyllis, answer me." She
9  turned around and looked at me, "did you go over this
10  with her?" I said, "Yes, I did." "Then why is it not
11  done? I need to know. Why is it not done?" I just
12  looked. I just felt so bad for her.
13        Phyllis stood up. She walked over to her
14  coat rack that was beside us. She brought it in for
15  the office. She picked up her coat crack, took my
16  things off of it. I think Olga may have had a scarf
17  or hat. Took the pictures of her family off and
18  proceeded to walk out the door crying. I ran
19  behind her. She said, "No, don't. Just let me go."
20        The nurse, I can't remember her name -- I
21  think she died recently of breast cancer, maybe about
22  a year ago -- was coming down the hall to sort of help
23  Phyllis out. I didn't know they had made that
24  connection because they were both going through the

Page 81

1  same thing. She wouldn't let anyone -- she was done.
2  When I called her that evening, she said, "I'm really
3  sorry," she said, "but I had to get out of there,
4  Sharon. I didn't mean to hurt you, or" -- I said,
5  "No, Phyllis, I just wanted to make sure you were
6  okay."
7        She walked out never to come back.
8  Q.  Where did this idea -- where did you hear this
9  statement that she had a problem with black people?
10  A.  Donna.
11  Q.  How --
12  A.  I don't know why she said -- Donna and I
13  talked. I talked about it. I said, you know. She
14  said, "Well you keep on telling her things. And it's
15  your responsibility." I said, "Well, Donna" -- Donna
16  said to me, "You know, Sharon, she had a problem with
17  African-Americans or someone black at another school."
18  I said, "Oh." I said, "Well, if" -- I remember my
19  response was -- and I joked about it -- I said, "Well,
20  if my handicapping condition today is that I woke up a
21  little browner than most, then that's all right" and
22  just laughed about it. Because I thought at that
23  time, whoa, that was really different. That was a
24  different way to manage the race card. I said, "This

Sharon E. Hill

Page 82

1  is new." And I just laughed about it
2  Q.  The implication being that --
3  A.  That she had difficulty taking directives from
4  me. I was like, Oh, well. That's just the way it is.
5  MR. BARTOSHESKY: Let me take a couple
6  minutes and get myself organized. And I think we're
7  almost finished. Okay.
8  (Recess taken.)
9  BY MR. BARTOSHESKY:
10  Q.  Was there a time that you observed that
11  somebody from the administration, Dr. Proffitt or
12  somebody else had somebody, had the tech people come
13  in and go through Olga's computer system?
14  A.  Yes, yes.
15  Q.  Was it just Olga's computer or was it somebody
16  else's also, if you know?
17  A.  Olga's computer, I recall, as well as mine, but
18  what I do -- I actually saw them go through Olga's
19  computer. What I found them to do when I returned
20  from my medical leave, miraculously -- I guess it's
21  the infamous oops-I-lied, which is one of Donna's
22  coined phrases when you would ask her did you do this
23  or did you have any knowledge of this. And when she
24  would get pinned into the corner,

Page 83

1  "oops-I-guess-I-lied" was a very common response.
2  Like the Lilly Tomlin, "I-lied-I-guess-I did."
3  We were coming back from lunch. Myself and
4  Darren Blackstone, who works for the district, had
5  been to lunch. And came in. And Phyllis was walking
6  in with us. Came in. And I remember looking. I am
7  like, "What is going on at Olga's desk?" I remember
8  seeing Dr. Proffitt and two guys from tech -- and one
9  of the guys -- I always forget his name. He had
10  short, fuzzy, gray hair and sort of like egg-shaped
11  rimless glasses. Very nice. Because he had helped me
12  log onto a computer before -- were bent over Olga's
13  desk. And they were just looking and gazing.
14  And I remember simply that the first thing
15  that I saw is that it was her AOL account because I
16  had an AOL account. And I knew that Olga was teaching
17  at the time. I said to Olga, "I wish you would let me
18  know because I need to take a class. I would have
19  taken that class." And they were commenting that
20  someone that she was, I guess, communicating with her
21  students or students were sending her assignments and
22  it was on Appoquinimink time, which I found to be very
23  unusual.
24  When I walked in, you know, I just looked

