Yatzus                                   v.   Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR                March 15, 2006

Page 7

1   term, "child advocacy."  Is there a specific part of

2   the process that requires you to be an advocate for a

3   student.

4      A.    A specific part of the process that requires me

5   to be an advocate for a student --

6      Q.    Let me try to clear that up.  Maybe it's not a

7   very good question.

8            One of the things you do as a school

9   psychologist, at least under my understanding, is

10  there are, for example, behavior manifestation

11  meetings.  When a student with a special need has some

12  kind of a disciplinary problem, there is a system set

13  up to try to determine whether that behavior, that

14  disciplinary problem is a manifestation of their

15  disability.  Is that part of the -- you go to one of

16  those meetings.  Are you there to be a child in that

17  setting, or?

18     A.    Among other duties, yes.

19     Q.    Okay.  Well, let me just go back to the basic

20  broad question then.  When are you a child -- an

21  advocate for a child?

22     A.    I advocate for children throughout my school

23  day, my workday.  I mean, that's ... yeah.

24     Q.    You mentioned part of your responsibilities as

B-141

Wilcox & Fetzer, Ltd.   Professional Court Reporters        (302) 655-0477

1237df4f-8960-47df-8c8c-431cb0e7d5c3

Yatzus                                    v.    Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR              March 15, 2006

Page 23

1   they -- that you have no right -- that the tenure laws

2   apply -- I have studied this as part of my education.

3   It's not that I ... -- the tenure laws apply, and

4   that until you have tenure, you can be dismissed for

5   any reason.  They don't have to have a reason to

6   dismiss you is my understanding, and ...

7       Q.   Is there supposed to be, according to your

8   understanding, a certain number of evaluations in that

9   three-year period?

10      A.   Yes.  Observations and reviews and meetings.

11  And I think it's like two observations per year, and

12  then sit down and discuss the observations, one

13  announced, one unannounced.  You know, there was a

14  whole procedure that was supposed to be followed.

15      Q.   Is that supposed to be a yearly review or is

16  it -- can these reviews be nothing for the first two

17  years and then three in one year?  Do you have --

18      A.   Oh, no.  They're supposed to be, as I recall,

19  at least two observations a year, one announced, one

20  unannounced.  Then there is a write-up once a year

21  remarking about -- over four areas of how you are

22  doing.  Okay?  For the first two years, I walked on

23  water on those write-ups, and the third year, they had

24  difficulty finding someone to do the observations and

B-142

Wilcox & Fetzer, Ltd.   Professional Court Reporters        (302) 655-0477

1237df4f-8960-47df-8c8c-431cb0e7d5c3

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §   Case No.: 05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §
and in his official capacity, MARY ANN §   **TRIAL BY JURY DEMANDED**
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

APPENDIX PAGE B143 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B144 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Yatzus                              v.    Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR              March 15, 2006

Page 51

1    into it, but the letter is in my file.

2        Q.    Do you feel that that write-up was justified?

3        A.    No.

4        Q.    Did you file a grievance through the union?

5        A.    No, no.

6        Q.    Is there a reason why not?

7        A.    Mm-hmm.

8        Q.    What's the reason why not?

9        A.    Because I did that before and I spent a whole

10   year in extended meetings and retaliations for acts

11   that happened next.  It just made it worse.  It didn't

12   resolve anything.

13       Q.    Is that sort of the same don't-fight-city-hall

14   problem that you mentioned in this document?

15       A.    Yes.

16       Q.    Now, one of the things you talked about earlier

17   that the school psychologists are supposed to do is

18   have these written evaluations prepared.  And if there

19   is an IEP meeting scheduled where your evaluation is

20   going to be part of the meeting, is there some kind of

21   time frame that you should have the written evaluation

22   finished before that meeting?

23       A.    There is nothing by law.  Ms. Mieczkowski

24   currently has it set up that you have to have it

B-145

Wilcox & Fetzer, Ltd.    Professional Court Reporters              (302)655-0477

1237df4f-8960-47df-8c8c-431cb0e7d5c3

Yatzus                                  v.    Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR              March 15, 2006

Page 52

1    handed to the -- have it ready before the meeting.

2    The diagnostician should see the document before the

3    meeting.  In one of my schools, the principals wants

4    it 24 hours ahead of time.  So I e-mail it to her.

5        Q.   Now, so there is a -- and I'll call it a

6    directive, but -- or a policy established by

7    Ms. Mieczkowski that it should be done -- the written

8    evaluation should be ready before the meeting.  How

9    long has she had that policy in place, do you know?

10       A.   No, I don't recall when that first came out it

11   should be --

12       Q.   Was there ever any requirement made to you that

13   you should have that written evaluation prepared 48

14   hours ahead of an IEP meeting?

15       A.   No.

16       Q.   Do you know if -- well, let me just ask you.

17   Have you ever received a written reprimand or any kind

18   of formal discipline because you did not have an

19   evaluation prepared prior to one of these meetings?

20       A.   No.

21       Q.   Have you ever not had one prepared prior to one

22   of these meetings?

23       A.   Yes.

24       Q.   Do you know if any of the other school

B-146

Wilcox & Fetzer, Ltd.    Professional Court Reporters         (302)655-0477

1237df4f-8960-47df-8c8c-431cb0e7d5c3

Yatzus                                    v.   Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR                March 15, 2006

Page 53

1    psychologists have ever been reprimanded or written

2    up?

3        A.    I don't know that.

4        Q.    You said, I think that there is no requirement

5    in the law as to when these written evaluations are to

6    be done.  Is that correct?

7        A.    That's correct.

8        Q.    Is it in fact sometimes the situation where

9    things happen at the IEP meeting that would -- where

10   it would be better for the psychologist  to actually

11   do the written evaluation because of the input that's

12   received at the meeting?

13       A.    That is another way of doing the evaluation

14   summary report, the component that's required by law.

15            For clarification.  Appoquinimink has a

16   policy the psychologist will prepare a psychological

17   report.  It's not necessary.  All that's necessary is

18   the evaluation summary report.  If a child had -- if

19   we're doing the -- an evaluation summary report, that

20   can be completed at the IEP meeting by simply

21   discussing with the teachers current levels of

22   performance, reviewing previous evaluations,

23   discussing with the parent any of their concerns,

24   discussing the behavioral difficulties the child may

B-147

1237df4f-8960-47df-8c8c-431cb0e7d5c3

Yatzus                                     v.   Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR                    March 15, 2006

Page 62

1      Q.    Now, what's the district's policy with respect

2    to absenteeism of a psychologist?  You know, when you

3    call in sick, what are you supposed to do?  Is there a

4    specific person you are supposed to talk to?  Is there

5    a specific thing you are supposed to say?

6      A.    No.  I just call.  I leave a message on the

7    phone for the school.  If no one answers because

8    they're on another line, I just leave a message on the

9    phone.  Usually I am just calling the secretary.

10      Q.    Is there a written policy someplace about what

11    you are supposed to do?  Is that just sort of common

12    sense?

13      A.    Well, the teachers have to call for subs first,

14    so that's all document.  But for psychologists, I

15    don't believe it's documented anyplace what we're

16    supposed to do.  I just call the school.

