**APPOQUINIMINK SCHOOL DISTRICT**
**118 SOUTH SIXTH STREET**
**ODESSA,DE  19730**
**302-378-5013**
**FAX# 302-378-5007**

Tony Marchio
Superintendent

Zenon Marusa
Human Resources Director

August 22, 2001

Ms. Olga Yatzus
101 Lynam Street
Stonehurst
Wilmington, De 19804

Dear Olga:

At the board meeting held Tuesday September 18, 2001, the Appoquinimink Board of Education approved your hire as a Psychologist, District Office, effective August 28, 2001.

We're looking forward to a great school year.

Sincerely,

Zenon Marusa
Human Resources Director

ZM/pw

P-54

C1

## Chronology
## Appoquinimink School District
### (Spring – Sept, 2002)

When I was hired as a school psychologist in August, 2001, I was offered 20 days of summer work to offset the $7,000 pay cut that I would have to take to come to Appoquinimink School District. ███████ told me that I would not come out on the salary schedule, but that it would be given for summer work the following summer (2002). With this condition given, I took the job. With the position of lead psychologist, I was also given $7,000 to be used for psychologists to order supplies and attend conferences.

After the report of ████████████████████████ an immediate investigation was conducted by Terri Cheek. (For a chronology of the events that lead to the report, see attached).During the investigation, to my knowledge████████ did not report to work. The investigation was concluded and the ██████████████ ████████. Initially no one contacted me until I made a call to Ann Nutter with the findings. At that time she told me that ██████only report to work on Mondays, and that he would not have any supervisory responsibilities. She stated that would essentially be a "Paper Pusher".

As time progressed, ████████did continue to supervise the special education coordinators and the others in the special services department with the exception of the psychologists. The interactions between the coordinators and the psychologists began to dramatically decline. There became blatant conflict that continued to escalate. ████████was continuing to supervisor them and would give them direct orders to take certain positions against us. This became unbearable and we had Tony Marchio attempt to resolve these conflicts. They did say at that time that no one informed them that they were not supposed to report to ████████ Tony brought Martha Brooks to clarify the State AMSES regarding the implementation of IDEA'97. This conflict continued from February until the end of the school year and the working conditions were intolerable.

During this time period, I had gone to Tony on a number of occasions to discuss the conditions and conflicts. It appeared that he (understandably) was getting very annoyed and frustrated with the situation; however, ████████ was still allowed to remain in his job.

I submitted a request to attend a two-day conference ($120 registration) in Baltimore for the beginning of May. I said that I did not need hotel accommodations because I would commute. Tony did not send the approval out in time to have my registration paid, but I was told that I could pay and that I would get reimbursed immediately. Aware that I had a budget to use for materials, I also purchased some relevant materials at a discount. I turned in all receipts in to Kathy Bromwell for reimbursement. Kathy passed them on to Tony for approval and I 194

1

was told that I should not have done that without prior approval. I explained that ████ had given me a budget, and I knew the money was available for those items. It took almost a month to receive my reimbursement.

Later, I asked to go to a one-day ($100) conference in Essington on June 19th. Although there was one offered the next day in Claymont, I was not able to attend due to my UD teaching obligations. My request was denied and I immediately asked Tony why. His first comment was that he thought that I am taking advantage of not having a supervisor. Then he said that he wanted to know why I would go to PA instead of DE and then I explained my reason. He said that I did not include a list of the other conferences, and the cost, so I did submit that. It turned out that the total of cost of conferences amounted to $370 (that was already given to me in the budget amount at the beginning of the school year). He finally agreed to allow me to go. I did tell him that I felt very offended by his comment and that I did not understand how he could say that, especially because I knew of two special services staff who were allowed to go to three week long conferences out of state that required airfare within one school year.

I later approached Tony requesting a performance evaluation and suggested that since I worked very closely with Ann Thomas, perhaps she could provide him with feedback. I have never received my first year performance appraisal at this time.

I also reminded Tony of the summer work that was promised to me at the time of hire and wanted to make sure that the commitment would still be honored. I tried to explain that there were so many students that still needed testing because of the dramatic increase in referrals due to the Wagner law. His comment to me was that he thought that I deliberately did not get work done so that I could summer work. Again I told him that I was really offended by that comment and that the hours were promised to me regardless.

I thought that it would be a good idea for all of the psychologists to meet with Tony to discuss the situation. My understanding was that he wanted a list of what we were to work on. I did express a concern that the coordinators all were allowed to work without question and did not have to submit a prior list of what they would be doing with their promised summer work.

During this same time, I received an email from Marilyn Sweeney requesting my presence at a meeting with the ████ for 4:30 on Tues, July 16th. Although I would have no problem attending, I was not able to since I had a contract with the University of Delaware to teach to summer session classes back to back on Tues and Thursdays from June 17 to July 18th. We only had 9 days of classes and one class was held from 1:00 – 4:00 and the other class was held from 5:00 – 8:00. Since I was on the main campus, it was impossible for me to attend. I tried explaining that to Marilyn and said that I was really sorry, but that if she had contacted me prior to setting up the meeting I would have told her that. She was extremely upset since she said that the ████ said that they wouldn't attend if I was not there. She went to

B-95

2

C3

Tony with what sounded like a complaint that I was being uncooperative. He came to me and insisted that I be there and that I should cancel class, stating that his professors did that quite a bit. I told him that I would not cancel class and that it was extremely unfair that I should be asked to do that. I also stated that if it was essential that I be there, then I should have been consulted prior to setting a definite time for the meeting. I also said that I would have rearranged anything else if I needed to but that this was not an option. He continued to pressure me on numerous occasions until I finally discussed this with my class and my second class was willing to come an hour later and stay an additional hour after the class. I told Tony that I was unable to stay for the whole meeting but that I would get there from 4:30 – 5:30, and that I would have to rush back to campus. Unfortunately, during rush hour traffic, it takes much longer than a half hour to get back and forth. He seemed annoyed that I was late. Here again, I felt that what I was asked to do was well beyond what others were asked to do, and the fact that my prior obligations were discounted. I do not believe that anyone else would have been treated that way.

I was extremely busy testing and meeting with parents and I forgot to submit my summer agenda to Tony. In my dealings with Tony over the ███ incident, he did not mention anything about needing anything else from. Obviously, my summer time schedule was not an issue as it pertained to attending the ███ meeting. He then sent me a letter which arrived right before the 4th of July holiday weekend which was very upsetting since there was no way I could discuss this with Tony for several days. I called his office after the long weekend and set up an appointment. I asked Chet if he would join us since he was the District Office building rep. Mitch also happened to be in the building, so I asked if she would be interested in attending this meeting, which she agreed to do. I itemized all of the work that I had done thus far, and listed of all the children that still needed testing. I had previously given Chrissy O'Grady my days that I would be in the office as was requested at the beginning of the summer, so I thought that was all that he wanted.

