IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　)　Volume 2
　　　　　　　　　　　　　　　　)　Civil Action
v.　　　　　　　　　　　　　　　)　No. 05-103 SLR
　　　　　　　　　　　　　　　　)
APPOQUINIMINK SCHOOL DISTRICT　)
and TONY MARCHIO, individually　)
and in his official capacity,　)
MARY ANN MIECZKOWSKI, individually)
and in her official capacity,　)
DONNA MITCHELL, individually and )
in her official capacity, and　)
MARION PROFFITT, individually　)
and in her official capacity,　)
　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　)

　　　Continued deposition of OLGA A. YATZUS taken
pursuant to notice at the law offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 1000
West Street, 15th Floor, Wilmington, Delaware,
beginning at 9:50 a.m. on Wednesday, April 26, 2006,
before Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

　　　　PHILIP B. BARTOSHESKY, ESQ.
　　　　Biggs and Battaglia
　　　　　921 Orange Street
　　　　　Wilmington, Delaware  19801
　　　　　for the Plaintiff,

　　　　ADRIA B. MARTINELLI, ESQ.
　　　　Young Conaway Stargatt & Taylor, LLP
　　　　　The Brandywine Building
　　　　　1000 West Street, 17th floor
　　　　　Wilmington, Delaware  19801
　　　　　for the Defendants.

- - - - - - - - - - - - - - - - - - - - - -
WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
(302) 655-0477

Olga A. Yatzus

278

1  what had happened?

2    A.    Right.  And Kitty that one day.  But not after

3  that.

4    Q.    I'm sorry.  So what was the conversation with

5  Kitty again?

6    A.    They told me that I had to -- if I turned in

7  that time sheet like that day and they needed to have

8  an administrator sign off on it.  So I had given it to

9  Kitty and explained to her that my time sheet had

10  gotten lost and could she help take care of that for

11  me.

12    Q.    Okay.  But Kitty didn't give you any

13  explanation as to why it wasn't taken care of the

14  first time?

15    A.    Nobody told me any reason why it hadn't been --

16  nobody seem to know anything about it.

17              (Yatzus Deposition Exhibit No. 40 was

18  marked for identification.)

19  BY MS. MARTINELLI:

20    Q.    I am showing you a document identified as

21  Exhibit 40, and on the lower left-hand corner it is

22  identified as D-81.  It appears to be an Appoquinimink

23  School District hourly personnel time sheet received

24  July 11th signed by you at the bottom July 11th, 2002.



WILCOX & FETZER LTD.
Registered Professional Reporters

C44

Olga A. Yatzus

279

1  Do you recognize this document?

2  A.    That's my handwriting, yes.

3  Q.    Okay.  And this was submitted on 7/11/2002,

4  which appears to be the last date listed on the list

5  of dates and times.  So do you think this was the

6  first time sheet that you submitted?

7  A.    That would be my guess.

8  Q.    And the total in the lower right-hand corner

9  appears to be 45 hours.  Is that correct?

10  A.    Yes.

11              (Yatzus Deposition Exhibit No. 41 was

12  marked for identification.)

13  BY MS. MARTINELLI:

14  Q.    And this document has been identified as

15  Exhibit 41, and also it's indicated as D-80 in the

16  lower left-hand corner.  This also appears to be a

17  school district time sheet signed by you for the same

18  period, 7/1 through 7/11/2002.  Only this time sheet

19  is dated 8/1/2002.  Do you believe this is the second

20  time sheet you submitted when requested?

21  A.    Right.  When I had gone in that date -- during

22  the summer, I would use the time sheet to just jot

23  down what hours that I was there.  And as I said

24  previously, I always made a copy, but this particular



Olga A. Yatzus

280

1    one I didn't.  So when payroll said, well, if you get

2    it in today ... and so I tried to recreate that from

3    my memory the best I could at that point.

4        Q.    So do I understand then you don't record your

5    hours anywhere except on this sheet --

6        A.    Right.

7        Q.    -- is what you are saying?

8        A.    Right.  I was keeping track of my hours on my

9    time sheet.

10       Q.    You don't have a calendar or anywhere else you

11   keep track of that time?

12       A.    No, I didn't on my calendar.  I just did on the

13   time sheets that I would go in and when I would leave.

14       Q.    With the first document that's identified as

15   Exhibit 40, would you on a daily basis enter these,

16   you know, times by each date?

17       A.    Yes.

18       Q.    So each of these entries were done on the date

19   themselves?

20       A.    Right.

21       Q.    And then you just did your best from memory to

22   recreate the document?

23       A.    Right.

24       Q.    It appears that the total on the second one is



Olga A. Yatzus

281

1  50 and a half hours.  So five and a half hours more

2  than the second document?

3     A.   Right.  I was just trying to recall from the

4  best of my recollection a month later, you know, what

5  those hours were.

