IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT,) | | |
| TONY MARCHIO, MARY ANN | ) | |
| MIECZKOWSKI, DONNA MITCHELL, | ) | |
| and MARION PROFFITT, | ) | |
| | ) | |
| Defendants. | ) | |

Philip B. Bartoshesky, Esquire of Biggs and Battaglia,
Wilmington, Delaware. Counsel for Plaintiff.

William W. Bowser, Esquire and Adria B. Martinelli, Esquire of
Young Conaway Stargatt & Taylor, LLP, Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: October 24, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

Plaintiff Olga Yatzus filed this action on February 21, 2005 alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; the Civil Rights Act of 1991, 42 U.S.C. § 1981(a); and the First and Fourteenth Amendments of the United States Constitution as actionable pursuant to 42 U.S.C. § 1983.   (D.I. 1)   Plaintiff also asserted state law claims of wrongful termination and intentional infliction of emotional distress.[1]   (Id.)   Named defendants are:   (1) the Appoquinimink School District ("District"); (2) Superintendent Tony Marchio ("Marchio"); (3) Assistant Superintendent Marion Proffitt ("Proffitt"); (4) Director of Special Education Mary Ann Mieczkowski ("Mieczkowski"); and (5) Middletown High School principal Donna Lee Mitchell ("Mitchell").   The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1334.   Before the court are defendants' motions for summary judgment to which opposition and replies have been filed.   (D.I. 44-62)   For the reasons that follow, defendants' motions are granted in part and denied in part.

## II.   BACKGROUND[2]

---

[1]Because of recent decisions, plaintiff concedes that her intentional infliction of emotional distress claim should be dismissed.   (D.I. 53)

[2]The court has endeavored to provide a synopsis of the relevant background; however, given the nature of the

## A. Lauer Sexual Harassment

Plaintiff was hired as a school psychologist by the District in August 2001. (D.I. 53) She had more than 20 years of school psychology experience, as well as a masters degree in psychotherapy and counseling of adolescents. (Id.) Her District supervisor was the head of Special Education, Vaughn Lauer ("Lauer"). (D.I. 55)

In the fall and winter of 2001-2002, plaintiff rebuffed inappropriate sexual advances made by Lauer. (D.I. 48, A49) Plaintiff did not immediately report these incidents to District administrators. In late January 2002, a Middletown High School ("MHS") student considered at risk for suicide climbed through a classroom window and went missing for a period of time ("the escape"). (D.I. 48, A52) Plaintiff, as well as other District employees and police officers, were involved with the student prior to the escape. A District investigation ensued. (Id. at A53)

On February 4, 2002, Lauer wrote plaintiff, threatening termination based on his conclusion that she was responsible for the escape. (Id. at A10, A53) A meeting was scheduled to discuss Lauer's conclusions. (Id.) During the meeting, plaintiff informed District administrators of Lauer's prior

---

allegations, there were many conflicts in testimony and documentation as to the events in issue. This summary, therefore, does not constitute a finding of facts.

inappropriate sexual advances and her belief that Lauer's findings and reprimand were retaliatory.  (Id. at A159)

As a result, the District consulted with legal counsel and hired Teresa Cheek, Esquire ("Cheek") to investigate plaintiff's allegations.  (Id. at A32)  On February 19, 2002, Cheek issued a report concluding that Lauer made inappropriate advances to plaintiff in the fall of 2001 and that his subsequent behavior toward plaintiff could be construed as retaliation.  (Id. at A55-59)  Cheek further recommended that Lauer not be involved in supervising plaintiff or any of the school psychologists.

During a meeting held shortly after Cheek's report issued, Marchio told Lauer he was dissatisfied with his job performance and conduct.  (Id. at 238)  Marchio reduced Lauer's supervisory responsibilities as well as the number of days he reported into work.  (Id.)  By the end of the Easter school break, Lauer did not return to work for the District.  (Id. at A241)  Marchio and Proffitt became plaintiff's immediate supervisors.  (Id. at A240)

## B.  Post-Lauer Conduct

On or about February 13, 2002, plaintiff received a letter from Proffitt that memorialized their conversations regarding the escape incident.  (D.I. 54 at B14)  The letter explained Proffitt's expectations on the steps necessary to avoid another escape and noted the importance of maintaining study safety.  It

3

is unclear whether any other employee received a similar letter.
(D.I. 54 at B158)

