IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OLGA ALEXANDRA YATZUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 05-103-SLR |
| | ) | |
| APPOQUINIMINK SCHOOL DISTRICT, | ) | JURY TRIAL DEMANDED |
| and TONY MARCHIO, individually | ) | |
| and in his official capacity, MARY ANN | ) | |
| MIECZKOWSKI, individually and in her | ) | |
| official capacity, DONNA MITCHELL, | ) | |
| individually and in her official capacity, and | ) | |
| MARION PROFFITT, individually | ) | |
| and in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR REARGUMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR REARGUMENT, OR, IN THE ALTERNATIVE CLARIFICATION OF THE COURT'S OCTOBER 24, 2006, RULING (D.I. 85)

Defendants hereby moves pursuant to Local Rule 7.1.5 for reargument of the Court's Memorandum Opinion (D.I. 81) and Order (D.I. 82) dated October 24, 2006, regarding the Plaintiff's claim under the implied covenant of good faith and fair dealing. Defendants also hereby submit their response to Plaintiff's motion for reargument, or, in the alternative, clarification of the Court's October 24, 2006, ruling (D.I. 85).

### STANDARD OF REVIEW

The standard for reargument is well-established.  The Court is required to hear reargument if it has erred as a matter of law or if it has misapprehended a pertinent fact.  *ISCO Int'l, Inc. v. Conductus, Inc.*, No. 01-487 GMS, 2003 U.S. Dist. LEXIS 3262, at **2-4 (Mar. 6, 2003) ("these types of motions [for reargument] are granted only if it appears that the court has patently misunderstood a party . . . or has made an error . . . of apprehension"); *In re DaimlerChrysler AG Securities Litigation*, 200 F. Supp.2d 439, 442

(D. Del. 2002) ("The purpose of a motion for reconsideration is 'to correct manifest errors of law or fact . . . .'").

## THE COURT'S DECISION

In its October 24, 2006, Memorandum Opinion (D.I. 81), the Court found that there was a genuine issue of material fact relating to Plaintiff's claim under the fourth exception of the implied covenant of good faith and fair dealing which prohibits an employer from falsifying or manipulating employment records to create fictitious grounds for termination (hereinafter "Implied Covenant"). In her complaint, Plaintiff Yatzus alleges that the Defendants fabricated certain reprimands that were issued to her in 2002 and 2003. D.I. 1. The Court found that a "reasonable jury could find that the reprimands (related to plaintiff's Title VII claim) were retaliatory" and thus there existed a material issue of fact. Mem. Op. at 23.

The purpose of this motion is to allow the Court to correct a misapprehension of an uncontested fact and correct an error regarding the application of the Implied Covenant. As set forth below, Yatzus never pointed to evidence in the record questioning the *authenticity* of the reprimands, but only that the District's *reason* for issuing the reprimands was retaliatory. This evidence alone is not sufficient to support a fabricated records claim under the Implied Covenant.

## THE NARROW APPLICATION OF THE IMPLIED COVENANT REQUIRES AN EVIDENTIARY SHOWING OF A FALSIFIED OR MANIPULATED RECORD

Plaintiff's "fabricated records" claim is under prong four of the Implied Covenant. The claim is based solely on the "act or acts of the employer manifesting bad faith or unfair dealing achieved by deceit or misrepresentation in falsified or manipulated employment records to create fictitious grounds for termination." *See E.I. DuPont de*

*Nemours and Co. v. Pressman*, 679 A.2d 436, 439 (Del. 1996).  "[N]o legally cognizable harm arises from the termination itself," since such would be antithetical to the at-will employment doctrine.  *Pressman*, 679 A.2d at 444.

An essential element for an Implied Covenant claim is that the disputed information in the records must, by definition, be manipulated or falsified.  *See, e.g., Parker v. Comcast Corp.*, No. 04-344-KAJ, 2006 U.S. Dist. LEXIS 10700, at *21 (D. Del. Mar. 17, 2006).  The mere fact that the employer harbored dislike, hatred, or some other form of bad motive, alone cannot be the basis for a cause of action for the termination of at-will employment.  *Pressman*, 679 A.2d at 444.  Nor is an employer who gives an employee a false reason for termination subject to liability under the implied covenant of good faith and fair dealing.  "Pressman only held culpable the *manufacture* of grounds for dismissal, not the *statement* of a false reason for dismissal."  *Williams v. Caruso*, 966 F. Supp. 287, 291 (D. Del. 1997) (emphasis in original) (*citing Pressman*, 679 A.2d at 444).  Indeed, in situations where the employee did not make an evidentiary showing that the record had been manipulated or falsified, the Implied Covenant claims have been dismissed.

For instance, in *Parker v. Comcast Corp.*, the plaintiff produced evidence that her employer had stated the reason for her termination was due to a reorganization, when in truth it was because of her poor performance.  2006 U.S. Dist. LEXIS 10700, at *21.  The court found this was insufficient to withstand summary judgment because there was nothing to show that fabricated criticisms had been placed in her employment file.  *Id.* at **19-20.

In *Layfield v. Beebe Medical Center, Inc.*, No. 95C-12-007, 1997 Del. Super. LEXIS 472, at *11 (Del. Super. July 18, 1997), the defendant discovered that the plaintiff, a nurse, had made documentation errors which violated hospital policies. *Layfield*, 1997 Del. Super. LEXIS 472, at *6. The defendant terminated the plaintiff, citing as the reason a lack of confidence in her due to the errors. *Id.* at *7. The plaintiff alleged that the defendant terminated her because of jealousy and resentment and that her record was manipulated in bad faith to justify it. *Id.* at *12. The court disagreed and granted summary judgment to the defendant, finding that because the plaintiff admitted to having failed to comply with company policy, she could not argue that her records had been falsified or manipulated. *Id.* at *14.