Page 84

1  and they looked back at me. And I looked again and
2  sat down at my desk and they continued to look for
3  maybe about, I'd say, eight to ten minutes, and they
4  left, which I found to be very alarming, which was
5  another sign to me that there was no regard or the
6  premise for respecting someone's personal space.
7  And I know that the district, when you're
8  working with them, has a right to look at your e-mails
9  or to access things that are Appoquinimink kinds of
10  business, but I was a little surprised that they could
11  actually see what -- I guess maybe that was the last
12  thing that Olga was looking at on her account that
13  they decided that they should read through it.
14  I actually had an opportunity to witness
15  that myself when I returned back from my medical leave
16  that I couldn't log into my computer. Someone -- I
17  had like several e-mails that were deleted that I knew
18  were there. Luckily, I sent them to myself so I had
19  them at home, which is another example of the
20  deception and just the toxicness of being there. I
21  could not fathom why it happened.
22  Q.  Did you ever ask anybody if they in fact did go
23  through your computer?
24  A.  I did.

Page 85

1  Q.  What did they say?
2  A.  I talked to Zen. As a matter of fact, it was
3  so -- this is another description of just irrational
4  and mean behavior. Donna knew when I was coming back.
5  Donna Mitchell knew when I would be returning. On the
6  day of my return, they were having a huge party in my
7  office for all of the people that they had rounded up
8  to help do my job. Wasn't that an epiphany? If it
9  took that many people to complete the professional
10  responsibilities that I was supposed to do, it should
11  have been a message to them not only were you behind,
12  but it was a task that was not designed for one person
13  to be able to execute effectively.
14  I went to another computer. I went to
15  Lynn. I forget her last name. But she was our DSEA
16  or AEA rep. And she said, "Well, here. Try to log on
17  here." And she tried to log on. Went over to
18  district office. And I remember walking by Donna and
19  saying to her, "It's enough already. It's enough." I
20  said, "I am not working under this stress. I can't do
21  it again."
22  Zen said to me, "Donna had to someone
23  had to authorize this, and it had to be your
24  principal." And I said, "I don't know. I didn't

B 136

22 (Pages 82 to 85)

**Page 90**

1  anymore, when she was out sick and then you were told
2  she was going to be moved to the district office, were
3  you aware that there were some complaints that had
4  been filed by parents of students with the OCR?
5  A. Yes.
6  Q. Do you know what those complaints were about?
7  A. I can't recall exactly verbatim, but I think it
8  sort of stemmed around the fact that the special
9  education process was not followed and they felt that
10  their civil rights were being violated from the school
11  district continuously putting their children out and
12  not providing educational remedy for them or effective
13  educational remedy. That was my understanding.
14  Q. Did anybody from OCR ever contact you about
15  that situation?
16  A. No.
17  Q. Did anybody from the school district ever talk
18  to you about those OCR claims anybody had made?
19  A. Not specifically the district, but I remember
20  just a conversation with John Martin -- and I can't
21  remember who the other person was that was in the
22  office -- that Olga was trying to sue the school
23  district and Olga was behind it. They felt she was
24  going to sue the school district. She had sued a

**Page 91**

1  previous school district. And that Olga had got the
2  parents to team up against the school district. And I
3  believe it was also a website that the parents and
4  Olga were supposed to have created that were supposed
5  to be anti-Appoquinimink.
6  Q. Who is John Martin?
7  A. He's the assistant principal.
8  Q. At?
9  A. Appoquinimink. At Middletown High.
10  Q. Did he replace Mr. Dooley at some point?
11  A. Yes. I think he -- I don't know if he was
12  there -- I think he came first and then Felicia came.
13  I think he did.
14  Q. Who is Felicia?
15  A. Dugan. She's the other assistant principal
16  there.
17  Q. When you started at Appoquinimink, Mr. Dooley
18  was the assistant principal?
19  A. Yes.
20  Q. Donna Mitchell was, I guess, the acting
21  principal at some point in that time?
22  A. Yes.
23  Q. Then she became the principal?
24  A. Mm-hmm.