17      Q.    Now, going back to -- we talked a little bit

18    about that one problem or one situation where Olga

19    Yatzus had some difficulty with her working that one

20    summer.  How is it normally done that psychologists

21    are scheduled for working during the summer?  What --

22    how is that set up?

23      A.    I was told by Dr. Lauer it was based on

24    seniority.  So my first summer, I got summer work

B-148

1237df4f-8960-47df-8c8c-431cb0e7d5c3

Yatzus                                    v.   Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR                    March 15, 2006

Page 68

1    people involved.

2              But it used to be that psychologists would

3    spend a good deal of their summers, summertimes

4    writing their reports for the year.  I think that's

5    still true in some districts in the state because we

6    have more work to do and we can do more things for

7    kids, and the paper -- we have signed everything, we

8    filled out an evaluation summary report at the

9    meetings.  You know, we don't -- the psychological

10   report takes much longer to do, so, we don't always

11   get that done.

12       Q.    Now, did you ever hear --

13       A.    In the past.

14       Q.    I'm sorry.  I don't mean to interrupt.  Did you

15   ever hear any complaints about Olga Yatzus' job

16   performance from any students?

17       A.    No.

18       Q.    Did you ever hear any complaints about her job

19   performance from any teachers?

20       A.    No.

21       Q.    Any complaints about her job performance from

22   any of the other psychologists?

23       A.    No.  Well, I have to rephrase that.  The

24   psychologists that came on board since that time, if

Yatzus                                    v.    Appoquinimink School District, et al.
Judith L. Green, Ed.D.  C.A. # 05-103 SLR              March 15, 2006

Page 69

1    there is a mention of Olga, they all laugh..

2        Q.    Is that plural, "psychologists," did you say?

3        A.    Yes.

4        Q.    Who were they?

5        A.    Erin Haupt; Holly Pommering; Elaine Baker --

6    Eileen Baker.

7        Q.    You take that as some kind of complaint about

8    Olga?

9        A.    Yes.

10       Q.    Why, why do you think that?

11       A.    It's just the thing that's expected.  That's

12   the reaction that's expected in our group meetings.

13       Q.    I am not sure I understand that.  Expected.

14   They're expected to do that; is that what you are

15   saying?  Why is there that expectation, do you

16   believe?

17       A.    One doesn't want one's allegiance to the school

18   district questioned.

19       Q.    So it's your impression that if the reaction

20   isn't sort of negative when her name is brought up,

21   that someone's allegiance may be questioned?

22       A.    Yes.

23       Q.    Have you ever heard any complaints about Olga's

24   job performance from any of the EDs?

B-149

Wilcox & Fetzer, Ltd.    Professional Court Reporters              (302)655-0477



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

## C.A. # 05-103 SLR

---

## Transcript of:

## James W. Dooley, Jr.

## April 6, 2006

---

**Wilcox & Fetzer, Ltd.**
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-150

Yatzus                              v.    Appoquinimink School District, et al.
James W. Dooley, Jr.  C.A. # 05-103 SLR              April 6, 2006

Page 10

1   A. As much as I could.
2   Q. And what, from your experience in that role,
3  are the responsibilities of a school psychologist?
4   A. A lot of it happened before the IEP meeting:
5  the testing of students, various batteries of tests
6  and then providing information when the IEP team sat
7  down at the table.
8   Q. Anything else you can think of?
9   A. As far as --
10   Q. A psychologist's responsibilities.
11   A. Also meeting with students.
12   Q. Were you aware of any performance problems
13  Ms. Yatzus had in her role as school psychologist?
14   A. Some of the concerns were providing the reports
15  for the meetings. And then there were some other
16  concerns through the year as certain students that
17  were out of classes coming to meet with her without a
18  clear procedure for that to happen.
19   Q. Okay. Let's start with the first one, I
20  believe you said, was providing reports in a timely
21  fashion. I am going to refer you back to Exhibit 1.
22  Have you seen this document before?
23   A. Yes.
24   Q. Do you recall writing this letter to

Page 11

1  Ms. Yatzus?
2   A. I recall writing it, yes.
3   Q. And can you describe the circumstances that
4  prompted this write-up based on your recollection?
5   A. It's been so long ago, I really can't remember
6  all the particulars.
7   Q. Okay. Do you want to take a minute to go ahead
8  and review the letter?
9   A. Sure. Okay.
10   Q. Does this letter refresh your recollection as
11  to the circumstances?
12   A. Not enough to comment on.
13   Q. Do you recall the -- the fifth line in the
14  first paragraph, it says, "During a third meeting, I
15  had to leave the parent and the team to retrieve you
16  from your office where you were hurriedly preparing a
17  folder of information to share with the parent but
18  still failed to produce a written report of the
19  findings." Do you recall that situation?
20   A. Vaguely. I mean, I remember having to go -- we
21  were at the meeting -- and having to go and find Olga,
22  but I don't recall the detail.
23   Q. Do you have any reason to question what you
24  wrote in this document?

Page 12

1   A. No.
2   Q. Did anyone direct to you write up this
3  document?
4   A. No.
5   Q. Did you have any conversations with Donna
6  Mitchell, Mary Ann Mieczkowski about the fact you
7  planned to write this reprimand?
8   A. No.
9   Q. Were you aware at all that Ms. Mitchell or
10  Ms. Mieczkowski planned to write reprimands based on
11  similar events occurring on that date at the time?
12   A. No.
13   Q. Would you have reviewed the content of your
14  letter with Ms. Mitchell at all?
15   A. Afterwards, it was -- being a new administrator
16  to high school, to Appoquinimink School District in
17  general, it was a common practice that often I would
18  consult Donna or any other administrator prior to
19  doing anything as far as sending this out, whether it
20  was teacher appraisals or letters of reprimand and
21  possibly even things going out to parents. So I know
22  there were times that I would share it with Donna
23  prior to anything going out.
24   Q. Okay. You think you may have shared this

Page 13

1  document -- a draft of this document with Ms. Mitchell
2  before you sent it out?
3   A. Most likely, yes.
4   Q. Do you recall her making any comments or
5  additions or suggestions for additions to this
6  document?
7   A. The -- sort of the summative paragraph, I guess
8  the third paragraph, just a general -- is that
9  correct? -- "The students at Middletown High School,"
10  the one that starts there.
11   Q. Okay. You think she may have suggested to add
12  the third paragraph that begins "Students at
13  Middletown High School"?
14   A. Yes, as a concluding statement.
15   Q. Did she explain why?
16   A. Just general procedural -- just part of the
17  procedure. It's just a general statement that sort of
18  summed it up.
19   Q. Do you recall ever learning that Ms. Mitchell
20  or Ms. Mieczkowski wrote up similar reprimands based
21  on the same events?
22   A. Can you repeat that, please? Sorry.
23   Q. Do you recall Ms. Mitchell -- do you recall
24  ever learning of the fact that Ms. Mitchell or

B-151

4 (Pages 10 to 13)