At that time, Chet also discussed his feelings that since I was given the same promise as the coordinators, that I shouldn't have to request prior approval for summer work. He stated that since he and Judy were not given any similar promises, that it was appropriate for them to have to seek prior approval.

During this meeting, Chet brought up an issue that he was extremely uncomfortable with. Several days prior to this meeting, I heard that Gary erroneously reported information to Tony regarding the way things were being done at Townsend regarding the qualification of students placed in special ed. I had a discussion with Gary regarding his inappropriate behavior, and that I felt that this should have been discussed between us if he had any questions. Chet overheard my discussion with Gary and Gary later told him that Tony requested him to get this information. When Chet brought this up with Tony, he denied it but at one point did say that when Gary came to him with his statements, he asked him to get more information.

P-196

3

C4

Chet stated that he thought this was totally inappropriate since none of this was ever brought to my attention.

Throughout this entire ordeal, I was deeply upset that it seemed that Tony had made a number of offensive statements to me and I felt that I was repeated treated in more of a hostile manner that anyone else in the department. I shared those feeling with Tony, at which time he vehemently denied it. I said that by having ▆▆▆▆▆ remain in his position until the end of June that many of his comments sounded like things ▆▆▆▆▆ would say to him. Tony said that he made the choice to allow ▆▆▆▆ to remain and that was that.

After the previous meeting with Tony and Chet, I never received feedback from Tony that my itemized list was not what he wanted. What I do know is that the next time sheet that was submitted on time to Kathy Bromwell for two weeks of summer work disappeared. Assuming that I would be paid the overtime, I sent out bills on payday, only to find out the time was never submitted. I contacted the payroll office and they said that it never arrived there. Everyone else in the departed did get paid for their summer hours. Kelly (in payroll) told me that if I submitted something immediately, there was a chance that I would be paid during the next pay period, but they couldn't guarantee it. I immediately asked if Kittie Rehrig could sign off as supervisor. I had to reproduce the time immediately. Kittie then had Tony sign off but said to me that he still was waiting for my schedule. I emailed Tony that I thought that I had given him what he wanted but that I would be more than willing to give him anything else that he needed.

After that, Tony emailed me with a very hostile tone and then emailed me with a statement that he had two time sheets for the same pay period that was not identical. He evidently had withheld my timesheet and never let me know for over three weeks nor did he ever ask me for anything additional until I went to the payroll office. I was leaving on vacation and felt that I could not respond to him alone, and that I should contact Vicky Boyd for assistance. I was not able to reach her and had to contact her while on vacation. She tried to contact Tony but he was also on vacation and could not be reached until the following week. When I finally caught up with her, she said that Tony was upset with me and suggested that I submit a calendar to him marking the days that I worked. She said that she sensed that Tony was not going to let this drop. I said that I would get that to him as soon as I could. This was right before the first week back to school and I did not have access to my files. I was planning on getting that to Tony as soon as I was able to gain access to my files, since they were packed away when our desks were moved from the district office. I spent the entire first week back to school in meetings and finally finished unpacking my office by 4:30 on Thursday, but my computer was not hooked up yet. I had to run to a liaison meeting and thought that I would work on that first thing on Tuesday. I did inform Vicky that I finally did get paid, for four weeks of overtime on my pay was really hit hard by the IRS, but I was happy to have finally gotten it. It took 6 weeks for me to get paid for those hours.

P-197

4

After my first week back to school, I was really looking forward to a good year with the changes in supervisors. I felt that I could finally focused on what I was hired to do, provide services to the students, staff and parents of the Appoquinimink School District.

Friday morning, I received another letter from Tony right at the beginning of another holiday weekend, but this one was certified. It seems that Tony is deliberately hurtful with his timing of these contacts and I now feel convinced that there has been deliberate hostility created by all that transpired since I have reported the ███████████ incident. I am totally exhausted with this and am not sure where to proceed from here.

After my early July meeting with Tony, Mitch and Chet, I was close to tears and told Mitch that I was extremely upset with what I felt was continued harassment in the way of an extremely hostile work environment. I then contacted Vicky Schaffner and Vicky Boyd to discuss my sense that there were serious issues regarding a continued hostile work environment and that I was at my wits end on how to cope with this situation. All I wanted was to do my job without constant harassment which made it very difficult for me to concentrate my efforts on my job. When I wasn't working with kids, I ended up spending lots of time at home affected by all of these hurdles that were constantly being thrown in my direction. Through all of this, I was not initiating the these conflicts, but I felt that if I was assertive and stood up for myself, then there seemed to be constant retaliation. All of the time that I had to work over the summer was spent directly working with students and their families. This obviously doesn't seem to matter because all of the harassment has nothing to do with providing services to kids....and that was what I thought I was hired to do.

Submitted by,

Olga Yatzus
8/1/02

P-198

5

C6

**Donna Mitchell**

From:        Phyllis Waecker [Phyllis Waecker@appo.k12.de.us]
Sent:        Tuesday, February 25, 2003 10:34 AM
To:          APHS MitchellDo
Subject:     ▬▬▬▬ Meeting

Donna

   I made a mistake, I thought I had sent the email to everyone involved.
But going through my sent messages I did not find anywhere were I sent the
notice, except to Mieczkowski

   Phyllis

**D-291**

C7

2/28/03

Donna,

On Wednesday 2/26/03, I asked for a meeting with you to discuss ████████████
2/25/03 meeting and I was not given more than a few minutes with you due to other
demands on your schedule. I felt that you immediately discounted my opinion and
proceeded to confront me on "not being on the same page" as the rest of the District. I
stated that I am a child advocate and that I am ethically responsible to use my
professional judgment. You stated that you told me previously asked me to share my
concerns with you prior to having that discussion in the presence of parents.

I agree that that would be a good alternative; however, I feel that my opinion is never
requested nor respected. I believe that the rest of the team had the opportunity for this
discussion, yet I am never invited to these discussions.

I also wanted to discuss my concerns about Mitch's blatantly rude and disrespectful
behavior toward me, not only in private, but publicly. I feel that I have no support from
you or the District office. I feel that everyone looks for every opportunity to reprimand
me and possible reason on the staff have observed this behavior.

I have many concerns with compliance issues that I wanted to discuss with you but you
cut me off and would not allow me to share these concerns with you.

This very hostile environment makes it very difficult for me to perform my job.

P-270

C8

Subj:     **RE: sorry I missed your call**
Date:     4/1/2003 3:54:20 PM Eastern Standard Time
From:     Vicky.Boyd@DSEA.ORG
To:       Olga22@aol.com
*Sent from the Internet (Details)*

FYI

I just got a call from Ruth Ann in Tony Marchio's office who fell all over herself apologizing because there is no tape of the hearing. She said she tested it and it was working, so the only thing she can think of is that the switch was turned the wrong way, to the "listen" mode, instead of record. I watched her turn it on and saw the wheels moving, so didn't double check. I don't see any subterfuge in this, as they wanted it taped too, and Ruth Ann has always proved to be an honest and upright person. I just think it's one of those things that happens.