6     Q.   And on the bottom of Exhibit 41, there's

7  handwriting kind of on the right-hand side that

8  indicates "August 23rd - paid."  Do you know is that

9  the date you finally did receive a paycheck for that

10  time?

11     A.   By the end of the month.  I don't recall

12  exactly the day.

13     Q.   Do you recall whether that paycheck was for 50

14  and a half hours or 45 hours?

15     A.   I don't recall.

16     Q.   Is there a set schedule?  When would you

17  normally receive a paycheck for the period 7/1 to

18  7/11, do you know?

19     A.   I think it would come like a week.  I can't

20  recall if it was a two-week turnaround time or like a

21  week turnaround time.  I can't remember exactly.

22     Q.   So I guess because it wasn't a regular time and

23  a regular salary, it wasn't like certain dates of the

24  month all the time, it was just the turnaround period

**W&F**

Olga A. Yatzus

291

1       MR. BARTOSHESKY:  I'll check, too.

2       MS. MARTINELLI:  If you'll just give me two

3   minutes, we'll wrap up.

4       MR. BARTOSHESKY:  Okay.

5       (Recess taken at 12:35 p.m. and reconvened

6   at 12:36 p.m.)

7   BY MS. MARTINELLI:

8    Q.   You've testified earlier that part of the

9   treatment you believe was discriminatory related to

10  your request to attend conferences.  Is that correct?

11   A.   It was not necessarily retaliatory, but just

12  the tone.  And I felt that it just seemed out of

13  nowhere.

14   Q.   Did you wind up attending the conference as you

15  requested to attend?

16   A.   After further discussion with Tony about the

17  nature and the purpose of the conference.  There was

18  one in particular that Tony was upset with me

19  requesting to go to, which was up by the airport,

20  rather than the one on Naamans Road, which was five

21  minutes up the road.  But explained to him that I

22  couldn't go to the Wilmington one because it was

23  during the time that I was teaching a class, so.

24   Q.   And following your explanations, did you wind



Olga A. Yatzus

292

1   up attending the conferences where you requested to

2   attend them?

3       A.   Yes.

4              MS. MARTINELLI:  That's all I have.

5              MR. BARTOSHESKY:  I think I just have one

6   area that I want to ask about that I may have just

7   written down something wrong.

8   BY MR. BARTOSHESKY:

9       Q.   Olga, you were talking about your testimony

10  about when you got involved with the parents in the

11  OCR situation.  You talked to Jeff Taschner.

12      A.   Yes.

13      Q.   And I thought you said you had talked to an

14  administrator from another district.

15      A.   Yes.

16      Q.   Who was that?

17      A.   Roberta Walker.

18      Q.   Who was Roberta Walker?

19      A.   She's the assistant superintendent at Red Clay.

20      Q.   Is that her current position?

21      A.   She just finished up this year.  She's going on

22  special assignment for next year and then she's going

23  to retire after that.

24      Q.   What did she say to you when you talked to her





WILCOX & FETZER LTD.

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

C.A. # 05-103 SLR

Transcript of:

Proffitt, Ed.D., Marion E.

February 21, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Marion E. Proffitt, Ed.D.

Page 85

1    Q.    Okay.    And is there some kind of record kept of

2    those hearings, minutes or recording or something like

3    that, when you have -- when a hearing is held in a

4    step 2 grievance, which is what this was?

5    A.    I would write what I was hearing.    And I, of

6    course, would have had the copy of the

7    superintendent's letter.

8    Q.    Are your writings kept someplace?

9    A.    No.    My writings are kept in my own little

10   scrap, and then I don't keep them.

11   Q.    There is not a tape-recording made of the

12   hearing?

13   A.    I don't remember if it was recorded.    I don't

14   record.    I have never used a tape-recorder myself.

15   Q.    But in the -- as part of the process, you don't

16   know whether or not this step of the grievance process

17   is tape-recorded?

18   A.    I don't remember whether that was a recording.

19   If it was, I wasn't -- there might have been for the

20   secretary's purpose a tape-recorder.    I don't recall.

21   Q.    But as far as you know, there is not a

22   recording made for the purpose of allowing the

23   employee to take it to the next step on the record

24   that was made at that hearing?

Marion E. Proffitt, Ed.D.

Page 86

1    A.    I don't remember.  Or I don't know.

2    Q.    So you never heard anything about a

3    tape-recording of this hearing that you held being

4    erased?

5    A.    Being erased?

6    Q.    Right.

7    A.    No.

8    Q.    Now, do you remember as part of that hearing

9    whether there was any indication that there were --

10   there was anyone else late for that same meeting?

11   A.    I believe there was another person who was late

12   for that meeting.

13   Q.    Do you know who that was?

14   A.    I think her name -- that might have been the

15   meeting that there was a lady that was in the district

16   named Sharon.  Now, what was Sharon's last name?