   In the beginning of the 2002 summer, Marchio requested the
summer schedules from all school psychologists. (D.I. 48 at
A172)  Specifically, he requested documentation of the tasks each
psychologist planned to complete, the number of proposed working
days and the number of students each would be evaluating. (Id.
at A73)  Marchio was dissatisfied with plaintiff's response and a
series of letters and emails were exchanged between them. (Id.
at A63, A68, A64-65, A69, A70-72, A174-75)  Plaintiff's union
representative tried to resolve the situation.  On August 29,
2002, Marchio wrote an official reprimand for plaintiff based on
her not supplying the requested information. (Id. at A73-74)

   On July 11, 2002, plaintiff submitted a time sheet for July
1-11, 2002. (Id. at A66)  Marchio questioned the 7.5 hours
plaintiff reported on July 3, 2002.  Marchio had tried to contact
plaintiff that day and learned she was not working anywhere in
the District. (Id. at A246-47)  Plaintiff disagrees, indicating
that she was working in the high school library on that day and,
upon learning that someone from the District called her home, she
called and reported her whereabouts to a District secretary.
(D.I. 55 at 4)  Plaintiff further avers that Marchio never
explained his concerns regarding July 3 in any of their
contemporaneous meetings. (Id.)  After not receiving a paycheck

for that time period, plaintiff learned from the Payroll
Department that it did not possess a time slip from her for that
period and instructed plaintiff to submit another. (Id. at 5)
After submitting another time sheet, plaintiff learned that
Marchio withheld her original time sheet. She was not paid for
the July 1-11 period until August 23, 2002. (Id.) Plaintiff
complained to the union and Cheek.

On September 25, 2002, three Individualized Education Plan
("IEP") meetings were held at MHS. Although plaintiff was
responsible for submitting the psychological reports needed for
the IEPs, the reports were not supplied. Plaintiff denies having
sufficient resources or time to complete the IEPs. (D.I. 53)
She maintains that the District was extremely behind in their IEP
meetings and, consequently, scheduled meetings at the last minute
and with little notice given to plaintiff. Plaintiff was issued
three separate reprimands for her performance on this date.
(D.I. 48 at A82, A83, A85)

Plaintiff grieved the three reprimands and a meeting was
held on November 6, 2002 to address her concerns. (Id. at A85)
As a result, the District requirements regarding IEP psychology
reports were clarified and the three reprimands issued to
plaintiff were combined into one. Plaintiff, however, avers that
the letters were not removed and a fourth reprimand letter
addressing this event was later added. (D.I. 55)

On January 8, 2003, MHS Assistant Principal James Dooley issued a written reprimand to plaintiff because she had not provided written feedback to his questions on the progress of four students. (D.I. 48 at A89)

On February 25, 2003, a behavior manifestation meeting was scheduled to being at 10:00 a.m. (Id. at A93) In addition to the parents of the child in question, District officials (including Marchio) and attorneys were present. Plaintiff arrived 30 minutes late for the meeting. (Id.) Plaintiff claimed she was helping an upset student and could not find the location of the meeting. Marchio issued plaintiff a written reprimand.    Because plaintiff filed a grievance, a hearing was held and the contents of Marchio's letter were upheld and remained in plaintiff's personnel file. (Id. at A96) The taped recording of this proceeding was later discovered to have been erased.

In late February 2003, plaintiff began to openly to express her dissatisfaction with the District's treatment of special education students. (D.I. 48 at A90-91, A209-223) Plaintiff believed the District was not complying with legal requirements and testing of special education students and that certain District employees were disrespectful to these students and their parents. (D.I. 55) She communicated these concerns, including

6

specific references to rude behavior to students by Mitchell and Mieczkowski, to Marchio.  (Id.)

On April 2, 2003, Mitchell issued plaintiff a written reprimand for failing to complete IEP paperwork.  (Id. at A98) On April, 2, 2003, Mitchell issued plaintiff a written reprimand for her failure to follow the proper procedure for calling in sick.  (Id. at A97)  On April 9, 2003, Mieczkowski wrote a reprimand for plaintiff's failure to complete documentation for an IEP.  (Id. at A104)

Also in April 2003, plaintiff began corresponding through her personal email account with a group of parents of special education and other students regarding their complaints about the District.  (D.I. 55)  Specifically, plaintiff assisted these parents in presenting claims to the Office of Civil Rights ("OCR") and in their presentation to the District's Board of Education.  (D.I. 55)  On or about May 1, 2003, parents filed a complaint with the OCR claiming that the District had discriminated against their son based on his disability. Specifically, the parents claimed that the "District is discriminating against their son for failing to implement his IEP by failing to provide accommodations, modifications and support services."  (D.I. 48 at A111)