Similarly, in *Patten v. Zeneca, Inc.*, No. 94C-07-180-WTQ, 1996 Del. Super. LEXIS 86 (Del. Super. Feb. 13, 1996), the plaintiff claimed that his employer's explanation for his termination was false and deceptive and that his termination therefore violated the covenant. He explained at his deposition that he was told that he had been fired because of inappropriate behavior at a meeting, but he did not agree that his behavior at the meeting had been inappropriate. The Superior Court held that an employee's subjective disagreement with his employer's perception of and opinions about his conduct did not provide an adequate factual predicate for a claim of breach of the covenant. *Id.* at **6-7.

These cases demonstrate that where a plaintiff is merely claiming that the employer harbored ill-motive and gave a false reason for termination, rather than producing evidence disputing the authenticity of the information in the employment

records themselves, there is no cause of action under the Implied Covenant.  This is exactly the situation in Yatzus's case.

Yatzus was issued reprimands for not having her reports prepared in time for meetings and incomplete psychological reports.  She does not contest the fact that she did not have her reports ready, but rather claims that she did not have the time or resources to complete them, and that other employees who did not have their reports ready were not disciplined.  *See* Tab 1, excerpts from Yatzus's deposition testimony, A183-88; A194-96; *see also* Plaintiff's Ans. Br. at 8.  Thus, Yatzus does not dispute the *authenticity* of the records themselves, only that the District's *reason* for issuing the reprimands was not true and that the real reason was retaliation.

Yatzus also was reprimanded for being late for meetings.  In her deposition, she admitted that she was late but asserts that she should not have been reprimanded because she had an emergency with a student and did not know about the meeting.  (A182-84); Plaintiff's Ans. Br. at 10.  Again, there is no contention that the basis for the reprimand (lateness) was fabricated, only that the District's *reason* for reprimanding her must have been retaliatory because she had an excuse to be late.

Another reprimand was issued to Yatzus for not reporting her absence.  Once again, Yatzus testified that she did, in fact, fail to report her absence that day.  (A178-79).  Her excuse, however, was that she believed she was not required to report her absence under her interpretation of the District's reporting methods.  (A179-181); Plaintiff Ans. Br. at 10.  Yatzus was also reprimanded for not turning in a summer schedule to the Superintendent.  She never denied that she did not hand in her schedule and testified that she had no way of knowing whether there was anything false in the

letter.  (A177).  Thus, the accuracy of the underlying basis for these reprimands is not contested, only the District's reason for issuing them.

The facts surrounding the reprimands to Yatzus do not even remotely compare to the facts which prompted the Delaware Supreme Court to create a claim under the Implied Covenant.  In *Pressman*, evidence was introduced that plaintiff's supervisor had misrepresented plaintiff's responsibilities to make it seem as if he was not completing assigned tasks, falsely edited a progress report to understate plaintiff's accomplishments, and placed a fictitious unsigned negative evaluation in plaintiff's personnel file.  *Pressman*, 679 A.2d at 439.

Here, on the other hand, Yatzus has failed to point to any evidence in the record to show that the reprimands were fabricated of falsified.  Her only claim is the District's reason was not legitimate but for retaliatory purposes.  Her subjective belief that the reprimands were unduly harsh based on her admitted actions cannot constitute a claim under the Implied Covenant under the limited application of *Pressman*.

Nor should Yatzus be allowed to bring an Implied Covenant claim based on the assumption that the reprimands were in retaliation for her Title VII complaints.  This is nothing more than a disguised claim under the public policy prong of the Implied Covenant – a claim this Court has already dismissed.  *See* Mem. Op. at 23.

In sum, Defendants respectfully submit that the Implied Covenant requires more than Yatzus simply asserting that her employer's true reason for its actions was retaliation.  Rather, as dictated by the Delaware Supreme Court in *Pressman*, the burden requires her to show that Defendants' falsified or manipulated a record to create fictitious grounds to justify her termination.  The record before this Court reveals that Yatzus has

not made a showing sufficient to establish the existence of this element essential to her Implied Covenant claim. The Court should reconsider its decision and grant summary judgment on this claim.

## PLAINTIFF'S MOTION FOR REARGUMENT SHOULD BE DENIED AS A VEILED ATTEMPT TO RE-LITIGATE HER DISMISSED FIRST AMENDMENT CLAIM

Yatzus also has moved the Court for reargument and/or clarification of the Court's decision on her Implied Covenant claim. Essentially, Yatzus argues that she must be allowed to submit evidence of her advocacy of student rights in order to prove that "a motivating factor in Defendants' decision to terminate her employment was her complying with her responsibility as a school psychologist in standing up for special needs students and bringing to the District's attention that those students' rights were being violated." *See* Plaintiff's Motion at 2. The transparency of Yatzus's motives for bringing this motion should provide the Court with sufficient comfort that not only should Yatzus's motion be denied but that summary judgment should be granted as to the Implied Covenant claim.

In her motion, Yatzus candidly admits her entire claim under the Implied Covenant is based on challenging the District's *reason* for issuing the reprimands and terminating her employment. Such an argument runs contrary to the holding in *Pressman* which counseled caution about creating causes of action based on an employer's motivation for termination. *Pressman*, 679 A.2d at 444. Indeed, the Delaware Supreme Court rejected jury instructions that would have allowed the jury to find in favor of the plaintiff by merely showing his discharge was by "acts of fraud, deceit, or intentional misrepresentation." *Pressman*, 679 A.2d at 444. The problem with these instructions, as

noted by the *Pressman* court, is that they did not tie the employer's malice with the intent to terminate the employee based on a <u>falsified record</u>.  *Pressman*, 679 A.2d at 444.

Yet, this is exactly what Yatzus seeks to accomplish here.  With no evidence that the information contained in the reprimands was falsified, Yatzus contends that she should be allowed to produce evidence that the District's reason for issuing the reprimands was because of her advocacy of student rights.  Defendants respectfully submit that allowing such a claim to proceed would essentially create a cause of action every time an employee disagreed with the reason for his or her termination.  This simply cannot be what the Delaware Supreme Court envisioned.  *See Pressman*, 679 A.2d at 444 ("Courts have been reluctant to recognize a broad application of the Covenant out of a concern that the Covenant could thereby swallow the Doctrine and effectively end at-will employment.").