**Page 92**

1  Q. Mr. Dooley. And there were a couple other
2  assistant principals?
3  A. Yes.
4  Q. You said you heard these things about Olga and
5  the OCR and the website from a Mr. Martin?
6  A. From Mr. Martin. That was my first time to
7  hear about it. I didn't know anything about it.
8  Q. There was somebody else there, too, but you
9  can't remember who, is that right?
10  A. Felicia Dugan that said -- I don't want to
11  provide misaccurate information.
12  Q. That's the last you heard of these OCR
13  complaints.
14  A. Mm-hmm.
15  Q. Is that correct?
16  A. Yes, yes, it is.
17  Q. Do you know why Mr. Dooley left Appoquinimink?
18  A. Stress. You know what his words were to me?
19  The night that he and I stayed -- here again another
20  misinformed -- we didn't get -- the comment was: "You
21  have to enter all these DSTP accommodations." I can
22  laugh about that because that's what I have been doing
23  today at one of my schools -- for these students. "Do
24  you know that?" I said, "How was I going to get in?

**Page 93**

1  Did you ever give me access to DELSYS?" "Did you ask?"
2  I said, "No." "You should have." That is something
3  when I was an ED in Red Clay, they'd just say, here's
4  your this, here's your that.
5      Mr. Dooley and I sat one evening until, I'd
6  say, 11:00 o'clock -- I didn't leave the school until
7  2:00 in the morning -- entering the accommodations for
8  students. And he was packing his things. He said,
9  "Sharon, I am going to tell you good-bye." He said,
10  "I hope I see you again. But call me before you
11  decide you want to drive your car off the side of the
12  bridge." He said, "Because this place is a mess." He
13  said, "My wife told me to come home." He said, "I
14  can't do it anymore." He said, "This is my last day."
15  I said, "You are really leaving, Jim?" He said,
16  "Yeah, I am out of here. I can't do it." He said,
17  "Before you get to that point, that you want to drive
18  off the St. George's bridge, you call me." I said,
19  "Oh, it's not that bad."
20  Q. What part of the school year was this, do you
21  remember?
22  A. It had to be close to this time, around this
23  time because it was DSTP time and I remember just
24  saying, I was so tired when I left because it was just

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B138 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## REDACTED PAGE
## CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Sharon E. Hill

Page 118

1  as something that would be --
2      MS. MARTINELLI: No.
3      MR. BARTOSHESKY: Okay.
4      THE WITNESS: I guess my question for you
5  is where is the letter where I responded to this that
6  this was not accurate.
7      MS. MARTINELLI: I don't have that with me.
8      THE WITNESS: There is a letter that goes
9  along with me.
10 BY MS. MARTINELLI:
11 Q.  I am confirming is that the document you were
12 referring to?
13 A.  Yes.
14      MS. MARTINELLI: Okay.  And can we mark
15 this as Exhibit 9, please?
16      (Hill Deposition Exhibit No. 9 was marked
17 for identification.)
18 BY MS. MARTINELLI:
19 Q.  Was this document ever mailed to you?
20 A.  Absolutely not.  I have never seen this.  And I
21 want it to be on record, and also -- no.  I want to go
22 on the record that I never received this.  And there
23 were not to be any discipline letters in my file.
24 That I was told that my file would be sealed.  And the