410180cb-041b-41da-804f-72ef2169537e

Yatzus                                              v.    Appoquinimink School District, et al.
James W. Dooley, Jr.  C.A. # 05-103 SLR                        April 6, 2006

Page 18

1  see if she in fact had meetings scheduled with them?
2    A.  As best as I can recollect, yes.
3    Q.  Okay.  Was Ms. Yatzus aware that students were
4  using her in this way, you know, identifying her as
5  the reason they were not in class?
6    A.  I don't know.
7    Q.  Did you ever put anything in writing regarding
8  this issue?
9    A.  I don't recall.
10        (Dooley Deposition Exhibit No. 3 was marked
11  for identification.)
12  BY MS. MARTINELLI:
13    Q.  Mr. Dooley, I am showing you a document that's
14  been marked as Exhibit 3, and in the lower right-hand
15  corner it has -- says P-269 and dated in the upper
16  left-hand corner as 2/28/03.  And this appears to be a
17  letter to you from Olga.  Do you want to take a minute
18  to review it?
19    A.  Please.  Okay.
20    Q.  Do you recall this discussion at all with
21  Ms. Yatzus?
22    A.  I remember vaguely the situation.
23    Q.  The situation being concern about students in
24  her office?

Page 19

1    A.  Yes.
2    Q.  Do you recall ever issuing her a letter of
3  reprimand based on that?
4    A.  I remember there was a reprimand that I had
5  written that we discussed.  But I don't remember if it
6  was this specific one.  I don't recall exactly.
7    Q.  Do you recall ever issuing a reprimand and then
8  rescinding it?
9    A.  Yes.
10    Q.  What do you recall about that?
11    A.  That after we had discussed it, I decided it
12  wasn't worth pursuing.  It wasn't ...
13    Q.  Why did you think it was not worth pursuing?
14    A.  I don't recall exactly all the details.
15    Q.  Besides this, what appears to be a write-up
16  that was rescinded, did you ever discuss your concern
17  about students in Ms. Yatzus' office with Ms. Yatzus
18  verbally?
19    A.  I couldn't recall the exact conversation, but I
20  am sure the conversation would have happened.
21    Q.  So you think you did; you just can't recall the
22  exact conversation?
23    A.  Right.
24    Q.  Do you recall a circumstance, a manifestation

Page 20

1  meeting that you had to call Chet Hadley to attend as
2  the psychologist?
3    A.  I remember the circumstance.  I am not sure if
4  I was the person that called them or not.
5    Q.  What do you recall about the circumstance?
6    A.  That we were having a manifestation meeting and
7  we needed a school psychologist.  And as far as I can
8  recollect, Olga had indicated that she wasn't
9  available and -- and I don't know if I was told to
10  call to find somebody to come over or somebody else
11  handled that, but ... and that's the reason Chet ended
12  up coming to the meeting.
13    Q.  So your recollection was that Ms. Yatzus was
14  unavailable for the meeting?
15    A.  As best as I can recollect.
16    Q.  And you needed a psychologist at the meeting?
17  Is that --
18    A.  Yes.
19    Q.  Did you ever have the impression that anyone in
20  the administration was trying to exclude Ms. Yatzus
21  from attending the meeting?
22    A.  I didn't have that impression, no.
23    Q.  Do you ever recall telling Ms. Yatzus that you
24  had to write her up or you would be written up?

Page 21

1    A.  No, I don't recall that.  If I did say anything
2  along those lines, it would have been more or less for
3  dereliction of my duties, not as a threat or as a ...
4    Q.  Do you mean you were never threatened --
5    A.  Right.
6    Q.  -- with regard to writing Ms. Yatzus up?
7    A.  Correct.
8    Q.  And if you made a statement similar to that,
9  what do you think you meant by that?
10    A.  That as a administrator, it's my -- part of my
11  job description to document issues regarding
12  performance of staff in the building.
13    Q.  Did anyone ever direct you to write Ms. Yatzus
14  up specifically or there would be consequences for
15  you?
16    A.  No.
17        MS. MARTINELLI:  That's all I have.
18  Mr. Bartoshesky.
19        MR. BARTOSHESKY:  Okay.  Thanks.
20  BY MR. BARTOSHESKY:
21    Q.  Mr. Dooley, with respect to what has been
22  marked as Exhibit No. 1, and that concerns a write-up
23  of Olga Yatzus that you did for events that happened
24  on September 25, 2002.  Do you know how the notice of

B-15(a)            6 (Pages 18 to 21)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

---

## Transcript of:

### Chet K. Hadley

### March 9, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-152

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.:  05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B153 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

C. K. Hadley

Page 38

1　discuss this with Tony for several days. I called his
2　office after the long weekend and set up an
3　appointment. I asked Chet if he would join us since
4　he was District Office building rep. Mitch," which is
5　Mary Ann Mieczkowski — "Mitch also happened to be in
6　the building, so I asked if she would be interested in
7　attending this meeting, which she agreed to do."
8　　　　And I guess I asked you earlier if you
9　remembered that kind of meeting. And does this at all
10　refresh your recollection that that kind of meeting
11　took place?
12　A.　　It doesn't. I mean, I have no reason to
13　doubt it, but I don't have specific memory of that
14　meeting, no.
15　Q.　　And in the next paragraph it says, "At that
16　time, Chet" — and by that "at that time" it means at
17　that meeting, I think. "At that time, Chet also
18　discussed his feelings that since I was given the same
19　promise as the coordinators, that I shouldn't have to
20　request prior approval for summer work. He stated
21　that since he and Judy were not given any similar
22　promises, that it was appropriate for them to have to
23　seek prior approval."
24　　　　Do you remember making that kind of

Page 39

1　statement at that meeting or at any meeting?
2　A.　　I don't recall making that statement.
3　Q.　　But is it true that you think that that was
4　accurate?
5　A.　　Yes, I would agree with that.
6　Q.　　Now, the next paragraph talks about a
7　situation. It says, "During this meeting, Chet
8　brought up an issue that he was extremely
9　uncomfortable with." And then it makes a reference to
10　somebody named Gary talking to Dr. Marchio about the
11　way things were being done at Townsend, and that's one
12　of the schools in the district, regarding the
13　qualification of students placed in special ed.
14　　　　Do you remember that situation at all?
15　A.　　Yes, I do.
16　Q.　　Can you tell us what that was about?
17　A.　　You know, I don't recall how it came to my
18　attention, but it was my understanding that Gary was
19　going through the files to report to Dr. Marchio
20　whether or not students had actually met criteria to
21　be identified for a specific disability. And I was
22　upset that somebody who is on the same contract level
23　was being asked to examine a colleague's work, and
24　that if he did have questions about an employee's

Page 40

1　work, that that should go through administrative
2　channels and not involve someone on the same --
3　someone who is a colleague of that employee.
4　Q.　　And who is Gary? What is his full name?
5　A.　　Gary Berg.
6　Q.　　And what was his position?
7　A.　　He was functioning as the educational
8　coordinator. I think that's what they were called at
9　the time.
10　Q.　　And you said that you were sort of upset
11　that he was examining a colleague's work, somebody on
12　the same level. Whose work is it your impression
13　that he was examining?
14　A.　　Ms. Yatzus's.
15　Q.　　And this looks like there was some
16　discussion or some indication or some question as to
17　whether or not Gary Berg was doing this with the
18　knowledge of or at the request of Dr. Marchio. Was
19　that part of your concern?
20　A.　　Can I take a second just to read this?
21　Q.　　Sure.
22　A.　　(Pause) Okay.
23　Q.　　-- Let me, rather than try to remember what my
24　question was, if you look three or four lines from the