There probably wasn't anything terribly important to record, anyway, so I think we're ok.

V

-----Original Message-----
**From:** Olga22@aol.com [mailto:Olga22@aol.com]
**Sent:** Friday, March 21, 2003 12:32 AM
**To:** Boyd, Vicky [DE]
**Subject:** sorry I missed your call

Hi Vicky,

Just to bring you up to speed in case we can't connect tomorrow.

1. The District is starting to feel the heat of parents breathing down their necks. This evening nine parents gathered to get organized to file a major class action OCR suit. Things are going to hit the fan in the very near future. Parents are coming in insisting on copies of audit, cum, attendance, discipline and medical records. It seems like watergate....they committed the crime, but the cover up is going to be what really nails them. Parents are coming in with attorneys and advocates and are quickly becoming quite knowledgeable about the law. They are dumb, but they realize that they are in trouble.

2. Knowing that the heat is coming on them, Mitch goes nuts trying to go through all of the audit files. They realize that they are clearly out of compliance with the majority of special education files.

3. They decide that they are going to have all of the case managers sign a form that states that they were given the case management procedures.....Why?  Now they have scapegoats.

4. Sharon Hill is fighting with Mitch because of her total disrespect and lack of support, in addition to the fact that she doesn't know the law. Sharon is now making it a racial issue, running to Marion constantly and sending her a letter of complaint regarding Donna and Mitch's behavior. They are

B-276

Sunday, April 27, 2003 America Online: Olga22

C9

having screaming matches and the plot thickens.

5. Another minority teacher is totally disrespected and insulted in an IEP meeting. Now the racial card gets flipped again.

6. Phyllis is being blamed for all of the woes of the record keeping. She has never received any form of training. She should "just know" these things, I guess.

7. Last week they try pulling a fast one on a parent. They want to schedule a behavior manifestation meeting without inviting the parent. I said, "I know this parent would want to be here". They said, we don't need to have her here since she canceled the last one (parent had to be in court with son). Then they said to me, we only need 5 minutes to complete the form. I said, "I don't think so. Where is our accountability here? We need to answer several questions that address the appropriateness of his program. He hasn't been in school long enough with all of his suspensions to be able to provide an educational program for him."

8. Behind my back, they call Chet and tell him that I couldn't be available due to a conflict in my schedule (lie) and could he cover the meeting. I happen to see him in Dooley's office and ask why he is there. He tells me and said that when he asked to see the student's file, he was told that they couldn't find it. They also told him that that was the only suspension this student had. At that point I told Chet what they were up to and he refused to participate.

9. Today we have a behavior manifestation on a student that has been suspended over 43 days thus far and his mother told the school in August that he had a 504 plan. It was never implemented. Now they wanted to have a behavior manifestation on this student and wanted to recommend alternative placement. Donna talks to me and I said that it is not right to send a student to an alternative school because we didn't do our job.

10. The parents show up and I'm talking to the parents. Donna has Byron Murphy escort the parents away from me and Donna tells me that she needs to "talk" to me for a second. She then proceeds to tell me that since this is a 504 meeting, that a school psychologist isn't required to be there by law and that I am now "uninvited" and am forbidden to attend the manifestation meeting to discuss whether his behavior was a manifestation of his disability, even though I have been working closely with him since October. This is a child who has been diagnosed and treated for Tourettes' and ADHD.

Vicky,
What is going on here is the worst nightmare that I have ever seen and the system is totally corrupt from the top down. Now they want to beat up on all of the teachers because they don't know what they are doing and are feeling the heat. Mitch is totally incompetent. She doesn't know the law and has zero people skills. Donna knows more but she is controlling and is blatantly deifying federal law. Then they want to set up teachers because they are sensing lawsuits may be coming their way.

The News Journal has also been contacted and they have been doing the investigation. This story will break within hours of the OCR complaint once it is filed. They will then assign a school reporter that will be assigned to follow this story. This staff is in dire need of protection. As for me, I can't wait until they fire me..........They the battle will begin.

I do want to nail them for their blatant unethical and illegal behavior. I was thinking of documenting these two events and copying them to Marchio and the Board. What do you think?

2.

P-277

Sunday, April 27, 2003 America Online: Olga22

C10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

# APPENDIX PAGES C11 THROUGH C13 TO DEFENDANT APPOQUINIMINK SCHOOL DISTRICT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# REDACTED
# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:        July 28, 2006

Subj:    **mad.....**
Date:    4/4/2003 1:54:01 AM Eastern Standard Time
From:    Olga22
To:      vicky.boyd@dsea.org

VICKY,

IN CASE YOU HAVEN'T FIGURED IT OUT, I HAVE REACHED MY LIMIT. I RECEIVED 2 LETTERS TODAY.
1. MY SON HAD A SENIOR PROJECT PRESENTATION AT HODGSON YESTERDAY AND HE NEEDED ME TO BRING HIS THINGS TO SCHOOL. HE THEN WANTED ME TO STAY FOR HIS PRESENTATION. I TOLD PHYLLIS WHILE MITCH AND DONNA WERE STANDING THERE. I SAID THAT I WOULD BE IN AS SOON AS I COULD GET IN. BY THE TIME EVERYTHING WAS OVER, IT WAS ALMOST 1:00. AT THAT POINT I CALLED INTO THE OFFICE AND TOLD THE SECRETARY THAT THERE WAS NO POINT IN MY COMING IN THAT DAY. I WAS WRITTEN UP FOR NOT FOLLOWING PROCEDURES.

2. .....SHE TRIED TO WRITE ME UP FOR NOT HAVING BEHAVIORAL GOALS ON THE IEP AND THAT THE MINUTES WERE NOT COMPREHENSIVE ENOUGH TO DESCRIBE OUR CONCERNS.

AS YOU CAN SEE, I HAVE KEPT MY TRUMP CARDS CLOSE TO MY CHEST, UNTIL TODAY. WE DO REACH A LIMIT.

THE ARTICLE WILL BE RUNNING IN SUNDAY'S PAPER. FRONT PAGE OF THE LOCAL SECTION. SINCE THEY KNOW I AM INVOLVED, I DECIDED THAT BECOMING THE "WHISTLER BLOWER" WILL WORK TO MY ADVANTAGE. WHEN THEY FIRE ME, I WILL HAVE PROOF THAT THEY KNEW I "BLEW THE WHISTLE".

THINGS WILL NEVER BE THE SAME IN APPO. WHO KNOWS, MAYBE WE WON'T BE CONSUMING 90% OF YOUR TIME.

IF IT BLOWS UP IN MY FACE, SO BE IT.

WHAT A SURPRISE, MARION RULED IN TONY'S FAVOR. DID YOU NOTICE THAT SHE NEVER RESPONDED TO THE CONCERN REGARDING INEQUITABLE TREATMENT. BY THE WAY, THE REASON ▇▇▇WASN'T WRITTEN IN THE APPOINTMENT BOOK WAS THAT HE CAME IN AS AN EMERGENCE. I SCHEDULED HIM IN MY BOOK FOR THE FOLLOWING DAY AS A FOLLOW UP.