17   Q.    Was it Sharon Hill?

18   A.    Yes.  I think she might have been late for that

19   meeting.

20   Q.    She was the ED?

21   A.    Yes.

22   Q.    And was a reprimand issued to her because she

23   was also late?

24   A.    I don't remember receiving any, a copy of any.

Marion E. Proffitt, Ed.D.

Page 100

1    the superintendent.  He would not ask me to do

2    something that was not germane to the school district.

3        Q.   Well, when you did the -- you sat on a

4    grievance hearing where he was -- had a conflict

5    because he issued the grievance.  Did that respect you

6    have for him color your --

7        A.   Oh, no.

8        Q.   -- ability to -- color your ability to make a

9    fair decision?

10       A.   My decisions are never colored; based on facts.

11   That was different.  He asked me to hear a grievance,

12   so I am hearing more than one side.

13              He asked me there to go and monitor, to

14   make sure, to stand to make sure that the tech pulled

15   off the information that was being requested.

16       Q.   Okay.  Do you know what parts of Olga Yatzus'

17   computer were being looked at?

18       A.   What parts?

19       Q.   What kind of files?  Was it an e-mail account?

20   Was it just her general files, typing that she may

21   have done, reports, or anything like that?

22       A.   I don't know.  Because I would have to know

23   what they were looking for, the specifics to know

24   whether they're -- if someone said they were looking

Marion E. Proffitt, Ed.D.

1    for reports, then that would, of course, not

2    necessarily have been an e-mail.  It could have just

3    been documents in her My Documents.  I am not sure.

4    I know they were looking for information that was

5    needed by Mrs. Mieczkowski for the process of some of

6    the special ed. cases.  Now, whether they're in forms

7    of documents or e-mails I can't say.

8        Q.    Now, you're aware that at some point Olga

9    Yatzus filed charges with the Delaware Department of

10   Labor and/or the Equal Employment Commission.

11   Correct?

12       A.    Yes.

13       Q.    You are aware of that.  How did you find out

14   that that had been done?

15       A.    Zen Marusa.

16       Q.    What did Mr. Marusa do that you know that that

17   had happened?

18       A.    He informed me that Mrs. Yatzus had filed a

19   complaint and that I should be available in case

20   someone contacted me from the Equal Employment agency.

21       Q.    Did he send you anything in writing about that?

22       A.    He might have.  I don't remember.

23       Q.    Did you ever see a copy of anything that

24   Mrs. Yatzus filed with the EEOC or the state agency?



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Yatzus

# v.

# Appoquinimink School District, et al.

## C.A. # 05-103 SLR

Transcript of:

Mitchell, Donna L.

February 23, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

D. L. Mitchell

9

1    There are a list of individuals in the building that

2    can act as administrator designees during any IEP

3    meeting.

4    Q.        And are you the one that makes that

5    designation?

6    A.        Am I the one that creates the list?

7    Q.        Okay.  Are you the one that creates the

8    list?

9    A.        Collaboratively, yes, with the staff.

10   Q.        And who decides which of those people will

11   attend any specific meeting?  Would that be you?

12   A.        Any specific meeting?  There is a process.

13   A lot of it has to do with scheduling, is dependent on

14   who is available and what the topic of conversation

15   is.

16   Q.        And what is the role of the school

17   psychologist with respect to these IEP meetings?

18   A.        I have one school psychologist.  In the

19   tenure that I have been there we have only had one.

20   Early it was part-time and I only had that person on a

21   part-time basis.  Now I have a full-time.

22            That individual is responsible for initial

23   evaluations, reevaluations, behavioral objectives,

24   homebound authorization for students with behavioral



WILCOX & FETZER LTD.
Registered Professional Reporters

C56

D. L. Mitchell

11

1    been?

2    A.        I am going to have to guess -- that's all it

3    is -- three years.

4    Q.        Well, let me ask it this way.  When Olga

5    Yatzus was a school psychologist in the district, was

6    Middletown High School her only responsibility?

7    A.        Again, I am going to have to speculate,

8    because at the time I was not directly aware of her

9    outside responsibilities.  She was assigned the last

10   year, I believe, at the high school.  Prior to that I

11   know I shared with at least one other elementary

12   school.

13   Q.        And who is the psychologist now?

14   A.        Eileen Baker.

15   Q.        And she was -- she came in directly after

16   Olga Yatzus?

17   A.        She was actually there -- I am sorry.  She

18   was actually there as an intern Olga's last year.  I

19   believe "intern" is the correct word.

20   Q.        Now, when you have IEP meetings, there are

21   records made; correct?

22   A.        Yes.

23   Q.        And who is responsible for keeping those

24   files?  Is there one specific person?



D. L. Mitchell

58

1   you?