By letter dated May 8, 2003, Marchio informed plaintiff that she was placed on special assignment for the balance of the

7

school year and her office was moved from MHS to the District's administrative offices. (Id. at A113) Plaintiff's office had been moved on several occasions during the summer and school year. (D.I. 48 at A198, A204)

On May 14, 2003, the District's Human Resources Director notified plaintiff in writing that the School Board decided not to renew her contract "due to the number and nature of letters in [her] personnel file." (D.I. 48 at A118) On that same date, plaintiff filed a charge of discrimination with the Delaware Department of Labor. (Id. at A117)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal

8

citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**IV. DISCUSSION**

**A. Title VII Retaliation Claim**[3]

---

[3]The Title VII claim is asserted against the District and not the individual defendants. According to plaintiff, "[her] cause of action against the individual defendants is limited to her claims of First Amendment retaliation under 42 U.S.C. § 1983. To the extent the [c]omplaint can be construed as bringing claims against the individual defendants under Title VII, for wrongful termination under state law, or for intentional infliction of emotion[al] distress, those should be dismissed." (D.I. 52) Accordingly, the court's order shall reflect this concession.

9

Plaintiff alleges that the District retaliated against her,
in violation of Title VII of the Civil Rights Act, after she
notified the District of Lauer's sexual advances.   The anti-
retaliation section of Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees
> or applicants for employment . . . because she has
> opposed any practice made an unlawful employment
> practice by this subchapter, or because she has made a
> charge, testified, assisted, or participated in any
> manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a)(as amended 1991).   To establish a prima
facie case of retaliation under Title VII, a plaintiff must first
prove that:   "(1) she engaged in activity protected by Title VII;
(2) her employer took an adverse employment action against her;
and (3) there is a causal connection between her participation in
the protected activity and the adverse employment action."   Moore
v. City of Philadelphia, 461 F.3d 331, 340-342 (3d Cir. 2006)
(quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir.
1995)).

"Protected activity" covers those who participate in certain
Title VII activity and those who oppose discrimination made
unlawful by Title VII.   Slagle v. County of Clarion, 435 F.3d
262, 266 (3d Cir. 2006).   Protected activities include filing
charges of discrimination or complaints about discriminatory
employment practices.   See Abramson v. William Paterson Coll. of
N.J., 260 F.3d 265, 287-88 (3d Cir. 2001).

10

As to the second element, the United States Supreme Court recently explained that a plaintiff must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, __ U.S. ___, 126 S.Ct. 2405, 2415 (2006).  The Court further stated that the scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  Id. at 2414.

To establish the third element of the prima facie case, a plaintiff must show a "causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might dissuade a reasonable worker from making or supporting a charge of discrimination."  Moore, 461 F.3d at 340.

After establishing the prima facie case of retaliation, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant is able to successfully articulate such a reason, then the burden shifts back to the plaintiff to show that the defendant's non-discriminatory reason for the termination was pretextual, and that "retaliation was the real reason for the

11

adverse employment action."   Moore, 461 F.3d at 342; McDonnell
Douglas Corp. at 802-804.   To survive a motion for summary
judgment, a plaintiff must adduce some evidence from which a jury
could reasonably reach these conclusions.   Moore, 461 F.3d at
342.

     The District argues that summary judgment is warranted
because plaintiff has failed to establish a prima facie case.
(D.I. 46)   Specifically, the District submits that plaintiff has
not demonstrated a causal connection between her protected
activity and any adverse employment action.   Morever, the
decision to terminate plaintiff was based, the District asserts,
on plaintiff's performance problems, which she has failed to
demonstrate were merely a pretext for retaliatory motivation.

     Plaintiff responds that these are factual issues that can
only be resolved by a jury.   (D.I. 53)   Particularly, she
maintains that she engaged in protected activity when complaining
of Lauer's conduct.   By reporting the conduct that ultimately led
to Lauer no longer working for the District, plaintiff asserts
the District administrators became antagonistic and hostile
toward her and treated her differently than the other school
psychologists.   The reprimands filed, she contends, were
contrived and designed to support the District's ultimate goal of
terminating her employment.