Of course, the real agenda behind Yatzus's motion is far more nefarious.  She seeks to gain admittance through the back door essentially all of the evidence supporting her First  Amendment claim by advocating that it is relevant to show one of the many "reasons" why she was terminated.  Yatzus would greatly expand the scope of the issues before the jury and basically relitigate her dismissed First Amendment claim.  Again, this demonstrates the absurdity of Yatzus's argument.  It would essentially allow every employee whose discrimination or retaliation claims were validly dismissed an opportunity to relitigate them as an Implied Covenant claim on the basis that the employee needs to show the "true motive" for the termination.

For the foregoing reasons, Defendants respectfully respect that their motion for reargument be granted.  Further, Defendants respectfully request that

Plaintiff's motion for reargument, or, in the alternative, clarification, be denied as moot

and that Plaintiff not be allowed to relitigate her First Amendment claim.

Respectfully submitted,

YOUNG CONWAY STARGATT & TAYLOR LLP

/s/ Adria B. Martinelli

William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
Maribeth L. Minella, Esquire (Bar. I.D. 4185)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601; 6623; 6708
Facsimile: (302) 576-3282; 3314; 3317
Email: wbowser@ycst.com; amartinelli@ycst.com;
mminella@ycst.com
Attorneys for Defendants

DATED:        October 31, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS,                    )
                                          )
                    Plaintiff,            )
                                          )
            v.                            )    C.A. No. 05-103-SLR
                                          )
APPOQUINIMINK SCHOOL DISTRICT,            )    JURY TRIAL DEMANDED
and TONY MARCHIO, individually            )
and in his official capacity, MARY ANN    )
MIECZKOWSKI, individually and in her      )
official capacity, DONNA MITCHELL,        )
individually and in her official capacity, and )
MARION PROFFITT, individually             )
and in her official capacity,             )
                                          )
                    Defendants.           )

## **ORDER**

Upon consideration of Plaintiff's Motion for Reargument, or, In The Alternative,

Clarification of the Court's October 24, 2006, Ruling (D.I. 85), and Defendants' response thereto,

and Defendants' Motion for Reargument,

IT IS NOW HEREBY ORDERED this _____ day of _____, 2006, that the

Plaintiff's Motion is hereby DENIED, and that Defendants' Motion for Reargument is

GRANTED.

_____
Chief Judge Sue L. Robinson

# TAB 1

Olga A. Yatzus

Page 93

1   School, but he wasn't getting his contract renewed,

2   and he was never in the building, it seemed.  So I

3   wasn't sure who my high school contact was at that

4   point.

5      Q.   No one ever told you someone would be replacing

6   Dr. Lauer as your supervisor in the interim until a

7   new person was hired?

8      A.   Tony said for us just to deal with him until

9   Vaughn's replacement got hired.  So we were kind of

10  floundering at that point.

11     Q.   And you said there were two different

12  conferences you requested to attend?

13     A.   I think it was, yeah, I think it was two.

14     Q.   Did Dr. Marchio deny your attending those

15  conferences?

16     A.   He allowed me to go to one.  Then he came back

17  with a comment for the other that he didn't know why I

18  wanted to go to Philly to the conference by the

19  airport there instead of the Delaware one.  I told him

20  that I -- I don't recall what.  I think it was

21  something with the university that I had to do that

22  particular day, so I couldn't go on the day that I

23  had -- that I would have preferred to go in Delaware,

24  but the same conference was offered five minutes down

Olga A. Yatzus

Page 94

1    the road.  So I asked to go to that one.

2       Q.   Did you explain that to Dr. Marchio?

3       A.   Yes, I did.  After I explained that, he allowed

4    me to go to that one.

5       Q.   He allowed to you attend the one you wanted to

6    go to?

7       A.   Yes.

8       Q.   And the other one you said you did attend also?

9       A.   Yes.

10      Q.   So as a result of the -- the original question

11   was at what point you believed you were being

12   retaliated against for your sexual harassment

13   allegations.  And you stated that before the summer --

14   issue with the summer hours there was this issue with

15   the conferences.  Is that the first time -- was that

16   the beginning --

17      A.   That was the first time I felt that -- it was

18   the tone of voice, it was the attitude and the comment

19   that I was trying to take advantage, that I felt

20   uncomfortable because nobody else was -- would have

21   been receiving that kind of comment that, oh, I just

22   think that you're trying to take advantage.

23      Q.   And you thought that other employees were being

24   treated more favorably?

A171

Olga A. Yatzus

1   A.   Yes.  I just -- I didn't hear him talk to

2   anyone else that way.  Let's put it that way.  I don't

3   know how other employees were being treated or not.

4   Q.   Now, at some point there was an issue about

5   your hours over the summer between you and

6   Dr. Marchio.  Is that correct?

7   A.   Yes.

8   Q.   Can you describe what that problem was?

9   A.   When Vaughn hired the special ed. coordinators

10  and when he hired me, we were given a guarantee of 20

11  days of summer work.  The program coordinators

12  automatically were going to put that team in without

13  any questions asked, and Tony told me that there was

14  no -- that he wasn't aware that that promise was made,

15  but that he made reference to the fact that he thought

16  I deliberately didn't do -- get some work done because

17  I expected to do it over the summer or something to

18  that effect -- or that I -- that I wanted an excuse or

19  a reason to work over the summer.  And that couldn't

20  have been further from the truth.

21  Q.   At some point, did Dr. Marchio have a meeting

22  with all the psychologists and request their summer

23  schedules?

24  A.   Yes.  We were told to make sure the secretary

Olga A. Yatzus

Page 96

1    knew what days we were going to be coming in, and so

2    that he wanted all of us to give him that information.