Page 119

1  letters that I had questions with would be removed.
2  And I have never received this.  And I will deal with
3  this another way with you all because this is
4  absolutely something I have never received.  So you
5  will be hearing from Joe Rhoades behind this one.
6      MR. BARTOSHESKY: Can I ask you again is
7  this something that's been produced before in this
8  litigation?
9      MS. MARTINELLI: No, there was no request
10 that it was responsive to.
11      MR. BARTOSHESKY: Well --
12      THE WITNESS: Can we take a break now?
13      MR. BARTOSHESKY: Let me -- not yet.  The
14 Rule 16 requirements and Rule 26 requirements are that
15 you identify documents you believe are going to be
16 relevant in this case.  So this is -- nothing from
17 Mrs. Hill's file or Sharon Hill's file was ever
18 identified previously.
19      MS. MARTINELLI: That's correct.  I just
20 received her personnel file yesterday, and I am
21 producing everything that I believe is relevant.  You
22 are welcome to request more.
23      MR. BARTOSHESKY: Well, I think you should
24 have an obligation to go back and identify more things

Page 120

1  that you now believe are relevant to this litigation
2  and in response to initial disclosures in District
3  Court.  We can take that up at another time.
4      THE WITNESS: Can we have a break?
5      MR. BARTOSHESKY: She's questioning you.
6      THE WITNESS: May I have a break, please?
7      MS. MARTINELLI: Yes.
8      (Recess taken.)
9      THE WITNESS: Can we please go on the
10 record and state this is my very first time to see
11 this document.  Okay.  I'm ready to move on.
12 BY MS. MARTINELLI:
13 Q.  I believe you testified that when you left the
14 Appoquinimink School District as well as some of the
15 others that left around the same time that no one
16 talked to them or found out why they were leaving or
17 investigated.  Is that your testimony?
18 A.  Can you --
19 Q.  I thought your testimony was that several
20 people besides yourself left around the same time and
21 that no one in the district asked why or got any
22 further information on why you or anyone else left or
23 cared, I think was the implication.
24 A.  No, I didn't say that that was --

Page 121

1  Q.  I am not trying to put words in your mouth.
2  A.  I didn't say that that was the fact.  That was
3  my opinion, that it just seems that no matter how much
4  turnover or whatever the problem was that it didn't
5  seem like it was adequately treated.  That it's just
6  common culture, you know, that it's acceptable to be
7  rude to people and disrespectful.  I am not saying the
8  district.  I am saying at the high school.  Because I
9  can't speak to the entire district.
10 Q.  Talking about the particular personnel that you
11 have spoken about before?
12 A.  Right.
13 Q.  Ms. Mieczkowski, Ms. Mitchell?
14 A.  Right.
15 Q.  And Ms. Proffitt, Dr. Proffitt?
16 A.  Not really Dr. Proffitt as well as
17 Mrs. Mieczkowski, Mrs. Mieczkowski.
18 Q.  Did you have an exit interview before you left?
19 A.  With Dr. Marchio, yes, I did.
20 Q.  Did you have an opportunity then to give your
21 side or any input you had on why you were leaving?
22 A.  I sort of listened.  I did say to him that
23 these are the reasons.  He said, "You know, Sharon, I
24 think that it just was not a good fit."  He assured me

13 -1382
ab583e46-5fea-4651-8e8f-fbd720d8638b

Sharon E. Hill

Page 122

1 that any further communication would be through him
2 and that it would not be anyone who was slandering or
3 saying bad things about what happened. That was my
4 understanding.
5         MS. MARTINELLI: That's all I have.
6 BY MR. BARTOSHESKY:
7   Q.  Let me just ask you a couple of questions. If
8 you can look at what has been marked as No. 8 and is
9 No. 9. They're the last two documents there.
10  A.  Okay.
11  Q.  They're both purport to be letters to you.
12 What is the date on No. 8?
13  A.  It is May 5th.
14  Q.  And on No. 9?
15  A.  May 5th.
16  Q.  And they both purport to be from Mr. Marusa?
17  A.  Right.
18  Q.  They seem to say that he wrote them on the same
19 day. Is that right?
20  A.  That's what it says. And I am saying that this
21 is -- the first one is the one I have seen. The
22 second one -- and this is just my opinion -- appears
23 to be a stamp. This looks to be more like Zen's
24 writing. This is what I have a copy of.