Page 41

1　bottom of the page 3, it says, "Chet overheard my
2　discussion with Gary and Gary later told him that Tony
3　requested him to get this information."
4　　　　Did Gary tell you that Tony Marchio
5　requested Gary to get that information?
6　A.　　Yes.
7　Q.　　And then it looks like initially at least,
8　according to this, Tony Marchio denied that he asked
9　Gary to get that information but then said when Gary
10　Berg came to Dr. Marchio, Dr. Marchio asked him to get
11　more information. Is that how you remember what
12　happened?
13　A.　　I really couldn't say anything about the
14　second part of that.
15　Q.　　Okay. And then the last part of that
16　paragraph, which carries over onto page 4, says that I
17　thought that was totally inappropriate, "since none of
18　this was ever brought to my," "my" being Olga
19　Yatzus's, "attention."
20　　　　I think that is consistent with what you
21　already said. You thought this wasn't the right way
22　to do things; is that right?
23　A.　　The more -- I think what I thought was
24　inappropriate was that he wasn't investigating through

B154

11　(Pages 38 to 41)

## C. K. Hadley

Page 46

1    Do you recall that you were short a
2 psychologist that year?
3    A.    Which year?
4    Q.    Well, I guess it would have been the school
5 year before the summer of 2002.
6    A.    Okay.  So that would be referring to the
7 first year that Ms. Yatzus was working?
8    Q.    Yes.
9    A.    So during that year there would have been
10 three school psychologists -- myself, Dr. Green, and
11 Ms. Yatzus -- working.  I am sorry.  What was your
12 question again?
13    Q.    Well, this sentence says, "We were short a
14 psychologist all year and I had both the high school
15 and Townsend, almost twice what Chet and Judy had."
16 Do you think that's accurate?
17    A.    I honestly don't recall.  I mean, I guess
18 the issue is were we short a school psychologist.  I
19 know during those years there were times when we were
20 seeking to get additional psychologists or an
21 additional psychologist.  But I don't recall if
22 specifically that year we were, quote, short.
23    The reason that makes that confusing is
24 every year we were growing, and some years it was

Page 47

1 appropriate to hire another psychologist, and then
2 some years we wouldn't.  And so it is difficult for me
3 to say.
4    Q.    I don't want to cut you off.  Are you
5 finished?
6    A.    Well, I guess the only other issue is the
7 issue of twice, whether or not she had twice the
8 caseload.  And she did have a higher number of
9 students, but it is difficult to always say whether or
10 not that number of overall students is equal,
11 depending on, you know, the special education caseload
12 or the evaluation caseload, because that can vary from
13 school to school based on, you know, the socioeconomic
14 level or, you know, just -- usually at younger ages
15 you often have more initial evaluations to complete.
16 So it is difficult to make a comparison between case
17 loads based on just the number of students.
18    Q.    Okay.  Going on to the next sentence, it
19 says, "With the Wagner law" -- and let me -- what is
20 the Wagner law, if you know?
21    A.    I believe it has something to do with the
22 retention or promotion of students, but I can't give
23 you the specifics on it.
24    Q.    It says, "With the Wagner law in place, we

Page 48

1 were bombarded with initial evaluations at the
2 elementary levels."
3    From your experience working in that
4 timeframe in that school district, does that seem to
5 be accurate?  There were a lot of initial evaluations
6 that had to be done?
7    A.    In all the elementary schools or --
8    A.    Well, I am just going by what it says here.
9 "We were bombarded with initial evaluations at the
10 elementary levels."
11    A.    I can't say whether or not that was more
12 than usual or not.
13    Q.    Now, part of the responsibility of a school
14 psychologist is to do student evaluations and then
15 reevaluations.  Is that correct?
16    A.    To do the formal testing, to present the
17 results, and guide the IEP team through the evaluation
18 process.  I guess that's how I would explain it best,
19 yes.
20    Q.    Is there a policy as to when the reports of
21 these evaluations are to be submitted in writing?
22    A.    The policy has been that we have them at the
23 IEP meeting where we make the eligibility
24 determination.

Page 49

1    Q.    And is that policy someplace in writing?
2    A.    My recollection is that the beginning of the
3 year, when Ms. Mieczkowski came in as being our
4 supervisor, that she did send us a memo stating that,
5 that we would have the reports at the meeting.
6    Q.    And is there a requirement that they be
7 submitted any certain -- the written report be
8 submitted a certain amount of hours or days before
9 these meetings or was it just you should have them at
10 the meeting when you show up at the meeting?
11    A.    I am not aware that there was any
12 requirement previous to that.
13    Q.    Requirement that they be submitted previous
14 to that?
15    A.    Right.
16    Q.    So you don't ever recall there being
17 something said saying you should have these reports
18 submitted 48 hours ahead of time?
19    A.    No.
20    Q.    Now, you say you believe there was a
21 memorandum from Ms. Mieczkowski saying that the
22 written report should be at the meeting.  Is that
23 something that is always done, always accomplished?
24    A.    I would say at least -- I can only speak

05f34e2c-dbb3-4e78-a282-a3d30af9426c

C. K. Hadley

Page 70

1  Q.    Now, is there a policy regarding what you as
2  a school psychologist should do if you are going to be
3  out sick for a day?  What are you supposed to do?
4  A.    Call in and -- and I am not positive about
5  what the policy is.  My procedure is I would call my
6  immediate administrators, the office's secretary, to
7  let them know that I would not be there, look at my
8  schedule and talk to the educational coordinator to
9  inform her, you know, that I wouldn't be available.
10 And it would depend on the situations.  There might be
11 some meetings that could be reasonably, you know,
12 moved.  Other meetings it could be, you know, we have
13 had a hard time getting this parent in and we need it
14 this day.  A situation like that I would probably ask
15 for a fellow psychologist to cover that meeting.  So
16 it would just depend on what types of meeting were
17 scheduled for that day.
18 Q.    Well, you said, "That's what I would do,
19 what I probably would do," and depending on your
20 schedule, which certainly makes a lot of sense.  But
21 is this something that you actually have done or are
22 you just sort of --
23 A.    Oh, yes, because that's -- you know, I just
24 feel it is the professional responsibility for you to