SHALL WE GO TO THE NEXT LEVEL OR DO I USE THIS AS A "INEQUITABLE TREATMENT DUE TO RACE?" SHARON SEEMS TO WANT TO USE THAT CARD OFTEN. BY THE WAY, AFTER OUR MEETING ON FRIDAY, MARION HAD HER TECH GUYS GOING THROUGH MY COMPUTER AND PHYLLIS'. ALSO, I ASSUME THAT MARION TOLD SHARON IN NO UNCERTAIN TERMS THAT SHE IS NEVER TO SPEAK NAME AGAIN. SHE HASN'T MENTIONED THE "I TALKED TO MRS. PROFFIT AND SHE DID...".

THE SPECIAL EDUCATION OFFICE WAS 50+ IEPS OUT OF COMPLIANCE FOR JUST THE ANNUAL REVIEW. MARILYN HAD SCHEDULED THEM ALL THROUGH JANUARY, AND SHARON CANCELED ALL OF THEM, AS WELL AS NEVER RESCHEDULING THEM, NOR DID SHE SCHEDULE FEB OR MARCH'S. THE OFFICE IS IN TOTAL CHAOS. MITCH AND DONNA HAVE BEEN IN OUR OFFICE ACTING LIKE TOTAL PSYCHOS. THEY WERE INFORMED ABOUT THE RUMBLINGS AND THE ACTIVITIES OF THE PARENTS. FINALLY TODAY, THEY HAVE BEEN BEHAVING THEMSELVES AND ACTUALLY WERE BEHAVING LIKE PROFESSIONALS. I CAN SEE THAT THEY ACTUALLY KNOW HOW TO BEHAVE.

P-282

Sunday, April 27, 2003 America Online: Olga22

C14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## APPENDIX PAGES C15 THROUGH C17 TO DEFENDANT APPOQUINIMINK SCHOOL DISTRICT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# REDACTED
# ENTIRETY OF DOCUMENT
# CONFIDENTIAL

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com

DATED:    July 28, 2006

Subj:   **FW: copy of letter sent to Tony**
Date:   4/23/2003 8:17:37 AM Eastern Standard Time
From:   Olga.Yatzus@appo.k12.de.us
To:     olga22@aol.com

*Sent from the Internet (Details)*

-----Original Message-----
**From:** Olga Yatzus [mailto:Olga.Yatzus@appo.k12.de.us]
**Sent:** Thursday, April 10, 2003 10:11 AM
**To:** APDO.MieczkowskiM
**Cc:** APDO.MarchioT; vicky.boyd@dsea.org; olga22@appo.k12.de.us
**Subject:** copy of letter sent to Tony

For your records, here is a letter that has been sent to Tony. I cannot work under the present abusive and disrespectful conditions that you have created. Phyllis and Sharon are both out this week for extremely high blood pressure. Your behavior is abusive and extremely unprofessional. On Monday, Sharon and I were in room 1006 conducting a behavior manifestation for ████████ You stormed into the office and immediately pulled the binder out of Sharon's hands. You then proceeded to attack both of us about our last meeting, but frankly, with your rude, loud and disrespectful behavior I found it impossible to even understand what you were saying. You were shouting and pushing the binder into me and were screaming, "Here, look here, what do you see?" Then, you continued to scream and yell and were standing over me yelling at me to check my emails. You were so close to me your body was touching my shoulder. I finally had to insist that you needed to back off and stop screaming in my ear. Your tirade lasted at least an hour and a half.

Professional behavior, in my opinion would resemble the following:

You ask to review the records.
If you have a question, you ask in a polite and respectful manner.
You can express you concern by saying, "I am concerned about...... Can you explain what happened at the meeting?"
Why did you reach this conclusion?
You could then ask what our plans were to reschedule the meeting.
Then you could suggest better ways that we might address this problem in the future.

Good management, in my opinion, empowers your employees. You model appropriate behavior and establish positive communication skills. If there are problems within the department, procedures, circumstances, you gather information, not to attack, but to resolve the problem. You also encourage, support and compliment workers. Those things go such a long way and make people feel valued. When people feel valued, they work and try harder.

Your constant attacks and your continual punitive behavior has done nothing but destroy this department.

Under your leadership, a very good and dedicated professional retired, and two are out sick (doctors orders).
-----Original Message-----
**From:** Olga22@aol.com [mailto:Olga22@aol.com]
**Sent:** Tuesday, April 08, 2003 7:31 PM
**To:** Tony.Marchio@appo.k12.de.us
**Subject:** Re: response to question

Tony,

Thank you for your response. I sent them both to Donna last Friday. The ████████email was a response to Donna's inquiry about his testing. The second letter was in response to Donna for her letter of reprimand regarding ████manifestation determination meeting.

I believe that these incidents are not the exception, but are representative of the way many

P-362

Sunday, May 11, 2003 America Online: Olga22

C18

children have been treated. I believe that many children get targeted by the administration, and then at the first opportunity, children are suspended and expelled with little evidence. Due process is by-passed repeatedly and parents are treated as if they are the enemy when they would like a chance to address their concerns. Often children are suspended and the parents never are notified. In reviewing their attendance records, often these suspensions are recorded as unexcused absences. Discipline records seem to be held in the strictest confidence. I have requested on numerous occasions for a weekly, or even daily report of all discipline referrals and their outcomes so that I can provide early intervention. I usually am not aware of suspensions unless the students or parents inform me.

Then special education office rarely gets notified of these situations and then we are unless to comply with timely meetings as required by law. This issue has been raised with the MHS office on a number of occasions. The discipline system at the high school is creating many more problems than it resolved. Our at-risk students are put out of school with such frequency, that they fall so far behind and then they see no point in trying. Once suspended there is no mechanism to help these children get back on track. They are thrown back in and have to sink or swim. Everything focuses on the punitive and there are little or no resources for support.

These children often have family issues, or have diagnosed emotional and neurological impairments that leave them vulnerable to school success in the first place. The high school is currently run like a police state with administrators waiting to catch children up and then they get suspended. These kids never know from one day to the next what the rules are and what they are going to be punished for. The hostility and negativity are beyond belief. We have five administrators and 3 guidance counselors. Children are being punished for going to the Wellness Center. I have had no office since Christmas to work with children privately. I often talk to children in the commons because there is no other place I can meet with them. They are public display. There are no support services for these students and frankly, I am overwhelmed. They are so depressed and desperate and I can't get to them on a consistent basis because I am spending most of my time focusing on behavioral manifestations and developing functional behavioral assessments.

The endless hours that we are spending on these issues and with angry and disgruntled parents is making it impossible for us to hold IEP meetings and attend to our other responsibilities in a timely fashion, if at all. Everything is in crisis mode all of the time. When I tried to talk to Donna about rethinking how we are disciplining our students, I have been yelled at and told that she doesn't want to talk to me about it. Attached you will find a 9th grade student's description of what happened to his education this year. His grandmother finally pulled him out of school and sent him to Germany to get away from what is happening here.