2           Did you respond to this; do you remember?

3   A.      I don't recall.

4   Q.      Do you remember talking to Olga Yatzus?  It

5   says, "On Wednesday, 2/26. . .I asked for a meeting

6   with you to discuss ████████████2/25/03 meeting and

7   I was not given more than a few minutes with you due

8   to other demands on your schedule."  Do you remember

9   that happening?

10  A.      I don't.  I mean, it is likely, but I don't

11  recall specifically it occurring.

12  Q.      Do you remember saying anything to Olga

13  Yatzus about that 2/25 meeting where -- well, it says

14  here, "proceeded to confront me on 'not being on the

15  same page' as the rest of the District."  Do you

16  remember saying anything like that to her at that

17  time?

18  A.      Yes, something of that context, yes.

19  Q.      What did you mean by that?

20  A.      She, in at least the meeting that I was

21  referring to, went in opposition of our

22  recommendations as a team, made comments that she

23  couldn't either back up with the data of an assessment

24  or an evaluation or anything that she had as a



WILCOX & FETZER LTD.
Registered Professional Reporters

C58

D. L. Mitchell

59

1    psychologist.  She didn't produce anything to support

2    the statements and in many cases didn't share those

3    concerns or evaluations until the meeting; in other

4    words, blindsiding us, not giving us any indication

5    what the recommendations would be for the child so

6    that as a team we could plan accordingly to meet his

7    needs.

8    Q.        Do you also remember discussing with her

9    what is said in the third paragraph here, the one that

10   starts off "I also wanted to discuss my concerns about

11   Mitch's blatantly rude and disrespectful behavior

12   toward me. . . ."?  Do you remember talking to Olga

13   about that?

14   A.        I don't recall specific conversation.

15   Q.        And you don't remember if you responded to

16   this in writing in any way?

17   A.        I don't remember.

18   Q.        Now, do you recall whether or not Olga

19   Yatzus filed a grievance with respect to the reprimand

20   that has been marked as Mitchell No. 14?

21   A.        I know there is grievances.  I can't

22   recollect specifically what they were in reference to.

23   Q.        Let me show you what has been previously

24   marked as or identified as D-9.



WILCOX & FETZER LTD.
Registered Professional Reporters

1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF DELAWARE

3  OLGA ALEXANDRA YATZUS,     :

             Plaintiff,   :

4

                       Civil Action No.

5        vs.        :

                       05-103 SLR

6  APPOQUINIMINK SCHOOL DISTRICT :

  and TONY MARCHIO, individually

7  and in his official capacity, :

  MARY ANN MIECZKOWSKI,

8  individually and in her      :

  official capacity, DONNA

9  MITCHELL, individually and in :

  her official capacity, and

10  MARION PROFFITT, individually :

  and in her official capacity,

11                :

           Defendants.

12               - - -

13          Deposition of CHET K. HADLEY, taken

14  pursuant to notice in the law offices of Biggs &

  Battaglia, 921 Orange Street, Wilmington, Delaware, on

15  Thursday, March 9, 2006, at 10:00 a.m., before

  Lorraine B. Marino, Registered Diplomate Reporter and

16  Notary Public.

              - - -

17

18

19

20

21

22         WILCOX & FETZER

23    1330 King Street - Wilmington, Delaware 19801

24         (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



C60

C. K. Hadley

39

1  statement at that meeting or at any meeting?

2  A.      I don't recall making that statement.

3  Q.      But is it true that you think that that was

4  accurate?

5  A.      Yes, I would agree with that.

6  Q.      Now, the next paragraph talks about a

7  situation.  It says, "During this meeting, Chet

8  brought up an issue that he was extremely

9  uncomfortable with."  And then it makes a reference to

10  somebody named Gary talking to Dr. Marchio about the

11  way things were being done at Townsend, and that's one

12  of the schools in the district, regarding the

13  qualification of students placed in special ed.

14          Do you remember that situation at all?

15  A.      Yes, I do.

16  Q.      Can you tell us what that was about?

17  A.      You know, I don't recall how it came to my

18  attention, but it was my understanding that Gary was

19  going through the files to report to Dr. Marchio

20  whether or not students had actually met criteria to

21  be identified for a specific disability.  And I was

22  upset that somebody who is on the same contract level

23  was being asked to examine a colleague's work, and

24  that if he did have questions about an employee's



C. K. Hadley

40

1   work, that that should go through administrative

2   channels and not involve someone on the same --

3   someone who is a colleague of that employee.

4   Q.        And who is Gary?  What is his full name?

5   A.        Gary Berg.

6   Q.        And what was his position?

7   A.        He was functioning as the educational

8   coordinator.  I think that's what they were called at

9   the time.

10   Q.        And you said that you were sort of upset

11   that he was examining a colleague's work, somebody on

12   the same level.  Whose work was it your impression

13   that he was examining?