                              12

Considering the record against the above authority, the court finds that plaintiff engaged in protected activity by reporting Lauer's sexual harassment. Turning to whether the District took materially adverse actions, the court is cognizant that it is essential to "separate significant from trivial harms." Burlington, 126 S.Ct. at 2415. To that end, a reasonable jury could conclude that the actions taken against plaintiff, including the reprimands, withholding of the time sheet, the moving of her office and termination, might well dissuade a reasonable worker from filing or supporting a charge of discrimination.

The third element, causal link, should be based on the evidence as a whole. Kacmar v. Sungard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997). Temporal proximity is some evidence of a causal link between two events. See, e.g., Id. Viewing this inference in the light most favorable to plaintiff, a reasonable jury could find the timing between the asserted protected activity and the events leading to plaintiff's termination to be suggestive of retaliation. The court declines to make the credibility determinations a jury should make with respect to plaintiff's argument that the District sought to create groundwork for her termination because of her claims against Lauer. There are genuine issues of material fact

regarding the proximity of these events that preclude the entry of a summary judgment in favor of the District.

Since the District has pointed to plaintiff's poor job performance as the non-discriminatory reason for terminating her, the court turns next to whether plaintiff has demonstrated that any material issues of fact exist with respect to whether the District's proffered explanations were a pretext for retaliation. Plaintiff argues that immediately after Lauer left the District, the ground work for her termination began.  For example, by issuing reprimands to plaintiff, exclusively, for conduct common among the other school psychologists, the District was able to create a record on which to base termination.

Whether the District's record against plaintiff was based on her job performance or something else is a matter uniquely within the province of the jury.  Accordingly, considering the record and inferences in a light most favorable to plaintiff, the court finds that genuine issues of material fact exist which could allow a jury to find the District's explanations were a pretext for retaliation.

## B.   First Amendment Claim

"To state a First Amendment retaliation claim, plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory

14

action." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241 (3d Cir.
2006). "A public employee's statement is protected activity when
(1) in making it, the employee spoke as a citizen, (2) the
statement involved a matter of public concern, and (3) the
government employer did not have 'an adequate justification for
treating the employee differently from any other member of the
general public' as a result of the statement he made." <u>Garcetti
v. Ceballos</u>, ___ U.S. ___, 126 S.Ct. 1951, 1958 (2006)(citations
omitted).

        Plaintiff asserts that she engaged in speech as a citizen
addressing matters of public concern and not as a school
psychologist. (D.I. 53)  She contends that her correspondence to
District administrators concerning problems with the special
education program and her assistance to a parents group caused
defendants to issue reprimands for the purpose of building a
record that would justify terminating her employment.

        Defendants contend that plaintiff's complaints that the
District was violating federal requirements and discriminating
against special needs students is not speech protected by the
First Amendment because plaintiff's statements were part of her
job responsibilities. (D.I. 46)  Because plaintiff testified at
her deposition that it was part of her job "to report what [she]
perceived as illegal behavior" and to assist parents with the OCR

complaints, defendants assert her speech is not protected under
the standards announced by the Supreme Court in Garcetti.

In Garcetti, the Supreme Court considered whether Ceballos,
a supervising deputy district attorney, had been retaliated
against in violation of § 1983 based solely on an internal
memorandum he wrote to his supervisors. The memorandum was
prepared entirely as part of his job responsibilities as a
calendar attorney. In determining whether Ceballos' speech was
protected, the Supreme Court recognized that this inquiry is
often difficult and is "the necessary product of the 'enormous
variety of fact situations. . .'" Id. at 1958 (quoting Pickering
v. Board of Ed. of Township High School Dist. 205 Will Cty., 391
U.S. 563, 569 (1968)). The controlling factor in Garcetti was
that it was undisputed that "his expressions were made pursuant
to his duties as a calendar deputy." Garcetti, 126 S.Ct. at
1960. Further,

> [t]hat consideration - the fact that Ceballos spoke
> as a prosecutor fulfilling a responsibility to advise
> his superior about how to best proceed with a pending
> case - distinguishes Ceballos' case from those in which
> the First Amendment provides protection against
> discipline. We hold that when public employees make
> statements pursuant to their official duties, the
> employees are not speaking as citizens for First
> Amendment purposes, and the Constitution does not
> insulate their communications from employer discipline.

Id. at 1960.

A public employee's speech is protected if he speaks "as a
citizen on a matter of public concern." Id. "An employee's

16

speech addresses public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 829 (3d Cir. 1994) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Moreover, "[t]he content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of governmental officials.'" Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001) (quoting Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993)).