3        Q.    The secretary being the special ed. secretary?

4        A.    Yes.

5        Q.    Is that -- who was that at the time, do you

6    recall?

7        A.    Chrissie O'Grady.

8        Q.    Your recollection of the meeting was

9    Dr. Marchio just asked you to tell Chrissie O'Grady --

10       A.    To turn in our schedules or what days we would

11    be working.

12       Q.    What days you were working?

13       A.    Yes.

14       Q.    No additional information you thought was

15    required?

16       A.    I didn't think there was any at that point.  I

17    recall Chrissie coming to my desk.  I was letting her

18    know what days I would be coming in.

19       Q.    You said you recalled going to Chrissie O'Grady

20    and letting her know what days?

21       A.    Chrissie and I sat down with her appointment

22    book, and I told her what days I would be coming in.

23       Q.    Was that shortly after the initial meeting with

24    Dr. Marchio?

Olga A. Yatzus

Page 101

1   as I would complete some evaluations, there were some

2   parents that would cancel, so I would have to

3   reschedule. Other times, I wasn't sure how long an

4   evaluation would take on a particular child. So some

5   days you could get two kids done in a day. Sometimes

6   it would take a whole day to get that particular child

7   done. So I would try to see where I was on that list

8   and then schedule a week or two in advance to get the

9   kids in.

10   Q.   So you are saying you were unable to provide a

11   list of dates?

12   A.   Exact date of who was coming and when for the

13   duration of that time because that was --

14   Q.   Could you provide dates that you were going to

15   be working over the summer?

16   A.   Yes.

17   Q.   Did you do that?

18   A.   I had given the information to Chrissie in

19   terms of what days I would be available to come into

20   work.

21   Q.   You had given the verbal information to

22   Chrissie?

23   A.   Yes.

24   Q.   You thought that complied with Dr. Marchio's

Olga A. Yatzus

Page 102

1    written requests?

2    A.    I -- after he sent the one thing that he wanted

3    to know who and what I was going to be doing, I gave

4    him this, and asked him if he needed anything more, to

5    let me know.

6    Q.    Your testimony is that prior to Dr. Marchio's

7    follow-up letter of July 3rd, 2002, you thought you

8    had complied with his request by your verbal --

9    A.    By letting --

10   Q.    -- discussion with Chrissie?

11   A.    -- Chrissie know what days I would be there.

12            MS. MARTINELLI:   Let me know when you want

13   to take a lunch break.   I can do it now.

14            MR. BARTOSHESKY:   You want to do it now?

15            MS. MARTINELLI:   That's fine.   Yeah.

16            (Luncheon recess taken at 12:10 p.m. and

17   reconvened at 12:58 p.m.)

18            (Yatzus Deposition Exhibit No. 16 was

19   marked for identification.)

20   BY MS. MARTINELLI:

21   Q.    Ms. Yatzus, you have been handed a document

22   identified as Exhibit 16, and in the lower right-hand

23   corner, it's identified as P-227.   It's dated

24   August 29th, 2002.   And it appears to be a letter from

Olga A. Yatzus

Page 106

1    Q.   So you didn't communicate any further directly

2    with Dr. Lauer on the summer schedule issue after

3    this?

4    A.   Dr. Lauer.

5    Q.   I apologize.  Dr. Marchio.

6    A.   Right.

7    Q.   And that was because you had gotten --

8    A.   Vicky --

9    Q.   -- Boyd involved?

10   A.   Yes.

11   Q.   Vicky Boyd was who?

12   A.   The Uniserve rep for the DSEA.

13   Q.   Vicky Boyd, you said, was the Uniserve rep for

14   DSEA?

15   A.   Mm-hmm.

16   Q.   Did she act as your advocate in that regard?

17   A.   She was -- I was asking her to help with the

18   communication.  Whether she was an advocate or not, I

19   was relying on her professional expertise.

20   Q.   Did she represent you at any grievance

21   hearings?

22   A.   She would -- yes.  She would be the one that

23   would come along with Lynn Kebler at times.

24   Q.   Did you consider Ms. Boyd to be a fair and

Olga A. Yatzus

Page 108

1   A.   I felt that the more information she had, the

2   better she would be able to help me with that.

3   Frankly, there was no other resource that I felt that

4   I could get opinions and get -- check things out.

5   There really wasn't another source for that.

6   Q.   I want to refer back to Dr. Marchio's reprimand

7   letter, dated August 29th, Exhibit 16.  Do you contend

8   that anything is false in this letter?

9   A.   Let me re-read it.

10  Q.   Okay.

11  A.   Well, there are some things I can't account --

12  I mean, I wouldn't know whether they were false or not

13  in terms of what Judy and Chet did in response.  I

14  don't have any way of knowing that.

15  Q.   Is there anything you know is -- I'm sorry.

16  Continue.

17  A.   I didn't deliberately ignore his request the

18  second time.  I thought I had given him what he

19  wanted.  On August 5th, I didn't deliberately not

20  respond or chose to ignore.  At that point, I had

21  asked Vicky to communicate on my behalf.  As far as

22  what he requires from other people, I can't attest to

23  that because I don't have any knowledge of that.

24  Q.   Did you ever provide any additional information

A177

Olga A. Yatzus

Page 110

1    writing?

2      A.    I can't recall.

3      Q.    At any point, did you receive a written

4    reprimand for being absent from work without proper

5    notification?

6      A.    Yes.  I recall seeing a reprimand to that

7    effect.

8              (Yatzus Deposition Exhibit No. 18 was

9    marked for identification.)

10   BY MS. MARTINELLI:

11     Q.    I am showing you what's been marked as Exhibit

12   18.  In the lower right-hand corner, it's identified

13   as D-7.  It's a document, dated April 2nd, 2003, to

14   you.  At the bottom, it appears to be signed by you

15   and Donna Mitchell.  Did you -- have you seen this

16   document before?