Page 123

1   Q.  When you say "this," No. 8 looks like Zen's
2 writing?
3   A.  No. 8 looks like Zen's writing. No. 9 does not
4 look like his writing. No. 8 is the letter that I
5 received. No. 9 I have never seen.
6   Q.  No. 8 is the letter that says that they want to
7 hire you as a special education teacher for the next
8 year. Correct?
9   A.  Yes.
10  Q.  And No. 9 says that your employment is going to
11 be terminated?
12  A.  As of June 18th of 2003.
13  Q.  Okay. It actually says your contract will not
14 be renewed?
15  A.  Mm-hmm.
16  Q.  Correct?
17  A.  Yes.
18  Q.  Just on a little bit of a different point.
19 Earlier in your deposition, I asked you when you first
20 start at Appoquinimink, and I don't think you were
21 very clear on the date. But is it -- it was at the
22 end of the 2003 school year that you left
23 Appoquinimink. Right?
24  A.  Yes, that's correct.

Page 124

1   Q.  You were only there for one year, one school
2 year?
3   A.  Yes.
4   Q.  So 2003 is the time frame?
5   A.  Yes, it is.
6         MR. BARTOSHESKY: Okay. I don't have any
7 other questions. Thank you. You're all done. You're
8 free to go.
9         The court reporter will make a transcript
10 of this. You can have the opportunity to read the
11 transcript before you sign off that it -- they will
12 send a copy to you. If there are mistakes in it or
13 things that you think were taken down wrong, you have
14 an opportunity to correct it. Would you like the
15 opportunity to do that?
16        THE WITNESS: Yes, I would.
17        (Deposition concluded at 4:00 p.m.)
18        -- -- -- --
19
20
21
22
23
24

Page 125

1              INDEX
2 WITNESS: SHARON E. HILL           PAGE
3   EXAMINATION BY MR. BARTOSHESKY         2
    EXAMINATION BY MS. MARTINELLI         98
4   EXAMINATION BY MR. BARTOSHESKY       122
      HILL DEPOSITION EXHIBITS
5
6 NO.                    MARKED
7  1 2/28/03 note to Jim from Olga, stamped   36
      P-269
8
    2 2/28/03 note to Mitch from Olga, stamped  38
9     P-267 - P-268
10  3 E-mail string, stamped D-88 - D-90     64
11  4 Memo to Z. Marusa from M. Mieczkowski,   72
      stamped D-84
12
    5 "Chronology; February '03,"          101
13    stamped P-204 - P-208
14  6 3/21/02 e-mail from O. Yatzus to V. Boyd, 109
      stamped P-274 - P-275
15
    7 3/4/03 e-mail from O. Yatzus to        113
16    P. Waecker, stamped P-337
17  8 5/5/03 letter from Z. Marusa to       117
      Ms. Hill, stamped P-27731
18
    9 5/5/03 e-mail from Z. Marusa to       118
19    Ms. Hill, stamped D-27720 - D-27730
20
21
22
23
24

130b
ab583e46-5fea-4651-8e8f-fbd720d8638b



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

---

## Transcript of:

### Judith L. Green, Ed.D.

### March 15, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-139

Yatzus                                      v.   Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR
                                                          March 15, 2006

Page 6

1    taught at the University of Wisconsin-Stout, and I was

2    a -- what was my position?  -- a psychologist at the

3    University of Arizona at Flagstaff.  And I was a

4    full-time student for my doctorate.

5        Q.    Have you ever practiced your profession in a

6    clinical setting?  Other than you mentioned the

7    du Pont Hospital, of course, but.

8        A.    Just for my internships.

9        Q.    Other than that, you have been involved with

10   schools?

11       A.    Yes.

12       Q.    At least let's put this in the context of when

13   you started at the Appoquinimink School District.

14   What is the job of school psychologist?  What do you

15   do?

16       A.    The job of the school psychologist, as is in my

17   job description, the first priority is to complete the

18   evaluations for special education placement, and then

19   counseling students, parents and teachers and child

20   advocacy.

21       Q.    What do you mean by "child advocacy"?  In what

22   setting?

23       A.    Excuse me.  What setting?

24       Q.    Well, that sounds to me to be sort of a broad

B-140