Page 71

1  inform other people about whether or not you can make
2  a meeting and then make efforts to either change the
3  meeting or have someone cover the meeting.
4  Q.    And you said you would call the secretary's
5  office of your immediate supervisor?
6  A.    Well, I would call the secretary in terms of
7  my being absent, but then I would also call the
8  educational coordinator, who schedules the meeting,
9  and inform them that I wasn't going to be there.  And
10 then depending on, you know, the seriousness of the
11 meeting or how vital my role in a particular meeting
12 was, I might also call another psychologist to see if
13 they could cover for me.
14 Q.    So a lot of what you would do depends on
15 what your schedule looked like for that day?
16 A.    Yes, the degree of -- I might not even have
17 a meeting scheduled that day, so I might just call the
18 secretary.  But depending on the types of meetings, it
19 would vary who I would call.
20 Q.    And you don't know if that process is
21 somewhere written down where you are exactly supposed
22 to do X, Y and Z?
23 A.    I guess I would just say that's just general
24 professional responsibility.  If I have tested a

Page 72

1  student or a student is in my building, I just have a
2  sense of ownership that I have to make sure that
3  things are taken care of and then I would do my best
4  to have somebody there or to give as much notice to
5  the parents as is possible if the meeting needed to be
6  changed.
7  Q.    Have you ever had a situation where you were
8  out sick and, you know, you went through this process,
9  and somebody from the administration came to you and
10 said, "Hey, you didn't do it the right way.  You
11 should have done this" or "you should have done that.
12 You should have called this person"?
13 A.    No, I haven't.
14 Q.    Now, I take it you have probably received
15 over the years certain letters from the administration
16 for various things.  Is that correct?  Just a letter
17 from the school district.
18 A.    Yes.  Letters from the school district, yes.
19 Q.    How were they addressed to you?  Dear Chet,
20 Dear Mr. Hadley, both ways, if you remember?
21 A.    I have never even noticed, I guess, to make
22 a difference.
23 Q.    Do you think you have ever had one addressed
24 to you that said Dear Hadley?  Would you have noticed

Page 73

1  that?
2  A.    Not to my recollection.
3  Q.    Now, you worked with Olga Yatzus for how
4  long, or had both worked at the same school district
5  for how long?
6  A.    Two years.
7  Q.    And during that time did you ever hear of
8  any complaints about the way that she was doing her
9  job from any of the students?
10 A.    From the students?  No.  On the other hand,
11 I wouldn't really have direct contact with her
12 students.
13 Q.    Did you ever hear any complaints from any of
14 the teachers about Olga Yatzus, the way she was doing
15 her job?
16 A.    Again, no.  But then again, I didn't have
17 direct contact with them either.
18 Q.    Was there -- did you ever hear any
19 complaints or did you, in fact, have any complaints or
20 concerns -- strike that.  Start over again.
21       Did any of the other school psychologists,
22 including yourself, ever have any complaints or
23 concerns about the way Olga Yatzus was doing her job?
24 A.    Only after she left, in that the school

C. K. Hadley

Page 78

1  by Ms. Mieczkowski. I wasn't given any specifics.
2  And I guess, though you didn't ask me, I think there
3  was concern also from her intern about that same
4  issue. I was aware of that from Ms. Baker, that she
5  was concerned that things weren't done on time or that
6  she was covering a lot of things that she felt
7  Ms. Yatzus should cover.
8  Q.     Well, you said you weren't given any
9  specifics by Ms. Mieczkowski. What did she say to you
10  or how did you know that she had some concern?
11  A.     Well, I knew that there was the issue of
12  Ms. Yatzus and her coordinator scheduling and getting
13  meetings set up, and all I remember concretely is
14  Ms. Mieczkowski saying that they weren't working
15  together on that.
16  Q.     Okay. Her coordinator was who?
17  A.     I believe it was Ms. Sharon Hill.
18  Q.     And the concern was that Sharon Hill and
19  Olga Yatzus weren't working together, the two of them?
20  A.     On scheduling and making sure things
21  happened in a timely manner.
22  Q.     And was that in a conversation you had with
23  Ms. Mieczkowski?
24  A.     I believe, yes, it was, like, after one of

Page 79

1  our department meetings.
2  Q.     Now, did Ms. Mieczkowski or anyone else ever
3  come to you and say, "Do you have any ideas how we can
4  address this situation?" or was it just sort of a
5  comment that this is going on?
6  A.     Well, I think actually the topic of one of
7  our meetings was that very thing, of working with our
8  coordinators to work out our schedules so we know
9  each week we knew what was coming up and that we could
10  coordinate with them.
11  And so, you know, we talked about, you know,
12  how I meet with my coordinator each Monday and we go
13  through the week and make sure we are ready. We meet,
14  we plan things out, you know, a month, sometimes a
15  month and a half ahead, and we just see each other on
16  a very regular basis and touch base with one another,
17  get e-mails if something is canceled. When she is
18  going to schedule something, I get an e-mail to make
19  sure that I am available. And she was concerned that
20  that communication take place so that people are at
21  the meetings they are supposed to be at.
22  Q.     Did you ever have any conversation with
23  anyone other than Ms. Mieczkowski along those lines,
24  either Dr. Proffitt or Dr. Marchio?

Page 80

1  A.     No. But I believe I did have them with the
2  intern, Ms. Baker.
3  MR. BARTOSHESKY: Let me take just a
4  couple minutes. I think we are probably pretty much
5  done.
6  (Recess taken.)
7  BY MR. BARTOSHESKY:
8  Q.     Near the time that Olga Yatzus's employment
9  with the district was ending, were you aware of any
10  investigations or communications with the Office of
11  Civil Rights with the Appoquinimink School District?
12  A.     I was aware that there were some parents
13  that were making complaints and that Ms. Yatzus was in
14  some way involved in that. I can't really tell you if
15  I became aware of that information prior, during or
16  after, you know, that time period.
17  Q.     Did you have anything to do with the
18  investigation in any way? Did somebody from the OCR
19  come and talk to you or did somebody from the
20  administration talk to you about any of those
21  situations?
22  A.     No.
23  Q.     Now, other than you have talked about the
24  school psychologist's responsibilities in doing

Page 81

1  testing for students and doing reports for these
2  different kind of meetings. Do you also have a
3  responsibility just to be a counselor or anything like
4  that for students? Is your door open for them if they
5  have a problem? Is that part of your
6  responsibilities?
7  A.     Not generally. Specifically, it is usually
8  psychologists are called in generally when there is a
9  serious threat and a counselor wants to be — consult
10  with you on a very particular case, but not as kind of
11  a drop-in counseling sort of basis.
12  Q.     When the counselor does do that, when that
13  kind of situation comes up, how does it get from the
14  counselor to you, to the school psychologist? Do they
15  call you on the phone and say I have got a real
16  problem here, can you come and talk to this student or
17  help me with this student?
18  A.     That's exactly what would happen. The
19  counselor would contact me directly and would want me
20  to consult with the counselor or sometimes consult,
21  you know, meet with a student individually to assess
22  severity of the problem.
23  Q.     Can it also be a request from a teacher
24  along the same lines?