In regard to the special education office at the high school, things are out of control. As I stated earlier, we are so overwhelmed with crises in regard to the fallout from the discipline situation, that it is impossible for us to sit down and regroup to come up with proactive strategies to address the problems. Sharon started in January and was never transitioned by anyone who could helped on plant her feet on the ground. We had so many students that were in the process of meetings and follow up services. Most of these ended up falling through the cracks. Last year there were so many internal problems that we addressed as a department. Those issues were never addressed and then Marilyn was assigned to the high school. She walked into a hornets nest. The files were not filed and were thrown about in the record room. There were sixty some items that were not brought to closure from the previous year. She also had approximately 200 students with schedules that did not reflect their IEP and she had to go through each IEP and schedule and then had to make recommendations to the counselors. Then she had to try to schedule and hold meetings on the students that were new to our school, etc. Phyllis never worked with special education files and needed training, which no had time to provide. Mitch treated Marilyn with such disdain, lack of respect and support that Marilyn left because she could not work under those

Sunday, May 11, 2003 America Online: Olga22

C19

conditions.

When Sharon started, she never had the opportunity to get a handle on the needs of the department, the procedures that were in place, etc. Since January, the majority of our time has been spent on dealing in a crisis mode with students and parents due to discipline. Mitch often comes into the office yelling, screaming and accusing anyone and every one of something that was not done correctly. Today she did not stop yelling and screaming for one and a half hours. This is unnecessary and does nothing but get everyone totally upset. It actually interferes in our ability to even think. I was trying to work on putting a list together for Mitch of students that need to re-evaluations and initial evaluations and was not able to stop being badgered until almost 4:30. The morale of the entire special education staff is beyond repair. Mitch has never gotten any handle on what the needs or this department were and yet teachers and staff are blamed and scapegoated whenever Mitch or Donna feel that they are in the hot seat. People can only get beaten up on for so long before the give up.

Tony, I have been so upset with everything that I see going on and feel that there is no avenue to pursue to have anyone willing to listen and address these problems. I feel that I have been dealing with a totally hostile situation and have been disrespected by everyone I encounter from an administrative standpoint. I believe that if we focus on the needs of the child, and try to support children to become the best that they can be, children will strive and thrive. Parents will be positive and supportive and they will work in cooperation with us. When children are being abused by an insane system that does nothing to promote success, but harshly and unjustly sets them up for failure and rejection, then we all have failed as a system. Most importantly, we have failed our youth. What is happening at Middletown High School is what happens, when we loose focus on our purpose to serve all children to the best of our abilities. The focal point of MHS has been about total control and power and has had nothing to do with fairness and compassion. We have behaved in a socially irresponsible manner. Our 15 and 16 year olds are thrown out of school and are arrested for trivial offenses. We are creating a community of high school drop outs with police records that have little or nothing productive to do with their unsupervised days out of school. I desperately hope that this nightmare will cease spinning out of control and that someone will say, lets sit down and look at what we've down. Once we identify the problems, lets figure out how to solve it in a responsible and ethical manner and that we will never lose sight of why we were hired in the first place.

P-364

Sunday, May 11, 2003 America Online: Olga22

C20

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor** and **EEOC**
(State, or local Agency, if any)

ENTER CHARGE NUMBER
☐ FEPA 05031062
☐ EEOC 17CA360411

NAME (Indicate Mr., Mrs., Ms)
Olga Alexandra Yatzus

HOME TELEPHONE NO. (Include Area Code)
(302)999-8365

STREET ADDRESS
101 Lynam St.   Wilmington DE 19804   NCC

CITY, STATE AND ZIP CODE

COUNTY

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

NAME
State of Delaware/Department of Education/Appoquinimink School District

NO. OF EMPLOYEES OR MEMBERS 100+

TELEPHONE NUMBER (Incl. Area Code)
302-376-4140

STREET ADDRESS
401 Federal St. P.O. Box 1402 Dover, DE 19903-1402

CITY, STATE AND ZIP CODE

TELEPHONE NUMBER (Include Area Code)

NAME

STREET ADDRESS

CITY, STATE AND ZIP CODE

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☒ RETALIATION ☒ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 2/5/02
LATEST 5/12/2003
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I am a white female who has been employed by the Respondent since 8/01 at Middletown Highschool as a School Phychiolgist. I am a qualified individual with a disability who is able to perform the essential functions of the position without reasonable accomodation. On 2/5/02, I reported allegations of sexual harassment to Marian Prophet (black, female), Assistant Superintendent. After an independent investigation, Respondent determined that the allegations were founded. Since about March of 2002, I have been subjected to retaliation by Tony Marchio (white, male), Superintendent. I have received numerous retaliatory write-ups based on embellished or unfounded grounds. Specifically, I was written up for not giving a physical calender of my summer schedule to Mr. Marchio even though I informed the secretary of my availablity and provided Mr. Marchio an itemized task list. In addition, I was written-up for having children in my office, although this is a part of my job. Also, Mr. Marchio pulled, without notification, my timesheet that had two weeks of overtime listed, thereby delaying my pay. Lastly, 2/25/03, Ms. Prophet pulled a write-up which was given to Sharon Hill (black), Education Diagnostian thereby removing it from her file however, I was similarly written up but my write-up was kept in my file by Mr. Marchlo. On 5/5/03, I received a letter stating that my contract would not be renewed and therefore, as of June 18, 2003, I will be terminated. On 5/12/03, I was informed by letter that I was going to be moved to a special assignment at the District Office until my termination date. On this date, I was locked out of my office, escorted out of the building and told that I could not return to the building.
  I believe that I have been discriminated and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act of 1991, as amended, the Delaware Discrimination in Employment Act and the Delaware Handicapped Persons Employment Protection Act based on my race, sex and my disability because: I have been disparately treated with regard to terms and conditions of employment specifically displinary action; I have received numerous retaliatory write-ups based on embellished or unfounded grounds, in an effort halt my tenure; the hostile working environment and physical conditions compounded with my disability has made it very difficult to perform my job sufficiently; I was subjected to verbal abuse both at work and by mail by Donna Mitchell, Principal, Jim Dooley, Assistant Principal and Mary Anne Mieczkowski, Supervisor; and  I was unfairly terminated effective June 18, 2003.

☒ I also want this charge filed with the EEOC, I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

_Olga Yatzus_  5/14/03

SIGNATURE OF COMPLAINANT

**D-66**

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

NOTARY - (When necessary to meet State and Local Requirements)

C21



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

### C.A. # 05-103 SLR

---

Transcript of:

Yatzus, Olga A. - Vol. 1 (1-189)

March 30, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Olga A. Yatzus

76

1  spoke to her later, and she told me that someone from

2  the school district should be contacting me or had

3  they contacted me yet, and I said, "No." And she

4  said, "Well, if they haven't yet, they should." And I

5  think I called Anne Nutter at that point, and that's

6  when Anne told me what Terri's findings were.