14   A.        Ms. Yatzus's.

15   Q.        And this looks like there was some

16   discussion or some indication or some question as to

17   whether or not Gary Berg was doing this with the

18   knowledge of or at the request of Dr. Marchio.  Was

19   that part of your concern?

20   A.        Can I take a second just to read this?

21   Q.        Sure.

22   A.        (Pause) Okay.

23   Q.        Let me, rather than try to remember what my

24   question was, if you look three or four lines from the



C. K. Hadley

41

1    bottom of the page 3, it says, "Chet overheard my

2    discussion with Gary and Gary later told him that Tony

3    requested him to get this information."

4           Did Gary tell you that Tony Marchio

5    requested Gary to get that information?

6    A.      Yes.

7    Q.        And then it looks like initially at least,

8    according to this, Tony Marchio denied that he asked

9    Gary to get that information but then said when Gary

10   Berg came to Dr. Marchio, Dr. Marchio asked him to get

11   more information.  Is that how you remember what

12   happened?

13   A.       I really couldn't say anything about the

14   second part of that.

15   Q.        Okay.  And then the last part of that

16   paragraph, which carries over onto page 4, says that I

17   thought that was totally inappropriate, "since none of

18   this was ever brought to my," "my" being Olga

19   Yatzus's, "attention."

20          I think that is consistent with what you

21   already said.  You thought this wasn't the right way

22   to do things; is that right?

23   A.       The more -- I think what I thought was

24   inappropriate was that he wasn't investigating through



**WILCOX & FETZER LTD.**
Registered Professional Reporters

C63



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

## C.A. # 05-103 SLR

Transcript of:

**Hill, Sharon E.**

**March 15, 2006**

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

C64

Sharon E. Hill

1    student's cumulative files instead of putting it in an

2    audit file.  The student was transferring, I believe,

3    from a treatment facility in New Jersey.  And when the

4    parent came back in, wanted to talk about services and

5    treatment -- but the parent didn't come in that school

6    year, they came in the following school year because I

7    guess the student was in crisis.  And it appears to me

8    that Barb Mazza started out having an IEP meeting on a

9    student that she did not have an IEP for.  She started

10   out taking minutes.  And she also had a participant's

11   page.  And I believe Mrs. Yatzus' name was on the

12   participants page.  Mary Ann was on and on how could

13   you do it?  It's against the law.  You only have 30

14   days.  You have 60 days for out-of-state student's

15   IEP.  Blah, blah, blah, went on and on.  When we found

16   out where the IEP was, Olga said, "I wouldn't have put

17   it there."  I said, "I certainly didn't even know

18   where to look for it."  And the response was, "Oh.

19   Well, Barb Mazza must have done that.  That's okay."

20   I was just like that is absolutely disgusting.  I

21   said, "I'm going home."  I said, "I cannot manage this

22   today."

23                I could not manage being in that building.

24   It was toxic and poisonous to the point that I had to

Sharon E. Hill

1   take medication.  All of us were sick.  Phyllis was

2   sick.  I was sick.  Olga was sick.  It's just that

3   emotional kind of -- the irritable bowel syndrome.  We

4   would laugh.  What are you taking today?  I am taking

5   Zelnorm.  I am taking this.  That's a terrible place.

6   That's a terrible disposition to have to be in.  And I

7   think the thing that probably rang so clear to me is

8   that that building, with the needs of the students in

9   that building, needed another ED, and they needed a

10  counseling psychologist as well as a psychologist to

11  do what they wanted to do with Olga.  It was

12  overwhelming.

13      Q.   What position did Ms. Mazza have?

14      A.   She was the previous ED.  I think what they did

15  is that they had like maybe an ED who covered

16  part-time the high school.  I don't know if Barb was

17  there full-time or not.  But I know she left to go to

18  another building.

19      Q.   And did it seem to you that when it was -- when

20  Ms. Mieczkowski found out that it was Barb Mazza makes

21  who put some paperwork --

22      A.   Oh, it was okay.

23      Q.   -- in some other file that that was no problem?

24      A.   Yes.  Absolutely.

Sharon E. Hill

Page 82

1   is new." And I just laughed about it

2       Q.   The implication being that --

3       A.   That she had difficulty taking directives from

4   me.  I was like, Oh, well.  That's just the way it is.

5                MR. BARTOSHESKY:  Let me take a couple

6   minutes and get myself organized.  And I think we're

7   almost finished.  Okay.

8                (Recess taken.)

9   BY MR. BARTOSHESKY:

10      Q.   Was there a time that you observed that

11  somebody from the administration, Dr. Proffitt or

12  somebody else had somebody, had the tech people come

13  in and go through Olga's computer system?

14      A.   Yes, yes.

15      Q.   Was it just Olga's computer or was it somebody

16  else's also, if you know?