The issue at bar rests upon whether plaintiff's communications regarding the problems with the special education program and her assistance to the parents' group was part of plaintiff's job responsibilities. Defendants contend that her deposition testimony establishes that she was acting pursuant to her school psychology duties and not as a private citizen. Plaintiff avers that her deposition testimony requires explanation and has submitted her affidavit in order to "clarify" portions of her deposition testimony. (D.I. 55)

Specifically, in her deposition taken on March 30 and April 26, 2006, plaintiff testified in relevant part:

    Q: What are the responsibilities of a school psychologist?
    A: A school psychologist has many responsibilities in that, responsible for the assessment; participation in the IEP process; being there as a consultant for teacher, the school process; counseling; crisis intervention. It's a multitude of different responsibilities.

17

(D.I. 48 at A148, deposition testimony dated March 30, 2006)

    Q: Did you think it was part of your job as a school
psychologist to report this concern?
A: I think it's part of the role of the school
psychologist to be an advocate for children and to see
what we could do to make sure we're doing everything
that we can to address the law and the needs of the
student. I have been an advocate for the student at
least in terms of trying to see that we were working
with what we needed to do for him.
Q: So in your role . . . as student advocate, you
thought it was important to report what you perceived
as illegal behavior?
A: Yes.
Q: Did you think that it was part of your job?
A: I felt it was part of my job.

(D.I. 48 at A210-11, deposition testimony dated March 30, 2006)

    Q: And your assistance with the OCR complaints, did you
think that was part of your job as school psychologist?
A: I think that as an advocate for children, absolutely.
As a school psychologist, part of the role and
responsibility on a national level in terms of what is
the role is that if there are violations that we really
need to be an advocate. And if being an advocate means
trying to represent that child in a meeting, whether
it's informing parents of what their rights are, what
the law is, I think that that is our job. I think that's
our job as special educators, that parents have a right
to be informed, and they need to understand the law. Most
parents don't understand the law. And it's not well
described for them. . . . I think when we see that children
are being railroaded or that certain things aren't
happening, it is our job to let parents know what they
need to do to be an advocate for their children. . . .

    Q: Okay. So [Mr. Taschner] indicated that in your role as
school psychologist that filing or going to the OCR was
appropriate?
A: Yes.

(Id. at A223-224, deposition testimony dated April 26, 2006)

The Supreme Court's decision in Garcetti was issued on May

30, 2006.  Plaintiff submitted her "clarifying" affidavit on July

13, 2006 and stated:

> It is not a responsibility or requirement of my position
> as an employee of the School District to monitor, evaluate
> and report on the actions of school administrators, such
> as [Mieczkowski and Mitchell] with respect to how they
> and the [District] administration handled students with
> special needs.  It is part of my ethical responsibility
> as a school psychologist to speak up for the rights and
> needs of my students and their parents, including
> communicating my concerns for student rights to School
> and District administrators . . . .

(D.I. 55)

Defendants urge the court to reject plaintiff's affidavit

because it does not clarify, but contradicts, her testimony in an

attempt to avoid the holding in Garcetti.  (D.I. 59)  They submit

that "when, without a satisfactory explanation, a nonmovant's

affidavit contradicts earlier deposition testimony, the district

court may disregard the affidavit in determining whether a

genuine issue of material fact exists."  Hackman v. Valley Fair,

932 F.2d 239, 241 (3d Cir. 1991).

The "sham affidavit" doctrine "refers to the trial courts

practice of disregarding an offsetting affidavit that is

submitted in opposition to a motion for summary judgment when the

affidavit contradicts the affiant's prior deposition testimony."

In re CitX Corp., Inc., 448 F.3d 672, 679-680 (3d Cir. 2006)

(citing Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)); see

also Martin v. Merrell Dow Pharms., Inc., 851 F.2d 703, 706 (3d

19

Cir. 1988) (doctrine applies to contradictions of prior
testimony). When considering a motion for summary judgment, a
trial court should consider both the deposition testimony and the
affidavit, with "greater reliability" attributed to the
deposition. Shearer v. Homestake Mining Co., 557 F. Supp. 549,
558 n.5 (D. S.D. 1983). Summary judgment may be granted "based
upon the deposition testimony if the court is satisfied that the
issue potentially created by the affidavit is not genuine." Id.
However, the "court may consider whether the conflict between the
affidavit and deposition creates a credibility issue preventing
summary judgment from being entered." In re CitX Corp., Inc.,
448 F.3d at 679.