17     A.    Yes.

18     Q.    And is this the reprimand you were referring

19   to?

20     A.    Yes.

21     Q.    Did you report to work on April 2nd -- I'm

22   sorry, yes, on April 2nd?

23     A.    I don't recall April 2nd.

24     Q.    Do you want to take time to review this

Olga A. Yatzus

1    reprimand?

2      A.    Well, I think you are talking about March 8th.

3    The letter was dated --

4      Q.    The second paragraph that's one sentence, "We

5    had seven IEP meetings today and planned on a

6    psychologist attending."  The following paragraph

7    said -- and "today" appears to be the date of the

8    letter, April 2nd, 2003.  It says, "You did not report

9    to work today and you did not contact the substitute

10   caller."

11     A.    All right.  Okay.  Yeah.  I'm sorry.  I recall

12   the day, whatever day that was, that there was an

13   emergency at my son's school as I dropped him off.  I

14   wasn't planning to be out that day.  Whatever I had to

15   deal with school that day took a lot longer than I had

16   intended.  So I contacted the school to say that I

17   needed to take that as a sick day.

18     Q.    Was the emergency related to a school project

19   he had, your son?

20     A.    Originally, there was supposed to be a school

21   project, but there was another issue that had come up

22   that I had to deal with that was much more involved.

23     Q.    And what was that issue?

24     A.    Something to do with some behavioral concerns.

A179

Olga A. Yatzus

Page 115

1    district office to notify them that we would be out.

2    So that's always been the procedure.

3      Q.    Notify them being who?

4      A.    Like the special ed. secretary.

5      Q.    The people you mentioned before?

6      A.    Yes.

7      Q.    The secretary or the ed.?

8      A.    Right.

9      Q.    When you say we were notified, do you remember

10   who --

11     A.    I think just us, the psychologists. We were

12   all kind of -- I think that first year I was hired, we

13   were instructed to call Kathy Bromwell if we were

14   going to be out and let her know.

15     Q.    Would that have been Dr. Lauer --

16     A.    Yes.

17     Q.    -- who gave you that instruction?

18            I think you mentioned at some point

19   Ms. Mitchell gave you different instructions?

20     A.    Right. She told me I had to call the

21   substitute caller. I recall saying I never had to do

22   that before since you don't call a substitute in for a

23   psychologist. She said, well, she didn't care what I

24   had been instructed before; that's what she wanted me

Olga A. Yatzus

Page 116

1    to do.

2        Q.    This document indicates that the discussion

3    occurred on March 8th, 2003.  Does that sound correct?

4        A.    It's here.  I don't have any recollection.

5        Q.    Did that discussion occur before this incident

6    with your son at the school and coming in late?

7        A.    Well, it says that on March 8th we had that

8    discussion.  So that would have been before.

9        Q.    Is there any reason you didn't follow those --

10       A.    I wasn't planning on being out the whole day.

11       Q.    When you did call in at 12:58, correct, you

12   said you wouldn't be able to make it in that day?

13       A.    Right.

14       Q.    And you didn't call the substitute caller then?

15       A.    Well, you are supposed to call the substitute

16   caller before 6:30 a.m.  If I didn't know I was going

17   to be out that whole day, how could I have called

18   before 6:30 a.m.?

19       Q.    So you thought it was no longer necessary

20   because you didn't figure out until 1:00 that you

21   weren't going to come in for the day?

22       A.    Right.

23       Q.    And I'm sorry.  Tell me who Sue Poore was

24   again.

A181

Olga A. Yatzus

Page 120

1    A.    The IEP team, the psychologist, generally

2    reviews the testing, any kind of documentation.    And

3    it's a committee process.

4    Q.    Is there someone who leads the discussion?

5    A.    Sometimes the ED will walk through that.

6    Sometimes the psychologist will.    But the psychologist

7    is involved in the process.

8    Q.    Is the psychologist's attendance more critical

9    for behavior manifestation than an IEP meeting?

10    A.    Yeah.

11    Q.    Is that required?

12    A.    A psychologist should be there.

13    Q.    Do you recall what time you arrived at this

14    meeting scheduled for 10:00 a.m.?

15    A.    I think it was about 10: -- this says 10:30.

16    It was around there.    I don't know exactly.

17    Q.    Why were you late for the meeting?

18    A.    There was a student that showed up at my office

19    that I had never seen before who was -- looked very

20    manicky.

21    Q.    I'm sorry.    Looked?

22    A.    Looked manicky.    He was agitated.    And I didn't

23    know the student at all.    And he -- I felt like I

24    needed to assess quickly what was going on to make

Olga A. Yatzus

Page 121

1    sure that, you know, he wasn't in crisis at that time.

2              So as I finished -- as I felt that he was

3    okay and sent him on his way, I went to find the

4    meeting, and checked several locations in the high

5    school, and -- because that's where I thought the

6    meeting was going to be held -- and then found out it

7    was actually going to be at the district office.  And

8    I got over there as quickly as I could.

9    Q.   So a student came to your office.  Is that --

10   A.   Yes.

11   Q.   And what student was that?

12   A.   What's his name?  I can see him.  I can't

13   recall his name.

14   Q.   Do you recall about what time that was?

15   A.   Probably about quarter to 10:00.  Somewhere

16   around there.

17   Q.   He was in your office for how long?

18   A.   I -- he wasn't in that particular office.  I

19   met -- there was another room -- because I shared an

20   office and I didn't like to talk with other people

21   there when I met with kids, if I could help it, so

22   there was another room that was available.  So I met

23   with him there for about 15 minutes, maybe.  And then

24   tried to get out of there so I could attend this

Olga A. Yatzus

Page 122

1    meeting.

2    Q.    And this was in the high school you worked --

3    A.    Yes.

4    Q.    -- you met with him?

5          And you knew the meeting was scheduled,

6    correct, at that time?