21 (Pages 78 to 81)

05f34e2c-dbb3-4e78-a282-a3d30af9426c

B-156 (a)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

Transcript of:

**Marion E. Proffitt, Ed.D.**

**February 21, 2006**

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-157

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §    Case No.:  05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §
and in his official capacity, MARY ANN §    **TRIAL BY JURY DEMANDED**
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

APPENDIX PAGE B158 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.:  05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B159 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Yatzus                                              v.                    Appoquinimink School District, et al.
Marion E. Proffitt, Ed.D.              C.A. # 05-103 SLR                              February 21, 2006

Page 90

1  been marked as D-291. It's an e-mail from Phyllis
2  Waecker to Donna Mitchell concerning the Radecke
3  meeting.
4        (Proffitt Deposition Exhibit No. 18 was
5  marked for identification.)
6  BY MR. BARTOSHESKY:
7    Q.  Have you ever seen that e-mail before?
8    A.  No, no.
9    Q.  Now, do you remember if Donna Mitchell showed
10  up at that hearing that you had on the grievance that
11  we have been just been talking about?
12    A.  I don't remember who was at that meeting other
13  than Ms. Yatzus and -- I do remember one of the
14  representatives being there. And I am not even sure
15  which one was there or whether both. But I would
16  imagine at least one. And the only reason I think it
17  was Ms. Kebler is because normally as co-presidents,
18  they -- one covers high -- secondary schools and the
19  other covers elementary.
20    Q.  And this e-mail that we're looking at as marked
21  now as Proffitt No. 18, and it's from Phyllis Waecker
22  to Donna, it says, "I made a mistake. I thought I had
23  sent the e-mail to everyone involved. But going
24  through my messages" -- I'm sorry, "but going through

Page 91

1  my sent messages I did not find anywhere where I sent
2  the notice except to Mieczkowski." Would that have
3  been important for you to know if you were deciding
4  whether or not notice had actually gone to --
5    A.  Yes.
6    Q.  But as you recall, you didn't know that?
7    A.  I don't remember that.
8    Q.  If you had known that, might it have changed
9  the outcome of your decision?
10    A.  It would have been weighed into the factors. I
11  can't say that it would have changed the outcome,
12  unless I go back and read everything in his
13  correspondence.
14    Q.  What do you mean "his correspondence"?
15    A.  The hearing, as I recall, was Mrs. Yatzus
16  asking to have Dr. Marusa's letter removed from the
17  files. So I would have to go back and review that
18  letter in order to weigh whether that would have
19  changed my decision.
20    Q.  But his letter does say there was written
21  notice to her. Right?
22    A.  I don't know. That's why I said I would have
23  to go back and review it. Would you like me to do
24  that now?

Page 92

1    Q.  Yes. I think it's No. 15. It does say she was
2  notified in writing of the meeting?
3    A.  That's what it says.
4        MR. BARTOSHESKY: We're about to go off
5  into a little different direction. It's 12:30. Do
6  you want to take a break now?
7        MS. MARTINELLI: Yes.
8        (Luncheon recess taken.)
9  BY MR. BARTOSHESKY:
10    Q.  Dr. Proffitt, during the time that Olga Yatzus
11  was a school psychologist in Appoquinimink School
12  District, where was her physical office located?
13    A.  When I came there originally, it was in the
14  district office, which is on Route 13, Appoquinimink
15  District Office.
16    Q.  And Olga was employed as a school psychologist
17  there before you arrived at Appoquinimink?
18    A.  I am not sure. I somehow think Olga was there
19  when I came.
20    Q.  Did her office move at some point?
21    A.  Yes, her office did move at some point into the
22  high school.
23    Q.  Do you remember when that was?
24    A.  No, I don't remember the date.

Page 93

1    Q.  While it was at the high school, was it in one
2  location the whole time?
3    A.  No, it was not in one location at the time, the
4  entire time, for the entire time.
5    Q.  And who decided that the location at the high
6  school should be moved from one room to another or one
7  place to another within the high school?
8    A.  In any building, the building principal makes
9  that decision about the use of space in their
10  building.
11    Q.  Do you have any input at all into that
12  decision?
13    A.  Only if it involves construction.
14    Q.  And in Ms. Yatzus' case, that was not the case,
15  it did not involve construction?
16    A.  No. It was an existing room that she went to.
17    Q.  Was it just the one move or were there more
18  than one move within Middletown High School of her
19  offices?
20    A.  Well, I can affirmatively say I know it was one
21  from the main office to -- I don't know the room
22  number, but it's the room that they're still in, the
23  special education office/ED room, where Ms. Waecker
24  was. I do know that. I am not sure if there was

B160

24 (Pages 90 to 93)

Wilcox & Fetzer, Ltd.              Professional Court Reporters                    (302)655-0477

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

APPENDIX PAGE B161 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

REDACTED PAGE
CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,            )
                                  )
              Plaintiff,          )
                                  )   Civil Action
v.                                )   No. 05-103 SLR
                                  )
APPOQUINIMINK SCHOOL DISTRICT     )
and TONY MARCHIO, individually    )
and in his official capacity,     )
MARY ANN MIECZKOWSKI, individually)
and in her official capacity,     )
DONNA MITCHELL, individually and  )
in her official capacity, and     )
MARION PROFFITT, individually     )
and in her official capacity,     )
                                  )
              Defendants.         )
```

     Deposition of TONY MARCHIO, Ed.D., taken pursuant
to notice at the law offices of Biggs and Battaglia,
921 Orange Street, Wilmington, Delaware, beginning at
9:58 a.m. on Wednesday, March 21, 2006, before Lucinda
M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

          PHILIP B. BARTOSHESKY, ESQ.
          Biggs and Battaglia
           921 Orange Street
           Wilmington, Delaware  19801
           for the Plaintiff,

          ADRIA B. MARTINELLI, ESQ.
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
           The Brandywine Building
           1000 West Street, 17th floor
           Wilmington, Delaware  19801
           for the Defendants.

ALSO PRESENT:  OLGA A. YATZUS
- - - - - - - - - - - - - - - - - - - - - - - - - --
                  WILCOX & FETZER, LTD.
     1330 King Street - Wilmington, Delaware  19801
                     (302) 655-0477

                                                    B-162
```

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B163 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

Tony Marchio, Ed.D.

Page 70

1  grievance because the other incident was a grievance,
2  but we did have a meeting where all of those things
3  were discussed. I distinctly remember that meeting
4  with the union representation there. It wasn't a
5  formal grievance, but it was to verify that she was
6  being reprimanded.
7    Q. And this letter, there is a -- it shows a copy
8  to Ms. Mary Ann Mieczkowski?
9    A. Yes.
10   Q. Was she the individual hired to replace
11  Dr. Lauer?
12   A. Yes, she was.
13   Q. And as of August 29, 2002, was she -- had she
14  already assumed her duties and responsibilities as the
15  special ed. supervisor?
16   A. I am not sure, to be perfectly honest with you.
17  She was hired, but there was -- she was in another
18  position when we hired her. She worked for the
19  Department of Education, and we were working back and
20  forth with them on release dates. So there was some
21  overlap there at the beginning of the school year. I
22  don't know exactly what her first day was and when she
23  started full-time for us.
24   Q. Now, on the first page of this document, the