7      Q.   And what did Anne tell you?

8      A.   Anne told me that Terri felt that the -- that

9  ▓▓▓▓▓▓▓▓▓▓▓ -- she was upholding that or

10  supported that and that the district would -- that

11  ▓▓▓▓ would no longer be my supervisor.

12     Q.   Did she tell you anything else about the

13  remainder of ▓▓▓▓▓▓ tenure?

14     A.   She said that he was going to stay until the

15  end of his contract, which would have been the end of

16  June, I think, and that he was going to not have any

17  supervisory capacity over the school psychologists and

18  that he would be using sick days and vacation days so

19  that he would only be in the office one or two days a

20  week.

21          Prior to that, ▓▓▓▓▓▓▓▓ had already been

22  notified that his contract wasn't going to be renewed,

23  so I think that they were just going to have him

24  handle more of the administrative stuff.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Olga A. Yatzus

78

1    Q.   I am showing you a document marked Yatzus

2   Exhibit 11.  And this is an e-mail, looks like --

3   well, at the top, it's from Terri Cheek to Anne

4   Nutter, and below that is an e-mail from, it appears,

5   from you to Terri Cheek.  At the bottom right-hand

6   corner of this document it is marked D-247.  Is this

7   the e-mail you are referring to?

8    A.   My e-mail was, right, on the bottom.  Right?

9    Q.   On the bottom, yes.  I'm sorry.

10    A.   I didn't see this e-mail until the documents

11   that were produced.

12    Q.   The e-mail that's from you --

13    A.   Yes.

14    Q.   -- to Terri is the follow-up e-mail when you

15   perceived retaliation?

16    A.   Yes.

17    Q.   At the conclusion of the investigation after

18   Ms. Nutter told you the results, at that time, how did

19   you feel about the conduct of the investigation?

20    A.   I felt pretty good about the way the district

21   had handled it.  I felt that they acted in a very

22   timely fashion, and I felt that Terri was very

23   thorough in her investigation.  And so I know I said

24   something to Tony about feeling good about the way it



Olga A. Yatzus

79

1  had been conducted.

2   Q.   Were you ▇▇▇▇▇ ▇▇▇▇▇ at all by ▇▇▇▇▇▇

3  following the conclusion of the investigation?

4   A.   No.

5   Q.   You testified that ▇▇▇▇▇ would, your

6  understanding, would use his sick time to finish out

7  the school year and only come in a day or two a week.

8  Is that correct?

9   A.   That's what I recall.

10   Q.   Did that in fact occur to the best of your

11  recollection?

12   A.   I don't know because I wasn't at the district

13  office.  I tried to stay away from there.

14   Q.   Did you have any professional interaction with

15  him following the conclusion of the investigation?

16   A.   I think he might have attended a couple of

17  meetings.

18   Q.   Did he still supervise any employees in the

19  district after the conclusion of the investigation?

20   A.   My understanding was that he wasn't supposed

21  to, but I do know that he was still working very

22  closely with the education coordinators.  So whether

23  he was supervising them or not I wouldn't know.

24   Q.   Did you believe that his involvement created



Olga A. Yatzus

93

1   School, but he wasn't getting his contract renewed,

2   and he was never in the building, it seemed.  So I

3   wasn't sure who my high school contact was at that

4   point.

5       Q.   No one ever told you someone would be replacing

6   ██████████ as your supervisor in the interim until a

7   new person was hired?

8       A.   Tony said for us just to deal with him until

9   ██████████ replacement got hired.  So we were kind of

10  floundering at that point.

11      Q.   And you said there were two different

12  conferences you requested to attend?

13      A.   I think it was, yeah, I think it was two.

14      Q.   Did Dr. Marchio deny your attending those

15  conferences?

16      A.   He allowed me to go to one.  Then he came back

17  with a comment for the other that he didn't know why I

18  wanted to go to Philly to the conference by the

19  airport there instead of the Delaware one.  I told him

20  that I -- I don't recall what.  I think it was

21  something with the university that I had to do that

22  particular day, so I couldn't go on the day that I

23  had -- that I would have preferred to go in Delaware,

24  but the same conference was offered five minutes down



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Olga A. Yatzus

94

1    the road.  So I asked to go to that one.

2      Q.    Did you explain that to Dr. Marchio?

3      A.    Yes, I did.  After I explained that, he allowed

4    me to go to that one.

5      Q.    He allowed to you attend the one you wanted to

6    go to?

7      A.    Yes.

8      Q.    And the other one you said you did attend also?

9      A.    Yes.

10      Q.    So as a result of the -- the original question

11    was at what point you believed you were being

12    retaliated against for your 

13    allegations.  And you stated that before the summer --

14    issue with the summer hours there was this issue with

15    the conferences.  Is that the first time -- was that

16    the beginning --

17      A.    That was the first time I felt that -- it was

18    the tone of voice, it was the attitude and the comment

19    that I was trying to take advantage, that I felt

20    uncomfortable because nobody else was -- would have

21    been receiving that kind of comment that, oh, I just

22    think that you're trying to take advantage.

23      Q.    And you thought that other employees were being

24    treated more favorably?

Olga A. Yatzus

101

1    as I would complete some evaluations, there were some

2    parents that would cancel, so I would have to

3    reschedule.  Other times, I wasn't sure how long an

4    evaluation would take on a particular child.  So some

5    days you could get two kids done in a day.  Sometimes

6    it would take a whole day to get that particular child

7    done.  So I would try to see where I was on that list

8    and then schedule a week or two in advance to get the

9    kids in.

10   Q.   So you are saying you were unable to provide a

11   list of dates?

12   A.   Exact date of who was coming and when for the

13   duration of that time because that was --

14   Q.   Could you provide dates that you were going to

15   be working over the summer?

16   A.   Yes.

17   Q.   Did you do that?

18   A.   I had given the information to Chrissie in

19   terms of what days I would be available to come into

20   work.

21   Q.   You had given the verbal information to

22   Chrissie?

23   A.   Yes.

24   Q.   You thought that complied with Dr. Marchio's



Olga A. Yatzus

102

1   written requests?

2       A.   I -- after he sent the one thing that he wanted

3   to know who and what I was going to be doing, I gave

4   him this, and asked him if he needed anything more, to

5   let me know.

6       Q.   Your testimony is that prior to Dr. Marchio's

7   follow-up letter of July 3rd, 2002, you thought you

8   had complied with his request by your verbal --

9       A.   By letting --

10      Q.   -- discussion with Chrissie?

11      A.   -- Chrissie know what days I would be there.

12              MS. MARTINELLI:  Let me know when you want

13  to take a lunch break.  I can do it now.

14              MR. BARTOSHESKY:  You want to do it now?

15              MS. MARTINELLI:  That's fine.  Yeah.

16              (Luncheon recess taken at 12:10 p.m. and

17  reconvened at 12:58 p.m.)