17      A.   Olga's computer, I recall, as well as mine, but

18  what I do -- I actually saw them go through Olga's

19  computer.  What I found them to do when I returned

20  from my medical leave, miraculously -- I guess it's

21  the infamous oops-I-lied, which is one of Donna's

22  coined phrases when you would ask her did you do this

23  or did you have any knowledge of this.  And when she

24  would get pinned into the corner,

Sharon E. Hill

Page 83

1    "oops-I-guess-I-lied" was a very common response.

2    Like the Lilly Tomlin, "I-lied-I-guess-I did."

3            We were coming back from lunch.  Myself and

4    Darren Blackstone, who works for the district, had

5    been to lunch.  And came in.  And Phyllis was walking

6    in with us.  Came in.  And I remember looking.  I am

7    like, "What is going on at Olga's desk?"  I remember

8    seeing Dr. Proffitt and two guys from tech -- and one

9    of the guys -- I always forget his name.  He had

10   short, fuzzy, gray hair and sort of like egg-shaped

11   rimless glasses.  Very nice.  Because he had helped me

12   log onto a computer before  -- were bent over Olga's

13   desk.  And they were just looking and gazing.

14           And I remember simply that the first thing

15   that I saw is that it was her AOL account because I

16   had an AOL account.  And I knew that Olga was teaching

17   at the time.  I said to Olga, "I wish you would let me

18   know because I need to take a class.  I would have

19   taken that class."  And they were commenting that

20   someone that she was, I guess, communicating with her

21   students or students were sending her assignments and

22   it was on Appoquinimink time, which I found to be very

23   unusual.

24           When I walked in, you know, I just looked



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

C.A. # 05-103 SLR

Transcript of:

Marchio, Ed.D., Tony

March 21, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Tony Marchio, Ed.D.

1    ████████████ position in the district or his

2    responsibilities?

3        A.    Yes.    There was some action taken.    I looked

4    back on the recommendations of Mrs. Cheek and tried to

5    follow what she was recommending to me.    I told

6    ████████████████████ two or three things.

7            Number one, that I thought there was reason

8    for concern here; that there were other employees who

9    had come in and registered similar complaints; and

10   that I felt there was some validity to what was being

11   described; and that it wasn't going to be tolerated;

12   and in order to protect this particular employee, he

13   would no longer be supervising or evaluating her

14   immediately.

15        I also told ████████████████████ knew

16   from previous discussions with him, that I was unhappy

17   with his job performance.    This occurred in February

18   of 2002.    In December of 2001, I had discussions with

19   him almost the entire month of December and expressed

20   to him that I would not be recommending renewal of his

21   contract.    So he knew that he was on shaky ground with

22   the school district at that particular time.

23        I also told him, you know, after this

24   revelation that it was making the situation even more

Tony Marchio, Ed.D.

Page 31

1   unbearable and he should consider employment someplace

2   else.  I was pretty blunt with him.

3       Q.   For the rest of this school year -- this was in

4   February, and the school year ends in spring, May or

5   June -- were his responsibilities changed?

6       A.   Well, we talked for two or three days on how we

7   would proceed, and the fact that he would no longer be

8   supervising the psychologists, I think was a concern

9   for him.  We did come to an agreement that he would

10  leave the district and that he would be, I believe

11  towards the end of the month, I believe on February

12  25th, just beginning on that day working one day a

13  week.  We talked about the six days he had

14  accumulated.  Typically, we would pay an employee for

15  unused sick days.  We thought, instead of that, we

16  would permit him to use his sick days, and he would

17  have enough sick days to carry him through the rest of

18  the year and that his employment with our district

19  would cease at that point.

20      Q.   Did he after that point, after February 25th or

21  so, did he have any supervisory responsibilities at

22  all?

23      A.   Well, he had responsibilities.  He was not

24  supervising Mrs. Yatzus from that point on.

Tony Marchio, Ed.D.

1    A.    I wouldn't say that it caused friction.  But I

2    would say that it made the employees uncomfortable.

3    Q.    In what way?

4    A.    Well, you know, he was a lame duck director.

5    The department was split.  There were different

6    factions within the department.  I think his presence

7    just made everyone feel awkward and uncomfortable.

8    Q.    Who did take up the responsibility to supervise

9    Olga Yatzus?

10    A.    We shared that until we were able to bring in

11    another person.  I had some of the responsibilities.

12    My assistant superintendent had some responsibilities.

13    We divvied up the duties.

14    Q.    When you say you brought in somebody, was there

15    a new employee who came?

16    A.    We were advertising for one.

17    Q.    Did one come in before the end of that school

18    year?

19    A.    No, one didn't, but -- I did want to say -- to

20    clarify the question you were asking before.  Because

21    it was awkward for the employees, ▓▓▓▓▓▓▓ we didn't

22    finish the school year with him.  After the first or

23    second Monday, we talked again, and we said, you know,

24    this just isn't working, so if you have more days,

Tony Marchio, Ed.D.