The Court of Appeals for the Tenth Circuit has created a
test for determining whether a party's affidavit constitutes an
attempt to create sham issues of fact. Franks v. Nimmo, 796 F.2d
1230 (10th Cir. 1986). Relevant factors to consider are whether:
(1) the affiant was cross-examined during earlier testimony; (2)
the affiant had access to the relevant evidence at the time of
the earlier testimony; (3) the affidavit was predicated on newly
discovered evidence; and (4) the earlier testimony reflects
confusion which the affiant attempts to explain. Id. at 1237
(citing Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d
1361, 1364-65 (8th Cir. 1983); Perma Research & Dev. Co. v. The
Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).

20

The record reflects that, when plaintiff was deposed in March and April, she was represented by able counsel and subject to examination by both her counsel and defendants' counsel. There is no indication that plaintiff had any cognitive problems affecting her comprehension of, or responses to, counsel's examination.  Plaintiff's critical testimony - relating to whether her activities fell within the scope of her employment - was clear and certain.  In the absence of any apparent confusion or doubt on her part, and with the factual record closed, the only plausible explanation for her July 13, 2006 affidavit is the intervening change in the law resulting from the Supreme Court's Garcetti decision.  The court declines to find that genuine issues of material fact have been generated by plaintiff's affidavit containing new, untested, contradictory facts that reflect the new legal standard.

## C.    Breach of Covenant of Good Faith and Fair Dealing

In her complaint, plaintiff alleges that the District's[4] termination of her employment was a breach of the covenant of good faith and fair dealing because it was in violation of public policy and based on fabricated reprimands.  (D.I. 1)

Under Delaware law, the covenant of good faith and fair dealing is recognized as a limited exception to the presumpiton of at-will employment.  E.I. DuPont de Nemours and Co. v.

_____

[4]This claim is asserted against the District.  (D.I. 1)

Pressman, 679 A.2d 436, 442-44 (Del. 1996). To bring a viable

claim under the covenant of good faith and fair dealing, a

plaintiff must demonstrate that her claim falls into one of four

exclusive categories:

> (1) where the termination violated public policy;
> (2) where the employer misrepresented an important fact
> and the employee relied 'thereon either to accept a new
> position or remain in a present one;
> (3) where the employer used its superior bargaining
> power to deprive an employee of clearly identifiable
> compensation related to the employee's past service; and
> (4) where the employer falsified or manipulated employment
> records to create fictitious grounds for termination.

Lord v. Souder, 748 A.2d 393, 400 (Del. 2000). Plaintiff's

claims implicate violations of the first and fourth Lord factors.

In Schuster v. Derocili, 775 A.2d 1029, 1039-40 (Del. 2001),

the Supreme Court of Delaware recognized a common law cause of

action for breach of the covenant of good faith and fair dealing

in an at-will employment contract where the employee alleged she

was terminated following sexual harassment in the workplace. In

2004, the Delaware legislature amended the statute concerning

employment discrimination, stating that the statute was the "sole

remedy for claims alleging a violation of the subchapter to the

exclusion of all other remedies." 19 Del. C. § 712(b) (2005).

The synopsis of the Senate Bill expressly supercedes the court's

holding in Schuster, stating, "This bill is the exclusive and

sole remedy for employment discrimination claims, requiring

initial processing of all such claims with the Department of

22

Labor for review and action.  This bill effectively re-
establishes the exclusive remedy put in question by the decision
in Schuster v. Derocili, . . . "  Delaware Bill Summary, 2004
Reg. Sess. S.B. 154.  The courts have begun to follow this
interpretation of the amended statute.  See E.E.O.C. v. Avecia,
Inc., 151 Fed. Appx. 162 (3d Cir. 2005) (amended statute barred a
state law claim for breach of the covenant of good faith and fair
dealing); Moon v. Del. River & Bay Auth., No. 05-261, 2006 WL
462551, at *4 (D. Del. Feb. 24, 2006).  Accordingly, plaintiff's
implied covenant claim based on the public policy prong must be
dismissed because the Delaware state statute provides the
exclusive remedy for relief.

Plaintiff asserts that the claims based on falsification of
reprimands is not affected by the above authority and that there
are genuine issues of material fact that preclude entry of
summary judgment.  The District contends that the reprimands were
valid and supported by the plaintiff's job performance.  Because
the court has found that a reasonable jury could find the
reprimands (related to plaintiff's Title VII claim) were
retaliatory, it follows that there are genuine issues of material
fact on the issue.

**V.    CONCLUSION**

For the reasons stated, defendants' motion for summary judgment is granted in part and denied in part.  An order shall issue.