7    A.    At that point, yeah, I did know the meeting was

8    scheduled.  I was planning on getting there, but felt

9    that I just quickly needed to find out what was going

10   on with this kid that I had never met him before.

11   Q.    Did you think your presence at this meeting was

12   important?

13   A.    Yes.

14   Q.    Do you recall being written up on any occasions

15   for not completing IEP reports?

16   A.    IEP reports?  I am not sure what an IEP report

17   is.

18   Q.    Evaluation report?

19   A.    Yes.

20   Q.    Psychological evaluation?

21   A.    Yes.

22   Q.    Do you recall being written up for not

23   completing psychological evaluations?

24   A.    Yes.

Olga A. Yatzus

Page 123

1          (Yatzus Exhibit Nos. 20, 21 and 22 were

2    marked for identification.)

3    BY MS. MARTINELLI:

4      Q.   Let's start with these two.  I have handed you

5    two documents identified as Exhibits 20 and 21.

6      A.   No.  I have -- oh, okay.  20, 21.

7      Q.   I'm sorry.  Those numbers are confusing.  They

8    are similar.  And on the bottom, the one identified as

9    20 is on the bottom D-23.  Is that correct?

10     A.   Yes.

11     Q.   Starting with the document that's been

12   identified as Exhibit 20.  It's dated September 30th,

13   2002.  In the bottom right-hand corner, it says D-22?

14     A.   No.  That's --

15     Q.   No.

16     A.   -- 21.

17     Q.   Exhibit 20 in the bottom right-hand corner says

18   D-23.  Is that correct?

19     A.   Yes.

20     Q.   Okay.  Starting with the document identified as

21   Exhibit 20 and in the lower resident corner says D-23.

22     A.   Right.

23     Q.   It's dated September 25th, 2002 and it's -- it

24   appears to be a letter from Donna Mitchell that you

Olga A. Yatzus

Page 124

1    and she signed.  Is that correct?

2      A.    That's correct.

3      Q.    This appears to document an incident in

4    which -- dealing with an evaluation report, as it's

5    described there, that wasn't presented in a timely

6    fashion.  Can you describe what happened there?

7      A.    During the month of September, we had a new ED

8    to our building that year that took over the high

9    school special ed. files which were left in hard

10   condition for Marilyn when she started.  And she was

11   immersed that whole month in trying to clean up

12   everything that she was left with.  So I had told

13   Marilyn I had tested some kids that we needed to

14   schedule some meetings for.  During the month of

15   September, trying to get computers up and running

16   isn't -- is a massive task for the technology staff.

17   So my computer hadn't been up and running at that

18   point.  So I would take whatever work that I needed to

19   at home and work at home.

20           There were -- some of the meetings that I

21   told Marilyn we didn't have to rush and get them done

22   before the 30th, that we could do them in October

23   because they weren't going to necessarily -- that they

24   weren't going to qualify for any services.  What we

A186

Olga A. Yatzus

Page 125

1   try to do is get the kids that would be eligible by

2   the 30th.

3             But I remember that it was a Monday

4   afternoon that I was leaving my office and saw an

5   envelope from Marilyn, I think.  But I was walking out

6   the door and I figured I'd check my mail when I came

7   back since I didn't want to misplace those papers.

8   So, evidently, I was given some notice of meetings at

9   that time, which I didn't -- like I said, I was

10  walking out of the building when it was placed in my

11  mailbox, so I didn't have a chance to really look at

12  it.

13            The next day, I was assigned to a different

14  school.  So I wasn't in the building that whole next

15  day.  When I arrived at work on Wednesday morning, I

16  found out that these meetings were scheduled, which I

17  didn't know prior to walking in at that particular

18  moment.  So the work that I was -- I had worked on was

19  at home.

20     Q.   These are the psychological evaluations you are

21  referring to?

22     A.   Yes.

23     Q.   Does -- is the notice for meeting what

24  generates your need to complete the --

A187

Olga A. Yatzus

Page 126

1    A.    When we are swamped with trying to get

2    everything done that we need to get done, we try to

3    get them done before the meeting.  But that doesn't

4    always mean that -- I mean, if we're testing and doing

5    a bunch of other things and we've got a meeting, then

6    we try to prepare for that meeting when you're doing a

7    bunch of other evaluations and anything else that

8    needs to be done prior to that time.

9    Q.    I'm sorry.  So the answer was it is the meeting

10   notice that generates your --

11   A.    Well, it depends.  I think it really depends.

12   I think it depends on when that meeting is scheduled

13   by, how much notice you are given as far as that goes,

14   and all of the other things that you have to

15   accomplish.  So if you know that the meeting is going

16   to be at that time, then you try to have that as

17   the -- you know, if this meeting is scheduled, I need

18   to try to make sure I have this together for that.

19   Q.    Were you expected to provide these reports in

20   advance of the meeting to anyone at the district?

21   A.    That wasn't communicated to me prior to this.

22   Q.    And you said that you had permission to do some

23   work on the reports at home.  Is that what you said?

24   Or you made the decision to work on these reports at

Olga A. Yatzus

1    home?

2    A.    I think it's impossible to get everything done

3    that you need to get done in the course of a school

4    day, so I don't know about you, but I would take a lot

5    of work home on a regular basis to try to keep up.

6    But especially when I didn't have my computer

7    operational at that time, I really needed to make sure

8    that I was able to get some of that stuff done at

9    home.

10    Q.    And you left it at home because you didn't

11    realize you had a meeting, that meeting that day until

12    you got in?

13    A.    Yes.

14    Q.    You have a second document in front of you

15    marked as Exhibit 21, and in the lower right-hand

16    corner is identified as D-22.  This appears to be a

17    letter, dated September 30th, from Mary Ann

18    Mieczkowski to you, and it's signed by Mary Ann at the

19    bottom.  Did you receive a copy of this letter at the

20    time?