Page 71

1  last paragraph, starts with the -- by "this document,"
2  I am talking about Marchio No. 6 again.
3    A. Okay.
4    Q. The last paragraph on the first page says,
5  "While you have chosen to characterize my request as
6  'harassment' and 'targeting you,' nothing is further
7  from the truth." Did you get those quotes from the
8  e-mail that Olga Yatzus sent to --
9    A. I believe so, yes.
10   Q. -- Terri Cheek?
11   A. I don't know if I got it from the -- she uses
12  the word "target" in there --
13   Q. I'm sorry. If you look at the first line on
14  the second page of that, it's D-248, it says, "After
15  the Vaughn incident, it seems that Tony has decided to
16  particularly target me." Is that what you are
17  referring to in your August 29 letter?
18   A. It could have been there or it could have been
19  from her union rep. because I had a lot of
20  discussions with her about that, too. She expressed
21  her concern to me that Olga was being harassed and
22  targeted. So it came from one or the other.
23   Q. So you had some meetings with the union rep,
24  and that's --

Page 72

1    A. I had some telephone discussions with them,
2  yes.
3    Q. And that would be the "Boyd" that's referred to
4  on D-28?
5    A. Yes, that's correct.
6    Q. And you had some of those discussions or
7  telephone conferences or some form of communications
8  with Ms. Boyd before the August 29, 2002 letter went
9  out?
10   A. Yes.
11   Q. Now, in this same general time frame, say,
12  August of 2002 or beginning, going into the beginning
13  of the next school year, did you have some problems
14  with Olga requesting time or reimbursement to go to
15  any kind of conferences or seminars, that kind of
16  thing?
17   A. Did I have a problem with that?
18   Q. Yes.
19   A. No, I didn't have a problem with that.
20   Q. Did you ever question her about whether she was
21  entitled to go to these things or question the amounts
22  she put in for reimbursement?
23   A. No. I did ask -- she requested to attend a
24  conference in Philadelphia. I believe it was near

Page 73

1  Philadelphia. And I did question it because the exact
2  conference was held nearby in Delaware, and so -- I
3  didn't have a problem with it, but I did question it:
4  You know, "Why would you go up there and spend the
5  whole day when you could just go a few miles up the
6  road?" I believe it was offered in Newark.
7    Q. Do you recall if she gave a satisfactory
8  explanation of why she wanted to go to the
9  Philadelphia version of the conference?
10   A. She did give a satisfactory explanation.
11   Q. And did you ever relate to her that you thought
12  that with respect to going to a conference or
13  conference that she was trying to take advantage of
14  not having a supervisor?
15   A. No. She was permitted to go. She said she
16  couldn't free up her schedule on that day that it was
17  offered in Delaware, and so that was the only day that
18  she was free to go. And so it was no problem; she was
19  given permission to go.
20   Q. Do you recall that when she was given this
21  permission this was during the time period before
22  Ms. Mieczkowski came on, but after Dr. Lauer was gone?
23   A. I don't remember exactly when the
24  conference was. I believe it was. I believe it was

# Tony Marchio, Ed.D.

Page 114

1  because of the number and nature of the reprimands in
2  her file?
3  A.  She left because she was offered a position in
4  another district.  She was recruited actually from a
5  former employee in Appoquinimink, the assistant
6  principal of Concord High School.  I believe she went
7  there.  The assistant principal recruited her to come
8  up there.
9  Q.  How did you find that out?
10  A.  Because he made no bones about it.
11  Q.  But you don't recall that there was ever a
12  consideration that she — a recommendation that her
13  contract not be renewed?
14  A.  At the time that she left and all through that,
15  I don't have any recollection of that.
16  Q.  Do you recall that at some point she was sent a
17  letter towards the end of May of 2003 time frame
18  indicating she would be offered a special education
19  teacher position next year rather than an ED position
20  the next year?
21  A.  Now, that — I do vaguely remember that, but it
22  wasn't — I wasn't real involved in that.  But I knew
23  we were going to make a lot of changes in the high
24  school and that we felt that we absolutely needed to

Page 115

1  do that in order for the program to survive.  So that
2  was, you know, one of the changes that we had hoped to
3  make.
4  Q.  And letters like that that make those kind of
5  personnel recommendations or informing an employee of
6  some kind of personnel change, would they have come
7  from Mr. Marusa?
8  A.  Yes, that's correct.
9  Q.  With respect to the recommendation that
10  ultimately was yours that Olga Yatzus' contract not be
11  renewed for the next year, do you remember when that
12  decision was made?
13  A.  I don't remember a specific date, no.  I can't
14  say that I do.
15  Q.  Well, how is that — I assume that at the end
16  of the school year that certain reviews are done and
17  decisions have to be made about what's going to happen
18  in the next school year.
19  A.  Right.
20  Q.  How does that process work?
21  A.  Well, there is a deadline.  They need to be
22  notified by the 15th of May.  I believe the process
23  here, and in almost every case, would be an official
24  notification from the human resource department that

Page 116

1  the contract will not be renewed.  There is an
2  opportunity via the code.  The code is included in
3  that letter that's sent to the employee.  The employee
4  then has a specific number of days to request the
5  reasons in writing.  And then that comes to me and
6  I — or to the human resource department.  I believe
7  it will go to the human resource department there and
8  they'll handle it.  So the reasons are given in
9  writing.  Then the employee has a right to a hearing
10  with the superintendent.  And the superintendent's
11  decision is final if it's a non- tenured teacher.
12  Q.  Final with respect to the recommendation or
13  does that process go past —
14  A.  No.  The process ends at that point.
15  Q.  Ultimately, the school board has to make the
16  final decision.  Isn't that correct?
17  A.  Right.
18  Q.  By the time this process goes through the
19  review and comes to the superintendent and you say
20  it's a final decision, is that before or after the
21  school board has made some kind of decision?
22  A.  It's before, typically, before the school board
23  makes a decision.
24  MR. BARTOSHESKY:  Let me show you this

Page 117

1  letter.  It's dated August 12, 2003.  It's from you to
2  Olga Yatzus.
3  (Marchio Deposition Exhibit No. 14 was
4  marked for identification.)
5  BY MR. BARTOSHESKY:
6  Q.  This letter — well, can you describe what part
7  of the process this letter represents?
8  A.  Olga had requested the reasons in writing, and
9  I had responded to her and/or someone had responded to
10  her.  And then she had an opportunity to meet with me
11  in the presence of the human resource director, the
12  UniServ director, the president of the union and
13  supervisor of special education and to give her
14  accounting of the situation.  And this is in response
15  to my conference with her.
16  Q.  So at this point, June 12, 2003, you've gone
17  through the entire process with Olga Yatzus and your
18  final decision is this is going to be my
19  recommendation?
20  A.  Yes.
21  Q.  And then after this, the school board would see
22  the situation and either say yes or no to your
23  recommendation?
24  A.  Yes.