18              (Yatzus Deposition Exhibit No. 16 was

19  marked for identification.)

20  BY MS. MARTINELLI:

21      Q.   Ms. Yatzus, you have been handed a document

22  identified as Exhibit 16, and in the lower right-hand

23  corner, it's identified as P-227.  It's dated

24  August 29th, 2002.  And it appears to be a letter from



C29

Olga A. Yatzus

107

1  objective representative?

2    A.  Not necessarily.  I always felt that the union

3  was in that conflict situation sometimes because a big

4  part of their job was to negotiate contracts and look

5  at the big picture.  And I felt that they had to walk

6  a fine line of supporting the district and doing what

7  they needed to support its members.  So I felt that at

8  times they were walking a tightrope.

9    Q.  Did you feel that at the time, or did you --

10    A.  I did question that at the time.

11        MR. BARTOSHESKY:  You have to wait for her

12  to finish her question.

13    A.  I'm sorry.

14    Q.  You did feel that at the time was your

15  response?

16    A.  I had some feelings in that regard.

17    Q.  You had quite a bit of correspondence with her

18  is that correct --

19    A.  Yes.

20    Q.  -- regarding your concerns?  And you confided a

21  lot of information in her, with her?

22    A.  Yes.

23    Q.  Despite the fact that you had concerns about

24  her objectivity?



Olga A. Yatzus

120

1   A.   The IEP team, the psychologist, generally

2   reviews the testing, any kind of documentation.  And

3   it's a committee process.

4   Q.   Is there someone who leads the discussion?

5   A.   Sometimes the ED will walk through that.

6   Sometimes the psychologist will.  But the psychologist

7   is involved in the process.

8   Q.   Is the psychologist's attendance more critical

9   for behavior manifestation than an IEP meeting?

10   A.   Yeah.

11   Q.   Is that required?

12   A.   A psychologist should be there.

13   Q.   Do you recall what time you arrived at this

14   meeting scheduled for 10:00 a.m.?

15   A.   I think it was about 10: -- this says 10:30.

16   It was around there.  I don't know exactly.

17   Q.   Why were you late for the meeting?

18   A.   There was a student that showed up at my office

19   that I had never seen before who was -- looked very

20   manicky.

21   Q.   I'm sorry.  Looked?

22   A.   Looked manicky.  He was agitated.  And I didn't

23   know the student at all.  And he -- I felt like I

24   needed to assess quickly what was going on to make



WILCOX & FETZER LTD.
Registered Professional Reporters

C31

Olga A. Yatzus

121

1    sure that, you know, he wasn't in crisis at that time.

2          So as I finished -- as I felt that he was

3    okay and sent him on his way, I went to find the

4    meeting, and checked several locations in the high

5    school, and -- because that's where I thought the

6    meeting was going to be held -- and then found out it

7    was actually going to be at the district office.  And

8    I got over there as quickly as I could.

9    Q.   So a student came to your office.  Is that --

10   A.   Yes.

11   Q.   And what student was that?

12   A.   What's his name?  I can see him.  I can't

13   recall his name.

14   Q.   Do you recall about what time that was?

15   A.   Probably about quarter to 10:00.  Somewhere

16   around there.

17   Q.   He was in your office for how long?

18   A.   I -- he wasn't in that particular office.  I

19   met -- there was another room -- because I shared an

20   office and I didn't like to talk with other people

21   there when I met with kids, if I could help it, so

22   there was another room that was available.  So I met

23   with him there for about 15 minutes, maybe.  And then

24   tried to get out of there so I could attend this



WILCOX & FETZER LTD.

Registered Professional Reporters

C32

Olga A. Yatzus

122

1    meeting.

2    Q.    And this was in the high school you worked --

3    A.    Yes.

4    Q.    -- you met with him?

5          And you knew the meeting was scheduled,

6    correct, at that time?

7    A.    At that point, yeah, I did know the meeting was

8    scheduled.   I was planning on getting there, but felt

9    that I just quickly needed to find out what was going

10   on with this kid that I had never met him before.

11   Q.    Did you think your presence at this meeting was

12   important?

13   A.    Yes.

14   Q.    Do you recall being written up on any occasions

15   for not completing IEP reports?

16   A.    IEP reports?   I am not sure what an IEP report

17   is.

18   Q.    Evaluation report?

19   A.    Yes.

20   Q.    Psychological evaluation?

21   A.    Yes.

22   Q.    Do you recall being written up for not

23   completing psychological evaluations?

24   A.    Yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

Olga A. Yatzus

139

1   started or right after the school year started our

2   office out of the district office was -- we were told

3   that we weren't to have any office space in the

4   district office at that point.  So we all -- all of

5   the EDs and psychologists had building assignments.

6   So that's where our office was to be in whatever

7   building we were assigned to.

8     Q.   So you started out at the district office.

9   Before the school year of '02-03, you were all in the

10  district office?

11    A.   We had office space there.

12    Q.   And then in the beginning, sometime in the

13  beginning of the '02-03 school year, you were moved

14  into the high school?

15    A.   Well, I had -- you would have a district

16  office, but you would have a space to work in at the

17  locations that you were assigned to.

18    Q.   Was your main office still considered in the

19  district office then?

20    A.   No.

21    Q.   Each psychologist was moved out to the school

22  they were working with?

23    A.   Their building.

24    Q.   Then what was the move you said occurred after



WILCOX & FETZER LTD.
Registered Professional Reporters

C34

Olga A. Yatzus

140

1    that?

2    A.    I got moved out of the main office.  There was

3    a new wing that was built on the high school and so

4    there was a room available that I was assigned to, and

5    I shared that space with Julie Bowers, who was the

6    transition coordinator.

7    Q.    Was Julie Bowers also moved at that time into

8    that space or was she new?

9    A.    No.  Julie and I moved in.  When we moved, we

10   moved together at that time.

11   Q.    Was anyone else affected by that move?

12   A.    Eileen had a desk there.

13   Q.    Okay.  And so you moved to a room available in

14   the new wing of the high school?

15   A.    Yes.

16   Q.    You, Julie and Eileen Baker?

17   A.    Yes.

18   Q.    And you moved again.  When was that?

19   A.    January.  When I returned from Christmas

20   vacation, my office had been moved prior to my return.

21   Q.    Was that the move you were referring to around

22   the time Mr. Dooley's --

23   A.    Yes.

24   Q.    You returned from vacation, and you didn't have



Olga A. Yatzus

141

1  notice of that move before you came back?

2     A.    No, I did not have notice.

3     Q.    And you were moved to what office then?

4     A.    To a much smaller office that I was to share

5  with Sharon Hill and Phyllis Waecker.

6     Q.    Did Sharon Hill and Phyllis Waecker also move

7  from another office with that move?

8     A.    Sharon had been a teacher prior to that.  So

9  she didn't have an office prior to that.