Page 34

1    then you can terminate your employment just as soon as

2    you can.  He agreed to work until Easter break.  So

3    actually from February the 25th until Easter, he

4    worked just three Mondays.  And after that, he didn't

5    return to the district.

6    Q.    Now, the very last paragraph, the very last

7    paragraph of the February 19 memorandum from

8    Ms. Cheek, it says, "In addition, it is important to

9    report back to Ms. Yatzus regarding the completion and

10   outcome of this investigation."

11           Do you know if that was done?

12   A.    Yes, it was done.

13   Q.    Who reported to Ms. Yatzus about the

14   investigation?

15   A.    Mrs. Nutter.

16   Q.    Do you know when that happened?

17   A.    It happened just right after the report was

18   given to us.

19   Q.    And how do you know that it happened?

20   A.    Well, I knew it for two or three reasons.

21   Number one, Mrs. Nutter told me that it happened.  She

22   had two discussions with Mrs. Yatzus.  I don't believe

23   she showed her the report.  But I believe she

24   summarized some of the findings in here and explained

Tony Marchio, Ed.D.

Page 35

1   to her that she would no longer be supervised by

2   ██████████

3         Also, I knew it from subsequent discussion

4   with Mrs. Yatzus.  She came into my office and was

5   extremely pleased that we had conducted the

6   evaluation.  She said it was done in a very

7   professional manner.  She was very thankful.  She was

8   surprised that it happened as quickly as it did and

9   that she was very pleased with what we had done.

10      Q.   And when did that happen, that meeting you had

11  with Olga?

12      A.   It happened -- this report, I think came out on

13  the 19th.  So it was just a day or two after that.

14  Maybe the 20, 21st, 22nd.  Somewhere in that

15  neighborhood.  It was just a couple of days after the

16  report was issued.  And I believe the letter to

17  ██████████ was -- I don't have a copy of that, but I

18  believe it was the 24th or 25th of February.  So it

19  was right in that time frame, the end of February.

20      Q.   Now, this last paragraph goes on to say that

21  "It's important to report back to Ms. Yatzus regarding

22  the completion and outcome of this investigation to

23  reassure her that she will be protected from any

24  further retaliation and ask her to contact you" -- you

Tony Marchio, Ed.D.

Page 52

1    Q.    And was there some kind of hearing held --

2    A.    Yes.

3    Q.    -- with respect to these complaints?

4    A.    Yes.

5    Q.    And it would have been Dr. Marion Proffitt who

6    would have --

7    A.    Yes, that's correct.

8    Q.    She would have presided over that kind of

9    proceeding?

10   A.    Yes.

11   Q.    Is there some kind of record made of that?

12   A.    Yes.

13   Q.    What kind of record?  Is it an audio recording,

14   tape-recording or is it just some kind of written

15   notes?

16   A.    There is a written response to the grievance.

17   It's typically not taped, but there is a written

18   response to it.  If the union requests that it be

19   taped, we would honor that, but we typically don't do

20   that.  We don't transcribe the meetings.

21   Q.    And what happens to that written response?

22   Where is that document or paperwork maintained?

23   A.    It's maintained in the personnel file.

24   Q.    Of the individual employee?

Tony Marchio, Ed.D.

Page 86

1    Q.    Did you attend that grievance proceeding

2    hearing?

3    A.    No.

4    Q.    Do you know who did?

5    A.    I just know Dr. Proffitt conducted the

6    grievance hearing.  So I don't know who was present

7    at -- I know AEA members are typically present for

8    those.  If there are any witnesses, anyone that would

9    need to provide testimony, they would be present, but

10   I don't know specifically who was there.

11   Q.    Then do you know if -- and I think you said

12   earlier that -- and I think probably you were talking

13   about this meeting -- the record of that proceeding

14   would have been the letter that Dr. Proffitt

15   eventually wrote with the results of that hearing.

16   Correct?

17   A.    Yes, that is correct.

18   Q.    Normally, there is no tape-recording or

19   anything else made of those meetings.  Is that right?

20   A.    Typically not.

21   Q.    Did you ever hear any comments from anyone that

22   there was to be a tape-recording of that meeting, but

23   it was accidentally not taped or accidentally erased

24   or anything along those lines?

Tony Marchio, Ed.D.

Page 87

1    A.    No, I never heard that.

2    Q.    Now, in the normal situation where you have

3  this level of a grievance proceeding, is there

4  something that -- if the employee isn't satisfied with

5  the result, do they have a recourse to take it to

6  another step or another level?

7    A.    They can appeal, yes.

8    Q.    To what body do they appeal to?

9    A.    They can appeal either to the superintendent or

10  to the Board of Education.