21    A.    Yes.

22    Q.    Can you tell me what this letter concerns?

23    A.    The same.  It was all for the same day.  The

24    same set of circumstances.

Olga A. Yatzus

Page 128

1    Q.    Does this reference anything that

2  Ms. Mitchell's letter did not?

3    A.    I am sure that ...

4    Q.    If I can direct your attention to the third

5  paragraph, the third sentence.  "As I further

6  researched the issue at hand, one student referred for

7  testing by the child study team in January 30th, 2002

8  and testing did not occur for him until the week of

9  September 16th."  Is that related?  It sounds

10  different.  Is that related to the September 25th

11  meeting or is that separate?

12    A.    Those -- these two letters were the result of

13  the same day as far as what Mitch wanted to pinpoint

14  in her letter and what Donna wanted to pinpoint in her

15  letter.  I am sure they decided which issues that they

16  wanted to confront.

17    Q.    Were Ms. Mitchell and Ms. Mieczkowski present

18  for that IEP meeting --

19    A.    They were both --

20    Q.    On the 25th?

21    A.    -- in the building.  I can't recall who

22  participated in which meeting.  I'd have to see

23  them -- the attendance minutes to see who was at what

24  meeting.  I think there were some that they both were

A190

Olga A. Yatzus

Page 129

1    in.

2       Q.   I am going to show you a third document.

3            (Yatzus Deposition Exhibit No. 23 was

4    marked for identification.)

5    BY MS. MARTINELLI:

6       Q.   This document is identified as Exhibit 23 and

7    in the lower right-hand corner as D-26.  It appears to

8    be a reprimand, dated September 25th, 2002, from James

9    Dooley.  Did you receive a copy of this?

10      A.   Yes, I did.

11      Q.   In the first paragraph it says, "On four

12   separate occasions today, you failed to present a

13   written report ..."  the letter is dated September

14   25th.  So it appears to be referring to the same IEP

15   meeting.  Is that --

16      A.   There were meetings scheduled throughout that

17   day.

18      Q.   Several meetings.  As a result of receiving

19   these three reprimands, did you file a grievance?

20      A.   Yes, I did.

21      Q.   What happened as a result of the grievance?

22      A.   A decision was made to pull these three letters

23   and replace it with one.

24      Q.   Was there a meeting held for the grievance?

Olga A. Yatzus

Page 130

1    A.    As I recall, yes.

2    Q.    A hearing, maybe, might be the proper term.

3         I am going to show you what was marked as

4    Exhibit 22.  This is a letter -- well, it's identified

5    as Exhibit 22 and in the lower right-hand corner

6    D-20 -- a letter dated November 17, 2002 to you and

7    signed by you and Ms. Mieczkowski.  Is this the letter

8    that replaced the three previous letters?

9    A.    Yes.  That was my understanding.

10   Q.    Okay.  As a result of the grievance hearing?

11   A.    Yes.

12   Q.    At the bottom of this letter, the last

13   paragraph, after -- the last paragraph indicates that

14   "... it is now understood that any information

15   provided by the psychologist during an IEP or 504

16   meeting regarding any student, in the form of an

17   evaluation summary or 'gathering of data,' shall be

18   considered a report and copies shall be provided to

19   the administration and educational diagnostician at

20   least 48 hours prior to the scheduled meeting."

21        Was that discussed in the hearing or the

22   grievance discussion?

23   A.    I don't recall exactly what was discussed at

24   that meeting.

Olga A. Yatzus

Page 131

1   Q.   But you saw this --

2   A.   Yes.

3   Q.   -- in this letter?

4        Regarding the meeting, the IEP meetings on

5   the 25th, you said you didn't get notice of them until

6   the day of?

7   A.   That morning, yes.  That's when I first saw it,

8   although Marilyn had placed them late Monday in my

9   box.

10  Q.   Do you have to initial requests for meetings?

11  A.   Do I have to initial requests for meetings?

12  Q.   Who makes a request for meetings?  How is the

13  meeting generated?  How is the process started for an

14  IEP meeting?

15  A.   The educational diagnostician would generally

16  schedule that and then give notice.  And they would

17  send the notice to the parent.

18       Now, if the meeting was scheduled by phone,

19  let's say, and the parent wanted to waive their right

20  to ten-day prior notice, then that would get taken

21  care of at the meeting.  If there was a circumstance

22  where they wanted to -- for whatever reason we needed

23  to get the meeting scheduled less than those ten days.

24       (Yatzus Deposition Exhibit No. 24 was

Olga A. Yatzus

Page 132

1    marked for identification.)

2    BY MS. MARTINELLI:

3      Q.    This is a document identified as Exhibit 24 and

4    in the lower right-hand corner as D-15.  It's dated

5    January 8th, 2003.  It appears to be a letter from

6    James Dooley to you.  Do you recall receiving a copy

7    of this letter?

8      A.    Yes.

9      Q.    And you refused to sign it.  Is that correct?

10     A.    That's correct.  At that point, Mr. Dooley and

11   I talked.  And on this particular day, or within that

12   period -- it was right after spring break, or

13   Christmas vacation, which would have been the

14   beginning of January, maybe January 2nd -- I arrived

15   at my office, and my entire office was moved.  I had

16   files left in one area.  Other things were scattered

17   all over the place.  I couldn't get my fingers on

18   anything.  And we were -- I was put into an office

19   with Sharon Hill and Phyllis Waecker.

20            And it seemed that I was being set up to

21   produce documentation while I was trying to move and

22   find my files and belongings.  And it was a ridiculous

23   request for me to try to get that before my computer

24   or anything else was set up or located.  And when I

Olga A. Yatzus

Page 133

1    talked to Mr. Dooley, he is like, well, I have to

2    write you up or I'll get written up.

3        Q.    Were those his words?

4        A.    Yes.

5        Q.    Did you request any clarification on that

6    statement?