B-165

# Tony Marchio, Ed.D.

Page 118

1  Q. And normally, they say, yes, isn't that true?
2  A. Yes, it is.
3  Q. Does the employee have any recourse beyond
4  that?
5  A. No.
6  Q. And is that the same whether -- well, does it
7  make any difference as to whether the employee, the
8  teacher or the psychologist or administrator whose
9  employment is not going to be renewed, do their rights
10 to pursue some kind of appeal or anything like that
11 depend at all upon how long they had been employed by
12 the district?
13 A. No. In this particular situation, the
14 recommendation, the decision of the superintendent was
15 final.
16 Q. Well, pending the action of the Board of
17 Education?
18 A. Right, mm-hmm.
19 Q. Are there some situations where the
20 superintendent's decision is not final?
21 A. Well, it depends on the circumstances and
22 the -- if a teacher is tenured and we're dismissing
23 because of job performance, then they can appeal that
24 beyond the superintendent.

Page 119

1  Q. To whom is that appealed?
2  A. That's appealed to the Board of Education. It
3  could go also to the labor board. If the union felt
4  that there was a strong enough case, then there is an
5  appeal process to that also.
6  Q. And how does one become tenured?
7  A. It's three years of continuous service in the
8  district.
9  Q. And in Olga Yatzus' case, this was done after
10 her second year. Is that right?
11 A. Yes.
12 Q. So if she had gone to the next -- if she had
13 been renewed for the next school year, would it be at
14 the end of that year she would be considered tenured
15 or do you have to finish that entire year and then
16 start the next year?
17 A. You have to start the entire year.
18     MR. BARTOSHESKY: Let me show you a letter,
19 dated May 5th, 2003, from Mr. Marusa to Olga Yatzus.
20     (Marchio Deposition Exhibit No. 15 was
21 marked for identification.)
22 BY MR. BARTOSHESKY:
23 Q. Have you ever seen this, a copy of this letter
24 before?

Page 120

1  A. No, I don't think I have.
2  Q. Now, it's dated May 5th, 2003. Would this not
3  go out -- am I correct in assuming that this type of
4  letter would not go out from the human resources
5  director until after you had made your determination
6  of what the recommendation would be for this person
7  for the next school year?
8  A. The wording is incorrect, but that -- there is
9  no doubt about that.
10 Q. Which part of the wording is incorrect?
11 A. I will be recommending. The recommendation
12 comes from me. I believe this is a notice that the
13 recommendation will be made that her contract will not
14 be renewed.
15 Q. So it should say that -- instead of saying, I,
16 meaning Mr. Marusa, it should say, Dr. Marchio will be
17 recommending?
18 A. Yes.
19 Q. And do you think that you had made your
20 decision with respect to what recommendation you would
21 make to the Board of Education before Mr. Marusa sent
22 out this letter?
23 A. I don't -- I can't recall exactly when the
24 final decision in my mind was made to not renew her

Page 121

1  contract. I just -- I can't say that. It would have
2  to have been made sometime in that time period in
3  order to give her the notice that's required by law to
4  meet the deadline.
5     MR. BARTOSHESKY: Let me show you another
6  letter also dated May 5th, again, from Mr. Marusa and
7  again to Mrs. Yatzus.
8     (Marchio Deposition Exhibit No. 16 was
9  marked for identification.)
10 BY MR. BARTOSHESKY:
11 Q. Now, it looks to me like the content of this
12 letter is, I think exactly -- of these two letters,
13 No. 15 and No. 16 are exactly the same. I take it you
14 never saw a copy of the May -- No. 16 either. Is that
15 true?
16 A. No. I wouldn't have seen it, no. Now, I don't
17 know what happened to -- both were sent. I have no
18 idea what happened here.
19 Q. Why there were two letters dated May 5th?
20 A. Yes.
21 Q. They are a little bit different in format at
22 least?
23 A. Yes.
24 Q. Do you know if Mr. Marusa ever used a stamp

B-166

Subj:       **FW: confidential**
Date:       5/6/2003 3:23:57 PM Eastern Standard Time
From:       Olga.Yatzus@appo.k12.de.us
To:         olga22@aol.com
*Sent from the Internet (Details)*

-----Original Message-----
**From:** Zen Marusa [mailto:Zenon.Marusa@appo.k12.de.us]
**Sent:** Thursday, May 01, 2003 7:11 AM
**To:** Olga Yatzus
**Subject:** RE: confidential

Olga, I will let you know when I get them. Zen.

        -----Original Message-----
        **From:** Olga Yatzus [mailto:Olga.Yatzus@appo.k12.de.us]
        **Sent:** Wednesday, April 30, 2003 4:21 PM
        **To:** APDO.MarusaZ
        **Subject:** confidential

        Zen,

        I am forwarding to complaint form that was filed with the Department of Labor and EEOC.  They advised
        me to share this with you as a notice that a formal complaint will be forth coming.  It will be coming through
        courier.

        Olga

B-167

Sunday, May 11, 2003 America Online: Olga22

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | § | |
| | § | |
| Plaintiff, | § | Case No.: 05-103 SLR |
| | § | |
| v. | § | |
| | § | |
| APPOQUINIMINK SCHOOL DISTRICT | § | |
| and TONY MARCHIO, individually | § | **TRIAL BY JURY DEMANDED** |
| and in his official capacity, MARY ANN | § | |
| MIECZKOWSKI, individually and in her | § | |
| official capacity, DONNA MITCHELL, | § | |
| individually and in her official capacity, | § | |
| and MARION PROFFITT, individually | § | |
| and in her official capacity, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX PAGE B168 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,                      §
                                            §
          Plaintiff,                        §       Case No.:  05-103 SLR
                                            §
                                            §
              v.                            §
                                            §
APPOQUINIMINK SCHOOL DISTRICT               §
and TONY MARCHIO, individually              §       **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN      §
MIECZKOWSKI, individually and in her        §
official capacity, DONNA MITCHELL,          §
individually and in her official capacity,  §
and MARION PROFFITT, individually           §
and in her official capacity,               §
                                            §
          Defendants.                       §

APPENDIX PAGE B169 TO PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

# REDACTED PAGE
# CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, §
§
Plaintiff, §        Case No.:  05-103 SLR
§
v. §
§
APPOQUINIMINK SCHOOL DISTRICT §
and TONY MARCHIO, individually §        **TRIAL BY JURY DEMANDED**
and in his official capacity, MARY ANN §
MIECZKOWSKI, individually and in her §
official capacity, DONNA MITCHELL, §
individually and in her official capacity, §
and MARION PROFFITT, individually §
and in her official capacity, §
§
Defendants. §

### APPENDIX PAGE B170 TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# REDACTED PAGE CONFIDENTIAL

**BIGGS AND BATTAGLIA**

Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Pbarto@batlaw.com
Attorney for Plaintiff

# CERTIFICATE OF SERVICE

I, Philip B. Bartoshesky, Esquire, do hereby certify that on July 25, 2006 one true and correct copy of PLAINTIFF'S APPENDIX TO THE ANSWERING BRIEFS IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT FILED UNDER SEAL (REDACTED) were forwarded via Electronic Filing to the following:

William W. Bowser, Esq.
Adria B. Martinelli, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Bldg., 17th Floor
1000 West St.
Wilmington, DE 19801


BIGGS AND BATTAGLIA


_____/s/ Philip B. Bartoshesky
Philip B. Bartoshesky, Esquire
921 Orange Street
P.O. Box 1489
Wilmington DE 19899-1489
(302) 655-9677
Attorney for Plaintiffs