10    Q.    She was new to that position?

11    A.    Yes.

12    Q.    And Ms. Waecker, did she move offices in that

13 move?

14    A.    She had an office space in the main office next

15 to Marilyn Sweeney's office prior to Marilyn leaving.

16 And Marilyn retired at the end of the 2002 -- December

17 of 2002.  So Marilyn retired or left -- her last day,

18 I think was right before Christmas vacation.  And

19 Phyllis' office was next to her.  And then when we

20 returned in January, Phyllis and Sharon and I were

21 placed in one room.

22    Q.    So Phyllis was new to the position, too?

23    A.    No.  Phyllis was working with Marilyn Sweeney

24 as the special ed. secretary for a few months.



WILCOX & FETZER LTD.
Registered Professional Reporters

C36

Olga A. Yatzus

142

1    Q.    But her space moved as a result of this move as

2    well?

3    A.    Yes.

4    Q.    And was anyone else affected by that move that

5    you can recall?

6    A.    Not that I can think of.  Well, yeah.  I

7    guess -- I think the interventionists used the space

8    that we moved into for a period of time.  So they

9    would have been affected.  They got moved to a room

10   upstairs, I think.

11   Q.    You don't recall the room number of that room.

12   A.    No, I don't.

13   Q.    And then was there a move after that?

14   A.    And it was just ungodly.  You couldn't function

15   in that room where we were placed in.  And none of us

16   could move or breathe in that room.  So we got moved

17   again back to the room that I had just left.

18   Q.    In the new wing of the high school space?

19   A.    Yes.

20   Q.    Was that all of you moved back to that space?

21   A.    Yes.

22   Q.    You, Sharon Hill, Phyllis Waecker all moved?

23   A.    Yes.

24   Q.    Was anyone else affected by that move?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

C37

Olga A. Yatzus

143

1    A.    No.   Oh.   And Julie Bowers, she got moved to

2    Marilyn Sweeney's old room in the main office.

3    Q.    And were you -- did it give you more space,

4    this move back to the new wing?

5    A.    Yes.

6    Q.    Were you displeased with that particular move?

7    A.    Not as far as space to sit down and do work,

8    but I didn't have a private location to do my job.

9    Q.    Were you given the use of a conference room for

10   counseling?

11   A.    Or testing or anything else or meeting with

12   parents or whatever I needed to do during the course

13   of my day.   That all depended on whether or not that

14   room was going to be used for meetings.   So whether or

15   not I could count on -- depend on a working space

16   depended on -- my use of that room was always

17   preempted by the need to use that space for meetings.

18   When you have the number of special ed. students or

19   whatever other meetings we needed to have, there were

20   a lot of meetings that would go on in the course of a

21   day.

22   Q.    Did you say when approximately you thought that

23   move back to the new wing in the high school was made?

24   A.    That was within a week or so.



WILCOX & FETZER LTD.
Registered Professional Reporters

Olga A. Yatzus

144

1    Q.    So back in January of '03?

2    A.    Yes.

3    Q.    What was the reason given for that move?

4    A.    I think they realized that we couldn't function

5    in that space.  There wasn't room to move.  There

6    wasn't space to put student files.  It was impossible

7    to work in there.

8    Q.    Was there ever a reason given to you at the

9    time for that move?

10   A.    I don't recall what reason other than we

11   decided that you're moving again.

12   Q.    Who told you you were moving?

13   A.    I don't recall.

14   Q.    So sometime in January of '03, you, Sharon Hill

15   and Phyllis Waecker moved back to the new wing in the

16   high school?

17   A.    Yes.

18   Q.    Was there a move after that?

19   A.    Then I got moved to that smaller conference

20   room.

21   Q.    In the high school?

22   A.    Yes.

23   Q.    Was that the conference room you were using

24   before when it was available?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Olga A. Yatzus

145

1    A.    Yes.

2    Q.    Were you by yourself in that smaller conference

3    room?

4    A.    Yes.

5    Q.    So no one else was affected by that move?

6    A.    No.

7    Q.    Except for you?  And were you unhappy with that

8    move?

9    A.    No.

10    Q.    Were you pleased by it?

11    A.    I felt that I could actually have a place that

12    I could work.  I wasn't pleased by the fact that I had

13    to keep moving, which, when you move, it takes a lot

14    of time.

15    Q.    Were you pleased with that new space?

16    A.    Yes.

17    Q.    And you don't know the room number of that?

18    A.    No, I don't.  I don't remember.

19    Q.    And then was there a move after that?

20    A.    Just when my lock was changed and I was

21    moved -- I was reassigned to the district office.

22    Q.    I want to go back for just a second.  The move

23    to the smaller conference room by yourself, do you

24    recall when that was?



WILCOX & FETZER LTD.
Registered Professional Reporters

C40

Olga A. Yatzus

183

1    Q.   In case I didn't identify it before.  This is

2  P-17 on the bottom.  In the final paragraph of this

3  letter e-mail attachment, the page identified as P-19,

4  it says, "It is very interesting you have had the

5  audacity to send me a letter of reprimand when you

6  clearly have been in violation of federal law and were

7  deliberately conspiring to get rid of this disabled

8  student in the most unethical and immoral manner."

9          Is that one of the statements you are

10  referring to regarding making written statements as to

11  illegality?

12    A.   Certainly that was a statement of concern.

13    Q.   Do you recall when this was sent?

14    A.   I don't recall the date.  I think it would have

15  been after Donna's letter.

16    Q.   It refs to the reprimand of ███████████ the

17  first line.

18    A.   So it probably was in April.  Because it's

19  saying that I am responding to a letter of reprimand.

20    Q.   Right.

21    A.   So it would have been, I think the April 2nd

22  letter, the one numbered Yatzus 27.

23    Q.   Did you think it was part of your job as school

24  psychologist to report this concern?



WILCOX & FETZER LTD.
Registered Professional Reporters

Olga A. Yatzus

184

1    A.    I think it's part of the role of the school

2  psychologist to be an advocate for children and to see

3  what we could do to make sure we're doing everything

4  that we can to address the law and the needs of the

5  student.  I have been an advocate for the student at

6  least in terms of trying to see that we were working

7  with what we needed to do for him.

8    Q.    So in your role as you -- your role as student

9  advocate, you thought it was important to report what

10  you perceived as illegal behavior?

11    A.    Yes.

12    Q.    Did you think it was a part of your job?

13    A.    I felt that that was part of my job.

14          And I had a conversation with Jeff Taschner

15  from the union expressing some concern about what I

16  observed happening.  He told me that if I saw this

17  going on and didn't report it, then I would be equally

18  responsible.  And so with his direction, I did what he

19  instructed me to do.

20    Q.    Who was that again?

21    A.    Jeff Taschner, who was the attorney for DSEA.

22    Q.    Do I understand he, essentially, conveyed to

23  you you wouldn't be doing your job if you did not

24  report this?



WILCOX & FETZER LTD.
Registered Professional Reporters