11    Q.    Well, in this case, Dr. Proffitt was acting,

12  essentially, as the superintendent; isn't that right?

13    A.    Right.

14    Q.    What was the other avenue of appeal?

15    A.    The Board of Education.

16    Q.    Have you ever been involved with a situation

17  where an employee took it to that level, appealed to

18  the Board of Education?

19    A.    No.

20    Q.    Well, do you know what the Board of Education

21  is supposed to do?  Do they start from scratch and

22  hear the whole thing or do they look at what the

23  previous --

24    A.    Typically review of records.

Tony Marchio, Ed.D.

Page 122

1   rather than signing his own name to it?

2   A.   I don't know that he -- if he did or he didn't.

3   I do know this, that Mr. Marusa was one of

4   the kindest, most considerate individuals that I ever

5   in my life worked with, very compassionate, very

6   understanding, tried his best to work with employees

7   and at one point in time would have never made any

8   errors in sending out letters and giving

9   notifications.  He was very, very ill.  He was dying

10  when this was written.  And we tried our best to keep

11  him in the district and keep him working.  We tried to

12  do a lot of things for him so that he could continue

13  to be functioning.  He passed away just shortly after

14  this.  He had lesions on his brain.  He was forgetful.

15  And we were discovering a lot of things that weren't

16  done exactly right, which isn't meant to excuse

17  anything here except that he just wasn't well.

18  I can't explain the two letters.  I can't

19  understand, you know, that it's -- the first one is so

20  poorly written, I would hope that he wouldn't send it

21  out, but.  I can't explain what happened there.

22  Q.   Was there a point where after Olga Yatzus was

23  informed that her contract was not going to be renewed

24  that her assignment was changed in the district?

C78



**WILCOX & FETZER LTD.**

In the Matter Of:

# Yatzus

## v.

# Appoquinimink School District, et al.

C.A. # 05-103 SLR

Transcript of:

Mieczkowski, Mary Ann

April 12, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

C79

Mary Ann Mieczkowski

Page 49

1    you issued another letter to her?

2    A.    It was decided at that meeting that the three

3    letters would be combined into one.  And I was chosen

4    as the person at the table to write the letter.

5    Q.    And when it's combined into one, does that mean

6    that the other three should have been sort of removed

7    from her folder or something like that?

8    A.    I believe, yes.

9    Q.    Do you know if that was ever done?

10    A.    I do not know.  I don't.

11    Q.    Whose responsibility would it have been to

12    remove them or do something with them so that they

13    aren't held against her as three different reprimands?

14    A.    The director of human resources, who was Zen

15    Marusa at the time.

16    Q.    Now, it says in this last paragraph that "the

17    report from the psychologist shall be provided to the

18    administration and educational diagnostician at least

19    48 hours prior to a scheduled meeting."  Why was that

20    requirement imposed?

21    A.    That requirement was imposed by Donna Mitchell.

22    A school principal can make the rules tighter within

23    their school building as then district-wide, just as

24    the district can impose rules that are tighter than

Mary Ann Mieczkowski

Page 50

1    the state and the state in turn can do the same with

2    federal regulations.  We cannot -- our rules can be

3    tighter, but they cannot supersede or -- not

4    supersede.  They cannot be considered less than the

5    federal law.

6    Q.    And so this was a requirement imposed by Donna

7    Mitchell upon Olga Yatzus that was different than that

8    imposed on any other school psychologist.  Is that

9    right?

10   A.    I can tell you in another school building that

11   a school principal requires hers 24 hours on her desk

12   prior to the meeting.

13   Q.    That was in -- back in 2002, that requirement

14   that you are talking about now?

15   A.    I don't remember when it was imposed.  I

16   believe so.

17   Q.    Who was that principal?

18   A.    Lorraine Lybarger.

19   Q.    What school is that?

20   A.    Olive B. Loss.

21   Q.    If you need to take that call.

22   A.    No.  I'll turn it off.  I thought it was off.

23   Q.    Now, at that meeting on November 6th, do you

24   remember what else was discussed other than the idea

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT | ) | |
| and TONY MARCHIO, individually and in | ) | **TRIAL BY JURY DEMANDED** |
| his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually and in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, Adria B. Martinelli, Esquire, hereby certify that on July 28, 2006, I
electronically filed a true and correct copy of the foregoing **Appendix to Defendant
Appoquinimink School District's Reply Brief in Support of Its Motion for Summary
Judgment (REDACTED)** with the Clerk of the Court using CM/ECF, which will send
notification that such filing is available for viewing and downloading to the following counsel of
record:

Philip B. Bartoshesky, Esquire (#2056)
Biggs & Battaglia
912 N. Orange Street
P.O. Box 1489
Wilmington, DE 19899

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Adria B. Martinelli
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
Email: wbowser@ycst.com; amartinelli@ycst.com