7        A.    No.  I kind of knew what he meant.

8        Q.    What did you think he meant?

9        A.    That he was instructed to write me up.

10       Q.    To write you up specifically?

11       A.    Yes.

12       Q.    Did he say anything else that would make you

13   think that's what --

14       A.    He said that to me on another occasion, too.

15       Q.    Just to quote, "If I don't write you up, I'll

16   be written up"?

17       A.    Right.

18       Q.    Did you at the time he -- Mr. Dooley made the

19   request for the written reports, did you tell him you

20   were unable to complete it because of the office

21   situation?

22       A.    Well, he certainly knew what the situation --

23            MR. BARTOSHESKY:  Wait.

24       A.    I'm sorry.

Olga A. Yatzus

Page 134

1    Q.    Did you tell him you would be unable to

2    complete it because of the situation in your office?

3    A.    I had explained to him I'll get what he was

4    asking for as soon as I could.

5    Q.    Did you mention the situation in your office?

6    A.    He was very aware of the situation in my office

7    because I discussed that situation with him at the

8    same time.

9    Q.    Were you issued a laptop by the school

10   district?

11   A.    I had a laptop that I allowed my intern to use

12   for a period of time because she was working at

13   Townsend Elementary and didn't have a computer

14   available to her at that time.

15   Q.    Which intern was that?

16   A.    Eileen Baker.  So I allowed her to use me

17   laptop and I used the desktop.

18   Q.    She was already working as your intern at this

19   time?

20   A.    Yes, she was.

21   Q.    She didn't have her own laptop?

22   A.    No, not at that time.

23   Q.    So you didn't have use of your laptop because

24   it was with her?

A196

Olga A. Yatzus

Page 135

1    A.   Yes.  As I recall.  Because I remember she
2  didn't have access, so I allowed her to use it.
3    Q.   And this says, Mr. Dooley's letter says, "As of
4  Wednesday, January 8 this written documentation has
5  not been submitted."  Was that true, you hadn't
6  submitted it yet at that time?
7    A.   Right.
8    Q.   Did you ever provide the documentation he
9  requested?
10   A.   As I recall.  We had moved that -- like I said,
11  I think everything was moved and scattered on
12  January 2nd when I arrived, and we were in that room
13  for -- trying to make headway with the chaos that was
14  in there -- for about a week maybe, and then they up
15  and moved us to another room right about then.  So
16  there were two separate moves that occurred within
17  about a week, week and a half.
18   Q.   You claim regarding the office moves you were
19  moved four times in one school year?
20   A.   I was moved one, two, three, four, and
21  eventually five.
22   Q.   In one school year?
23   A.   Yes.
24   Q.   Can you describe your different office

Olga A. Yatzus

Page 138

1    A.    No.   A separate space.

2    Q.    Just the school psychologists?    All the school

3    psychologists were in the one --

4    A.    No, no.   Everybody was assigned to their own

5    building.

6    Q.    You were in your own office?

7    A.    Yes.

8    Q.    In the high school?

9    A.    Yes.

10   Q.    And --

11   A.    And just -- I started out sharing my time

12   between Townsend Elementary and the district -- or the

13   high school that year.

14   Q.    So the beginning of 2002-2003, you started in

15   the main office of the high school; you were in an

16   office by yourself?

17   A.    Yes.

18   Q.    And do you recall what the office number?   By

19   any chance, do you remember?

20   A.    No, I don't.

21   Q.    When Mary Ann Mieczkowski came on-board, you

22   were moved; is that what you said?

23   A.    No.   Mary Ann came on-board in the summer of

24   2002.   I can't recall if it was before the school year

Olga A. Yatzus

Page 139

1    started or right after the school year started our

2    office out of the district office was -- we were told

3    that we weren't to have any office space in the

4    district office at that point.  So we all -- all of

5    the EDs and psychologists had building assignments.

6    So that's where our office was to be in whatever

7    building we were assigned to.

8        Q.    So you started out at the district office.

9    Before the school year of '02-03, you were all in the

10   district office?

11       A.    We had office space there.

12       Q.    And then in the beginning, sometime in the

13   beginning of the '02-03 school year, you were moved

14   into the high school?

15       A.    Well, I had -- you would have a district

16   office, but you would have a space to work in at the

17   locations that you were assigned to.

18       Q.    Was your main office still considered in the

19   district office then?

20       A.    No.

21       Q.    Each psychologist was moved out to the school

22   they were working with?

23       A.    Their building.

24       Q.    Then what was the move you said occurred after

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OLGA ALEXANDRA YATZUS, )
)
Plaintiff, )
)     C.A. No. 05-103-SLR
v. )
)
APPOQUINIMINK SCHOOL DISTRICT, )     JURY TRIAL DEMANDED
and TONY MARCHIO, individually )
and in his official capacity, MARY ANN )
MIECZKOWSKI, individually and in her )
official capacity, DONNA MITCHELL, )
individually and in her official capacity, and )
MARION PROFFITT, individually )
and in her official capacity, )
)
Defendants. )

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2006, I electronically filed a true and correct

copy of the foregoing **Defendants' Motion for Reargument and Response to Plaintiff's**

**Motion for Reargument, or, in the Alternative Clarification of the Court's October 24,**

**2006, Ruling (D.I. 85)** with the Clerk of the Court using CM/ECF, which will send notification

that such filing is available for viewing and downloading to the following counsel of record:

> Philip B. Bartoshesky
> Biggs and Battaglia
> 921 North Orange Street
> Wilmington, DE 19801
>
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> /s/Adria B. Martinelli
> _____
> William W. Bowser, Esquire (Bar I.D. 2239)
> Adria B. Martinelli, Esquire (Bar I.D. 4056)
> Maribeth L. Minella (Bar I.D. 4185)
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> Telephone: (302) 571-6601; 6613; 6708
> Facsimile: (302) 576-3282; 3314; 3317
> Email:  wbowser@ycst.com; amartinelli@ycst.com;
> mminella@ycst.com
> Attorneys for Defendants